**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Cutera, Inc., *et al.*,[1] | Case No. 25-90088 (ARP) |
| Debtors. | (Jointly Administered) |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

1.     **PLEASE TAKE NOTICE** that, on March 5, 2025, Cutera, Inc. and Crystal Sub, LLC, the above-captioned debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), filed the *Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors* [Docket No. 7] (as may be amended or modified, the "Plan") with the United States Bankruptcy Court for the Southern District of Texas (the "Court").

2.     **PLEASE TAKE FURTHER NOTICE** that, on March 5, 2025, the Debtors also filed the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors* [Docket No. 6] (as may be amended or modified, the "Disclosure Statement").[2]

3.     **PLEASE TAKE FURTHER NOTICE** that attached to this notice as **Exhibits A** through **G** are the following Plan Supplement documents:

        **Exhibit A**:     Assumed Executory Contract and Unexpired Lease List

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cutera, Inc. (2262) and Crystal Sub, LLC (6339).  The Debtors' service address is 3240 Bayshore Boulevard, Brisbane, CA 94005-1021.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan or Disclosure Statement, as applicable.

Exhibit B:     Rejected Executory Contracts and Unexpired Lease List

Exhibit C:     Form of Exit Facility Credit Agreement

Exhibit D:     Management Incentive Plan Term Sheet

Exhibit E:     Schedule of Retained Causes of Action

Exhibit F:     Form of New Governance Documents

- **Exhibit F-1**:     Certificate of Incorporation of Cutera, Inc.
- **Exhibit F-2**:     Bylaws of Cutera, Inc.
- **Exhibit F-3**:     Stockholders Agreement

Exhibit G:     Identity of New Board Members

4.     **PLEASE TAKE FURTHER NOTICE** that certain of the documents in the Plan Supplement remain subject to negotiation and the Debtors and Required Consenting Senior Noteholders (as defined in the Restructuring Support Agreement) reserve all rights, including all rights under the Restructuring Support Agreement, subject to the terms and conditions set forth in the Plan, to amend, revise, or supplement the Plan Supplement and any of the documents and designations, attached hereto as **Exhibits A** through **G**, at any time through the Effective Date of the Plan or by an order of the Court.

5.     **PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  The Plan Supplement documents have not yet been approved by the Court.  If the Plan is confirmed, the documents contained in the Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

6.     **PLEASE TAKE FURTHER NOTICE** that the Court has established **April 9, 2025 at 4:00 p.m.**, prevailing Central Time (the "Objection Deadline") as the deadline to object to the adequacy of the Disclosure Statement or confirmation of the Plan, including any

supporting memoranda (an "Objection").  Objections **must**: (a) be in writing; (b) comply with the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state the name and address of the objecting party and the amount and nature of the claim or interest owned by such entity against the estates or property of the Debtors; (d) state with particularity the legal and factual basis for such objections, and, if practicable, a proposed modification to the Plan or Disclosure Statement that would resolve such objections; and (e) be filed with the Court with proof of service thereof, and served upon those parties who have filed a notice of appearance in these chapter 11 cases as well as the following parties so as to be **actually received** on or before the Objection Deadline:

| *Counsel to the Debtors* | *Office of the U.S. Trustee* |
|---|---|
| **ROPES & GRAY LLP** | United States Trustee for the Southern District of Texas |
| Ryan Preston Dahl (admitted *pro hac vice*) | 515 Rusk Street, Suite 3516 |
| Conor P. McNamara (admitted *pro hac vice*) | Houston, Texas 77002 |
| 191 North Wacker Drive, 32nd Floor | Attn: Vianey Garza |
| Chicago, Illinois 60606 | Telephone: (713) 718-4663 |
| Telephone: (312) 845-1200 | E-mail: Vianey.Garza@usdoj.gov; |
| Facsimile: (212) 596-9090 | |
| E-mail:  ryan.dahl@ropesgray.com | *Co-Counsel to the Debtors* |
| conor.mcnamara@ropesgray.com | |
| | **HUNTON ANDREWS KURTH LLP** |
| -and- | Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503) |
| | Philip M. Guffy (Texas Bar No. 24113705) |
| **ROPES & GRAY LLP** | Catherine A. Rankin (TX Bar No. 24066008) |
| Natasha S. Hwangpo (admitted *pro hac vice*) | 600 Travis Street, Suite 4200 |
| 1211 Avenue of the Americas | Houston, Texas 77002 |
| New York, New York 10036 | Telephone: (713) 220-4200 |
| Telephone: (212) 596-9000 | Facsimile: (713) 220-4285 |
| Facsimile: (212) 596-9090 | E-mail: taddavidson@hunton.com |
| E-mail: natasha.hwangpo@ropesgray.com | pguffy@hunton.com |
| | catherinerankin@hunton.com |

7.     **PLEASE TAKE FURTHER NOTICE** that a hearing (the "Combined Hearing") to consider the adequacy of the Disclosure Statement and confirmation of the Plan, any objections thereto, and any other matter(s) that may properly come before the Court, will be held before the Honorable Alfredo R. Pérez, United States Bankruptcy Judge in the United States

Bankruptcy Court for the Southern District of Texas located at 515 Rusk Street, Houston, Texas 77002, on **April 16, 2025 at 4:00 p.m., prevailing Central Time** via videoconference.  The Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on parties entitled to notice.

8.      **PLEASE TAKE FURTHER NOTICE** that copies of the Disclosure Statement, Plan, Plan Supplement (including any amendments thereto), and all other documents filed with the Court are available free of charge on the Debtors' case information website maintained by the Debtors' claims and noticing agent, Kurtzman Carson Consultants, LLC d/b/a Verita Global ("Verita"), located at https://www.veritaglobal.net/cutera or can be requested by email at cuterainfo@veritaglobal.com or by calling the toll-free information line (888) 788-0109 (US & Canada toll free) and +1 (781) 575-2045 (International).  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.txs.uscourts.gov. Please be advised that Verita is authorized to answer questions and provide additional copies of solicitation materials but may not advise you as to whether you should object to the Plan.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 2, 2025
    Houston, Texas

**HUNTON ANDREWS KURTH LLP**

*/s/ Timothy A. "Tad" Davidson II*
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Philip M. Guffy (Texas Bar No. 24113705)
Catherine A. Rankin (TX Bar No. 24066008)
600 Travis Street, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Facsimile: (713) 220-4285
Email: taddavidson@hunton.com
       pguffy@hunton.com
       catherinerankin@hunton.com

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email: ryan.dahl@ropesgray.com
       conor.mcnamara@ropesgray.com

**ROPES & GRAY LLP**
Natasha S. Hwangpo (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail: natasha.hwangpo@ropesgray.com

*Proposed Co-Counsel to the Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on April 2, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II

**Exhibit A**

**Assumed Executory Contract and Unexpired Lease List**

All Executory Contracts and Unexpired Leases of the Debtors shall be assumed absent an objection as set forth in Section 5.2 of the Plan or an order requiring rejection, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code as of the Effective Date, except for those Executory Contracts and Unexpired Leases that, in each case, (i) have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court, (ii) are the subject of a motion to reject filed by the Debtors pending on the Effective Date, (iii) are identified as rejected Executory Contracts and Unexpired Leases by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases filed in the Plan Supplement, which may be amended by the Debtors up to and through the Effective Date to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court a subsequent Plan Supplement and serving it on the affected non-Debtor contract parties; or (iv) are rejected or terminated pursuant to the terms of the Plan.  Each Executory Contract and Unexpired Lease shall be fully enforceable by the Reorganized Debtors in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption of all Executory Contracts or Unexpired Leases, as described in the Plan, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assumption and assignment, or rejection, as the case may be, is in the best interests of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

Except as otherwise provided in the Plan or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

Unless otherwise agreed in writing by such counterparty, any monetary defaults that are required to be cured to assume an Executory Contract or Unexpired Lease shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in the ordinary course of business. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely raise any objection that could have been raised under section 365 of the Bankruptcy Code shall be deemed to have consented to the Debtors' assumption of such Executory Contract or Unexpired Lease, to the extent any such consent is required, and all such counterparties shall be forever enjoined and barred from objecting to the Debtors' assumption of such Executory Contract or Unexpired Lease for any reason.

If there is a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, then the Bankruptcy Court shall retain jurisdiction in all respects to hear such disputes; *provided* that the occurrence of any such dispute shall not prevent or delay Confirmation or Consummation of the Plan; *provided further* that the Debtors may settle any such dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided further* that notwithstanding anything to the contrary herein, the Debtors and Reorganized Debtors reserve the right to either reject or nullify the assumption of any Executory Contract or Unexpired Lease within forty-five (45) days after the entry of a Final Order resolving an objection to assumption, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the continued performance thereunder (or the payment of a Cure Cost, if any), shall result in the full release, satisfaction, and cure of any defaults thereunder, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of such assumption or assumption and assignment. Any and all Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to Section 5.2 of the Plan, shall be deemed Disallowed and expunged as of the Effective Date, without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Claim, a Proof of Claim must be served upon the Debtors and their counsel within thirty (30) days after the earlier of (i) notice of entry of the Confirmation Order or (ii) other notice that the Executory Contract or Unexpired Lease has been rejected. Any Claims not served within the applicable time period will be forever barred from assertion against the Debtors, the Reorganized Debtors, their Estates, and their property.

Any and all Indemnification Obligations of the Debtors, including pursuant to their corporate charter, agreements, bylaws, memorandum, or other organizational documents, or

board resolutions, employment contracts, or other agreements for the directors, officers, managers, employees, attorneys, other professionals, and agents employed by the Debtors to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors based upon any act or omission for or on behalf of the Debtors shall remain in full force and effect to the maximum extent permitted by applicable Law and shall not be discharged, impaired, or otherwise affected by the Plan.  All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations in Section 5.4 of the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors will survive and remain unaffected by entry of the Confirmation Order.

All Insurance Policies pursuant to which the Debtors have any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with each such policy's respective terms.

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or Reorganized Debtors have any liability thereunder.

## **Exhibit B**

**Rejected Executory Contract and Unexpired Lease List**


**NONE**

**<u>Exhibit C</u>**

**Form of Exit Facility Credit Agreement**

*Subject to Change*

TERM CREDIT AGREEMENT

among

CUTERA, INC.,
as the Borrower,

THE LENDERS PARTY HERETO and

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent and Collateral Agent

Dated as of [●], 2025

# TABLE OF CONTENTS

Page

SECTION I.      DEFINITIONS..................................................................................................... 1

1.1    Defined Terms ................................................................................................... 1
1.2    Other Definitional Provisions ........................................................................ 35
1.3    [Reserved]........................................................................................................ 35
1.4    Exchange Rates; Currency Equivalents ......................................................... 36
1.5    Covenants........................................................................................................ 36
1.6    Accounting Terms........................................................................................... 36
1.7    Divisions ......................................................................................................... 36

SECTION II.     AMOUNT AND TERMS OF COMMITMENTS ....................................... 37

2.1    Commitments................................................................................................... 37
2.2    Procedure for Borrowing, Conversions and Continuations of Loans ............ 37
2.3    Repayment of Loans ....................................................................................... 38
2.4    [Reserved] ....................................................................................................... 39
2.5    [Reserved] ....................................................................................................... 39
2.6    [Reserved] ....................................................................................................... 39
2.7    [Reserved] ....................................................................................................... 39
2.8    Repayment of Loans ....................................................................................... 39
2.9    Fees and Premiums ......................................................................................... 39
2.10   [Reserved] ....................................................................................................... 40
2.11   Optional Prepayments .................................................................................... 40
2.12   Mandatory Prepayments ................................................................................ 40
2.13   [Reserved] ....................................................................................................... 42
2.14   [Reserved] ....................................................................................................... 42
2.15   Interest Rates and Payment Dates .................................................................. 43
2.16   Computation of Interest and Fees .................................................................. 43
2.17   Alternate Rate of Interest ............................................................................... 43
2.18   Pro Rata Treatment and Payments ................................................................. 45
2.19   Repayment Premium ....................................................................................... 47
2.20   Taxes................................................................................................................ 47
2.21   Indemnity ........................................................................................................ 50
2.22   Break Funding Payments ................................................................................ 50
2.23   Change of Lending Office ............................................................................... 51
2.24   Replacement of Lenders ................................................................................. 51
2.25   Requirements of Law; Illegality ..................................................................... 52

SECTION III.    [Reserved]........................................................................................................ 54

SECTION IV.    REPRESENTATIONS AND WARRANTIES ......................................... 54

4.1    Financial Condition......................................................................................... 54
4.2    No Change ....................................................................................................... 54
4.3    Existence; Compliance with Law ................................................................... 54
4.4    Corporate Power; Authorization; Enforceable Obligations ........................... 55

4.5      No Legal Bar...................................................................................................... 55
4.6      No Material Litigation .......................................................................................... 56
4.7      No Default............................................................................................................ 56
4.8      Ownership of Property; Leasehold Interests; Liens.............................................. 56
4.9      Intellectual Property............................................................................................. 56
4.10     Taxes.................................................................................................................... 56
4.11     Federal Regulations ............................................................................................. 56
4.12     ERISA................................................................................................................... 56
4.13     Investment Company Act ..................................................................................... 57
4.14     Subsidiaries ......................................................................................................... 57
4.15     Environmental Matters ......................................................................................... 57
4.16     Accuracy of Information, etc. ............................................................................... 57
4.17     Security Documents ............................................................................................. 58
4.18     Solvency............................................................................................................... 58
4.19     Anti-Terrorism ..................................................................................................... 59
4.20     Use of Proceeds ................................................................................................... 59
4.21     Labor Matters....................................................................................................... 59
4.22     [Reserved]............................................................................................................ 59
4.23     Sanctions Compliance .......................................................................................... 59
4.24     Anti-Corruption Compliance ................................................................................ 59

SECTION V.       CONDITIONS PRECEDENT .................................................................... 59

5.1      Conditions to Closing Date ................................................................................... 59

SECTION VI.      AFFIRMATIVE COVENANTS ................................................................ 62

6.1      Financial Information ........................................................................................... 63
6.2      Certificates; Other Information ............................................................................. 64
6.3      Payment of Taxes.................................................................................................. 65
6.4      Conduct of Business and Maintenance of Existence, etc.; Compliance with the
         Requirements of Law ........................................................................................... 65
6.5      Maintenance of Property; Insurance ..................................................................... 65
6.6      Inspection of Property; Books and Records; Discussions ..................................... 66
6.7      Notices ................................................................................................................. 66
6.8      Additional Collateral, etc. .................................................................................... 67
6.9      Use of Proceeds ................................................................................................... 71
6.10     Post-Closing......................................................................................................... 71
6.11     Line of Business ................................................................................................... 71
6.12     Changes in Jurisdictions of Organization; Name................................................... 71
6.13     Additional Beneficial Ownership Certification ..................................................... 71

SECTION VII.     NEGATIVE COVENANTS....................................................................... 71

7.1      [Reserved]............................................................................................................ 71
7.2      Indebtedness......................................................................................................... 71
7.3      Liens .................................................................................................................... 75
7.4      Fundamental Changes........................................................................................... 78
7.5      Dispositions of Property ....................................................................................... 80
7.6      Restricted Payments............................................................................................. 82

|      |                                                                 |     |
|------|-----------------------------------------------------------------|-----|
| 7.7  | Investments                                                     | 84  |
| 7.8  | Prepayments, Etc. of Indebtedness; Amendments                   | 87  |
| 7.9  | Transactions with Affiliates                                    | 88  |
| 7.10 | Sales and Leasebacks                                            | 89  |
| 7.11 | Changes in Fiscal Periods                                       | 89  |
| 7.12 | Negative Pledge Clauses                                         | 90  |
| 7.13 | Clauses Restricting Subsidiary Distributions                    | 91  |
| 7.14 | Limitation on Hedge Agreements                                  | 93  |
| 7.15 | Liquidity                                                       | 93  |

SECTION VIII.   EVENTS OF DEFAULT ........................................................................ 93

| 8.1  | Events of Default                                               | 93  |

SECTION IX.   THE AGENTS ...................................................................................... 97

| 9.1  | Appointment                                                    | 97  |
| 9.2  | Delegation of Duties                                           | 97  |
| 9.3  | Exculpatory Provisions                                         | 97  |
| 9.4  | Reliance by the Agents                                         | 99  |
| 9.5  | Notice of Default                                              | 100 |
| 9.6  | Non-Reliance on Agents and Other Lenders                       | 100 |
| 9.7  | Indemnification                                                | 101 |
| 9.8  | Agent in Its Individual Capacity                               | 102 |
| 9.9  | Successor Agents                                               | 102 |
| 9.10 | Certain Collateral Matters                                     | 103 |
| 9.11 | Agents May File Proofs of Claim                                | 104 |
| 9.12 | Survival                                                       | 105 |
| 9.13 | Right to Realize on Collateral and Enforce Guarantee          | 105 |
| 9.14 | [Reserved]                                                     | 105 |
| 9.15 | Erroneous Payments                                             | 105 |

SECTION X.   MISCELLANEOUS ............................................................................... 108

| 10.1  | Amendments and Waivers                                        | 108 |
| 10.2  | Notices; Electronic Communications                           | 111 |
| 10.3  | No Waiver; Cumulative Remedies                               | 113 |
| 10.4  | Survival of Representations and Warranties                    | 114 |
| 10.5  | Payment of Expenses; Indemnification                         | 114 |
| 10.6  | Successors and Assigns; Participations and Assignments       | 116 |
| 10.7  | Adjustments; Set off                                         | 120 |
| 10.8  | Counterparts                                                  | 121 |
| 10.9  | Severability                                                  | 121 |
| 10.10 | Integration                                                  | 121 |
| 10.11 | GOVERNING LAW                                                 | 121 |
| 10.12 | Submission to Jurisdiction; Waivers                          | 121 |
| 10.13 | Acknowledgments                                              | 122 |
| 10.14 | Confidentiality                                              | 123 |
| 10.15 | Release of Collateral and Guarantee Obligations             | 125 |
| 10.16 | [Reserved]                                                   | 126 |

iii

10.17   WAIVERS OF JURY TRIAL ................................................................... 126
10.18   USA PATRIOT ACT................................................................................ 127
10.19   [Reserved].............................................................................................. 127
10.20   Interest Rate Limitation ......................................................................... 127
10.21   Payments Set Aside ................................................................................ 127
10.22   Electronic Execution of Assignments and Certain Other Documents ........... 127
10.23   Acknowledgement and Consent to Bail-In of Affected Financial Institutions .............. 128
10.24   Section Headings ................................................................................... 128

iv

SCHEDULES:

| | |
|---|---|
| 2.1(a) | Initial Cashless Term Commitments |
| 2.1(b) | Initial Funded Term Commitments |
| 2.9(a) | Upfront Payment |
| 4.6 | Material Litigation |
| 4.8 | Real Property |
| 4.14 | Subsidiaries |
| 4.21 | Labor Matters |
| 6.10 | Post Closing Matters |
| 7.2(c) | Existing Other Indebtedness |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.7 | Existing Investments |
| 7.9 | Transactions with Affiliates |
| 7.12 | Existing Negative Pledge Clauses |
| 7.13 | Clauses Restricting Subsidiary Distributions |

EXHIBITS:

| | |
|---|---|
| A | Form of Committed Loan Notice |
| B | Form of Compliance Certificate |
| C | Form of Assignment and Assumption |
| D | Form of Exemption Certificate |
| E | Form of Solvency Certificate |
| F | Form of Loan Note |
| G | Form of Prepayment Option Notice |
| H | Form of Guarantee and Collateral Agreement |

v

TERM CREDIT AGREEMENT, dated as of [●], 2025, among CUTERA, INC., a Delaware corporation (the "Company" or the "Borrower"), the financial institutions or other entities from time to time parties to this Agreement as lenders (the "Lenders") and WILMINGTON SAVINGS FUND SOCIETY, FSB ("WSFS"), as Administrative Agent and Collateral Agent.

WHEREAS, on March 5, 2025, the Borrower and certain of the Borrower's Domestic Subsidiaries (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "Case" and collectively, the "Cases") and continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on April [●], 2025 the Bankruptcy Court entered the Confirmation Order approving the Restructuring Plan of the Debtors, and concurrently with the making (and/or deemed making) of the Loans hereunder, the effective date with respect to the Restructuring Plan has occurred;

WHEREAS, pursuant to the terms of the Restructuring Plan, the holders of DIP Claims (as defined in the Restructuring Plan) are entitled to receive on account of the principal amount of such claims, among other things, Loans provided for hereunder in the aggregate principal amount of $[●];

WHEREAS, the Borrower has requested that the Lenders provide $10,000,000 in Initial Funded Term Commitments in respect of Loans to be made in a single draw on the Closing Date; and

WHEREAS, by execution and delivery of this Agreement and the other Loan Documents and entry of the Confirmation Order in respect of the Debtors, the Subsidiary Guarantors agree to guarantee the Obligations, and the Borrower and each Subsidiary Guarantor agrees to secure all of the Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, the Collateral, on and subject to the terms and priorities set forth in the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

SECTION I.    DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABL Facility": an asset-based revolving credit facility (a) made available to the Borrower and the Subsidiary Guarantors by commercial banks and other financial institutions that customarily provide asset-based revolving loan financing in the ordinary course of business, (b) providing for revolving credit loans in the ordinary course of business with availability based upon a customary borrowing base formula calculated by the value of ABL Priority Collateral, (c) secured by Liens only on the Collateral (which Liens may be senior in priority to the Liens securing the Obligations with respect to Collateral that constitutes ABL Priority Collateral and shall be junior in priority as to all other Collateral) and subject to the ABL Intercreditor Agreement[, and (d) subject to terms, conditions, covenants and events of default that are not materially more restrictive than those set forth in this Agreement, taken as a whole (other than with respect to provisions customarily included in an asset-based revolving credit facility, including borrowing base formulas and financial covenants).]

1

"ABL Intercreditor Agreement":  an intercreditor agreement among the Agents and the agent or agents for the ABL Facility and acknowledged by the Borrower, which agreement shall be in form and substance [acceptable] to the Required Lenders, as the same may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time with the consent of the Administrative Agent (acting at the direction of the Required Lenders).

"ABL Priority Collateral":  Collateral consisting of (a) Accounts (as defined in Article 9 of the UCC) and accounts receivable (unless relating to the sale of assets that do not constitute ABL Priority Collateral), (b) Inventory (as defined in Article 9 of the UCC), (c) cash and Cash Equivalents, (d) Deposit Accounts, Securities Accounts and Commodity Accounts (as each is defined in Article 9 of the UCC) (excluding identifiable proceeds of assets that do not constitute ABL Priority Collateral), (e) Payment Intangibles (as defined in Article 9 of the UCC) (excluding identifiable proceeds of assets that do not constitute ABL Priority Collateral), including tax refunds and intercompany indebtedness owing in respect of ABL Priority Collateral, (f) all rights to business interruption insurance and credit insurance with respect to Accounts and Payment Intangibles, (g) to the extent relating to the foregoing, books and records, General Intangibles, Instruments, Documents (as each is defined in Article 9 of the UCC) and other customary inclusions, and (h) products and Proceeds (as each is defined in Article 9 of the UCC) of the foregoing; provided that ABL Priority Collateral shall not include Intellectual Property or Capital Stock of the Borrower or any Subsidiary.

"ABR": for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate for a one month Interest Period as published two (2) U.S. Government Securities Business Days prior to such day plus 1.00%; provided that, for purposes of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology).  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate, respectively.  If the ABR is being used as an alternate rate of interest pursuant to Section 2.17 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.17(b)), then the ABR shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.  For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00% for purposes of this Agreement.

"ABR Borrowing": a Borrowing comprised of ABR Loans.

"ABR Loan": each Loan bearing interest based on the ABR.

"ABR Term SOFR Determination Day": as defined in the definition of "Term SOFR".

"Accepting Lender":  as defined in Section 2.12(e).

"Adjusted Term SOFR Rate": for any Interest Period, an interest rate per annum equal to (a) Term SOFR for such Interest Period, plus (b) 0.10%; provided that if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"<u>Administrative Agent</u>": WSFS, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors and permitted assigns in such capacity in accordance with <u>Section 9.9</u>.

"<u>Affected Financial Institution</u>": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, in either case whether by contract or otherwise.

"<u>Agent Fee Letter</u>":  that certain Fee Letter, dated as of [●], 2025, by and between the Borrower and the Agents, as amended or modified from time to time.

"<u>Agent Parties</u>":  as defined in <u>Section 10.2(d)</u>.

"<u>Agents</u>":  the collective reference to the Collateral Agent and the Administrative Agent, and "Agent" refers to either one, as applicable.

"<u>Agreed Purposes</u>":  as defined in <u>Section 10.14</u>.

"<u>Agreement</u>":  this Term Credit Agreement, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"<u>Ancillary Fees</u>": as defined in <u>Section 10.1(a)(v)</u>.

"<u>Anti-Corruption Law</u>":  the United States Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, any applicable law or regulation implementing the OECD Convention on Combatting Bribery of Foreign Public Officials in International Business Transactions, or any other applicable similar law or statute.

"<u>Applicable Margin</u>": (a) with respect to Loans that are SOFR Loans, 7.50% and (b) with respect to Loans that are ABR Loans, 6.50%.

"<u>Applicable Premium</u>": as of any date of determination, [as calculated by the Borrower in consultation with the Required Lenders,] an amount in cash equal to the sum of (a) the present value of the sum of all interest (calculated at the then applicable interest rate) that would have accrued on the Loans being repaid, prepaid, replaced or that have become or are declared accelerated pursuant to Section 8.01 or otherwise or that have otherwise become due and payable, as the case may be, from the Settlement Date through the third anniversary of the Closing Date (excluding accrued and unpaid interest to the Settlement Date), which present value shall be calculated using a discount rate equal to the Treasury Rate plus 50 basis points as of the day such premium becomes due *plus* (b) 1.00% *multiplied by* the aggregate principal amount of the Loans so repaid, prepaid, replaced or that have become or are declared accelerated pursuant to Section 8.01 or otherwise or that have otherwise become due and payable.  In no event shall the Administrative Agent be responsible for calculating the Applicable Premium.

"<u>Applicable Threshold Price</u>": as defined in the definition of "Dutch Auction".

"<u>Approved Fund</u>":  as defined in <u>Section 10.6(b)</u>.

"Asset Sale":  any Disposition of Property or series of related Dispositions of Property by the Borrower or any of its Subsidiaries (a) under Section 7.5(l) or (r) that generates Net Cash Proceeds in excess of $[●] or (b) not permitted pursuant to Section 7.5.[1]

"Assignee":  as defined in Section 10.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit C or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Auction Amount": as defined in the definition of "Dutch Auction".

"Auction Assignment and Acceptance": as defined in the definition of "Dutch Auction".

"Auction Manager": the party appointed by the Required Lenders, which may be the Administrative Agent or another financial institution or advisor.

"Auction Notice": as defined in the definition of "Dutch Auction".

"Auction Offeror": as defined in the definition of "Dutch Auction".

"Available Tenor": as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (f) of Section 2.17.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court": the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or any other court having jurisdiction over the Cases from time to time.

"Benchmark": initially, Term SOFR; provided that if a replacement of the Benchmark has occurred pursuant to Section 2.17, then "Benchmark" shall mean the applicable Benchmark

---

[1] NTD: To discuss

Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.17.

"Benchmark Replacement": for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)     the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(2)     the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable currency at such time and (b) the related Benchmark Replacement Adjustment;

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents. If the Benchmark Replacement is Daily Simple SOFR plus the related Benchmark Replacement Adjustment, all interest payments will be payable on a quarterly basis.

"Benchmark Replacement Adjustment": with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable currency at such time.

"Benchmark Replacement Conforming Changes": with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR", the definition of "Business Day", the definition of "U.S. Government Securities Business Day", the definition of "Interest Period" or any similar or analogous definition, timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides in its reasonable discretion that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines in its reasonable discretion that no market practice for the

administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date": the earliest to occur of the following events with respect to the then-current Benchmark:

(1)        in the case of clause (1) or (2) of the definition of "Benchmark Transition Event", the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)        in the case of clause (3) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative or non-compliant with or non-aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided that such non-representativeness, non-compliance or non-alignment will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event": with respect to any Benchmark, the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period": with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.17 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.17.

"Beneficial Ownership Certification": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Benefited Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors": (a) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the board of directors of the general partner of the partnership, or any committee thereof duly authorized to act on behalf of such board or the board or committee of any Person serving a similar function; (c) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof or any Person or Persons serving a similar function; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Borrower":  as defined in the preamble hereto.

"Borrower Materials": as defined in Section 10.2(c).

"Borrowing": Loans made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Business":  the business activities and operations of the Borrower and/or its Subsidiaries on the Closing Date.

"Business Day":  any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.  In the case of a SOFR Loan, references to "Business Day" shall be deemed to be references to "U.S. Government Securities Business Day".

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, provided, that for the purposes of this definition, "GAAP" shall mean generally accepted accounting principles in the United States as in effect on the Closing Date.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, and any and all equivalent ownership interests in a Person (other than a corporation).

"Cases": as defined in the recitals to this Agreement.

["Cash Equivalents":

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within 18 months from the date of acquisition thereof;

(b)     certificates of deposit, time deposits and eurodollar time deposits with maturities of 18 months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 18 months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus at the date of acquisition thereof in excess of $250,000,000;

(c)     repurchase obligations with a term of not more than 3 months for underlying securities of the types described in clauses (a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)     commercial paper having a rating of at least A-1 from S&P or P-1 from Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and maturing within 18 months after the date of acquisition and Indebtedness and preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 18 months or less from the date of acquisition;

(e)     readily marketable direct obligations issued by or directly and fully guaranteed or insured by any state of the United States or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 18 months or less from the date of acquisition;

(f)     marketable short-term money market and similar securities having a rating of at least P-1 or A-1 from Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and in each case maturing within 18 months after the date of creation or acquisition thereof;

(g)      Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(h)      (x) such local currencies in those countries in which the Borrower and its Subsidiaries transact business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (g) or otherwise customarily utilized in countries in which the Borrower and its Subsidiaries operate for short term cash management purposes; and

(i)      Investments in funds which invest substantially all of their assets in Cash Equivalents of the kinds described in clauses (a) through (h) of this definition.]

"Cash Management Obligations":  obligations in respect of any overdraft or other liabilities arising from treasury, depository and cash management services, credit or debit card, or any automated clearing house transfers of funds.

"Certificated Security":  as defined in the Guarantee and Collateral Agreement.

"Chapter 11 Plan": a plan of reorganization in any or all of the Cases.

"Charges":  as defined in Section 10.20.

"Chattel Paper":  as defined in the Guarantee and Collateral Agreement.

"Closing Date":  [●], 2025.

"Code":  the Internal Revenue Code of 1986, as amended from time to time (unless otherwise indicated).

"Collateral":  all the "Collateral" as defined in any Security Document and all other property that is subject to any Lien in favor of the Secured Parties and/or the Administrative Agent or the Collateral Agent for the benefit of the Secured Parties to secure the payment and performance of the Obligations pursuant to any Security Document.

"Collateral Agent": WSFS, in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents, together with any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Commitment": an Initial Cashless Term Commitment or an Initial Funded Term Commitment, as the context may require.

"Committed Loan Notice": a request by the Borrower in accordance with the terms of Section 2.2 and substantially in the form of Exhibit A or another form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent).

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with any Loan Party within the meaning of Section 4001 of ERISA or is part of a group that includes any Loan Party and that is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Company":  as defined in the preamble hereto.

"Company Parties":  as defined in the Restructuring Support Agreement.

"Compliance Certificate":  a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Confidential Information":  as defined in Section 10.14.

"Confirmation Order":  the [*Findings of Fact, Conclusions of Law, and Order Confirming the Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors*] [Docket No. [●]] which has been entered by the Bankruptcy Court on [●], 2025.

"Consenting Senior Noteholders": as defined in the Restructuring Support Agreement.

"Consolidated Total Assets": at any date, the total assets of the Borrower or a Subsidiary, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower and its Subsidiaries for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to Section 6.1, or prior to the first such delivery, delivered under Section 5.1(r), determined on a pro forma basis.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any written or recorded agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Corresponding Tenor": with respect to any Available Tenor, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Daily Simple SOFR": for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debtor" or "Debtors": as defined in the recitals to this Agreement.

"Debtor Relief Laws": (a) the Bankruptcy Code of the United States, (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, administration, receivership, insolvency, reorganization, debt adjustment, or similar debtor relief laws from time to time in effect and affecting the rights of creditors generally (including, without limitation, any plan of arrangement provisions of applicable corporation statutes) of the United States or other applicable jurisdictions from time to time in effect, and (c) any order made by a court of competent jurisdiction in respect of any of the foregoing.

"Declined Amount":  as defined in Section 2.12(e).

"Default":  any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Default Rate":  as defined in Section 2.15(d).

"Defaulting Lender": any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans or (ii) pay over to any Loan Party any other amount required to be paid by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Administrative Agent or the Borrower in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent or the Borrower, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied; *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's or the Borrower's, as applicable, receipt of such certification in form and substance satisfactory to the Borrower or the Administrative Agent, as applicable, or (d) has become, or is a direct or indirect Subsidiary of any Person that is, the subject of (i) a Bail-In Action or (ii) a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business or assets appointed for it, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment; *provided* that, none of the foregoing events or circumstances under this clause (ii) shall result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of the foregoing clauses shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender.

"Designated Jurisdiction": any country or territory that is the target of comprehensive Sanctions (as of the date of this Agreement, Iran, Syria, Cuba, North Korea, and Crimea, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Kherson, and Zaporizhzhia regions of Ukraine).

"Designated Non-Cash Consideration": the Fair Market Value of non-cash consideration received by the Borrower or one of its Subsidiaries in connection with a Disposition that is so designated as Designated Non-Cash Consideration pursuant to an officer's certificate, setting forth the basis of such valuation, less the amount of cash and Cash Equivalents received in connection with a subsequent sale of such Designated Non-Cash Consideration within 180 days of receipt thereof.

"Disclosure Statement Date": the date of approval by the Bankruptcy Court of the disclosure statement delivered in connection with the Restructuring Plan, which date is [●], 2025.

"Discount Range": as defined in the definition of "Dutch Auction".

"Disinterested Director": with respect to any Person and transaction, a member of the Board of Directors of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction. A member of any such Board of Directors shall not be deemed to have such a financial interest by reason of such member's holding Capital Stock of the Borrower or any options, warrants or other rights in respect of such Capital Stock.

"Disposition":  with respect to any Property, any sale, sale and leaseback, assignment, conveyance, transfer, license or other disposition thereof, in each case, to the extent the same constitutes a complete sale, sale and leaseback, assignment, conveyance, transfer or other disposition, as applicable. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock":  Capital Stock that (a) requires the payment of any dividends (other than dividends payable solely in shares of Qualified Capital Stock), (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof (other than solely for Qualified Capital Stock), in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness, Capital Stock or other assets other than Qualified Capital Stock, in the case of each of clauses (a), (b) and (c), prior to the date that is 91 days after the Maturity Date in effect on the date such Capital Stock is issued (other than (i) upon payment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) or (ii) upon a "change in control"; provided, that any payment required pursuant to this clause (ii) is subject to the prior repayment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) that are then accrued and payable and the termination of the Commitments); provided, further, however, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Borrower or the Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by the Borrower or a Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Disqualified Institution": (i) those institutions identified by the Borrower in writing to the Administrative Agent prior to the Closing Date and (ii) business competitors of the Borrower and its Subsidiaries identified by Borrower in writing to the Administrative Agent from time to time. A list of the Disqualified Institutions provided by Borrower will be posted by the Administrative Agent on the Platform and be available for inspection by all Lenders. Any designation of Disqualified Institutions by the Borrower at any time after the Closing Date in accordance with the foregoing shall not apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in the Loans or Commitments.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Subsidiary":  any direct or indirect Subsidiary that (i) is organized under the laws of any jurisdiction within the United States and (ii) is not a direct or indirect Subsidiary of a Foreign Subsidiary.

"Dutch Auction":  an auction whereby any Lender may, at any time, assign all or a portion of its Loans on a non-pro rata basis to the Borrower or one of its Subsidiaries (the "Auction Offeror") in accordance with the procedures set forth below or such other procedures as may be agreed between the Administrative Agent and the Borrower from time to time, pursuant to an offer made available to all Lenders on a pro rata basis, subject to the limitations set forth in Section 10.6(h):

(a)     Notice Procedures.  In connection with each Dutch Auction, the Auction Offeror will notify the Auction Manager (for distribution to the Lenders) of the Dutch Auction by delivering to the Auction Manager a written notice in form and substance reasonably satisfactory to the Auction Manager (an "Auction Notice"). Each Auction Notice shall contain (i) the maximum principal amount of Loans the Auction Offeror is willing to purchase (by assignment) in the Dutch Auction (the "Auction Amount"), which shall either be all outstanding Loans or no less than $1,000,000 or an integral multiple of $250,000 in excess of thereof, (ii) the range of discounts to par (the "Discount Range"), expressed as a range of prices per $1,000 of Loans, at which the Auction Offeror would be willing to purchase Loans in the Dutch Auction and (iii) the date on which the Dutch Auction will conclude, on which date Return Bids (as defined below) will be due at the time provided in the Auction Notice (such time, the "Expiration Time"), as such date and time may be extended upon notice by the Auction Offeror to the Auction Manager not less than 24 hours before the Expiration Time. The Auction Manager will deliver a copy of the notice procedures documentation (the "Offer Documents") for such Dutch Auction to each Lender promptly following receipt thereof.

(b)     Reply Procedures.  In connection with any Dutch Auction, each Lender wishing to participate in such Dutch Auction shall, prior to the Expiration Time, provide the Auction Manager with a notice of participation in form and substance reasonably satisfactory to the Auction Manager (the "Return Bid") to be included in the Offer Documents, which shall specify (i) a discount to par that must be expressed as a price per $1,000 of Loans (the "Reply Price") within the Discount Range and (ii) the principal amount of Loans, in an amount not less than $250,000, that such Lender is willing to offer for sale at its Reply Price (the "Reply Amount"); *provided* that each Lender may submit a Reply Amount that is less than the minimum amount and incremental amount requirements described above only if the Reply Amount equals the entire amount of the Loans held by such Lender at such time. A Lender may only submit one Return Bid per Dutch Auction, but each Return Bid may contain up to three component bids (or such other amount as may be determined by the Auction Manager), each of which may result in a separate Qualifying Bid (as defined below) and each of which will not be contingent on any other component bid submitted by such Lender resulting in a Qualifying Bid.  In addition to the Return Bid, a participating Lender must execute and deliver, to be held by the Auction Manager, an assignment and acceptance in the form included in the Offer Documents which shall be in form and substance reasonably satisfactory to the Auction Manager (the "Auction Assignment and Acceptance").  The Auction Offeror will not purchase any Loans at a price that is outside of the applicable Discount Range, nor will any Return Bids (including any component bids specified therein) submitted at a price that is outside such applicable Discount Range be considered in any calculation of the Applicable Threshold Price (as defined below).

(c)     Acceptance Procedures.  Based on the Reply Prices and Reply Amounts received by the Auction Manager, the Auction Manager, in consultation with the Auction Offeror, or as otherwise agreed by the Auction Manager and Auction Offeror, will calculate the lowest purchase price (the "Applicable Threshold Price") for the Dutch Auction within the Discount Range for the Dutch Auction that will allow the Auction Offeror to complete the Dutch Auction by purchasing the full Auction Amount (or such lesser amount of Loans for which the Auction Manager has received Qualifying Bids).  If the Applicable Threshold Price is not equal to the lowest Reply Price received pursuant to the Return Bids, the Auction Offeror shall be entitled, at its election, to either (i) complete the Dutch Auction at the Applicable Threshold Price or (ii) withdraw the Dutch Auction. In the case of clause (i) above, the Auction Offeror shall purchase (by assignment) Loans from each Lender whose Return Bid is within the Discount Range and contains a Reply Price that is equal to or less than the Applicable Threshold Price (each, a "Qualifying Bid"). All Loans included in Qualifying Bids received at a Reply Price lower than the Applicable Threshold Price will be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration. If a Lender has submitted a Return Bid containing multiple component bids at different Reply Prices, then all Loans of such Lender offered in any such component bid that constitutes a Qualifying Bid with a Reply Price lower than the Applicable Threshold Price shall also be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration.

(d)     Proration Procedures. In the case of clause (c)(i) above, all Loans offered in Return Bids (or, if applicable, any component bid thereof) constituting Qualifying Bids equal to the Applicable Threshold Price will be purchased at a purchase price equal to the Applicable Threshold Price; provided that if the aggregate principal amount of all Loans for which Qualifying Bids have been submitted in any given Dutch Auction equal to the Applicable Threshold Price would exceed the remaining portion of the Auction Amount (after deducting all Loans purchased below the Applicable Threshold Price), the Auction Offeror shall purchase the Loans for which the Qualifying Bids submitted were at the Applicable Threshold Price ratably based on the respective principal amounts offered and in an aggregate amount up to the amount necessary to complete the purchase of the Auction Amount. For the avoidance of doubt, no Return Bids (or any component thereof) will be accepted above the Applicable Threshold Price.

(e)     Notification Procedures. The Auction Manager or Auction Offeror will calculate the Applicable Threshold Price no later than the third Business Day after the date that the Return Bids were due. The Auction Manager or Auction Offeror will insert the amount of Loans to be assigned and the applicable settlement date determined by the Auction Manager in consultation with the Auction Offeror onto each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid. Upon written request of the applicable submitting Lender, the Auction Manager will promptly return any Auction Assignment and Acceptance received in connection with a Return Bid that is not a Qualifying Bid.

(f)     Additional Procedures.

(i)     Once initiated by an Auction Notice, the Auction Offeror may withdraw a Dutch Auction by written notice to the Auction Manager (x) in the circumstances described in clause (c)(i) above or (y) no later than 24 hours before the original Expiration Time so long as no Qualifying Bids have been received by the Auction Manager at or prior to the time the Auction Manager receives such written notice from the Auction Offeror. Any Return Bid (including any component bid thereof) delivered to the Auction Manager may not be modified, revoked, terminated or cancelled; provided that a Lender may modify a Return Bid at any time prior to the Expiration Time solely to

14

reduce the Reply Price included in such Return Bid. However, a Dutch Auction shall become void if the Auction Offeror fails to satisfy one or more of the conditions to the purchase of Loans set forth in, or to otherwise comply with the provisions of Section 10.6 of this Agreement. The purchase price for all Loans purchased in a Dutch Auction shall be paid in cash by the Auction Offeror directly to the respective assigning Lender on a settlement date as determined by the Auction Manager in consultation with the Auction Offeror (which shall be no later than ten (10) Business Days after the date Return Bids are due), along with accrued and unpaid interest (if any) on the applicable Loans up to the settlement date. The Auction Offeror shall execute each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid.

(ii)     All questions as to the form of documents and validity and eligibility of Loans that are the subject of a Dutch Auction will be determined by the Auction Manager, in consultation with the Auction Offeror, and the Auction Manager's determination will be conclusive, absent manifest error. The Auction Manager's interpretation of the terms and conditions of the Offer Document, in consultation with the Auction Offeror, will be final and binding.

(iii)     None of the Auction Manager, any other Agent or any of their respective Affiliates or Related Parties assumes any responsibility for the accuracy or completeness of the information concerning the Borrower, its Subsidiaries or any of their Affiliates contained in the Offer Documents or otherwise or for any failure to disclose events that may have occurred and may affect the significance or accuracy of such information.

(iv)     The Auction Manager acting in its capacity as such under a Dutch Auction shall be entitled to the benefits of the provisions of Section 9 and Section 10.5 of this Agreement to the same extent as if each reference therein to the "Loan Documents" were a reference to the Offer Documents, the Auction Notice and Auction Assignment and Acceptance, each reference to any Agent were a reference to the Auction Manager and each reference therein to the "Transactions" were a reference to the transactions contemplated hereby.

(v)     The procedures listed in clauses (a) through (f) above shall not require the Borrower or any of its Subsidiaries to initiate any Dutch Auction, nor shall any Lender be obligated to participate in any Dutch Auction.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

152254164_6

"Environmental Laws": any and all laws, rules, orders, regulations, statutes, ordinances, codes or decrees (including principles of common law) of any international authority, foreign government, the United States, or any state, provincial, local, municipal or other Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, the preservation or protection of the environment, natural resources or human health and safety (as related to Releases of or exposure to Materials of Environmental Concern), as have been, are now, or at any time hereafter are, in effect.

"Environmental Liability": any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, to the extent arising from or relating to: (a) non-compliance with any Environmental Law or any permit, license or other approval required thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the Release or threatened Release of any Materials of Environmental Concern, (e) any investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Authority (including without limitation Governmental Authority oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse) or (f) any contract, agreement or other consensual arrangement pursuant to which any Environmental Liability under clause (a) through (e) above is assumed or imposed.

"Equity Issuance": any issuance by the Borrower or any Subsidiary of its Capital Stock in a public or private offering.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Escrow Entity": any direct or indirect Subsidiary of the Borrower formed solely for the purposes of issuing any bonds, notes, term loans, debentures or other debt.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default": any of the events specified in Section 8.1; provided, that any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"Exchange Act": the Securities Exchange Act of 1934, as amended.

"Excluded Account": as defined in the Guarantee and Collateral Agreement.

"Excluded Collateral": as defined in Section 6.8(e); provided that the Borrower may designate in a written notice to the Administrative Agent any asset not to constitute "Excluded Collateral", whereupon the Borrower shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired.

"Excluded Equity Securities": (i) to the extent applicable law requires that any Subsidiary issue directors' qualifying shares, such shares or nominee or other similar shares and (ii) any Capital Stock in joint ventures or other entities in which the Loan Parties directly own 50% or less of the Capital Stock, but only in the case of this clause (ii) if, and to the extent that, and for so long as granting a security interest or other Liens therein would violate applicable law or regulation or a shareholder

16

agreement or other contractual obligation (in each case, after giving effect to Section 9-406(d), 9-407(a) or 9-408 of the Uniform Commercial Code, if and to the extent applicable, and other applicable law) binding on such Capital Stock and in effect on the Closing Date or granted thereafter but not granted in contemplation the acquisition of such Capital Stock by any Loan Party.

"Excluded Subsidiary":  any Subsidiary that is:

(a)     not wholly owned directly by the Borrower or one or more of its wholly owned Subsidiaries, but only if, and to the extent that, and for so long as the guaranteeing or granting of a Lien on its assets to secure the Obligations would violate applicable law or regulation or a binding shareholder agreement or other contractual obligation in effect on the Closing Date (in each case, after giving effect to Section 9-406(d), 9-407(a) or 9-408 of the Uniform Commercial Code, if and to the extent applicable, and other applicable law),

(b)     any Subsidiary that is a Foreign Subsidiary or any Domestic Subsidiary of a Foreign Subsidiary on the Closing Date (other than, in each case, (i) any Subsidiary not identified as an Excluded Subsidiary on Schedule 4.14, (ii) any other Subsidiary if, at any time after the Closing Date, the Administrative Agent (acting on the instructions of the Required Lenders, acting reasonably and in good faith), shall have notified the Borrower that such Subsidiary shall no longer constitute an Excluded Subsidiary pursuant to this clause (b), or (iii) any Subsidiary that ceases to be an Excluded Subsidiary pursuant to the last paragraph of Section 6.8(c)) or any other future Foreign Subsidiary or any Domestic Subsidiary of a Foreign Subsidiary if agreed by the Required Lenders;

(c)     a Subsidiary that (i) is prohibited by any applicable Requirement of Law from guaranteeing or granting of a Lien on its assets to secure the Obligations, but only if, and to the extent that, and for so long as, such prohibition remains in effect and applicable to such Subsidiary or (ii) which would require governmental (including regulatory) consent, approval, license or authorization to provide a guarantee or grant any Lien unless, such consent, approval, license or authorization has been received, but only if, and to the extent that, and for so long as such consent, approval, license or authorization has not been received and continues to be required,

(d)     a Subsidiary that is prohibited from guaranteeing or granting a Lien on its assets to secure the Obligations by any Contractual Obligation in existence on the Closing Date (or, in the case of any newly-acquired Subsidiary, in existence at the time of acquisition thereof but not entered into in contemplation thereof and not created in contemplation of such guarantee), provided, that this clause (d) shall not be applicable if (1) the other party to such Contractual Obligation is a Loan Party, a wholly-owned Subsidiary of the Borrower or (2) consent has been obtained to provide such guarantee or such prohibition is otherwise no longer in effect,

(e)     a Subsidiary with respect to which a guarantee by it of, or granting a Lien on its assets to secure the Obligations would reasonably be expected to result in material adverse tax consequences (including as a result of Section 956 of the Code or any related provision) to the Borrower or any of their respective Subsidiaries as reasonably determined in good faith by the Borrower,

(f)     established or created pursuant to Section 7.7(x) and meeting the requirements of the proviso thereto; provided that such Subsidiary shall only be an Excluded Subsidiary for the period contemplated by Section 7.7(x),

(g)        not-for-profit subsidiaries, or

(h)        any other Subsidiary with respect to which, in the reasonable judgment of the [Required Lenders in consultation with the Borrower], the cost or other consequences of guaranteeing or granting a Lien on its assets to secure the Obligations shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom;

provided, that (x) if a Subsidiary executes the Guarantee and Collateral Agreement as a "Guarantor," then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Guarantee and Collateral Agreement as a "Guarantor" in accordance with the terms hereof and thereof), (y) the Borrower may designate in a written notice to the Administrative Agent a Subsidiary not to constitute an "Excluded Subsidiary" whereupon such Subsidiary shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired; provided, further, that no Loan Party on the Closing Date may be designated an Excluded Subsidiary and each such Loan Party shall remain a Subsidiary Guarantor hereunder, and (z) in no event shall any Subsidiary that (A) is a Subsidiary Guarantor as of the Closing Date (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder) or (B) is a guarantor under (or has pledged its Property or assets to secure the obligations of) any ABL Facility, constitute an "Excluded Subsidiary" under the Loan Documents and no such Subsidiary may be designated an "Excluded Subsidiary" following the Closing Date and each such Subsidiary shall remain a Subsidiary Guarantor hereunder (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder or, in the case of a Subsidiary described in clause (B) above, ceases to be a guarantor (or pledgor) under such ABL Facility and such Subsidiary is not otherwise required to guarantee or grant a Lien on its assets to secure the Obligations).

"Excluded Taxes": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient, (i) net income Taxes (however denominated), net profits Taxes, franchise Taxes, and branch profits Taxes (and net worth Taxes and capital Taxes imposed in lieu of net income Taxes), in each case, (A) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, if such Recipient is a Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (B) that are Other Connection Taxes, (ii) any U.S. federal withholding Taxes (including backup withholding) imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in a Loan or Commitment or this Agreement pursuant to a law in effect on the date on which (A) such Recipient becomes a party to this Agreement (other than pursuant to an assignment requested by the Borrower under Section 2.24) or (B) if such Recipient is a Lender, such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient became a party hereto or, if such Recipient is a Lender, to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with paragraphs (e) or (g), as applicable, of Section 2.20 and (iv) any withholding Taxes imposed under FATCA.

"Executive Officer": the Borrower's Chief Executive Officer, Chief Financial Officer, Chief Operating Officer or Chief Legal Officer.

"Facility": the secured term loan credit facility in an aggregate principal amount of $[●] consisting of the Loans.

"Fair Market Value": with respect to any asset or Property (including any Capital Stock of any Person), the fair market value thereof as determined in good faith by the Borrower, the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset; provided that with respect to any such asset determined to have a

Fair Market Value in excess of (i) $1,000,000, such Fair Market Value shall be determined in good faith by the board of directors or, pursuant to a specific delegation of authority by such board of directors or a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower which is selling or owns such asset and (ii) $2,500,000, such Fair Market Value shall be determined by (x) a nationally recognized investment banking firm which determination shall be documented in a letter delivered to the Administrative Agent stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or (y) a written valuation of such asset from a recognized independent third party appraiser reasonably acceptable to the Administrative Agent.

"Fair Value": the amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole and would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreements (together with any law implementing such agreements), treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided, that if the Federal Funds Effective Rate is less than zero, it shall be deemed to be zero hereunder for all instances.

"Floor": the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to any Benchmark. With respect to Adjusted Term SOFR Rate, the "Floor" shall be 1.00%.

"Foreign Plan": any Plan that is not subject to U.S. law and is established, maintained or contributed to by any Loan Party or any other Commonly Controlled Entity.

"Foreign Asset Sale":  as defined in Section 2.12(g).

"Foreign Plan Event": with respect to any Foreign Plan, (a) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (b) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any other Commonly Controlled Entity under applicable law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein or (e) the occurrence of any transaction that is prohibited under any applicable law and that would reasonably be expected to result in the incurrence of any liability by a Loan Party or any other Commonly Controlled Entity, or the imposition on a Loan Party or any other

Commonly Controlled Entity of, any fine, excise tax or penalty resulting from any noncompliance with any applicable law.

"Foreign Recovery Event":  as defined in Section 2.12(g).

"Foreign Subsidiary":  any Subsidiary of the Borrower that is not a Domestic Subsidiary in accordance with clause (i) of such definition and each direct or indirect Subsidiary of another Foreign Subsidiary.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority":  any nation or government, any state, province or other political subdivision thereof and any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and, as to any Lender, any securities exchange, any self-regulatory organization (including the National Association of Insurance Commissioners) and any supranational bodies (including the European Union and the European Central Bank).

"Guarantee":  collectively, the guarantee made by the Subsidiary Guarantors under the Guarantee and Collateral Agreement in favor of the Secured Parties, together with each other guarantee delivered pursuant to Section 6.8.

"Guarantee and Collateral Agreement":  the Guarantee and Collateral Agreement, substantially in the form of Exhibit H, among the Borrower, each Subsidiary Guarantor from time to time party thereto and the Collateral Agent, as the same may be amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) pursuant to which the guaranteeing person has issued a guarantee, reimbursement, counterindemnity or similar obligation, in either case guaranteeing or by which such Person becomes contingently liable for any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets or any Investment permitted under this Agreement.  The amount of any Guarantee Obligation of any guaranteeing Person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made

and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case, the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such Person in good faith.

"Hedge Agreements":  all agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, entered into by the Borrower or any Subsidiary; provided, that no phantom stock, deferred compensation or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a Hedge Agreement.

"Immaterial Subsidiary" means any Subsidiary whose aggregate Consolidated Total Assets and annual consolidated revenues, in each case on an individual basis, do not at any time exceed [1.0 - 2.5]% of the Consolidated Total Assets and [1.0 - 2.5]% of the annual consolidated revenues, respectively, of the Borrower and its Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time).

"Indebtedness": of any Person:  without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by (i) bonds (excluding surety bonds), debentures, notes or similar instruments, and (ii) surety bonds, (c) all obligations of such Person for the deferred purchase price of Property or services already received, (d) all Guarantee Obligations by such Person of Indebtedness of others, (e) all Capital Lease Obligations of such Person, (f) [reserved], (g) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instrument in respect of which a back-to-back letter of credit has been issued under or permitted by this Agreement) and (ii) in respect of bankers' acceptances and (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Capital Stock of such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided, that Indebtedness shall not include (A) trade and other payables, accrued expenses and liabilities and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue arising in the ordinary course of business, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out and other contingent obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP and (E) obligations owing under any Hedge Agreements or in respect of Cash Management Obligations.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof (or provides for reimbursement to such Person).

"Indebtedness for Borrowed Money":  (a) to the extent the following would be reflected on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP, the principal amount of all Indebtedness of the Borrower and its Subsidiaries with respect to (i) borrowed money, evidenced by debt securities, debentures, acceptances, notes or other similar instruments and (ii) Capital Lease Obligations, (b) reimbursement obligations for letters of credit and financial guarantees (without duplication) (other than ordinary course of business contingent reimbursement obligations) and

(c) Hedge Agreements; provided, that the Obligations shall not constitute Indebtedness for Borrowed Money.

"Indemnified Liabilities":  as defined in Section 10.5.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Indemnitee":  as defined in Section 10.5.

"Initial Cashless Term Commitment": as to any  Lender, the commitment of such Lender to be deemed to have made a Loan to the Borrower pursuant to Section 2.1(a) in the principal amount set forth under the heading "Initial Cashless Term Commitment" opposite such  Lender's name on Schedule 2.1(a) to this Agreement. The aggregate principal amount of the Initial Cashless Term Commitments as of the Closing Date is $[●].[2]

"Initial Funded Term Commitment": as to any Lender, the obligation of such Lender to make a Loan to the Borrower pursuant to Section 2.1(b) in the principal amount set forth under the heading "Initial Funded Term Commitment" opposite such Lender's name on Schedule 2.1(b) to this Agreement. The aggregate principal amount of the Initial Funded Term Commitments as of the Closing Date is $10,000,000.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Instrument":  as defined in the Guarantee and Collateral Agreement.

"Intellectual Property":  as defined in the Guarantee and Collateral Agreement.

"Intercreditor Agreements": collectively, the ABL Intercreditor Agreement and any Other Intercreditor Agreement.

"Interest Payment Date": (a) with respect to any SOFR Loan, (i) the last day of the Interest Period applicable to the Borrowing of which such Loan is a part, (ii) [reserved] and (iii) in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter.

"Interest Period": as to any SOFR Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing (in the case of a conversion or continuation), as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter as the Borrower may elect or as shall be deemed elected pursuant to Section 2.2 (as long as such tenor is available for such SOFR Borrowing); provided, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which

---

[2] NTD: To be calculated to include outstanding principal amount of the DIP, including upfront premium and repayment premium but excluding interest and fees.

case such Interest Period shall end on the next preceding Business Day.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Investments":  as defined in Section 7.7.

"IRS": the United States Internal Revenue Service.

"Junior Financing": as defined in Section 7.8.

"Junior Financing Documentation": the definitive documentation governing any Junior Financing.

"Lenders": as defined in the preamble hereto.

"Liabilities":  the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the Closing Date after giving effect to the consummation of the Transactions determined in accordance with GAAP consistently applied.

"Lien":  any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity": at any time, the sum of, without duplication, (i) all Unrestricted Cash of the Borrower and its Subsidiaries and (ii) the aggregate indebtedness permitted to be borrowed and available to be drawn at such time under any ABL Facility then in effect.

"Loan": any loan made (or deemed made) by any Lender to the Borrower pursuant to this Agreement, including the Loans made (and/or deemed to have been made) to the Borrower on the Closing Date pursuant to Section 2.1(a) and Section 2.1(b).

"Loan Documents":  the collective reference to this Agreement, the Security Documents, the Notes, any Intercreditor Agreements, and the Agent Fee Letter, together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"Loan Parties":  the Borrower and each Subsidiary Guarantor, and "Loan Party" means any one of them.

"Mandatory Prepayment Date":  as defined in Section 2.12(e).

"Material Adverse Effect":  a material adverse effect on (a) the business, operations, assets, financial condition or results of operations of the Borrower and its Subsidiaries, taken as a whole, or (b) the material rights and remedies available to the Administrative Agent and the Lenders, taken as a whole, or on the ability of the Loan Parties, taken as a whole, to perform their payment obligations to the Lenders, in each case, under the Loan Documents; provided that Material Adverse Effect shall expressly exclude the effect of the filing of the Cases, the events and conditions resulting from or leading up thereto, the emergence from the Cases, the Transactions and any action required to be taken under the Loan Documents.

"<u>Materials of Environmental Concern</u>":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity and any other substances that are defined, listed or regulated as hazardous, toxic (or words of similar regulatory intent or meaning) under any Environmental Law, or that are regulated pursuant to Environmental Law or which may give rise to any Environmental Liability.

"<u>Maturity Date</u>":  the fifth anniversary of the Closing Date; <u>provided</u> that if such date is not a Business Day, the Maturity Date will be the next succeeding Business Day.

"<u>Maximum Rate</u>":  as defined in <u>Section 10.20</u>.

"<u>Moody's</u>":  Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"<u>Multiemployer Plan</u>":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>":  (a) in connection with any Asset Sale or any Recovery Event occurring on or after the Closing Date, (I) the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) received by any Loan Party or any Subsidiary and (II) the proceeds in the form of cash and Cash Equivalents received by any Loan Party or any Subsidiary from any sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in connection with any such Asset Sale or Recovery Event, net of (i)(x) selling expenses, attorneys' fees, accountants' fees, investment banking fees, brokers' fees and consulting fees, (y) the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and (z) other customary fees and expenses actually incurred by any Loan Party or any Subsidiary in connection therewith; (ii) Taxes paid or reasonably estimated to be payable by any Loan Party or any Subsidiary as a result thereof and, without duplication, any tax distribution that is required as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); (iii) the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities (other than any Taxes deducted pursuant to <u>clause (ii)</u> above) (A) associated with the assets that are the subject of such event and (B) retained by the Borrower or any of its Subsidiaries, <u>provided</u>, that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such event occurring on the date of such reduction and (iv) the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this <u>clause (iv)</u>) attributable to minority interests and not available for distribution to or for the account of the Borrower or any Domestic Subsidiary as a result thereof and (b) in connection with any Equity Issuance or issuance or sale of debt securities or instruments or the incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith[; provided that no proceeds calculated in accordance with the foregoing clause (a) shall constitute Net Cash Proceeds until the aggregate amount of all such proceeds shall exceed $2,000,000 (and thereafter only such cash payments and proceeds in excess of such amount shall constitute Net Cash Proceeds)].

"<u>New Subsidiary</u>":  as defined in <u>Section 7.2(u)</u>.

"<u>Non-Excluded Subsidiary</u>":  any Subsidiary of the Borrower which is not an Excluded Subsidiary.

"<u>Non-Guarantor Subsidiary</u>":  any Subsidiary of the Borrower which is not a Subsidiary Guarantor.

"<u>Non-Supporting Senior Noteholder</u>":  as defined in the Restructuring Support Agreement.

"<u>Non-US Guarantor</u>": any Subsidiary Guarantor not organized under the laws of any jurisdiction within the United States.

"<u>Non-US Lender</u>":  as defined in <u>Section 2.20(e)</u>.

"<u>Not Otherwise Applied</u>":  with reference to any proceeds of any transaction or event that is proposed to be applied to a particular use or transaction, that such amount (a) was not required to prepay Loans pursuant to <u>Section 2.12</u> and (b) has not previously been (and is not simultaneously being) applied to anything other than such particular use or transaction.

"<u>Note</u>":  any promissory note evidencing any Loan, which promissory note shall be in the form of <u>Exhibit F</u>, or such other form as agreed upon by the applicable Lender and the Borrower.

"<u>Obligations</u>":  the unpaid principal of and interest on the Loans, including interest accruing after maturity and after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding, and all other obligations and liabilities (including fees, premiums, the Repayment Premium and make-wholes) of the Borrower or any Subsidiary Guarantor to the Agents or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, premiums, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Agents or any Lender that are required to be paid by the Borrower pursuant hereto or any other Loan Document) or otherwise and including all indemnity claims of the Agents and the Lenders pursuant to <u>Section 10.5</u> or any other Loan Document.

"<u>OFAC</u>": the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Offer Documents</u>": as defined in the definition of "Dutch Auction".

"<u>Other Connection Taxes</u>": with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from (and that would not have existed but for) such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document.

"<u>Other Intercreditor Agreement</u>": an intercreditor agreement, (a) to the extent in respect of Indebtedness intended to be secured by some or all of the Collateral on a pari passu basis with the Obligations, an intercreditor agreement the terms of which are consistent with market terms governing

security arrangements for the sharing of liens on a pari passu basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, as determined in good faith by the Borrower and the Required Lenders, and (b) to the extent in respect of Indebtedness intended to be secured by some or all of the Collateral on a junior priority basis with the Obligations, an intercreditor agreement the terms of which are consistent with market terms governing security arrangements for the sharing of liens on a junior basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, in form and substance [satisfactory] to the Required Lenders and the Administrative Agent.

"Other Taxes":  all present or future stamp, court or documentary, intangible, recording, filing similar Taxes that arise from any payment made under or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.25).

"Parent":  as defined in Section 7.6(e).

"Participant":  as defined in Section 10.6(c)(i).

"Participant Register":  as defined in Section 10.6(c)(iii).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Periodic Term SOFR Determination Day": as defined in the definition of "Term SOFR".

"Permitted Acquisition":   (a) any acquisition or other Investment approved by the Required Lenders, (b) any acquisition or other Investment made solely with the Net Cash Proceeds of any substantially concurrent Equity Issuance or capital contribution (other than Disqualified Capital Stock) and such Equity Issuance or capital contribution is Not Otherwise Applied or (c) any acquisition, in a single transaction or a series of related transactions, of a majority controlling interest in the Capital Stock, or all or substantially all of the assets, of any Person, or of all or substantially all of the assets constituting a division, product line or business line of any Person, in each case to the extent the applicable acquired company or assets engage in or constitute a Permitted Business or Related Business Assets, so long as in the case of any acquisition described in this clause (c), no Event of Default shall be continuing immediately after giving pro forma effect to such acquisition.

"Permitted Business": (i) the Business or (ii) any business that is a natural outgrowth or a reasonable extension, development or expansion of any such Business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing.

"Permitted Initial Investors": (a) Aequim Alternative Investments LLC, (b) Braidwell LP, (c) Context Capital Management, LLC, (d) Davidson Kempner Capital Management LP, (e) Highbridge Capital Management, LLC, (f) Silverback Asset Management, LLC, and (g) Walleye Manager Opportunities LLC.

"Permitted Investors":  the collective reference to (i) the Permitted Initial Investors, (ii) any controlled Affiliates or accounts, investment vehicles (including any co-invest vehicles) or funds, advised, co-advised, managed or co-managed by any Person listed in the foregoing clause (i), (iii) the members of management of the Borrower or any of its Subsidiaries that have ownership interests in the Borrower as of the Closing Date or thereafter pursuant to the Management Incentive Plan (as defined in

the Restructuring Plan), (iv) the directors of the Borrower or any of its Subsidiaries as of the Closing Date, and (v) the members of any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of which any Person described in clauses (i), (ii), (iii) or (iv) of this definition is a member; provided that, in each case of such group and without giving effect to the existence of such group or any other group, Persons who are either Persons described in clauses (i), (ii), (iii) or (iv) of this definition have aggregate beneficial ownership of more than 50% of the total voting stock of the Borrower.

"Permitted Refinancing":  with respect to any Person, refinancings, replacements, modifications, refundings, renewals or extensions of Indebtedness (including a prior Permitted Refinancing of Indebtedness); provided, that any such refinancing, replacement, modification, refunding, renewal or extension of Indebtedness effected pursuant to a clause in Section 7.2 or 7.3 in reliance on the term "Permitted Refinancing" must comply with the following conditions:

(a)    there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses *plus* other reasonable amounts paid and fees and expenses reasonably incurred in connection with such refinancing, replacement, modification, refunding, renewal or extension and by an amount equal to any existing commitment unutilized thereunder and as otherwise permitted under the applicable clause of Section 7.2);

(b)    the Weighted Average Life to Maturity of such Indebtedness is greater than or equal to the Weighted Average Life to Maturity of the Indebtedness being refinanced (other than a shorter Weighted Average Life to Maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for a shorter Weighted Average Life to Maturity than the Weighted Average Life to Maturity of the Indebtedness being refinanced) and such Indebtedness shall not have a final maturity earlier than the maturity date of the Indebtedness being refinanced;

(c)    immediately after giving effect to such refinancing, replacement, refunding, renewal or extension, no Event of Default shall be continuing;

(d)    neither the Borrower nor any Subsidiary shall be an obligor or guarantor of any such refinancings, replacements, modifications, refundings, renewals or extensions except to the extent that such Person was (or would have been required to be) such an obligor or guarantor in respect of the applicable Indebtedness being modified, refinanced, replaced, refunded, renewed or extended; provided, that this clause (d) shall not apply to a Permitted Refinancing permitted under Section 7.2(x), so long as all such obligors with respect to such Permitted Refinancing also guarantee the Obligations;

(e)    any Liens securing such Permitted Refinancing shall be limited to the assets or property that secured the Indebtedness being refinanced; provided, that Liens in respect of assets or property granted as a result of the operation of after-acquired property clauses shall be permitted to the extent any such assets or property secured (or would have secured) the Indebtedness the subject of the Permitted Refinancing; provided, further, that this clause (e) shall not apply to a Permitted Refinancing permitted under Section 7.2(x), so long as all such assets or property securing such Permitted Refinancing are also subject to Liens securing the Obligations;

(f)    to the extent the Indebtedness being refinanced is subject to the ABL Intercreditor Agreement or an Other Intercreditor Agreement, to the extent that it is secured by

27

the Collateral, the Permitted Refinancing shall be subject to the ABL Intercreditor Agreement or Other Intercreditor Agreement, as applicable, on terms no less favorable to the Lenders, taken as a whole (as determined in good faith by the Borrower);

(g)     except as otherwise permitted by this definition of "Permitted Refinancing", the covenants and events of default applicable to such Permitted Refinancing shall be not materially more restrictive, taken as a whole, to the Borrower and its Subsidiaries than the covenants and events of default contained in customary agreements governing similar indebtedness in light of prevailing market conditions at the time of such Permitted Refinancing (as determined in good faith by the Borrower);

(h)     to the extent the Indebtedness being refinanced is subordinated in right of payment to the Obligations, the Permitted Refinancing shall be subordinated in right of payment to the Obligations on substantially similar terms; and

(i)     to the extent the Indebtedness being refinanced constitutes Junior Financing, the Permitted Refinancing shall constitute Junior Financing.

"Person":   an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"PIK Interest Amount":  as defined in Section 2.15(c).

"Plan":   at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA (whether or not subject to ERISA) and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability, including a Multiemployer Plan.

"Plan Effective Date": the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date) of one or more Chapter 11 Plans confirmed pursuant to an order entered by the Bankruptcy Court.

"Platform":  as defined in Section 10.2(c).

"Pledged Securities":  as defined in the Guarantee and Collateral Agreement.

"Pledged Stock":  as defined in the Guarantee and Collateral Agreement.

"Prepayment Option Notice":  as defined in Section 2.12(e).

"Prime Rate": the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent); each change in the Prime Rate shall be effective on the date such change is publicly announced as effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"Proceeding": as defined in Section 10.5(c).

"Property":  any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"Public Information":  as defined in Section 10.2(c)

"Public Lender":  as defined in Section 10.2(c).

"Qualified Capital Stock":  any Capital Stock that is not Disqualified Capital Stock.

"Qualifying Bid": as defined in the definition of "Dutch Auction".

"Real Property":  collectively, all right, title and interest of the Borrower or any of its Subsidiaries in and to any and all parcels of real property owned or leased by the Borrower or any such Subsidiary together with all improvements and appurtenant fixtures, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Recipient": (a) any Lender, (b) the Administrative Agent or (c) the Collateral Agent, as applicable.

"Recovery Event":  any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Subsidiary, in an amount for each such event exceeding $500,000.

"Register":  as defined in Section 10.6(b)(iv).

"Related Business Assets":  assets (other than cash and Cash Equivalents) used or useful in a Permitted Business; provided, that any assets received by the Borrower or a Subsidiary in exchange for assets transferred by the Borrower or a Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Subsidiary.

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Related Person": as defined in Section 10.5.

"Release":  any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure or facility.

"Relevant Governmental Body": the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Repayment Premium":  as defined in Section 2.19.

"Replaced Lender":  as defined in Section 2.24.

"Reply Amount": as defined in the definition of "Dutch Auction".

"Reply Price": as defined in the definition of "Dutch Auction".

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty (30) day notice period is waived by the PBGC in accordance with the regulations thereunder.

"Representatives":  as defined in Section 10.14.

"Required Consenting Senior Noteholders": as defined in the Restructuring Support Agreement.

"Required Lenders":  at any time, Lenders holding more than 50% of the sum of (a) the unused Commitments then in effect and (b) the aggregate unpaid principal amount of the Loans then outstanding (excluding any unused Commitments and outstanding Loans of Defaulting Lenders).

"Requirement of Law":  as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Resolution Authority": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer":  any officer at the level of Vice President or higher of the relevant Person or, with respect to financial matters, the Chief Financial Officer, Treasurer, Controller or any other Person in the Treasury Department at the level of Vice President or higher of the relevant Person.

"Restricted Payments":  as defined in Section 7.6.

"Restructuring Plan":  the *Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and Its Affiliated Debtors* [Docket No. [●]] and all exhibits, supplements, appendices, and schedules thereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

"Restructuring Support Agreement":  as defined in the Restructuring Plan.

"Return Bid": as defined in the definition of "Dutch Auction".

"S&P":  Standard & Poor's Ratings Group, Inc., or any successor to the rating agency business thereof.

"Sanction(s)": any international economic sanction administered or enforced by the U.S. government, including OFAC and the U.S. Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury, or any other applicable sanctions authorities.

"SEC":  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Secured Parties":  collectively, the Lenders, the Administrative Agent, the Collateral Agent, any other holder from time to time of any of the Obligations and, in each case, their respective successors and permitted assigns.

"Security":  as defined in the Guarantee and Collateral Agreement.

"Security Documents":   the collective reference to the Guarantee and Collateral Agreement, and all other security documents hereafter delivered to the Administrative Agent or the Collateral Agent, as applicable, purporting to grant a Lien on any Property of any Loan Party to secure the Obligations.

"Senior Indebtedness": as defined in Section 10.1(a)(v).

"Senior Notes":  as defined in the Restructuring Support Agreement.

"Settlement Date": with respect to any Loans, the date on which such Loans are repaid, prepaid, replaced or have become due or are declared accelerated pursuant to Section 8.1 or otherwise or are otherwise due and payable pursuant to this Agreement.

"Single Employer Plan":  any Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability.

"SOFR":  a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator":  the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing":  a Borrowing comprised of SOFR Loans.

"SOFR Loan":  any Loan bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate in accordance with the provisions of Section II, other than pursuant to clause (c) of the definition of "ABR".

"Solvent":   with respect to the Borrower and its Subsidiaries, as of any date of determination, (i) the Fair Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated exceeds their Liabilities; (iii) the Borrower and its Subsidiaries taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern for the period from the Closing Date through the Maturity Date; and (iv) the Borrower and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

"Stated Maturity":   with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the re-purchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"<u>Subsidiary</u>":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of the Borrower.

"<u>Subsidiary Guarantors</u>": (a) each Subsidiary other than any Excluded Subsidiary, and (b) any other Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement.  For the avoidance of doubt, as of the Closing Date, only the Borrower's Domestic Subsidiaries [and Cutera Japan K.K.] shall be Subsidiary Guarantors.

"<u>Successor Borrower</u>":  as defined in <u>Section 7.4(j)</u>.

["<u>Supermajority Lenders</u>": at any time, Lenders holding more than [75]% of the sum of (a) the unused Commitments then in effect and (b) the aggregate unpaid principal amount of the Loans then outstanding (excluding any unused Commitments and outstanding Loans of Defaulting Lenders).]

"<u>Tax Group</u>":  as defined in <u>Section 7.6(e)</u>.

"<u>Taxes</u>":  all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, fines, additions to tax or penalties applicable thereto.

"<u>Term Prepayment Amount</u>":  as defined in <u>Section 2.12(e)</u>.

"<u>Term SOFR</u>":

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "<u>Periodic Term SOFR Determination Day</u>") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "<u>ABR Term SOFR Determination Day</u>") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; <u>provided</u>, that if as of 5:00 p.m. (New

York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Administrator": CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate": the forward-looking term rate based on SOFR.

"Transaction Costs": as defined in the definition of "Transactions".

"Transactions": each of the following transactions:

(a)     the execution, delivery and performance of the Loan Documents;

(b)     the borrowing (and/or deemed borrowing) of the Loans on the Closing Date;

(c)     the use of the proceeds thereof;

(d)     the Restructuring Transactions (as defined in the Restructuring Plan);

(e)     the payment of all fees, costs and expenses incurred in connection with the transactions described in the foregoing provisions of this definition (the "**Transaction Costs**"); and

(f)     the other transactions contemplated by the Loan Documents or the Restructuring Plan.

"Treasury Rate": as of the date of any repayment, prepayment, replacement, redemption or acceleration of Loans or the Loans becoming due and payable, the yield to maturity as of such date of U.S. Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two (2) Business Days prior to such day of repayment, prepayment, redemption or acceleration or such date such Loan became due and payable (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date of repayment, prepayment, redemption or acceleration or such date such Loan became due and payable to the date that is thirty-six (36) months following the Closing Date.

"Type": when used in respect of any Loan or Borrowing, the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" shall include the Term SOFR and the ABR.

"U.S. Government Securities Business Day": any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends

33

that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement":  the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" or "U.S.":  the United States of America.

"Unrestricted Cash": cash or Cash Equivalents of the Borrower or any of its Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any of its Subsidiaries (other than solely as a result of such cash or cash equivalents being so classified as a result of being subject to a Lien securing the Obligations or any ABL Facility).

"Upfront Payment": as defined in Section 2.9(a).

"US Lender":  as defined in Section 2.20(g).

"USA Patriot Act":  as defined in Section 10.18.

"Weighted Average Life to Maturity": when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Will be able to pay their Liabilities as they mature":  for the period from the Closing Date through the Maturity Date, the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions will have sufficient assets, credit capacity and cash flow to pay their Liabilities as those Liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by the Borrower and its Subsidiaries as reflected in the projected financial statements and in light of the anticipated credit capacity.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that

34

Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2     <u>Other Definitional Provisions</u>.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Subsidiaries not defined in <u>Section 1.1</u> and accounting terms partly defined in <u>Section 1.1</u>, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," and (iii) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and <u>Section,</u> <u>Schedule</u> and <u>Exhibit</u> references are to this Agreement unless otherwise specified.

(d)     The term "license" shall include sub-license.  The term "documents" includes any and all documents whether in physical or electronic form.

(e)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)     Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(g)     Any references in this Agreement to "Obligations" or "Lenders" (or any similar terms) in the phrase "pari passu basis with the Liens securing the Obligations" or "pari passu with the Liens of the Lenders" (or any similar phrases) or in the phrase "secured on a junior basis with the Liens securing the Obligations" or "junior to the Liens of the Lenders" (or any similar phrases) shall, in each case, be deemed to refer to the Obligations in effect on the Closing Date (i.e., the Loans) or the Lenders, as applicable, and any other Indebtedness or commitments incurred under this Agreement that is intended to be secured on a pari passu basis with the liens securing the Loans or the Lenders, as applicable.

1.3     [Reserved].

1.4     Exchange Rates; Currency Equivalents.  If any basket is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates.

1.5     Covenants. For purposes of determining compliance with Section VII (other than Section 7.2(a), Section7.2(x), Section 7.3(h), Section 7.3(ff) or Section 7.6), in the event that an item or event (or any portion thereof) meets the criteria of one or more of the categories described in a particular covenant contained in Section VII (other than Section 7.2(a), Section7.2(x), Section 7.3(h), Section 7.3(ff) or Section 7.6), the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify (as if incurred at such later time) such item or event (or any portion thereof) and may include the amount and type of such item or event (or any portion thereof) in one or more of the relevant clauses or subclauses, in each case, within such covenant and will be entitled to include such item or event (or any portion thereof) only in one of the relevant clauses or subclauses (or any portion thereof). Furthermore, (A) for purposes of Section 7.2, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on the applicable exchange rate, in the case of such Indebtedness incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness), on the date that such Indebtedness was incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the applicable exchange rate on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of accrued interest, fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing, (B) for purposes of Sections 7.3, 7.5, 7.6 and 7.7, the amount of any Liens, Dispositions, Restricted Payments and Investments, as applicable, denominated in any currency other than Dollars shall be calculated based on the applicable exchange rate, and (C) for purposes of any calculation under Sections 7.2 and 7.3, if the Borrower elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with Section 7.2 or 7.3, but for so long as such Indebtedness is outstanding or in effect, the entire committed amount of such Indebtedness then in effect shall be included in any calculations under Sections 7.2 and 7.3.

1.6     Accounting Terms.  For purposes of determining compliance with any provision of this Agreement, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of proposed Accounting Standards Update (ASU) Leases (Topic 840) issued August 17, 2010, or any successor proposal.

1.7     Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

SECTION II.   AMOUNT AND TERMS OF COMMITMENTS

2.1   Commitments.

(a)      Subject to the terms and conditions hereof, to give effect to the satisfaction of the DIP Claims (as defined in the Restructuring Plan) in accordance with the Restructuring Plan, each Lender with an Initial Cashless Term Commitment as of the Closing Date shall (i) be automatically deemed to have made a Loan in Dollars to the Borrower on the Closing Date in an amount equal to the amount of the Initial Cashless Term Commitment of such Lender and (ii) be bound by the provisions of this Agreement as a Lender hereunder and shall have the obligations of a Lender hereunder by its acceptance of the benefits of this Agreement and the other Loan Documents, and be deemed to have executed and delivered this Agreement, regardless of whether such Lender has executed and delivered a signature page hereto.

(b)      Subject to the terms and conditions hereof, each Lender with an Initial Funded Term Commitment as of the Closing Date severally, and not jointly, agrees to make Loans denominated in Dollars to the Borrower on the Closing Date in an aggregate amount not to exceed such Lender's Initial Funded Term Commitment (if any).

(c)      On the Closing Date, the principal amount of all DIP Claims held by each Lender will automatically be deemed satisfied, compromised, settled, released and discharged in full pursuant to and in accordance with the Restructuring Plan.  After giving effect to the deemed funding of Loans pursuant to Section 2.1(a), the funding of Loans pursuant to Section 2.1(b) and the payment of discounts and premiums pursuant to Section 2.9(a), the aggregate outstanding principal amount of Loans shall be $[●].  The aggregate outstanding principal amount of the Loans for all purposes of this Agreement and the other Loan Documents shall be the stated principal amount thereof outstanding from time to time.  For the avoidance of doubt, the Commitments of each Lender shall be automatically and permanently reduced to $0 upon the making (or deemed making) of such  Lender's Loans pursuant to Section 2.1(a) and Section 2.1(b) on the Closing Date. Loans borrowed and repaid or prepaid may not be reborrowed.

2.2   Procedure for Borrowing, Conversions and Continuations of Loans.

(a)      Each Borrowing, each conversion of loans from one Type to the other, and each continuation of Loans shall be made upon irrevocable notice by the Borrower to the Administrative Agent.  Each such notice must be in writing and must be received by the Administrative Agent not later than  (i) 11:00 a.m. (New York City time) two Business Days prior to the requested date of (x) conversion of ABR Loans to, or continuation of, SOFR Loans, or (y) conversion of SOFR Loans to, or continuation of, ABR Loans (ii) 5:00 pm (New York City time) one Business Day prior to the requested date of any Borrowing of Loans on or after the Closing Date and (iii) 11:00 a.m. (New York City time) two Business Days for all other Borrowings (but not conversion) of Loans.  Each notice by the Borrower pursuant to this Section 2.2(a) shall be delivered to the Administrative Agent in the form of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower.  Each Borrowing of SOFR Loans shall be in a principal amount equal to $1,000,000 or a whole multiple of $1,000,000 in excess thereof. Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing, a conversion of Loans from one Type to the other or a continuation of SOFR Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which an existing Loans are to be converted and/or continued and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to ABR Loans. Any such automatic conversion of SOFR Loans to ABR Loans pursuant to the immediately

37

preceding sentence shall be effective as of the last day of the Interest Period then in effect with respect to such SOFR Loans.  If the Borrower requests a Borrowing of, conversion to, or continuation of SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month. No more than six Interest Periods among SOFR Loans shall be outstanding at any time.

(b)      Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its ratable share of the applicable Loans, and if no timely notice of a conversion or continuation of a SOFR Loan is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to ABR Loans or SOFR Loans with an Interest Period of one month, as applicable, described in Section 2.2(a).  Each Lender shall make (except with respect to the  Loans deemed to have been made on the Closing Date in respect of such Lender's Initial Cashless Term Commitment) the amount of its Loan available to the Administrative Agent in same day funds at the Funding Office not later than (i) 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Loan Notice for any Borrowing of SOFR Loans and (ii) 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Loan Notice for any Borrowing of ABR Loans.  Upon satisfaction of the applicable conditions set forth in Section 5.1, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Administrative Agent by the Borrower.

(c)      Conversions and continuations of Loans are also subject to the following terms: (i) each conversion or continuation shall be made pro rata among the applicable Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing; (ii) the Interest Periods and Types of any Loans that have been borrowed or issued on the same date shall at all times be identical, including with respect to any subsequent extensions or conversions thereof; (iii) each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Borrowing of such Lender resulting from such conversion, and accrued interest on any Term SOFR Loan (or a portion thereof) being converted shall be paid by the Borrower at the time of conversion; (iv) except as otherwise provided herein, a SOFR Loan may be continued or converted only on the last day of an Interest Period for such SOFR Loan unless the Borrower pays the amount due under Section 2.22 in connection therewith at the time of conversion; (v) any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Term SOFR Borrowing; (vi) any portion of a Term SOFR Borrowing that cannot be converted into or continued as a Term SOFR Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing; (vii) no Interest Period may be selected for any Term SOFR Borrowing that would end later than the scheduled Maturity Date occurring on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of the Term SOFR Borrowings with Interest Periods ending on or prior to the applicable date would not be at least equal to the principal amount of applicable Term SOFR Borrowings to be paid on such date; and (viii) during the existence of an Event of Default which is continuing, at the written election of the Required Lenders, no Loans may be requested as, converted to or continued as SOFR Loans.

2.3      Repayment of Loans. The Loans of each  Lender shall be payable in consecutive quarterly installments on the last Business Day of each March, June, September and December, commencing on [●], 2025, in an amount equal to one quarter of one percent (0.25%) of the stated principal amount of the Loans funded (and/or deemed to have been funded) on the Closing Date, with the remaining balance thereof payable on the Maturity Date.

2.4     [Reserved].

2.5     [Reserved].

2.6     [Reserved].

2.7     [Reserved].

2.8     Repayment of Loans.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender, the principal amount of each outstanding Loan of such Lender made (or deemed to have been made) to the Borrower in installments as set forth in Section 2.3 and on the Maturity Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8.1). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to the Borrower from time to time outstanding from the date made until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(b)(iv), in which shall be recorded (i) the amount of each Loan made hereunder and each Interest Period applicable thereto, (ii) the amount of any principal, interest and fees, as applicable, due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Sections 2.8(b) and 2.8(c) shall, to the extent permitted by applicable law, be presumptively correct absent demonstrable error of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of the Administrative Agent or any Lender to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.9     Fees and Premiums.

(a)     Upfront Payment. On the Closing Date, the Borrower shall pay to the Administrative Agent for the account of each applicable Lender holding Initial Funded Term Commitments, an upfront payment (the "Upfront Payment") in an amount equal to 5.50% of the aggregate principal amount of the Initial Funded Term Commitments on the Closing Date, which Upfront Payment shall be payable in the form of an increase in the principal amount of Loans owing to each such Lender as set forth on Schedule 2.9(a). For the avoidance of doubt, the Upfront Payment shall not be payable in respect of Initial Cashless Term Commitments.

(b)     The Borrower agrees to pay (i) to the Administrative Agent, for the account of each Agent, fees payable in the amounts and on the dates separately agreed upon in writing between the Borrower and such Agents, including pursuant to the Agent Fee Letter, and (ii) such other fees as

separately agreed upon in writing to be paid by the Borrower to the Lenders (after giving effect to clause (a) above).

(c)     All fees and premiums payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution to the applicable Agent for its own account.

(d)     For the avoidance of doubt, the parties hereto agree to treat, for U.S. federal and applicable state and local income tax purposes, any increase in the principal amount of Loans owing to any Lender under this Section 2.9 as "original issue discount".

2.10     [Reserved].

2.11     Optional Prepayments.

(a)     The Borrower may at any time and from time to time prepay the Loans (subject to Section 2.11(b) below), in whole or in part, without premium or penalty except as specifically provided in Section 2.19, upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, three Business Days prior thereto, which notice shall specify (x) the date and amount of prepayment and (y) whether the prepayment is of SOFR Loans or ABR Loans; provided, that if a SOFR Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Sections 2.21 and 2.22. Promptly following receipt of any such notice the Administrative Agent shall notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (provided, that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with accrued interest to such date on the amount prepaid. Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof, and in each case shall be subject to the provisions of Section 2.18.

(b)     In connection with any optional prepayments by the Borrower of the Loans pursuant to Section 2.11(a), such prepayment shall be applied to all then outstanding Loans on a pro rata basis.

2.12     Mandatory Prepayments.

(a)     Unless the Required Lenders shall otherwise agree, if any Indebtedness (excluding any Indebtedness permitted to be incurred in accordance with Section 7.2) shall be incurred by the Borrower or any Subsidiary, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied not later than one (1) Business Day after the date of receipt of such Net Cash Proceeds toward the prepayment of the Loans as set forth in Section 2.12(d).

(b)     Subject to the requirements of any Intercreditor Agreement then in effect (including with respect to ABL Priority Collateral pursuant to any ABL Intercreditor Agreement), unless the Required Lenders shall otherwise agree, if on any date the Borrower or any Subsidiary shall for its own account receive Net Cash Proceeds from any Asset Sale or Recovery Event with respect to any assets or Property (including, for the avoidance of doubt, any Intellectual Property licenses in respect thereof), then such Net Cash Proceeds shall be applied not later than [ten (10)] Business Days after such date toward the prepayment of the Loans as set forth in Section 2.12(d)[; provided that no prepayment shall be

40

required pursuant to this Section 2.12(b) with respect to such portion of such Net Cash Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest (or entered into a binding commitment or a binding letter of intent to reinvest) in accordance with Section 2.12(c).]

(c)     [With respect to any Net Cash Proceeds realized or received with respect to any Asset Sale or any Recovery Event, the Borrower or any Subsidiary, at its option, may reinvest all or any portion of such Net Cash Proceeds in assets useful for their business within (x) [[●] ([●])] following receipt of such Net Cash Proceeds or (y) if the Borrower or any Subsidiary enters into a legally binding commitment or a legally binding letter of intent to reinvest such Net Cash Proceeds within [[●] ([●])] following receipt thereof, within the later of (i) [[●] ([●])] following receipt thereof and (ii) [[●] ([●])] of the date of such legally binding commitment or legally binding letter of intent; provided that if any Net Cash Proceeds are no longer intended to be or cannot be so reinvested at any time after such reinvestment election, and subject to clauses (h) and (j) of this Section 2.12, an amount equal to any such Net Cash Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Cash Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Loans as set forth in this Section 2.12.][3]

(d)     Amounts to be applied in connection with prepayments of Loans pursuant to this Section 2.12 shall, subject to the requirements of any Intercreditor Agreement then in effect (including with respect to ABL Priority Collateral pursuant to any ABL Intercreditor Agreement), be applied to the prepayment of the Loans in accordance with Section 2.18 until all Loans are paid in full.  In connection with any mandatory prepayments by the Borrower of the Loans pursuant to this Section 2.12, such prepayments shall be applied on a pro rata basis to the then outstanding Loans being prepaid, and (to the extent required by the terms thereof) may be applied, along with such prepayments of Loans, to purchase, redeem or repay any other Indebtedness secured by the Collateral on a pari passu basis with the Liens securing the Obligations pursuant to one or more Other Intercreditor Agreements, pursuant to the agreements governing such other Indebtedness; provided that no such purchase, redemption or repayment of other Indebtedness may be made unless the Loans are also prepaid on a not less than pro rata basis with such other Indebtedness.  Each prepayment of the Loans under this Section 2.12 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid, any amounts owing pursuant to Section 2.22, and the Repayment Premium described in Section 2.19.

(e)     Notwithstanding anything to the contrary in Section 2.12 or 2.18, with respect to the amount of any mandatory prepayment pursuant to Section 2.12(b) or (c) (such amount, the "Term Prepayment Amount"), the Borrower may, in its sole discretion, in lieu of applying such amount to the prepayment of Loans as provided in paragraph (d) above, not later than 12:00 p.m. (New York City time) on the Business Day prior to the date specified in this Section 2.12 for such prepayment, give the Administrative Agent notice in writing requesting that the Administrative Agent provide to each Lender a notice (each, a "Prepayment Option Notice") as described below.  As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Lender a Prepayment Option Notice, which shall be in the form of Exhibit G (or such other form approved by the Administrative Agent and the Borrower), and shall include an offer by the Borrower to prepay, on the date (each a "Mandatory Prepayment Date") that is ten Business Days after the date of the Prepayment Option Notice, the Loans of such Lender by an amount equal to the portion of the Term Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Loans.  Each Lender may reject all or a portion of its Term Prepayment Amount by providing written notice to the Administrative Agent and the Borrower no later than 5:00 p.m. (New York City time) five

_____
[3] NTD: To discuss.

(5) Business Days after such Lender's receipt of the Prepayment Option Notice (which notice shall specify the principal amount of the Term Prepayment Amount to be rejected by such Lender) (such rejected amounts, collectively, the "Declined Amount"); provided, that any Lender's failure to so reject such Term Prepayment Amount shall be deemed an acceptance by such Lender of such Prepayment Option Notice and the amount to be prepaid in respect of Loans held by such Lender (each such Lender, an "Accepting Lender").  On the Mandatory Prepayment Date, the Borrower shall pay to the Accepting Lenders (A) the aggregate amount necessary to prepay that portion of the outstanding Loans in respect of which such Accepting Lenders have (or are deemed to have) accepted prepayment as described above and (B) concurrently with the prepayment described in the preceding clause (A), the Declined Amount on a pro rata basis among such Accepting Lenders.  To the extent that any Accepting Lender rejects all or any portion of its pro rata share of such Declined Amount, any such Declined Amount so rejected may be used by the Borrower for any purpose not prohibited by this Agreement.

(f)     [Reserved].

(g)     Notwithstanding any other provisions of this Section 2.12, (A) to the extent that any or all of the Net Cash Proceeds of any Asset Sale by a Foreign Subsidiary  (a "Foreign Asset Sale") or the Net Cash Proceeds of any Recovery Event with respect to a Foreign Subsidiary (a "Foreign Recovery Event"), in each case giving rise to a prepayment event pursuant to Section 2.12(b), are or is prohibited, restricted or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.12 but may be retained by the applicable Foreign Subsidiary so long, but only so long, as the applicable local law will not permit or restricts repatriation to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds will be promptly (and in any event not later than five (5) Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof including, without duplication, any repatriation costs associated with repatriation of such proceeds from the applicable recipient to the Borrower) to the repayment of the Loans in accordance with this Section 2.12 and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all of the Net Cash Proceeds of any Foreign Asset Sale or any Foreign Recovery Event derived from a Foreign Subsidiary could reasonably be expected to result in a material adverse tax consequence (taking into account any foreign tax credit or benefit, in the Borrower's reasonable judgment, expected to be realized in connection with such repatriation) with respect to such Net Cash Proceeds, the Net Cash Proceeds so affected may be retained by the applicable Foreign Subsidiary, provided, that, in the case of this clause (B), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to this Section 2.12, (x) the Borrower shall apply an amount equal to such Net Cash Proceeds to such reinvestments or prepayments as if such Net Cash Proceeds had been received by the Borrower rather than such Foreign Subsidiary, less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds had been repatriated (or, if less, the Net Cash Proceeds that would be calculated if received by such Foreign Subsidiary) or (y) such Net Cash Proceeds shall be applied to the repayment of Indebtedness of a Foreign Subsidiary, in each case, other than as mutually agreed by the Borrower and the Administrative Agent (acting on the instructions of the Required Lenders).

2.13     [Reserved].

2.14     [Reserved].

2.15    <u>Interest Rates and Payment Dates</u>.

(a)    The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin for ABR Loans *plus* the ABR, in each case, in effect from time to time.

(b)    The unpaid principal amount of each SOFR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin for SOFR Loans *plus* the Adjusted Term SOFR Rate.

(c)    Interest shall be payable by the Borrower in immediately available funds in arrears on each applicable Interest Payment Date, on each date a prepayment is made pursuant to <u>Section 2.11(a)</u> or required to be made pursuant to Section 2.12 and, in any event, on the Maturity Date, except with respect to interest payable pursuant to <u>Section 2.15(d)</u> which shall be payable in immediately available funds by the Borrower from time to time on demand; <u>provided</u> that, at the Borrower's election (and upon notice to the Administrative Agent (which may be delivered via email) at least two (2) Business Days prior to any Interest Payment Date), on any Interest Payment Date occurring on or prior to the first anniversary of the Closing Date, the Borrower shall pay-in-kind (in lieu of cash payment) all interest accrued from the immediately prior Interest Payment Date (or in the case of the first Interest Payment Date, accrued from the Closing Date) to such Interest Payment Date in respect of all Loans (the "<u>PIK Interest Amount</u>"), in which case, on and as of such Interest Payment Date, an amount equal to the PIK Interest Amount in respect of such Loans for such period shall be automatically capitalized and added to the then-outstanding principal amount of such Loans.

(d)    Upon the occurrence and during the continuance of an Event of Default, the principal amount of outstanding Loans, any fees and/or any other amount outstanding or payable by the Borrower or any other Loan Party hereunder shall automatically bear interest (after as well as before judgment) at a rate per annum (the "<u>Default Rate</u>") equal to (i) in the case of the principal amount of any Loan, 2.00% per annum plus the rate otherwise applicable to such Loan and (ii) in the case of any other amount, 2.00% per annum <u>plus</u> the rate applicable to ABR Loans, in each case, from the date of the occurrence of such Event of Default until no Event of Default is continuing or the Loans are paid in full. Such interest shall be payable in cash by the Borrower from time to time on demand.

2.16    <u>Computation of Interest and Fees</u>.

(a)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the ABR at times when the ABR is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable ABR, Adjusted Term SOFR Rate or Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct in the absence of demonstrable error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a) and Section 2.15(b).

2.17    <u>Alternate Rate of Interest</u>.

(a)     [Reserved].

(b)     If prior to the commencement of any Interest Period for a SOFR Borrowing:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted Term SOFR Rate for such Interest Period; or

(ii)     the Administrative Agent is advised by the Required Lenders that the Adjusted Term SOFR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or electronic means as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Committed Loan Notice that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a SOFR Borrowing shall be ineffective and such Borrowing shall be converted to or continued as on the last day of the Interest Period applicable thereto an ABR Borrowing, and (ii) if any Committed Loan Notice requests a SOFR Borrowing, such Borrowing shall be made as an ABR Borrowing.

(c)     Upon the occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document; provided that, solely if the Administrative Agent and the Borrower determine that (x) the Relevant Governmental Body has not made any selection or recommendation for a replacement benchmark rate or the mechanism for determining such a rate and (y) there is no evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark, so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.

(d)     In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right, in consultation with the Borrower, to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(e)     The Administrative Agent will promptly notify the Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event and its related Benchmark Replacement Date, (ii) the

implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of a Benchmark pursuant to clause (f) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.17, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.17.

(f)     At any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate any such previously removed tenor for Benchmark (including Benchmark Replacement) settings.

(g)     Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any request for a Borrowing of, conversion to or continuation of Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request for a SOFR Loan into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

(h)     Furthermore, if any Loan is outstanding on the date of the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period with respect to the rate applicable to such Loan, then on the last day of the Interest Period applicable to such Loan (or the next succeeding Business Day if such day is not a Business Day), such Loan shall be converted by the Administrative Agent to, and shall constitute an ABR Loan on such day.

2.18     Pro Rata Treatment and Payments.

(a)     Except as expressly otherwise provided herein (including as expressly provided in Sections 2.12, 2.20, 2.21, 2.24, 2.25, 10.5, 10.6 and 10.7), each payment (other than prepayments) in respect of principal or interest in respect of any Loans and each payment in respect of fees payable

45

hereunder with respect to the Loans shall be applied to the amounts of such obligations owing to the Lenders, pro rata according to the respective amounts then due and owing to such Lenders.

(b)     Each optional and mandatory prepayment of the Loans shall be allocated among the Loans then outstanding pro rata; provided, that any mandatory prepayment of Loans under Section 2.12(b) shall be subject to the opt-out provision under Section 2.12(e).

(c)     [Reserved].

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees, the Repayment Premium (if any) or otherwise, shall be made without setoff, deduction or counterclaim and shall be made prior to 3:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders and/or Agents, as applicable, at the Funding Office, in immediately available funds.  Any payment received by the Administrative Agent after 3:00 p.m., New York City time may be considered received on the next Business Day in the Administrative Agent's sole discretion.  The Administrative Agent shall distribute such payments to the relevant Lenders and/or Agents, as applicable, promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the SOFR Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be presumptively correct in the absence of demonstrable error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall give notice of such fact to the Borrower and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to SOFR Loans with an Interest Period of one month, on demand, from the Borrower. Nothing herein shall be deemed to limit the rights of the Administrative Agent or the Borrower against any Defaulting Lender.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder or under any other Loan Document that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the relevant Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the

Case 25-90088   Document 176   Filed in TXSB on 04/02/25   Page 63 of 253

Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.19    Repayment Premium. In the event that all or any portion of the Loans is repaid or prepaid or required to be repaid or prepaid in any manner and for any reason, whether pursuant to Section 2.11(a), Section 2.12(a), or Section 2.12(b), (excluding a replacement of a Lender pursuant to Section 2.24), on the Maturity Date or following acceleration of the Loans or otherwise, such prepayment or repayment shall be accompanied by a premium (the "Repayment Premium") in an amount equal to (a) at any time on or prior to the third anniversary of the Closing Date, the Applicable Premium and (b) at any time after the third anniversary of the Closing Date and on or prior to the fourth anniversary of the Closing Date, a premium equal to 1.00% *multiplied by* the aggregate principal amount of the Loans so prepaid or repaid or required to be repaid or prepaid. If the Loans are accelerated or otherwise become due prior to their Maturity Date, in each case as a result of an Event of Default (including the acceleration of claims by operation of law), the amount of principal of and premium on the Loans that becomes due and payable shall automatically equal 100% of the principal amount of the Loans *plus* the Repayment Premium as if such acceleration or other occurrence were a voluntary prepayment of the Loans or otherwise becoming due, and such Repayment Premium shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's loss as a result thereof. Any premium payable above shall be presumed to be the liquidated damages sustained by each Lender and the Borrower agrees that it is reasonable under the circumstances currently existing. THE BORROWER EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE APPLICABLE PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION. The Borrower expressly agrees (to the fullest extent it may lawfully do so) that: (A) the Repayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Repayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the Repayment Premium; and (D) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph and in Section 2.9 of this Agreement. For the avoidance of doubt, the parties hereto agree to treat, for U.S. federal and applicable state and local income tax purposes, any increase in the principal amount of Loans owing to any Lender under this Section 2.19 as "original issue discount." There shall be no Repayment Premium in the event that all or any portion of the Loans is repaid or prepaid or required to be repaid or prepaid in any manner and for any reason after the fourth anniversary of the Closing Date.

2.20    Taxes.

(a)    Except as otherwise required by law, all payments made by or on account of the Borrower or any Loan Party under this Agreement and the other Loan Documents to any Recipient under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes. If applicable law requires withholding or deduction of any Tax from any such payment, the Borrower, any other Loan Party or other withholding agent shall make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. If any Indemnified Taxes are required to be deducted or withheld from any such payments, the amounts so payable to the applicable Recipient shall be increased to the extent necessary so that after deduction or withholding of such Indemnified Taxes (including Indemnified Taxes

47

152254164_6

attributable to amounts payable under this Section 2.20(a)) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)      Without duplication of other amounts payable by the Borrower under this section, the Borrower or any Loan Party under this Agreement and the other Loan Documents shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      Whenever any Taxes are payable by the Borrower or any Loan Party under this Agreement or the other Loan Documents, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the Administrative Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower or Loan Party showing payment thereof if such receipt is obtainable, or, if not, such other evidence of payment as may reasonably be required by the Administrative Agent or such Lender.

(d)      The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes, including any amounts payable pursuant to this Section 2.20, payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any incremental Taxes and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered to the Borrower by a Recipient (with a copy to the Administrative Agent if applicable) shall be conclusive absent manifest error.

(e)      Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "Non-US Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) (A) (i) two accurate and complete copies of IRS Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, (ii) in the case of a Non-US Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit D and two accurate and complete copies of IRS Form W-8BEN or W-8BEN-E, or any subsequent versions or successors to such forms, in each case properly completed and duly executed by such Non-US Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on all payments by the Borrower or any Loan Party under this Agreement and the other Loan Documents, or (iii) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (i) and (ii) above, provided that if the Non-US Lender is a partnership, and one or more of the partners is claiming portfolio interest treatment, the certificate in the form of Exhibit D may be provided by such Non-US Lender on behalf of such partners) and (B) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made. Such forms shall be delivered by each Non-US Lender on or about the date it becomes a party to this Agreement (or, in the case of any Participant, on or about the date such Participant purchases the related participation). In addition, each Non-US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent. Each Non-US Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower and the Administrative Agent (or any other form of certification adopted by the United States taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this

paragraph that such Non-US Lender is not legally able to deliver provided that it shall promptly notify the Borrower and the Administrative Agent in writing of such inability.

(f)     [reserved]

(g)     Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "<u>US Lender</u>") shall deliver to the Borrower and the Administrative Agent two accurate and complete copies of IRS Form W-9, or any subsequent versions or successors to such form and certify that such Lender is not subject to backup withholding.  Such forms shall be delivered by each US Lender on or about the date it becomes a party to this Agreement.  In addition, each US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.  Each US Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certifications to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose).

(h)     If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this <u>Section 2.20</u> (including by the payment of additional amounts pursuant to this <u>Section 2.20</u>), it shall promptly pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid under this <u>Section 2.20</u>, with respect to the Indemnified Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u>, that such indemnifying party, upon the request of such Recipient, agrees to repay the amount paid over to the indemnifying party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority other than any such penalties, interest or other charges resulting from the gross negligence or willful misconduct of the relevant Recipient (as determined by a final and non-appealable judgment of a court of competent jurisdiction)) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority; <u>provided</u>, <u>further</u>, that such Recipient shall, at the indemnifying party's request, provide a copy of any notice of assessment or other evidence of the requirement to pay such refund received from the relevant Governmental Authority (provided that the Recipient may delete any information therein that it deems confidential). This paragraph shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person. In no event will any Recipient be required to pay any amount to an indemnifying party the payment of which would place such Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund of any Indemnified Taxes had never been paid.

(i)     [reserved]

(j)     If a payment made to a Lender under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that, if any, such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such

49

payment.  Solely for purposes of this Section 2.20(j), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(k)     To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting the provisions of this Section 2.20, each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c)(iii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (k).

(l)     The agreements in this Section 2.20 shall survive the termination of this Agreement and payment of the Loans and all other amounts payable under any Loan Document, the resignation of the Administrative Agent and any assignment of rights by, or replacement of, any Lender.

(m)     For purposes of this Section 2.20, for the avoidance of doubt, applicable law includes FATCA.

2.21     Indemnity.  Other than with respect to Taxes, which shall be governed solely by Section 2.20, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense (other than lost profits, including the loss of the interest rate margin) that such Lender actually sustains or incurs as a consequence of (a) any failure by the Borrower in making a borrowing of or continuation of SOFR Loans after the Borrower has given notice requesting the same in accordance with the provisions of this Agreement, (b) any failure by the Borrower in making any prepayment of SOFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment or continuation of SOFR Loans on a day that is not the last day of an Interest Period with respect thereto.  A reasonably detailed certificate as to (showing in reasonable detail the calculation of) any amounts payable pursuant to this Section 2.21 submitted to the Borrower by any Lender shall be presumptively correct in the absence of demonstrable error.  This covenant shall survive the termination of this Agreement and the payment of the Obligations.

2.22     Break Funding Payments.  In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow (other than due to the default of the relevant Lender), convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.24, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a SOFR Loan, such loss, cost or expense to any Lender shall be deemed to be the amount determined by such Lender (it being understood that the deemed amount shall not exceed the actual amount) to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had

50

such event not occurred, at the Term SOFR, as applicable, that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue a SOFR Loan, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for deposits in Dollars of a comparable amount and period from other banks in the eurocurrency market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.22 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

2.23    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the payment of additional amounts pursuant to Section 2.20(a) or Section 2.25 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) that would, in the Lender's judgment, avoid or minimize any amounts payable pursuant to such Sections (including by designating another lending office for any Loans affected by such event with the object of avoiding the consequences of such event); provided, that such designation is made on terms that, in the good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage or unreimbursed cost or expense; provided, further, that nothing in this Section 2.23 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.20(a) or Section 2.25. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation or assignment.

2.24    Replacement of Lenders.  The Borrower shall be permitted to replace with a financial entity or financial entities any Lender (each such Lender, a "Replaced Lender") that (i) requests reimbursement for amounts owing or otherwise results in increased costs imposed on the Borrower or on account of which the Borrower is required to pay additional amounts to any Governmental Authority, in each case, pursuant to Section 2.20, 2.21 or 2.25 (to the extent a request made by a Lender pursuant to the operation of Section 2.21 is materially greater than requests made by other Lenders) or gives a notice of illegality pursuant to Section 2.25(e), (ii) is a Disqualified Institution, (iii) has refused to consent to any waiver or amendment with respect to any Loan Document that requires such Lender's consent and has been consented to by the Required Lenders, or (iv) is a Defaulting Lender; provided, that, in the case of a replacement pursuant to clause (i) above:

(a)    such replacement does not conflict with any Requirement of Law;

(b)    the replacement financial entity or financial entities shall purchase, at par (which purchase price shall exclude, for the avoidance of doubt, any Repayment Premium), all Loans and other amounts owing to such Replaced Lender on or prior to the date of replacement;

(c)    the Borrower shall be liable to such Replaced Lender under Section 2.22 (as though Section 2.22 were applicable) if any SOFR Loan owing to such Replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto;

(d)    the replacement financial entity or financial entities, (x) if not already a Lender, an Affiliate of a Lender or an Approved Fund, shall be reasonably satisfactory to the Administrative Agent to the extent that an assignment to such replacement financial institution of the rights and obligations being acquired by it would otherwise require the consent of the Administrative Agent pursuant to Section 10.6(b)(i)(2) and (y) shall pay (unless otherwise paid by the Borrower) any processing and recordation fee otherwise required under Section 10.6(b)(ii)(2);

51

(e)     the Administrative Agent (solely with respect to providing its consent in accordance with the terms hereof), any replacement financial entity or entities and in accordance with the last paragraph of this Section 2.24, the Replaced Lender or the Borrower shall execute and deliver, and such Replaced Lender shall thereupon be deemed to have executed and delivered, an appropriately completed Assignment and Assumption to effect such substitution;

(f)     the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated;

(g)     in respect of a replacement pursuant to clause (iii) above, the replacement financial entity or financial entities shall consent to such amendment or waiver;

(h)     any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the Replaced Lender; and

(i)     in the case of any such replacement resulting from a requirement that the Borrower pay additional amounts pursuant to Section 2.20, 2.21 or 2.25, such replacement will result in a reduction in such payments thereafter.

In connection with any such replacement under this Section 2.24, if the Replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption and/or any other documentation necessary to reflect such replacement by the later of (x) the date on which the replacement Lender executes and delivers such Assignment and Assumption and/or such other documentation and (y) the date as of which all obligations of the Borrower owing to the Replaced Lender relating to the Loans and Commitments so assigned shall be paid in full to such Replaced Lender, then such Replaced Lender shall be deemed to have executed and delivered such Assignment and Assumption and/or such other documentation as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Replaced Lender, and the Administrative Agent shall record such assignment in the Register.

2.25     Requirements of Law; Illegality

(a)     Except with respect to Indemnified Taxes, Excluded Taxes and Other Taxes, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made, in each case, subsequent to the Closing Date:

(i)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by any office of such Lender that is not otherwise included in the determination of the Adjusted Term SOFR Rate hereunder;

(ii)     shall subject any Recipient to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liability or capital attributable thereto; or

(iii)     shall impose on such Lender any other condition not otherwise contemplated hereunder;

and the result of any of the foregoing is to increase the cost to such Lender or other Recipient, by an amount which such Lender or other Recipient reasonably deems to be material, of making, converting into, continuing or maintaining SOFR Loans (in each case hereunder), or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, in Dollars, within thirty (30) Business Days after the Borrower's receipt of a reasonably detailed invoice therefor (showing with reasonable detail the calculations thereof), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this <u>Section 2.25</u>, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have reasonably determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any entity controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority first made, in each case, subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such entity's capital as a consequence of its obligations hereunder to a level below that which such Lender or such entity could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such entity's policies with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor (consistent with the detail provided by such Lender to similarly situated borrowers), the Borrower shall pay to such Lender, in Dollars, such additional amount or amounts as will compensate such Lender or such entity for such reduction.

(c)     A certificate prepared in good faith as to any additional amounts payable pursuant to this <u>Section 2.25</u> submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of demonstrable error.  Notwithstanding anything to the contrary in this <u>Section 2.25</u>, the Borrower shall not be required to compensate a Lender pursuant to this <u>Section 2.25</u> for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; <u>provided</u>, that if the circumstances giving rise to such claim have a retroactive effect, then such 180-day period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this <u>Section 2.25</u> shall survive the termination of this Agreement and the payment of the Obligations. Notwithstanding the foregoing, the Borrower shall not be obligated to make payment to any Lender with respect to penalties, interest and expenses if written demand therefor was not made by such Lender within 180 days from the date on which such Lender makes payment for such penalties, interest and expenses.

(d)     Notwithstanding anything in this <u>Section 2.25</u> to the contrary, solely for purposes of this <u>Section 2.25</u>, (i) the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date.

(e)     Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case, first made after the Closing Date, shall make it unlawful for any Lender to make or maintain SOFR Loans as contemplated

by this Agreement, such Lender shall promptly give notice thereof to the Administrative Agent and the Borrower, and (a) the commitment of such Lender hereunder to make SOFR Loans, continue SOFR Loans as such and convert ABR Loans to SOFR Loans shall be suspended during the period of such illegality and (b) such Lender's Loans then outstanding as SOFR Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a SOFR Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Sections 2.21 and 2.22.

SECTION III.   [RESERVED]

SECTION IV.   REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants (as to itself and each of its Subsidiaries) to the Agents and each Lender, which representations and warranties shall be deemed made on the Closing Date after giving effect to the Restructuring Plan, the Confirmation Order and the Restructuring Transaction and on the date of each Borrowing of Loans hereunder that:

4.1     Financial Condition.

(a)     The audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at December 31, 2024, and the related statements of income, stockholders' equity and cash flows for the fiscal year ended on such date, reported on by and accompanied by [a [qualified][unqualified] (other than with respect to the effect of the events and conditions leading up to the filing of the Cases)] report from BDO USA, P.C., present fairly in all material respects the financial condition of the Borrower and its consolidated Subsidiaries as at such date and the results of their operations, their cash flows and their changes in stockholders' equity for the respective fiscal year then ended.  All such financial statements, including the related schedules and notes thereto and year-end adjustments, have been prepared in accordance with GAAP (except as otherwise noted therein).

(b)     The financial projections and estimates and information of a general economic nature prepared by or on behalf of the Borrower or any of its representatives, and that have been made available to any Lenders or the Administrative Agent in connection with the Facility or the other transactions contemplated hereby (i) have been prepared in good faith based upon assumptions believed by the Borrower to be reasonable as of the date thereof (it being understood that actual results may vary materially from such projections and estimates), as of the date such projections and estimates were furnished to the Lenders and as of the Closing Date, and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower.

4.2     No Change.  Since the Disclosure Statement Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

4.3     Existence; Compliance with Law.  Each of the Borrower and its Subsidiaries, (a) (i) is duly organized (or incorporated), validly existing and in good standing (or, only where applicable, the equivalent status in any foreign jurisdiction) under the laws of the jurisdiction of its organization or incorporation, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) has the corporate or other organizational power and authority, and the legal right, to own and operate its Property,

54

to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (iii) is duly qualified as a foreign corporation or other entity and in good standing (where such concept is relevant) under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except, in each case, to the extent that the failure to be so qualified or in good standing (where such concept is relevant) would not have a Material Adverse Effect and (b) is in compliance with all Requirements of Law except to the extent that any such failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

4.4    Corporate Power; Authorization; Enforceable Obligations.

(a)    Each Loan Party has the corporate or other organizational power and authority to execute and deliver, and perform its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.  Each Loan Party has taken all necessary corporate or other action to authorize the execution and delivery of, and the performance of its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    No consent or authorization of, filing with, or notice to, any Governmental Authority is required to be obtained or made by any Loan Party for the extensions of credit hereunder or such Loan Party's execution and delivery of, or performance of its obligations under, or validity or enforceability of, this Agreement or any of the other Loan Documents to which it is party, as against or with respect to such Loan Party, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) consents, authorizations, filings and notices the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (iii) the filings referred to in Section 4.17.

(c)    Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto.  Assuming the due authorization of, and execution and delivery by, the parties thereto (other than the applicable Loan Parties) and this Agreement constitutes, and each other Loan Document upon execution and delivery by each Loan Party that is a party thereto will constitute, a legal, valid and binding obligation of each such Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms (provided, that, with respect to the creation and perfection of security interests with respect to the Capital Stock of Foreign Subsidiaries, only to the extent enforceability thereof is governed by the Uniform Commercial Code or the Bankruptcy Code, as applicable), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing.

4.5    No Legal Bar.  Assuming the consents, authorizations, filings and notices referred to in Section 4.4(b) are obtained or made and in full force and effect, the execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties thereto, the borrowings hereunder and the use of the proceeds thereof will not (a) violate the organizational or governing documents of (i) the Borrower, or (ii) except as would not reasonably be expected to have a Material Adverse Effect, any other Loan Party, (b) violate any Requirement of Law binding on the Borrower or any of its Subsidiaries that would not reasonably be expected to have a Material Adverse Effect, (c) violate any material Contractual Obligation of the Borrower or any of its Subsidiaries or (d)

152254164_6

except as would not have a Material Adverse Effect, result in or require the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents).

4.6     No Material Litigation. Except for the Cases and as set forth on Schedule 4.6, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries or against any of their Properties which, taken as a whole, would reasonably be expected to have a Material Adverse Effect.

4.7     No Default.  No Default or Event of Default has occurred and is continuing.

4.8     Ownership of Property; Leasehold Interests; Liens.  Each of the Borrower and its Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all of its Real Property, and good title to, or a valid leasehold interest in, all of its other Property (other than Intellectual Property), in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and none of such Real Property or other Property is subject to any Lien, except as permitted by the Loan Documents.  Schedule 4.8 lists all Real Property owned in fee simple by any Loan Party as of the Closing Date.

4.9     Intellectual Property.  Each of the Borrower and its Subsidiaries owns, or has a valid license or right to use, all Intellectual Property necessary for the conduct of its business as currently conducted free and clear of all Liens, except as permitted by Section 7.3 and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  Neither the Borrower nor any of its Subsidiaries is infringing, misappropriating, diluting or otherwise violating any Intellectual Property rights of any Person in a manner that would reasonably be expected to have a Material Adverse Effect. No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened, which would reasonably be expected to have a Material Adverse Effect.  The Borrower and its Subsidiaries take all reasonable actions that should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.10     Taxes.  Each of the Borrower and its Subsidiaries (a) has filed or caused to be filed all federal, state, and other Tax returns that are required to be filed and (b) has paid or caused to be paid all taxes shown to be due and payable on said returns and all other taxes, fees or other charges imposed on it or on any of its Property by any Governmental Authority (other than (i) any returns or amounts that are not yet due or (ii) amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of the Borrower or such Subsidiary, as the case may be), except in each case where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.11     Federal Regulations.   No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for any purpose that violates the provisions of the regulations of the Board.

4.12     ERISA.

(a)     Except as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect:  (i) neither a Reportable Event nor a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA has occurred during

56

the five-year period prior to the date on which this representation is made with respect to any Single Employer Plan, and each Single Employer Plan has complied with the applicable provisions of ERISA and the Code; (ii) no termination of a Single Employer Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen on the assets of any Loan Party or any other Commonly Controlled Entity, during such five-year period; the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Single Employer Plan allocable to such accrued benefits; (iii) no Loan Party or any other Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA; (iv) no Loan Party or any other Commonly Controlled Entity would become subject to any liability under ERISA if such Loan Party or such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made; (v) no Multiemployer Plan is Insolvent or is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA); and (vi) no Foreign Plan Event has occurred during the five-year period prior to the date on which this representation is made with respect to any Foreign Plan, and each Foreign Plan has complied with the provisions of any applicable law.

(b)     The Borrower and its Subsidiaries have not incurred, and do not reasonably expect to incur, any liability under ERISA or the Code with respect to any Plan which is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that is maintained or contributed to by a Commonly Controlled Entity (other than the Borrower and its Subsidiaries) merely by virtue of being treated as a single employer under Title IV of ERISA with the sponsor of such plan that would reasonably be likely to have a Material Adverse Effect.

4.13    <u>Investment Company Act</u>.  No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

4.14    <u>Subsidiaries</u>.  <u>Schedule 4.14</u> sets forth a list of all of the Subsidiaries of the Borrower as of the Closing Date, together with the name and jurisdiction of incorporation of each such Subsidiary, the breakdown of ownership of each class of Capital Stock of such Subsidiary and whether any such Subsidiary is an Excluded Subsidiary.

4.15    <u>Environmental Matters</u>.  Other than exceptions to any of the following that would not reasonably be expected to have a Material Adverse Effect, to the knowledge of any Executive Officer, (A) none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law for the operation of the Business; or (ii) has become subject to any pending or threatened Environmental Liability and (B) to the Borrower's knowledge, there are no existing facts or circumstances (including any presence or Release of Materials of Environmental Concern at any Real Property or any real property formerly owned or operated by Borrower or its Subsidiaries) that are reasonably likely to give rise to any Environmental Liability of the Borrower or any of its Subsidiaries.

4.16    <u>Accuracy of Information, etc.</u> As of the Closing Date, no statement or written information (excluding the projections and <u>pro forma</u> financial information referred to below) contained in this Agreement, any other Loan Document or otherwise furnished to the Administrative Agent or the Lenders or any of them (in their capacities as such), by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, when taken as a whole, contained as of the date such statement, information or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the

statements contained herein or therein, in light of the circumstances under which they were made, not materially misleading.  As of the Closing Date, the projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

4.17    Security Documents.

(a)    The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under Article 9 of the UCC (including any proceeds of any such item of Collateral).

(b)    In the case of (i) the Pledged Securities described in any Security Document (other than Excluded Collateral), when any stock, shares or share certificates or notes, as applicable, representing such Pledged Securities are delivered to the Collateral Agent together with any proper indorsements executed in blank and such other actions have been taken with respect to the Pledged Securities of Foreign Subsidiaries as are required under the applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary and the terms of the relevant Security Document and (ii) the other Collateral described in the Security Documents (other than Excluded Collateral), when financing statements in appropriate form are filed in the offices specified in the Guarantee and Collateral Agreement and other filings are filed or registered, as applicable, in the applicable offices or system of registration (or, in the case of other Collateral not in existence on the Closing Date, such other offices or system of registration as may be appropriate) (which financing statements have been duly completed and executed (as applicable), filed and delivered to the Collateral Agent) and such other filings as are specified in the Guarantee and Collateral Agreement are made (or, in the case of other Collateral not in existence on the Closing Date, such other filings as may be appropriate), the Collateral Agent shall have a fully perfected first priority Lien (or, in the case of any ABL Priority Collateral following the Borrower's entry into an ABL Facility in accordance with this Agreement, a fully perfected second priority Lien) in such Collateral (including any proceeds of any item of such Collateral) described in the Security Documents to which the Collateral Agent is a party (to the extent a security interest in such Collateral can be perfected through the filing of such documents and financing statements in the offices specified in the Guarantee and Collateral Agreement (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) and the other filings specified in the Guarantee and Collateral Agreement (or, in the case of other Collateral not in existence on the Closing Date, such other filings or system of registration as may be appropriate), and through the delivery of the Pledged Securities required to be delivered pursuant to the ABL Intercreditor Agreement or any Other Intercreditor Agreement), as security for the Obligations, in each case prior in right to the Lien of any other Person (except (A) in the case of Collateral other than Pledged Securities that comprise stock of wholly-owned Subsidiaries, Liens permitted by Section 7.3 and (B) Liens having priority by operation of law) to the extent required by the Security Documents.

4.18    Solvency. As of the Closing Date, the Borrower and its Subsidiaries are (on a consolidated basis), and immediately after giving effect to the Reorganized Plan, the Confirmation Order and the Transactions (including the Restructuring Transaction) and immediately following the application of the proceeds of each Loan made (or deemed to have been made) on the Closing Date will be, Solvent.

152254164_6

4.19     Anti-Terrorism.  As of the Closing Date, the Borrower and its Subsidiaries are in compliance with the USA Patriot Act, except as would not reasonably be expected to have a Material Adverse Effect.

4.20     Use of Proceeds.  The Borrower will use the proceeds of the Loans solely in compliance with Section 6.9 of this Agreement.

4.21     Labor Matters.  Except as set forth on Schedule 4.21 or, in the aggregate, as would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower or such Subsidiary, as applicable.

4.22     [Reserved].

4.23     Sanctions Compliance. No Loan Party, to the knowledge of any Executive Officer, (i) is currently the target of any Sanctions or (ii) is located, organized or residing in any Designated Jurisdiction. To the knowledge of the Borrower, the Borrower and each its Subsidiaries (and all Persons acting on behalf of the Borrower and each of its Subsidiaries) is in material compliance with applicable Sanctions. No Loan, nor the proceeds from any Loan, has been or will be used by any Loan Party, directly or indirectly, to lend, contribute, provide or has been or will be otherwise made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the target of any Sanctions, or in any other manner that will, in each case, result in any violation by any party hereto (including any Lender or the Administrative Agent) of Sanctions.

4.24     Anti-Corruption Compliance.   To the knowledge of the Borrower, the Borrower and each of its Subsidiaries (and all Persons acting on behalf of the Borrower and each of its Subsidiaries) is in compliance with applicable Anti-Corruption Laws. No part of the proceeds of the Loans has been or will be used by the Borrower or its Subsidiaries, directly or indirectly, for any payments to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law.

SECTION V.   CONDITIONS PRECEDENT

5.1     Conditions to Closing Date.   The effectiveness of this Agreement and the agreement of each Lender to make the initial extension of credit requested to be made (or to be deemed to be made) by it on the Closing Date is subject to the satisfaction (or waiver), prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement; Guarantee and Collateral Agreement.   The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Borrower and (ii) the Guarantee and Collateral Agreement, executed and delivered by the Borrower and each Subsidiary Guarantor party thereto.

(b)     Representations and Warranties.   Each of the representations and warranties made by any Loan Party in or pursuant to any of the Loan Documents shall be true and correct in all

material respects (and in all respects if any such representation or warranty is already qualified by materiality or a Material Adverse Effect) on the Closing Date.

(c)    Borrowing Notice.  The Administrative Agent shall have received a Committed Loan Notice from the Borrower with respect to the Loans in accordance with Section 2.2.

(d)    Fees.  (i) The Borrower shall have paid all fees and premiums due and payable under the Restructuring Support Agreement and the Restructuring Plan, including all fees payable to the Administrative Agent, Collateral Agent or any Lender with respect to the Facility and separately agreed in writing with the Borrower and (ii) the Administrative Agent shall have received all fees and premiums due and payable on or prior to the Closing Date in respect of the Facility and, to the extent invoiced at least three (3) Business Days prior to the Closing Date (or such later date as the Borrower may reasonably agree), shall have been reimbursed for all reasonable and documented out-of-pocket expenses, including the reasonable fees, charges and disbursements of each of (x) McDermott Will & Emery LLP, counsel for the Administrative Agent and (y) the Ad Hoc Committee Advisors (as defined in the Restructuring Support Agreement), required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document; provided, in each case, that such fees may be net funded from the proceeds of the Loans.

(e)    The Administrative Agent and each Lender shall have received a customary executed legal opinion of Ropes & Gray LLP, counsel to the Loan Parties, dated as of the Closing Date, addressed to the Agents and the Lenders, and in form and substance reasonably satisfactory to the Required Lenders.

(f)    No Default.  No Default or Event of Default exists or has occurred and is continuing on the Closing Date or, after giving effect to this Agreement and the consummation of the Transactions, including the Borrowings, would result from the consummation of such Transactions.

(g)    Officer's Certificate.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in clauses (b), (f), and (p) of this Section 5.1.

(h)    Secretary Certificates.  The Administrative Agent shall have received certificates dated as of the Closing Date and executed by a Responsible Officer of each Loan Party, in form and substance satisfactory to the Required Lenders attaching thereto (i) a copy of the certificate or articles of incorporation or organization (or similar organizational document), including all amendments thereto, of each Loan Party, certified, if applicable, as of a recent date by the secretary of state of the state of its organization, and a certificate as to the good standing (or local equivalent) of each Loan Party (to the extent available in the relevant jurisdiction) as of a recent date, from such Secretary of State or similar Governmental Authority, (ii) a certificate of the Secretary, Assistant Secretary or another Responsible Officer of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or operating (or limited liability company) agreement (or similar governing document) of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, [(B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party, the transactions contemplated hereby and thereby and, in the case of the Borrower, the Borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect,] (C) that the certificate or articles of incorporation or formation of such Loan Party have not been amended since the date of the last amendment thereto shown on the documents furnished pursuant to clause (i) above, and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party, and (iii) a certificate

60

of another officer as to the incumbency and specimen signature of the Secretary, Assistant Secretary or another Responsible Officer executing the certificate pursuant to clause (ii) above

(i)        USA Patriot Act.  The Administrative Agent and the Lenders shall have received from the Borrower and each of the Loan Parties, at least two (2) Business Days prior to the Closing Date, all documentation and other information reasonably requested by the Administrative Agent and any Lender no less than seven (7) calendar days prior to the Closing Date that the Administrative Agent and any such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(j)        Filings.  Except as set forth on Schedule 6.10, there shall have been delivered to the Collateral Agent in proper form for filing each Uniform Commercial Code financing statement and each intellectual property security agreement to be filed with the U.S. Patent and Trademark Office and the U.S. Copyright Office, in each case as required by the Guarantee and Collateral Agreement in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein.

(k)        [Pledged Stock; Stock Powers.  Except as set forth on Schedule 6.10, the Collateral Agent, pursuant to the terms of the Security Documents, shall have received the certificates, if any, representing the shares of Pledged Stock held by the Loan Parties pledged pursuant to the Guarantee and Collateral Agreement and the other Security Documents, together with an undated stock power or share transfer instrument for each such certificate executed in blank by a duly authorized officer of the pledgor thereof.]

(l)        Lien Searches.  The Administrative Agent and the Lenders shall have received appropriate UCC search results or other relevant search certificates reflecting no Liens (other than Liens permitted pursuant to Section 7.3) encumbering the Collateral in each of the jurisdictions or offices in which UCC financing statements should be made to evidence perfected security interests in all Collateral.

(m)        Solvency Certificate.  The Administrative Agent shall have received a solvency certificate signed by the chief financial officer on behalf of the Borrower, substantially in the form of Exhibit E, after giving effect to the Transactions or, at the Borrower's option, a solvency opinion from an independent investment bank or valuation firm of nationally recognized standing.

(n)        Restructuring Plan Effective Date; Confirmation Order.  (i) All conditions precedent to the confirmation and occurrence of the Plan Effective Date, as set forth in the Restructuring Plan, shall have been satisfied or waived in accordance with the terms thereof, and (ii) Plan Effective Date shall have occurred (or occur contemporaneously with the Closing Date).

(o)        Equity Rights Offering.  The Equity Rights Offering (as defined in the Restructuring Plan) shall have been consummated on terms consistent in all respects with the Restructuring Support Agreement, and the Borrower shall have received gross proceeds in an amount no less than $30,000,000 from such Equity Rights Offering.

(p)        Material Adverse Effect.  Since the Disclosure Statement Date, there shall not have been a Material Adverse Effect.

(q)        Approvals.  The Borrower and the other Loan Parties shall have received all approvals, consents, licenses and permits required in connection with the Facility, which approvals, consents, licenses and permits remain in full force and effect.

(r)    <u>Financial Statements</u>.   The Administrative Agent and the Lenders shall have received (i) audited consolidated balance sheets and related statements of income and cash flows of the Borrower and its subsidiaries for the fiscal year ended December 31, 2024 and (ii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 30 days before the Closing Date.

(s)    <u>No Litigation</u>.   Other than the Chapter 11 Cases, as of the Closing Date, there shall not be any litigation, action, suit, investigation or other arbitral, administrative or judicial proceeding pending or known by a Loan Party to be threatened against any Loan Party drawing into question any transaction contemplated by the Loan Documents, or that could reasonably be expected to have a Material Adverse Effect on the Loan Parties and their Subsidiaries, taken as a whole.

(t)    <u>Restructuring Support Agreement</u>.  The Restructuring Support Agreement shall not have terminated with respect to the Consenting Senior Noteholders, and there shall be no defaults or termination rights thereunder that would permit the Required Consenting Senior Noteholders to terminate the Restructuring Support Agreement on such date or after the giving of notice, the lapse of time, or both, and such default has not been otherwise waived in accordance with the Restructuring Support Agreement; *provided* that this condition precedent shall not fail to have been satisfied to the extent the Company Parties terminate the Restructuring Support Agreement as to a Non-Supporting Senior Noteholder so long as the Consenting Senior Noteholders (excluding such Non-Supporting Senior Noteholder as to which the Restructuring Support Agreement has been terminated ) continue to hold or control at least two-thirds in principal amount of the then outstanding principal amounts of Senior Notes.

(u)    <u>Payment of DIP Claims</u>.   The Debtors shall have satisfied all DIP Claims in accordance with the Restructuring Plan (including through the issuance of the Loans).

(v)    <u>Business Plan</u>.   The Borrower shall have delivered a long-term business plan to the Administrative Agent, which business plan shall be in form and substance acceptable to the Required Lenders.

(w)    <u>Insurance</u>. To the extent such items can be delivered on or prior to the Closing Date after the exercise of commercially reasonable efforts, subject to the immediately succeeding paragraph, the Administrative Agent shall have received evidence of all insurance required to be maintained, and evidence that the Administrative Agent shall have been named as an additional insured and loss payee, as applicable, on all insurance policies covering loss or damage to Collateral and on all liability insurance policies as to which the Administrative Agent (at the direction of the Required Lenders) has reasonably requested to be so named.

To the extent that any of the items described in this <u>Section 5.1(w)</u> shall not have been received by the Administrative Agent notwithstanding the Borrower's use of its commercially reasonable efforts to provide same, delivery of such items shall not constitute a condition to effectiveness of this Agreement and the obligations of each Lender to make Loans hereunder, and the Borrower shall, instead, cause such items to be delivered to the Administrative Agent not later than 45 days following the Closing Date (or such later date as the Required Lenders shall agree in their discretion by notifying the Borrower by email).

SECTION VI.   AFFIRMATIVE COVENANTS

The Borrower (on behalf of itself and each of its Subsidiaries) hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to

any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), the Borrower shall, and shall cause (except in the case of the covenants set forth in <u>Section 6.1</u>, <u>Section 6.2</u> and <u>Section 6.7</u>) each of its Subsidiaries to:

6.1     <u>Financial Information</u>.  Furnish to the Administrative Agent for delivery to each Lender (which may be delivered via posting on the Platform):

(a)     within 120 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ended December 31, 2025, a copy of the unaudited consolidated balance sheets, income statements and statements of cash flow of the Borrower and its consolidated Subsidiaries as at the end of such year, setting forth, commencing with the financial statements with respect to the fiscal year ended December 31, 2025, in comparative form the figures as of the end of and for the previous year, reported on without qualification, exception or explanatory paragraph as to "going concern" or arising out of the scope of the audit [(but may contain a "going concern" explanatory paragraph or like qualification that is due to (i) the impending maturity of any Indebtedness, (ii) any anticipated inability to satisfy any financial covenant (including Section 7.15)] or (iii) any default with respect to any financial covenant (including <u>Section 7.15</u>)), certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes);[4]

(b)     within 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower (or 90 days after the end of the fiscal quarter ending [March 31], 2025), commencing with the fiscal quarter ending [March 31], 2025, the unaudited consolidated balance sheets, income statements and statements of cash flow of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the portion of the fiscal year through the end of such quarter, setting forth, in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes); and

(c)     not later than the tenth Business Day of the last month of each fiscal year and the fifth Business Day of every other month, commencing the second full calendar month after the Closing Date, a certificate of a Responsible Officer on behalf of the Borrower certifying the amount of Liquidity as of the last Business Day of the immediately preceding month.

All such financial statements shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein and except in the case of the financial statements referred to in <u>clause (b)</u>, for customary year-end adjustments and the absence of complete footnotes).  Any financial statements or other deliverables required to be delivered pursuant to this <u>Section 6.1</u> and any financial statements or reports required to be delivered pursuant to <u>clause (b)</u> of <u>Section 6.2</u> shall be deemed to have been furnished to the Administrative Agent on the date that (i) such financial statements or deliverable (as applicable) are posted on the SEC's website at www.sec.gov or the website for the Borrower and (ii) the Administrative Agent has been provided written notice of such posting.

Documents required to be delivered pursuant to this <u>Section 6.1</u> may also be delivered by posting such documents electronically and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on the Platform.

---

[4] NTD: Subject to review.

6.2    Certificates; Other Information.  Furnish to the Administrative Agent for delivery to each Lender (in each case, which may be delivered via posting on the Platform):

(a)    concurrently with the delivery of any financial statements pursuant to Section 6.1(a) or (b), commencing with delivery of financial statements for the first period ending after the Closing Date, (i) a Compliance Certificate of a Responsible Officer on behalf of the Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default that has occurred and is continuing except as specified in such certificate and (ii) to the extent not previously disclosed to the Administrative Agent, (x) a description of any Default or Event of Default that occurred, (y) a description of any new Subsidiary and of any change in the name or jurisdiction of organization of any Loan Party since the date of the most recent list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date) to the extent not previously disclosed pursuant to Section 6.8 and (z) solely in the case of financial statements delivered pursuant to Section 6.1(a) and (b), a listing of any registrations of or applications for Intellectual Property by any Loan Party filed since the last such report, together with a listing of any intent-to-use applications for trademarks or service marks for which a statement of use or an amendment to allege use has been filed since the last such report;

(b)    promptly after the same become publicly available, copies of all financial statements and material reports that the Borrower sends to the holders of any class of its publicly traded debt securities or public equity securities, in each case to the extent not already provided pursuant to Section 6.1 or any other clause of this Section 6.2;

(c)    promptly, such additional financial and other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary as the Administrative Agent (for its own account or upon the request from any Lender) may from time to time reasonably request to the extent such additional financial or other information is reasonably available to, or can be reasonably obtained by, the Borrower;

(d)    within a reasonable period following the delivery of any financial statements pursuant to Section 6.1, dial-in details in respect of a conference call with Lenders (which may be satisfied by a call with holders of the Borrower's publicly listed debt or equity securities attended by any Lender) and during which representatives from the Borrower will be available to discuss the details of the relevant financial statements and otherwise address additional matters in a manner consistent with the Borrower's past practice; and

(e)    not later than 120 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2025, a consolidated forecast for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income), which forecast shall be prepared in good faith on the basis of assumptions believed by the Borrower to be reasonable at the time of preparation of such forecast (it being understood that any projections contained therein are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond the control of the Loan Parties and that no assurance can be given that any particular projections will be realized, that actual results may differ and that such differences may be material).

Notwithstanding anything to the contrary in this Section 6.2, (a) none of the Borrower or any of its Subsidiaries will be required to disclose any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-

client or similar privilege or constitutes attorney work product or (iv) constitutes classified information and (b) unless such material is identified in writing by the Borrower as "Public" information, the Administrative Agent shall deliver such information only to "private-side" Lenders (i.e., Lenders that have affirmatively requested to receive information other than Public Information).

Documents required to be delivered pursuant to this Section 6.2 may be delivered by posting such documents electronically and if so posted, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website or (ii) on which such documents are posted on the Borrower's behalf on the Platform.

6.3     Payment of Taxes.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its Taxes, governmental assessments and governmental charges (other than Indebtedness), except (a) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves required in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be, or (b) to the extent that failure to pay or satisfy such obligations would not reasonably be expected to have a Material Adverse Effect.

6.4     Conduct of Business and Maintenance of Existence, etc.; Compliance with the Requirements of Law.  (a) Preserve and keep in full force and effect its corporate or other existence and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law (including ERISA, Environmental Laws, and the USA Patriot Act) except to the extent that failure to comply therewith would not reasonably be expected to have a Material Adverse Effect; provided, that with respect to Environmental Laws, none of the Borrower or any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.5     Maintenance of Property; Insurance.

(a)     Keep all Property useful and necessary in its business in reasonably good working order and condition, ordinary wear and tear excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)     Take all commercially reasonable steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar offices or agencies, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material Intellectual Property owned by the Borrower or its Subsidiaries, including filing of applications for renewal, affidavits of use and affidavits of incontestability.

(c)     Maintain insurance with financially sound and reputable insurance companies on all its material  Property that is necessary in, and material to, the conduct of business by the Borrower and its Subsidiaries, taken as a whole, in at least such amounts and against at least such risks as are usually insured against in the same general area by similar companies engaged in the same or a similar business, and use its commercially reasonable efforts to ensure that all such material insurance policies shall, to the extent customary (but in any event, not including business interruption insurance and personal injury insurance) name the Collateral Agent (or, in the case of any ABL Priority Collateral following the Borrower's entry into an ABL Facility in accordance with this Agreement, the collateral agent under the definitive documentation governing an ABL Facility) as an additional insured and loss payee/mortgagee.

6.6    <u>Inspection of Property; Books and Records; Discussions</u>.

(a)    Keep proper books of records and accounts in a manner to allow financial statements to be prepared in conformity with GAAP (or, with respect to Subsidiaries organized outside of the United States, the local accounting standards applicable to the relevant jurisdiction; <u>provided</u>, that, to the extent that any such Subsidiary is permitted to prepare financial statements in accordance with different local accounting standards, such Subsidiary shall continue to apply the local accounting standard applied as of the Closing Date (as such standard may be updated or revised from time to time and, for the avoidance of doubt, with any discretions, judgments and elections afforded by such local accounting standard, including any changes in the application of such discretions, judgments and elections as such Subsidiary shall determine) except to the extent of changes between local accounting standards required by applicable law or regulation).

(b)    Permit representatives designated by the Administrative Agent (at the direction of Required Lenders) to visit and inspect any of its properties and examine and make abstracts from any of its books and records upon reasonable notice and at such reasonable times during normal business hours (<u>provided</u>, that (i) such visits shall be limited to no more than one such visit per calendar year at each facility, and (ii) such visits by the Administrative Agent or its designee shall be at the Lenders' expense, except in the case of the foregoing <u>clauses (i)</u> and <u>(ii)</u> during the continuance of an Event of Default).

(c)    Permit representatives designated by the Administrative Agent (at the direction of Required Lenders) to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with officers of the Borrower and its Subsidiaries upon reasonable notice and at such reasonable times during normal business hours (<u>provided</u>, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions, (ii) such discussions shall be coordinated by the Administrative Agent, and (iii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default).

(d)    Permit representatives designated by the Administrative Agent (at the direction of Required Lenders) to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with its independent certified public accountants to the extent permitted by the internal policies of such independent certified public accountants upon reasonable notice and at such reasonable times during normal business hours (<u>provided</u>, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions and (ii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default).

Notwithstanding anything to the contrary in this <u>Section 6.6</u>, none of the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discuss, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information.

6.7    <u>Notices</u>.    Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, give notice to the Administrative Agent of:

(a)      the occurrence of any Default or Event of Default or any default, event of default or similar circumstance under any ABL Facility;

(b)      any litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Subsidiaries and any other Person, that in either case, would reasonably be expected to have a Material Adverse Effect;

(c)      the occurrence of any Reportable Event or Foreign Plan Event, where there is any reasonable likelihood of the imposition of liability on any Loan Party as a result thereof that would reasonably be expected to have a Material Adverse Effect;

(d)      any other development or event that has had or would reasonably be expected to have a Material Adverse Effect; and

(e)      any entry by the Borrower or any of its Subsidiaries into an ABL Facility, any amendment, restatement, amendment and restatement, modification, supplement or waiver of the terms thereof (which notice shall include a copy of the underlying documentation for the foregoing).

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth in reasonable detail the occurrence referred to therein and stating what action the Borrower or the relevant Subsidiary proposes to take with respect thereto.

6.8      Additional Collateral, etc.

(a)      [With respect to any Property (other than Excluded Collateral) located in the United States (or, with respect to Property of any Non-US Guarantor (if any), any Property (other than Excluded Collateral) located in the jurisdiction of formation of such Non-US Guarantor or any other jurisdiction in which such Non-US Guarantor has previously granted a security interest to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party) having a value, individually or in the aggregate, of at least $[1,000,000] acquired after the Closing Date by the Borrower or any Subsidiary Guarantor (other than (i) any interests in Real Property and any Property described in paragraph (c) or paragraph (d) of this Section 6.8, (ii) any Property subject to a Lien expressly permitted by Section 7.3(g) or 7.3(v), and (iii) Instruments, Certificated Securities, Securities and Chattel Paper, which are referred to in the last sentence of this paragraph (a)) as to which the Collateral Agent for the benefit of the Secured Parties does not have a perfected Lien, promptly (A) give notice of such Property to the Collateral Agent and execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Collateral Agent reasonably requests to grant to the Collateral Agent for the benefit of the Secured Parties a security interest in such Property and (B) take all actions reasonably requested by the Collateral Agent to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Loan Documents and with the priority required by Section 4.17) in such Property (with respect to Property of a type owned by the Borrower or any Subsidiary Guarantor as of the Closing Date to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in such Property as of the Closing Date), including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or any other Security Documents or by law or as may be reasonably requested by the Collateral Agent.  If any amount in excess of $[1,000,000] payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security, Security or Chattel Paper (or, if more than $[1,000,000] in the aggregate payable under or in connection with the Collateral shall become evidenced by Instruments, Certificated Securities, Securities or Chattel Paper), such Instrument, Certificated Security, Security or Chattel Paper shall be promptly

67

delivered to the Collateral Agent in accordance with the Security Documents indorsed in a manner reasonably satisfactory to Required Lenders (or, in the case of any Collateral that constitutes ABL Priority Collateral following the Borrower's entry into an ABL Facility in accordance with this Agreement, delivered to the collateral agent under the definitive documentation governing an ABL Facility pursuant to the terms of an ABL Intercreditor Agreement).][5]

(b)        [Reserved].

(c)        Subject to clause (f) below, with respect to (x) any new Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any Subsidiary that was previously an Excluded Subsidiary that becomes a Non-Excluded Subsidiary) by the Borrower or any Subsidiary Guarantor or (y) any other Subsidiary that the Borrower elects to designate as not constituting an "Excluded Subsidiary" pursuant to clause (y) of the proviso to the definition thereof, promptly, and in any event within thirty (30) calendar days:

(i)        give notice of such acquisition, creation or designation to the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other documents as are required to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary that is owned by the Borrower or such Subsidiary Guarantor (as applicable);

(ii)        deliver to the Collateral Agent pursuant to the terms of the Security Documents, the certificates, if any, representing such Capital Stock (other than Excluded Collateral), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Subsidiary Guarantor (as applicable); and

(iii)        cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and (B) to take such actions reasonably necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Subsidiary (to the extent the Collateral Agent, for the benefit of the Secured Parties, has or should have a perfected security interest in the same type of Collateral as of the Closing Date), including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be reasonably requested by the Collateral Agent.

[Without limiting the foregoing, if the aggregate Consolidated Total Assets [(excluding any intercompany assets)] or annual consolidated revenues [(excluding any intercompany revenues)] of any individual Non-Guarantor Subsidiary shall at any time exceed 10.0% of Consolidated Total Assets [(excluding any intercompany assets)] or 10.0% of annual consolidated revenues [(excluding any intercompany revenues)], respectively, of the Borrower and its Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), the Borrower shall promptly, to the extent not already effected and to the extent such obligation is not waived by Administrative Agent (acting at the direction of the Required Lenders), (A) cause each affected Subsidiary to take such actions to become a "Subsidiary Guarantor" hereunder and under the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments referred to in this paragraph (c) to the extent such affected Subsidiary is not otherwise an Excluded Subsidiary and (B) cause the owner of the Capital Stock of such affected Subsidiary to take such reasonable actions to pledge such Capital Stock to the extent required by, and

---

[5] NTD: Subject to ongoing review.

otherwise in accordance with, the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments required hereby and thereby unless such Capital Stock otherwise constitutes Excluded Collateral.]

(d)      With respect to any new first-tier Foreign Subsidiary created or acquired after the Closing Date by the Borrower or any Subsidiary Guarantor, promptly (i) give notice of such acquisition or creation to the Collateral Agent and execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement as are required to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary (other than any Excluded Collateral) that is owned by the Borrower or such Subsidiary Guarantor (as applicable) and (ii) deliver to the Collateral Agent pursuant to the terms of the Security Documents the certificates, if any, representing such Capital Stock (other than any Excluded Collateral), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Subsidiary Guarantor (as applicable).

(e)      Notwithstanding anything in this Section 6.8 or any Security Document to the contrary, (i) none of the Borrower or any of its Subsidiaries shall be required to take any actions in order to create or perfect the security interest in the Collateral granted to the Collateral Agent for the benefit of the Secured Parties under the laws of any jurisdiction outside the United States (unless, in the case of any Non-US Guarantor, such jurisdiction is the jurisdiction of organization for such Non-US Guarantor or such Non-US Guarantor has previously granted a security interest in such jurisdiction to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party), (ii) no control agreement shall be required with respect to any Excluded Account and (iii) no Liens shall be required to be pledged or created with respect to any of the following (collectively, the "Excluded Collateral"):

(i)      (x) motor vehicles or other assets subject to certificates of title or (y) any "intent-to-use" application for registration of a trademark or service mark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(ii)      any property or asset to the extent that such grant of a security interest is prohibited or effectively restricted by any applicable law (only so long as such prohibition exists) or requires a consent not obtained of any Governmental Authority pursuant to such applicable laws (only so long as such consent requirement exists);

(iii)      any Excluded Accounts and any Excluded Equity Securities;

(iv)      the property and assets of the Excluded Subsidiaries;

(v)      (w) any assets owned on or acquired after the Closing Date, to the extent that, and only for so long as, taking such actions would violate applicable law or regulation (after giving effect to Section 9-406(d), 9-407(a), 9-408 or 9-409 of the Uniform Commercial Code and other applicable law), (x) any assets acquired before or after the Closing Date, to the extent that and for so long as such grant would violate an enforceable contractual obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on

69

such assets in contemplation or in connection with the acquisition of such assets, (y) any assets (1) owned on the Closing Date or (2) acquired after the Closing Date, in each case in this clause (y), securing Indebtedness of the type permitted pursuant to Section 7.2(c) (or Section 7.2(d) or 7.2(u) if such Indebtedness is of the type that is contemplated by Section 7.2(c)) that is secured by a Lien permitted by Section 7.3 so long as the documents governing such Lien do not permit the pledge of such assets to the Collateral Agent, or (z) any lease, license or other agreement, any asset embodying rights, priorities or privileges granted under such leases, licenses or agreements, or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate, breach or invalidate such lease, license or agreement or purchase money arrangement or create a right of acceleration, modification, termination or cancellation in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or applicable law, other than proceeds and receivables thereof, and only for so long such prohibition exists and to the extent such prohibition was not creation in contemplation of such grant; and

(vi)    (x) any assets to the extent a security interest in such assets would reasonably be expected to result in material adverse tax consequences (including as a result of Section 956 of the Code or any related provision) to the Borrower and their respective Subsidiaries, taken as a whole, as agreed by the Borrower and the Required Lenders, or (y) any assets as to which the Required Lenders and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein outweigh the value of the security afforded thereby.

(f)    From time to time the Loan Parties shall execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Collateral Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of continuing the rights of the Secured Parties with respect to the Collateral as to which the Collateral Agent, for the benefit of the Secured Parties, has or should have a perfected Lien pursuant hereto or thereto, including filing any financing or continuation statements or financing statement amendments under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created thereby. Notwithstanding the foregoing, the provisions of this Section 6.8 shall not apply to assets as to which the Required Lenders and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the value of the security afforded thereby.  The Administrative Agent (at the direction of the Required Lenders) may grant extensions of time or waivers of requirement for the creation or perfection of security interests in or the obtaining of insurance (including title insurance) or surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where the Required Lenders reasonably determine, in consultation with the Borrower, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Loan Documents.

(g)    Notwithstanding the foregoing, to the extent any new Subsidiary is created solely for the purpose of consummating a merger transaction pursuant to an acquisition permitted by Section 7.7, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it substantially contemporaneously with the closing of such merger transaction, such new Subsidiary shall not be required to take the actions set forth in Section 6.8(c) or 6.8(d), as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective merger transaction shall be required to so comply within ten (10) Business Days (or such longer period as the Administrative Agent shall agree, at the direction of the Required Lenders)).

6.9     Use of Proceeds.  The proceeds of (i) the Loans deemed to have been made on the Closing Date pursuant to Section 2.1(a) shall be used to effect the Transactions in accordance with the Restructuring Plan, including to satisfy the DIP Claims (as defined in the Restructuring Plan), and (ii) the Loans funded on the Closing Date pursuant to Section 2.1(b) shall be used to make payments and distributions under the Restructuring Plan, to pay the Transaction Costs and for general corporate purposes of the Borrower and its Subsidiaries not otherwise prohibited by this Agreement.

6.10     Post-Closing.  Satisfy the requirements set forth on Schedule 6.10, on or before the date set forth opposite such requirements or such later date as consented to by the Required Lenders in their reasonable discretion, which consent may be provided via electronic mail from the Administrative Agent (acting at the direction of the Required Lenders).

6.11     Line of Business.  Continue to operate solely as a Permitted Business.

6.12     Changes in Jurisdictions of Organization; Name.  Provide prompt written notice to the Collateral Agent of any change of name or change of jurisdiction of organization of any Loan Party, and deliver to the Collateral Agent all additional executed financing statements, financing statement amendments and other documents required or reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests to the extent provided for in the Security Documents.

6.13     Additional Beneficial Ownership Certification.  At least five (5) days prior to any Person becoming a Borrower, if requested by any Lender, the Borrower (including, for the avoidance of doubt, any Successor Borrower) shall cause any such Person that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and has not previously delivered a Beneficial Ownership Certification to deliver a Beneficial Ownership Certification to the Administrative Agent and the Lenders.

## SECTION VII.  NEGATIVE COVENANTS

The Borrower hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), the Borrower shall not, and shall not permit any of its Subsidiaries to:

7.1     [Reserved].

7.2     Indebtedness.  Create, issue, incur, assume, or permit to exist any Indebtedness, except:

(a)     Indebtedness of the Borrower and any of its Subsidiaries pursuant to this Agreement and any other Loan Document;

(b)     unsecured Indebtedness of the Borrower or any of its Subsidiaries owing to the Borrower or any of its Subsidiaries, provided, that any such Indebtedness owing by a non-Loan Party to a Loan Party is permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof);

(c)     (i) Capital Lease Obligations, and Indebtedness of the Borrower or any of its Subsidiaries incurred to finance or reimburse the cost of the acquisition, development, construction, purchase, lease, repair, addition or improvement of any property (real or personal), equipment or other assets used or useful in a Permitted Business, whether such property,

equipment or assets were originally acquired directly or as a result of the purchase of any Capital Stock of any Person owning such property, equipment or assets, in an aggregate outstanding principal amount for this clause (i) not to exceed $[●] (inclusive of the Capital Lease Obligations existing on the Closing Date and listed on Schedule 7.2(c); and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (c)(i) above;

(d)     (i) Indebtedness outstanding or incurred pursuant to facilities outstanding on the Closing Date up to the aggregate principal amounts listed on Schedule 7.2(d) and (ii) any Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (d)(i) above;

(e)     Guarantee Obligations (i) by the Borrower or any of its Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor not prohibited by this Agreement to be incurred; provided that any Subsidiary that is not a Subsidiary Guarantor providing such Guarantee Obligations with respect to Indebtedness of the Borrower in reliance on this clause (e) shall also provide a Guarantee with respect to the Obligations on a pari passu basis, (ii) by the Borrower or any Subsidiary Guarantor of obligations of any Non-Guarantor Subsidiary or joint venture or other Person that is not a Subsidiary to the extent permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof), (iii) by any Non-Guarantor Subsidiary of obligations of any other Non-Guarantor Subsidiary; and (iv) by any Non-Guarantor Subsidiary of the obligations of any other Person that is not a Subsidiary to the extent permitted by Section 7.2 (other than by reference to Section 7.2 or any clause thereof);

(f)     Indebtedness of the Borrower or any of its Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is promptly repaid;

(g)     (i) Indebtedness of the Borrower or any other Loan Party in an aggregate principal amount (for the Borrower and all such Loan Parties) not to exceed $1,000,000 at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (g)(i) above; [provided that amounts incurred under this Section 7.2(g) in respect of Indebtedness for Borrowed Money may only be secured by Collateral on a junior secured basis to the Liens securing the Obligations pursuant to Section 7.3(g);][6]

(h)     (i) Indebtedness of Non-Guarantor Subsidiaries that are Foreign Subsidiaries under local bilateral credit facilities for working capital and general corporate purposes, in an aggregate principal amount not to exceed $1,000,000 at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (h)(i);

(i)     Indebtedness of the Borrower or any of its Subsidiaries in respect of workers' compensation claims, bank guarantees, warehouse receipts or similar facilities, property casualty or liability insurance, take-or-pay obligations in supply arrangements, self-insurance obligations, performance, bid, customs, government, VAT, duty, tariff, appeal and surety bonds, completion guarantees, and other obligations of a similar nature, in each case in the ordinary course of business;

---

[6] NTD:  Subject to review.

(j)      Indebtedness incurred by the Borrower or any of its Subsidiaries arising from agreements providing for indemnification related to sales, leases or other Dispositions of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or Disposition of any business, assets or Subsidiary, in each case in the ordinary course of business;

(k)      Indebtedness of the Borrower or any Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business or otherwise consistent with industry practice;

(l)      Indebtedness (i) owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business and (ii) in the form of pension and retirement liabilities not constituting an Event of Default, to the extent constituting Indebtedness;

(m)      (i) Guarantee Obligations made in the ordinary course of business; provided, that such Guarantee Obligations are not of Indebtedness for Borrowed Money, (ii) Guarantee Obligations in respect of lease obligations of the Borrower and its Subsidiaries in the ordinary course of business, (iii) Guarantee Obligations in respect of Indebtedness of joint ventures, (iv) Guarantee Obligations in respect of Indebtedness permitted by clause (l)(ii) above and (v) Guarantee Obligations by the Borrower or any of its Subsidiaries of any Subsidiary's purchase obligations under supplier agreements and in respect of obligations of or to customers, distributors, franchisees, lessors, licensees and sublicensees; provided, that all Guarantee Obligations under this clause (m) are not of Indebtedness for Borrowed Money and are incurred in the ordinary course of business;

(n)      Indebtedness representing deferred compensation or stock-based compensation to employees of the Borrower or any Subsidiary incurred in the ordinary course of business;

(o)      Indebtedness (and Guarantee Obligations in respect thereof) in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(p)      Indebtedness of the Borrower or any of its Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary or joint venture in the ordinary course of business;

(q)      Indebtedness to any Person (other than an Affiliate of the Borrower) in respect of the undrawn portion of the face amount of or unpaid reimbursement obligations in respect of letters of credit not issued under any ABL Facility for the account of the Borrower or any of its Subsidiaries in an aggregate amount at any one time outstanding not to exceed $500,000;

(r)      Indebtedness in the form of earn-outs, indemnification, incentive, non-compete, consulting, ordinary course deferred purchase price, purchase price adjustment or other similar arrangements and other contingent obligations in respect of the Transactions and other acquisitions or Investments permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof) (both before or after any liability associated therewith becomes fixed);

(s)      [reserved];

(t)       Indebtedness supported by a letter of credit issued under any ABL Facility permitted under this Section 7.2, including in respect of unpaid reimbursement obligations relating thereto, in a principal amount not to exceed the stated amount of such letter of credit;

(u)       (i) Indebtedness of any Person that becomes a Subsidiary or is merged with or into the Borrower or any of its Subsidiaries after the Closing Date (a "New Subsidiary") or that is associated with assets being purchased or otherwise acquired, in each case, as part of an acquisition, merger or consolidation or amalgamation or other Investment not prohibited hereunder; *provided* that (x) such Indebtedness exists at the time such Person becomes a Subsidiary or is acquired, merged, consolidated or amalgamated by, with or into the Borrower or such Subsidiary or when such assets are acquired and is not created in contemplation of or in connection with such transaction (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such transaction), and (y) none of the Borrower or any of its Subsidiaries (other than the applicable New Subsidiary and its Subsidiaries) shall provide security or any guarantee therefor, and (ii) Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (u)(i) above;

(v)       (i) Indebtedness incurred to finance any acquisition or Investment permitted under Section 7.7 to the extent (A) unsecured at all times during the term of this Agreement and (B) in an aggregate principal amount for all such Indebtedness under this clause (v)(i) not to exceed $1,000,000 and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (v)(i) above;

(w)       Indebtedness issued by the Borrower or any of its Subsidiaries to the officers, directors and employees of the Borrower or any Subsidiary of the Borrower or their respective estates, trusts, family members or former spouses, in lieu of or combined with cash payments, to finance the purchase of Capital Stock of the Borrower, in each case, to the extent such purchase is permitted by Section 7.6;

(x)       (i) Indebtedness of the Borrower and any Subsidiary Guarantor under an ABL Facility and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (x)(i) above;

(y)       (i) unsecured Indebtedness of the Borrower or any Subsidiary Guarantor not to exceed $5,000,000; provided that (w) such Indebtedness is subordinated in right of payment to the Obligations, (y) the maturity date of such Indebtedness shall not be earlier than 91 days after the Maturity Date in effect at the time such Indebtedness is incurred and (z) such Indebtedness shall not require the payment of cash interest prior to the Maturity Date in effect at the time such Indebtedness is incurred and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (y)(i) above;

(z)       all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations described in clauses (a) through (y) above.

To the extent that any Indebtedness incurred under Section 7.2(c), (d), (g), (h), (u), (v) or (y) is refinanced in a Permitted Refinancing under clause (ii) of the relevant foregoing Section, then the aggregate outstanding principal amount of such Permitted Refinancing shall be deemed to utilize the related dollar basket under the relevant foregoing Section on a dollar for dollar basis.  Any ABL Facility and any Permitted Refinancing thereof shall only be permitted to be incurred under Section 7.2(x). The Obligations under the Loan Documents shall only be permitted to be incurred under Section 7.2(a).

7.3     Liens.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)     Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings; provided, that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, to the extent required by GAAP;

(b)     landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or that are being contested in good faith by appropriate proceedings;

(c)     (i) pledges, deposits or statutory trusts in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens incurred in the ordinary course of business securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries in respect of such obligations;

(d)     deposits and other Liens to secure the performance of bids, government, trade and other similar contracts (other than for Indebtedness for Borrowed Money), leases, subleases, statutory or regulatory obligations, surety, judgment and appeal bonds, performance bonds and other obligations of a like nature and liabilities to insurance carriers incurred in the ordinary course of business;

(e)     (i) Liens and encumbrances shown as exceptions in any title insurance policies insuring any mortgages, and (ii) easements, zoning restrictions, rights-of-way, leases, licenses, covenants, conditions, restrictions and other similar encumbrances, in each case with respect to Real Property, incurred in the ordinary course of business that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     Liens (i) in existence on the Closing Date after giving effect to the Transactions and listed on Schedule 7.3(f) and securing Indebtedness permitted by Section 7.2(c), and (ii) created after the Closing Date in connection with any refinancing, refundings, renewals or extensions thereof permitted by Section 7.2(d)(ii); provided that no such Lien is extended to cover any additional Property of the Borrower or any of its Subsidiaries after the Closing Date unless such Lien utilizes a separate basket under this Section 7.3;

(g)     (i) Liens securing Indebtedness of the Borrower or any of its Subsidiaries incurred pursuant to Sections 7.2(c), (d), (e), (f), (g), (h), (k), (l), (m) and (u); provided, that (A) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(h), such Liens do not at any time encumber any Property of the Borrower or any Subsidiary Guarantor, (B) in the case of any such Liens securing Indebtedness incurred pursuant to Section 7.2(l), such Liens do not encumber any Property other than cash paid to any such insurance company in respect of such insurance, (C) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(u)(i), such Liens exist at the time that the relevant Person becomes a Subsidiary or such assets are acquired and are not created in contemplation of or in connection with such Person becoming a Subsidiary or the acquisition of such assets (except to the extent such Liens secure Indebtedness which refinanced other secured Indebtedness to facilitate such Person becoming a Subsidiary or to facilitate the merger, consolidation or amalgamation or other acquisition of assets referred to in such Section 7.2(u)(i)), (D) in the case of Liens securing Guarantee Obligations pursuant to Section 7.2(e), the underlying obligations are secured by a Lien permitted to be incurred pursuant to this Agreement, and (E) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(g), such Indebtedness may only be secured by the Collateral on a junior basis with the Liens securing the Obligations, and no such Liens shall apply to any other Property of the Borrower or any of

75

its Subsidiaries that is not Collateral, and (ii) any extension, refinancing, renewal or replacement of the Liens described in clause (i) of this Section 7.3(g) in whole or in part; provided, that such extension, renewal or replacement shall be limited to all or a part of the property which secured (or was permitted to secure) the Lien so extended, renewed or replaced (plus improvements on such property, if any);

(h)     Liens created pursuant to the Loan Documents or any other Lien securing all or a portion of the Obligations or any obligations in respect of a Permitted Refinancing thereof in accordance with Section 7.2;

(i)     Liens arising from judgments in circumstances not constituting an Event of Default under Section 8.1(h);

(j)     (i) Liens on Property of Non-Guarantor Subsidiaries securing Indebtedness or other obligations not prohibited by this Agreement to be incurred by such Non-Guarantor Subsidiaries, in each case in the ordinary course of business and not exceeding $1,000,000  and (ii) Liens securing Indebtedness or other obligations of the Borrower or any of its Subsidiaries in favor of any Loan Party;

(k)     receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(l)     Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods;

(m)     Liens arising out of consignment or similar arrangements for the sale by the Borrower and its Subsidiaries of goods through third parties in the ordinary course of business or otherwise consistent with past practice;

(n)     Liens deemed to exist in connection with Investments permitted by Section 7.7(b) that constitute repurchase obligations;

(o)     Liens upon specific items of inventory, equipment or other goods and proceeds of the Borrower or any of its Subsidiaries arising in the ordinary course of business securing such Person's obligations in respect of bankers' acceptances and letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory, equipment or other goods;

(p)     Liens securing Hedge Agreements of the Borrower and its Subsidiaries in an aggregate amount not to exceed $[●] at any time outstanding entered into in the ordinary course of business for their respective operating requirements or of hedging interest rate or currency exposure, and not for speculative purposes;[7]

(q)     any interest or title of a lessor under any leases or subleases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and any financing statement filed in connection with any such lease;

(r)     (i) Liens that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness in the ordinary course of business, (B) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of

_____

[7] NTD: To discuss.

business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with distributors, clients, customers, vendors or suppliers of the Borrower or any of its Subsidiaries in the ordinary course of business, (ii) other Liens securing cash management obligations in the ordinary course of business and (iii) Liens encumbering reasonable and customary initial deposits and margin deposits in respect of, and similar Liens attaching to, commodity trading accounts and other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(s)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(t)     Liens on Capital Stock in joint ventures and other non-wholly owned entities securing obligations of such joint venture or entity and options, put and call arrangements, rights of first refusal and similar rights relating to Capital Stock in joint ventures and other non-wholly owned entities;

(u)     Liens securing obligations incurred in the ordinary course of business in respect of trade-related letters of credit permitted under Section 7.2 and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(v)     other Liens with respect to obligations the principal amount of which do not exceed $1,000,000 at any time outstanding;

(w)     non-exclusive licenses, sublicenses, and cross-licenses of Intellectual Property granted by the Borrower or any of its Subsidiaries in the ordinary course of business consistent with past practice, which do not interfere in any material respect with the conduct of the business of the Borrower or such Subsidiary;

(x)     Liens arising from precautionary UCC financing statement filings (or other similar filings in non-U.S. jurisdictions) regarding leases, subleases, licenses or consignments, in each case, entered into by the Borrower or any of its Subsidiaries;

(y)     (i) zoning or similar laws or rights reserved to or vested in any Governmental Authority to control or regulate the use of any real property and (ii) Liens in favor of the United States of America for amounts paid by the Borrower or any of its Subsidiaries as progress payments under government contracts entered into by them (provided, that no such Lien described in this clause (ii) shall encumber any Collateral);

(z)     Liens on cash deposits in respect of Indebtedness permitted under Section 7.2(p); provided, that the amount of any such deposit does not exceed 103% of the amount of the Indebtedness such cash deposits secures;

(aa)     Liens on inventory or equipment of the Borrower or any Subsidiary granted in the ordinary course of business to the Borrower's or such Subsidiary's (as applicable) distributor, vendor, supplier, client or customer at which such inventory or equipment is located;

(bb)     Liens on Property or assets acquired pursuant to an acquisition permitted under Section 7.7 (and the proceeds thereof) or assets of a Subsidiary in existence at the time such Subsidiary is acquired pursuant to an acquisition permitted under Section 7.7 and not created in contemplation thereof and Liens created after the Closing Date in connection with any refinancings, refundings, replacements or renewals or extensions of the obligations secured thereby permitted under this Section 7.3(bb); provided that no such Lien is extended to cover any additional Property (other than other Property of such Subsidiary or the proceeds or products of the acquired assets or any accessions or improvements thereto

77

and after-acquired property subjected to a Lien pursuant to terms existing at the time of such acquisition) after the Closing Date (unless such Lien utilizes a separate basket under this Section 7.3);

(cc)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with an Investment permitted by Section 7.7;

(dd)    Liens on cash and Cash Equivalents (including the net proceeds of the incurrence of Indebtedness permitted under Section 7.2) used to defease or to satisfy and discharge or redeem or repurchase Indebtedness; provided that such defeasance or satisfaction and discharge or redemption is not prohibited hereunder;

(ee)    Liens on cash and Cash Equivalents (and the related escrow accounts) in connection with the issuance into (and pending the release from) escrow of, any Indebtedness permitted under Section 7.2 and, in each case, any Permitted Refinancing thereof;

(ff)    Liens on the Collateral securing (i) Indebtedness in respect of an ABL Facility incurred pursuant to Section 7.2(x); provided that any Liens incurred pursuant to this Section 7.3(ff) shall be subject to the ABL Intercreditor Agreement;

(gg)    any extension, renewal or replacement of any Liens permitted by this Section 7.3; provided that the Liens permitted by this clause (gg) shall not extend to or secure any additional Indebtedness (other than applicable Permitted Refinancings) or property (other than the proceeds or products thereof or any accessions or improvements thereto and after-acquired property subjected to a Lien pursuant to terms no broader than the equivalent terms existing at the time of such extension, renewal or replacement, and other than a substitution of like property) unless such lien uses a separate basket under this Section 7.3);

(hh)    other Liens incidental to the conduct of the business of the Borrower and its Subsidiaries or the ownership of any of their assets not incurred in connection with Indebtedness, which Liens do not in any case materially detract from the value of the Property subject thereto or interfere with the ordinary course of business of the Borrower or its Subsidiaries; and

(ii)    Liens securing all premiums (if any), interest (including postpetition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations permitted to be incurred pursuant to Section 7.2(a) through (y) and the subject of any Lien permitted pursuant to clauses (a) through (hh) above.

Any Liens securing any ABL Facility and any Permitted Refinancings thereof shall only be permitted to be secured under Section 7.3(ff).  Any Liens securing the Obligations shall only be permitted to be secured under Section 7.3(h).

7.4    Fundamental Changes.    Consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of a material portion of its Property or business, except that:

(a)    (i) any Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, the Borrower as long as such merger, amalgamation or consolidation does not adversely affect the Liens in favor of the Collateral Agent securing the Obligations or the priority thereof (provided, that the Borrower shall be the continuing or surviving Person) or (ii) any Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, any Subsidiary Guarantor (provided, that (A) such Subsidiary Guarantor shall be the continuing or surviving Person or

(B) substantially simultaneously with such transaction, the continuing or surviving Person shall become a Subsidiary Guarantor and the Borrower shall comply with Section 6.8 in connection therewith;

(b)     any Non-Guarantor Subsidiary may be merged or consolidated with or into, or be liquidated into, any other Non-Guarantor Subsidiary;

(c)     any Subsidiary may Dispose of all or substantially all of its assets upon voluntary liquidation (or otherwise) to any Loan Party;

(d)     any Non-Guarantor Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Non-Guarantor Subsidiary;

(e)     Dispositions expressly permitted by Section 7.5 (other than Section 7.5(c)) may be consummated;

(f)     any Investment expressly permitted by Section 7.7 (other than Section 7.7(k)) may be structured as a merger, consolidation or amalgamation;

(g)     the Borrower and its Subsidiaries may consummate the Transactions;

(h)     any immaterial Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interest of the Borrower and is not disadvantageous to the Lenders, (ii) to the extent such Subsidiary is a Loan Party, any assets of such Subsidiary shall be transferred to a Loan Party after giving effect to such liquidation or dissolution and (iii) to the extent such Subsidiary is a Loan Party, any business of such Subsidiary not otherwise discontinued (if the Borrower determines in good faith that such discontinuation is in the best interest of the Borrower and is not disadvantageous to the Lenders) shall be transferred to, or otherwise conducted by, a Loan Party after giving effect to such liquidation or dissolution;

(i)     any Escrow Entity may be merged with and into the Borrower or any Subsidiary (provided that the Borrower or such Subsidiary shall be the continuing or surviving entity); and

(j)     if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, any Person may be merged, amalgamated or consolidated with or into the Borrower, provided that (A) the Borrower shall be the surviving entity or (B) if the surviving entity is not the Borrower (such other person, the "Successor Borrower"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a supplement or thereto in form reasonably satisfactory to the Administrative Agent and the Required Lenders, (3) each Subsidiary Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guarantee and Collateral Agreement confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (4) each Subsidiary Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant to clause (3), and (5) the Successor Borrower shall deliver to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) a customary opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel

79

delivered on the Closing Date pursuant to Section 5.1(e) (it being understood that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement).

7.5    [Dispositions of Property.  Dispose of any of its owned Property (including receivables) whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of Capital Stock (other than directors' qualifying shares) to any Person, except:

(a)    (i) the Disposition of surplus, obsolete, damaged or worn out Property (including scrap and byproducts) in the ordinary course of business, Dispositions of Property no longer used or useful or economically practicable to maintain in the conduct of the business of the Borrower and other Subsidiaries in the ordinary course and Dispositions of Property necessary in order to comply with applicable Requirements of Law or licensure requirements (as determined by the Borrower in good faith), (ii) the sale of defaulted receivables in the ordinary course of business, (iii) abandonment or cancellation in the ordinary course of business of any Intellectual Property not material to the Business and determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business (unless it is not possible to maintain such Intellectual Property as a matter of applicable law) and (iv) sales, leases or other Dispositions of inventory determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business in the ordinary course of business;

(b)    (i) the sale of inventory in the ordinary course of business, (ii) the non-exclusive licensing, sublicensing or cross-licensing of Intellectual Property in the ordinary course of business consistent with past practice, which do not interfere in any material respect with the conduct of the business of the Borrower or such Subsidiary, and (iii) the contemporaneous exchange, in the ordinary course of business, of Property for Property of a like kind, to the extent that the Property received in such exchange is of a Fair Market Value equivalent to the Fair Market Value of the Property exchanged (provided, that after giving effect to such exchange, the Fair Market Value of the Property of any Loan Party subject to Liens in favor of the Collateral Agent under the Security Documents is not materially reduced);

(c)    Dispositions permitted by Section 7.4 (other than Section 7.4(e));

(d)    the sale or issuance of any Subsidiary's Capital Stock to any Loan Party;

(e)    any Recovery Event; provided, that the requirements of Section 2.12(b) are complied with in connection therewith;

(f)    the leasing, licensing, occupying pursuant to occupancy agreements or sub-leasing of Real Property that would not materially interfere with the use in the ordinary course of such Property by the Borrower or its Subsidiaries;

(g)    the sale or discount, in each case without recourse and in the ordinary course of business, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(h)    (i) transfers of condemned Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and (ii) transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(i)     the transfer of Property (i) by the Borrower or any Subsidiary Guarantor to any other Loan Party or (ii) from a Non-Guarantor Subsidiary to (A) any Loan Party; provided, that the portion (if any) of such Disposition made for more than Fair Market Value shall constitute an Investment and comply with Section 7.7 or (B) any other Non-Guarantor Subsidiary;

(j)     the Disposition of cash and Cash Equivalents (or the foreign equivalent of Cash Equivalents) in the ordinary course of business;

(k)     to the extent constituting Dispositions, (i) Liens expressly permitted by Section 7.3 (other than by reference to Section 7.5 or any clause thereof), (ii) Restricted Payments expressly permitted by Section 7.6 (other than by reference to Section 7.5 or any clause thereof) and (iii) Investments expressly permitted by Section 7.7 (other than by reference to Section 7.5 or any clause thereof);

(l)     Dispositions of Investments in joint ventures and other non-wholly owned entities to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements, shareholder agreements and similar binding arrangements; provided that the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith;

(m)     the unwinding of Hedge Agreements permitted hereunder pursuant to their terms;

(n)     the sale of services, or the termination of any other contracts, in each case in the ordinary course of business;

(o)     Dispositions made on the Closing Date to consummate the Transactions;

(p)     Dispositions of Property in the ordinary course of business to the extent that (i)(A) such Property is exchanged for credit against the purchase price of similar replacement Property or (B) the proceeds of such Disposition are applied to the purchase price of such replacement Property and (ii) to the extent such Property constituted Collateral, such replacement Property constitutes Collateral as well;

(q)     any Disposition of Property in the ordinary course of business that represents a surrender or waiver of an immaterial contract right or settlement, surrender or release of a contract or tort claim;

(r)     any Disposition of assets; provided that if (i) the total value of assets subject to such Disposition is in excess of $[●], such Disposition shall be for Fair Market Value, (ii) at least 75% of the total consideration received by the Borrower and its Subsidiaries is in the form of cash or Cash Equivalents, (iii) no Default or Event of Default then exists or would result from such Disposition, and (iv) the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith; provided, further, that for purposes of the foregoing clause (r)(ii), the following shall be deemed to be cash: any Designated Non-Cash Consideration received by the Borrower or any of its Subsidiaries in such Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (r) that is at that time outstanding, not to exceed $[●] (with the Fair Market Value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value);

(s)     the Disposition of assets acquired pursuant to or in order to effectuate a Permitted Acquisition which assets are (i) obsolete or (ii) not used or useful to the core or principal business of the Borrower and its Subsidiaries; and

(t)     Dispositions of Property between or among the Borrower and/or Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise expressly permitted pursuant to clauses (a) through (s) above;

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary (i) to the extent any Capital Stock of any Subsidiary Guarantor is permitted to be Disposed of under this Section 7.5, such Disposition shall be of no less than all of the Capital Stock of any such Subsidiary Guarantor, and (ii) each of the Borrower and its Subsidiaries shall not sell, assign, convey, transfer or otherwise Dispose of its Intellectual Property to any Affiliate, Subsidiary or other Person, nor shall it permit any of its Intellectual Property (whether now owned or hereafter acquired) to be owned, held or licensed by any Affiliate, Subsidiary or any other Person, except (A) as exists on the Closing Date, and (B) the non-exclusive licensing, sublicensing or cross-licensing of Intellectual Property in the ordinary course of business consistent with past practice, which do not interfere in any material respect with the conduct of the business of the Borrower or such Subsidiary.]

7.6     Restricted Payments.  Directly or indirectly, declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of the Borrower or such Subsidiary (collectively, "Restricted Payments"), except that:

(a)      (i) any Subsidiary may make Restricted Payments to any Loan Party and (ii) Non-Guarantor Subsidiaries may make Restricted Payments to other Non-Guarantor Subsidiaries;

(b)     to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted (other than by reference to Section 7.6 or any clause thereof) by any provision of Sections 7.4, 7.5, 7.7 and 7.9 (other than Section 7.9(b)(vi), (vii) or (ix);

(c)     [the Borrower and its Subsidiaries may make payments of fees, indemnities and other amounts and reimbursement of costs and expenses pursuant to its operative documents;]

(d)     the Borrower may make Restricted Payments in the form of Capital Stock of the Borrower;

(e)     [the Borrower and any Subsidiary may make Restricted Payments to the Borrower or any direct or indirect parent of the Borrower (the "Parent") for any taxable period (or portion thereof) for which the Borrower or any of its Subsidiaries are members of a consolidated, combined, unitary or similar Tax group for U.S. federal or applicable state or local Tax purposes with the Parent (or the Borrower is an entity disregarded from its owner and the Borrower's regarded owner is a member of such group for applicable Tax purposes) (a "Tax Group"), to pay the portion of any U.S. federal, state or local Taxes (as applicable) of such Tax Group for such taxable period that are attributable to the taxable income or activities of the Borrower and/or any of its Subsidiaries (and such Borrower's Subsidiaries shall be permitted to make cash distributions to such Borrower in amounts necessary to enable such Borrower to make such cash distributions pursuant to this clause; provided that for each such taxable period (or portion thereof) the amount of such payments made in respect of such taxable period in the aggregate will

not exceed the amount that such Borrower and the applicable Subsidiaries would have been required to pay in respect of such taxable income as stand-alone taxpayers or a stand-alone Tax Group (calculated by assuming such Borrower is a corporation);]

(f)     [the Borrower and any of its Subsidiaries may make Restricted Payments to, directly or indirectly, purchase the Capital Stock of the Borrower or any Subsidiary from present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of the Borrower or any Subsidiary upon the death, disability, retirement or termination of the applicable officer, director, consultant, agent or employee or pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement; provided, that the aggregate amount of payments under this clause (f) in any fiscal year of the Borrower shall not exceed the sum of (i) $[●] in any fiscal year, plus (ii) any proceeds received from key man life insurance policies, plus (iii) any proceeds received by the Borrower during such fiscal year from sales of the Capital Stock of the Borrower to directors, officers, consultants or employees of the Borrower or any Subsidiary in connection with permitted employee compensation and incentive arrangements; provided, that any Restricted Payments permitted (but not made) pursuant to sub-clause (i), (ii) or (iii) of this clause (f) in any prior fiscal year may be carried forward to the immediately subsequent fiscal year; provided, further, that cancellation of Indebtedness owing to the Borrower or any Subsidiary by any member of management of the Borrower or any Subsidiary in connection with a repurchase of the Capital Stock of the Borrower will not be deemed to constitute a Restricted Payment for purposes of this Section 7.6;]

(g)     the Borrower and its Subsidiaries may make Restricted Payments to make, (i) non-cash repurchases of Capital Stock deemed to occur upon exercise of stock options or similar equity incentive awards, if such Capital Stock represents a portion of the exercise price of such options or similar equity incentive awards, (ii) tax payments on behalf of present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of the Borrower or any Subsidiary in connection with noncash repurchases of Capital Stock pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement of the Borrower or any Subsidiary, (iii) make-whole or dividend-equivalent payments to holders of vested stock options or other Capital Stock or to holders of stock options or other Capital Stock at or around the time of vesting or exercise of such options or other Capital Stock to reflect dividends previously paid in respect of Capital Stock of the Borrower and (iv) payments under a Dutch Auction conducted in accordance with the procedures set forth in this Agreement;

(h)     the Borrower may make Restricted Payments to make payments in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Capital Stock of any such Person;

(i)     the Borrower and its Subsidiaries may make Restricted Payments on or after the Closing Date to consummate the Transactions;

(j)     the payment of dividends and distributions within 60 days after the date of declaration thereof, if at the date of declaration of such payment, such payment would have been permitted pursuant to another clause of this Section 7.6; and

(k)     provided that no Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments in respect of reasonable fees and expenses incurred in connection with any successful or unsuccessful debt or equity offering or any successful or unsuccessful acquisition or strategic transaction of the Borrower.

83

7.7     <u>Investments</u>.  Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or all or substantially all of the assets constituting an ongoing business from, or make any other similar investment in, any other Person (all of the foregoing, "<u>Investments</u>"), except:

(a)     (i) extensions of trade credit in the ordinary course of business, (ii) loans, advances and promotions made to distributors, customers, vendors and suppliers in the ordinary course of business or in accordance with market practices, (iii) purchases and acquisitions of inventory, supplies, materials and equipment, purchases of contract rights, accounts and chattel paper, purchases of put and call foreign exchange options to the extent necessary to hedge foreign exchange exposures or foreign exchange spot and forward contracts, or purchases of notes receivable, in each case in the ordinary course of business, to the extent such purchases and acquisitions constitute Investments, (iv) Investments among the Borrower and its Subsidiaries in connection with the sale of inventory and parts in the ordinary course of business and (v) purchases and acquisitions of Intellectual Property or purchases of licenses of Intellectual Property, in each case, in the ordinary course of business, to the extent constituting Investments;

(b)     Investments in Cash Equivalents (or the foreign equivalent of Cash Equivalents) and Investments that were Cash Equivalents (or the foreign equivalent of Cash Equivalents) when made;

(c)     Investments arising in connection with (i) the incurrence of Indebtedness permitted by <u>Section 7.2</u> (other than by reference to <u>Section 7.7</u> or any clause thereof) to the extent arising as a result of Indebtedness among the Borrower or any of its Subsidiaries and Guarantee Obligations permitted by <u>Section 7.2</u> (other than by reference to <u>Section 7.7</u> or any clause thereof) and payments made in respect of such Guarantee Obligations, (ii) the forgiveness or conversion to equity of any Indebtedness permitted by <u>Section 7.2</u> (other than by reference to <u>Section 7.7</u> or any clause thereof) and (iii) guarantees by the Borrower or any of its Subsidiaries of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(d)     loans and advances to employees, consultants or directors of the Borrower or any of its Subsidiaries in the ordinary course of business in an aggregate amount (for the Borrower and all of its Subsidiaries) not to exceed $[1,000,000] (excluding (for purposes of such cap) tuition advances, travel and entertainment expenses, but including relocation advances) at any one time outstanding;

(e)     Investments (i) (other than those relating to the incurrence of Indebtedness permitted by <u>Section 7.7(c)</u>) by the Borrower or any of its Subsidiaries in the Borrower or any Person that, prior to such Investment, is a Loan Party (or is a Subsidiary that becomes a Loan Party in connection with such Investment); (ii) by the Borrower or any Subsidiary Guarantor in any Non-Guarantor Subsidiaries so long as such Investment is part of a series of Investments by Subsidiaries in other Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Loan Parties, (iii) comprised solely of equity purchases or contributions by the Borrower or any of its Subsidiaries in any other Subsidiary made for tax purposes, so long as, prior to such Investment, the Borrower provides to the Administrative Agent evidence reasonably acceptable to the Administrative Agent (at the direction of Required Lenders) and the Required Lenders that, after giving pro forma effect to such Investments, the granting, perfection, validity and priority of the security interest of the Secured Parties in the Collateral is not impaired in any material respect by such Investment, and (iv) existing on the Closing Date in any Non-Guarantor Subsidiary;

(f)     Permitted Acquisitions to the extent that any Person or Property acquired in such acquisition becomes a Subsidiary or a part of a Subsidiary; <u>provided</u>, that (i) immediately before and after

giving effect to any such Permitted Acquisition, no Event of Default shall have occurred and be continuing and (ii) the aggregate amount of consideration paid by the Borrower and its Subsidiaries in connection with Permitted Acquisitions of Persons other than Loan Parties and of Property that does not become Collateral shall not exceed $2,500,000;

(g)     Investments (including debt obligations) received in the ordinary course of business by the Borrower or any of its Subsidiaries in connection with (w) the bankruptcy or reorganization of suppliers, vendors, distributors, clients, customers and other Persons, (x) settlement of delinquent obligations of, and other disputes with, suppliers, vendors, distributors, clients, customers and other Persons arising in the ordinary course of business, (y) endorsements for collection or deposit and (z) customary trade arrangements with suppliers, vendors, distributors, clients and customers, including consisting of Capital Stock of clients and customers issued to the Borrower or any Subsidiary in consideration for goods provided and/or services rendered;

(h)     Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(i)     Investments in existence on, or pursuant to legally binding written commitments in existence on, the Closing Date after giving effect to the Transactions and listed on Schedule 7.7 and, in each case, any extensions, renewals or replacements thereof, so long as the amount of any Investment made pursuant to this clause (i) is not increased (other than pursuant to such legally binding commitments);

(j)     Investments of the Borrower or any of its Subsidiaries under Hedge Agreements permitted hereunder;

(k)     to the extent constituting Investments, transactions expressly permitted (other than by reference to this Section 7.7 or any clause thereof) under Sections 7.4, 7.5, 7.6 and 7.8;

(l)     Investments arising directly out of the receipt by the Borrower or any of its Subsidiaries of non-cash consideration for any sale of assets permitted under Section 7.5 (other than by reference to Section 7.7 or any clause thereof);

(m)     (i) Investments resulting from pledges and deposits referred to in Sections 7.3(c) and (d) and (ii) cash earnest money deposits made in connection with Permitted Acquisitions or other Investments made pursuant to this Section 7.7;

(n)     Investments made on the Closing Date to consummate the Transactions;

(o)     Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers;

(p)     Investments in an aggregate amount not to exceed (i) $[2,500,000] *minus* the aggregate amount of any prepayments, redemptions, purchases, defeasements or other satisfactions prior to the scheduled maturity of any Junior Financing pursuant to Section 7.8(a)(ii); provided, that Investments made by any Loan Party pursuant to this clause (p) shall not be in the form of Intellectual Property (or of Capital Stock of Subsidiaries owning Intellectual Property);

(q)     advances of payroll payments to employees, or fee payments to directors, in the ordinary course of business;

(r)      Investments constituting loans or advances in lieu of Restricted Payments permitted pursuant to <u>Section 7.6</u>;

(s)      the Borrower or any of its Subsidiaries may make Investments in prepaid expenses, negotiable instruments held for collection and lease and utility and worker's compensation deposits provided to third parties in the ordinary course of business;

(t)      Investments in (i) [reserved] and (ii) any other Investment available to highly compensated employees under any "excess 401-(k) plan" of the Borrower (or any of its Domestic Subsidiaries, as applicable), in each case to the extent necessary to permit the Borrower (or such Domestic Subsidiary, as applicable) to satisfy its obligations under such "excess 401-(k) plan" for highly compensated employees;

(u)      loans by the Borrower or any of its Subsidiaries to the employees, officers or directors of any the Borrower or any of its Subsidiaries in connection with management incentive plans <u>provided</u>, that such loans represent cashless transactions pursuant to which such employees, officers or directors directly (or indirectly) invest the proceeds of such loans in the Capital Stock the Borrower;

(v)      Investments of any Person existing, or made pursuant to binding commitments in effect at the time such Person becomes a Subsidiary or consolidates, amalgamates or merges with the Borrower or any of its Subsidiaries (including in connection with a Permitted Acquisition); <u>provided</u>, that such Investment was not made in anticipation of such Person becoming a Subsidiary or of such consolidation, amalgamation or merger;

(w)      Subsidiaries of the Borrower may be established or created, if (i) to the extent such new Subsidiary is a Domestic Subsidiary, the Borrower and such Subsidiary comply with the provisions of <u>Section 6.8(c)</u> and (ii) to the extent such new Subsidiary is a Foreign Subsidiary, the Borrower complies with the provisions of <u>Section 6.8(d)</u>; <u>provided</u>, that, in each case, to the extent such new Subsidiary is created solely for the purpose of consummating a merger, consolidation, amalgamation or similar transaction pursuant to an acquisition permitted by this <u>Section 7.7</u>, and such new Subsidiary at no time holds any assets or liabilities other than any consideration contributed to it substantially contemporaneously with the closing of such transactions, such new Subsidiary shall not be required to take the actions set forth in <u>Section 6.8(c)</u> or <u>6.8(d)</u>, as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective transaction shall be required to so comply within ten Business Days or such longer period as the Administrative Agent shall agree);

(x)      Investments to the extent that payment for such Investments is made solely by the issuance of Capital Stock (other than Disqualified Capital Stock) of the Borrower to the seller of such Investments.

It is further understood and agreed that for purposes of determining the value of any Investment outstanding for purposes of this <u>Section 7.7</u>, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired less any returns on such Investment (not to exceed the original amount invested).

[Notwithstanding anything in this Agreement to the contrary and in addition to the foregoing, Investments by Loan Parties in Subsidiaries that are not Subsidiary Guarantors from and after the Closing Date (including at the time of designation as a non-Loan Party) shall not exceed $[●][8] at any time (<u>provided</u> that (i) to the extent any such Investment is not in cash, the Fair Market Value of such investment shall be

---

[8] NTD: To discuss.

determined by the Borrower in good faith and (ii) this paragraph shall not apply to (x) Investments in connection with the sale of inventory in the ordinary course of business and consistent with past practice or (y) Investments made pursuant to Sections 7.7(a), (c)(ii) (provided that the forgiveness or conversion to equity of any Indebtedness pursuant to such Section 7.7(c)(ii) shall not be deemed to reduce the amount of any Investment made in connection with the incurrence of such Indebtedness), (c)(iii), (e), (f), (k), [(p),] (u), (v), and (x)).  For the avoidance of doubt, this paragraph shall not restrict Investments in existence on the Closing Date.]

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, (i) to the extent any Capital Stock of any Loan Party is permitted to be subject to an Investment under this Section 7.7, such Investment shall be of no less than all of the Capital Stock of such Loan Party (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and continues to be a Loan Party) and (ii) each of the Borrower and its Subsidiaries shall not make any Investment of Intellectual Property in any Affiliate or Subsidiary, nor shall it permit any of its Intellectual Property (whether now owned or hereafter acquired) to be owned, held or licensed by any Affiliate or Subsidiary, except (A) as exists on the Closing Date and (B) the non-exclusive licensing, sublicensing or cross-licensing of Intellectual Property in the ordinary course of business consistent with past practice, which do not interfere in any material respect with the conduct of the business of the Borrower or such Subsidiary.

7.8    Prepayments, Etc. of Indebtedness; Amendments.

(a)    Optionally prepay, redeem, purchase, defease or otherwise satisfy prior to the day that is 90 days before the scheduled maturity thereof in any manner the principal amount of (x) any Indebtedness for Borrowed Money that is expressly subordinated by contract in right of payment to the Obligations, (y) (I) any Indebtedness for Borrowed Money incurred pursuant to Section 7.2(u) and (v) that is secured by all or any part of the Collateral or (II) any other Indebtedness for Borrowed Money incurred pursuant to Section 7.2 that is secured by all or a material part of the Collateral, in each case of clauses (I) and (II), on a junior basis relative to the Obligations, but is not also secured by any substantial part of the Collateral on a pari passu or senior basis relative to the Obligations or (z) any Indebtedness for Borrowed Money incurred pursuant to Section 7.2 that is unsecured (collectively, "Junior Financing") (it being understood, for the avoidance of doubt, that (1) payments of regularly scheduled interest and principal on all of the foregoing shall be permitted and (2) the term "Junior Financing" does not include any Indebtedness for Borrowed Money under (A) an ABL Facility or (B) this Agreement), or make any payment in violation of any subordination terms of any Junior Financing Documentation, except:

(i)    the prepayment, redemption, purchase, defeasement or other satisfaction of any Junior Financing with any Permitted Refinancing thereof;

(ii)    the prepayment, redemption, purchase, defeasement or other satisfaction prior to the day that is 90 days before the scheduled maturity of any Junior Financing, in an aggregate amount not to exceed (i) $2,500,000 minus (ii) the aggregate amount of Investments made pursuant to Section 7.7(p);

(iii)    the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness for Borrowed Money incurred or assumed pursuant to Section 7.2(u);

(iv)    the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness for Borrowed Money to consummate the Transactions;

(v)     the prepayment, redemption, purchase, defeasance or other satisfaction of any intercompany indebtedness (A) owing by a Loan Party to another Loan Party, (B) owing by a Subsidiary that is Non-Guarantor Subsidiary to a Subsidiary that is Non-Guarantor Subsidiary and (C) owing by a Subsidiary that is Non-Guarantor Subsidiary to a Loan Party; and

(vi)     the termination, cancellation, setoff or forgiveness of any intercompany indebtedness outstanding on the Closing Date if the Borrower reasonably determines that such termination, cancellation, setoff or forgiveness occurs in connection with a tax optimization of the Borrower and its Subsidiaries.

(b)     amend or modify the documentation in respect of any Junior Financing in a manner, taken as a whole (as shall be determined by the Borrower in good faith), that would be materially adverse to the Lenders; provided, that nothing in this Section 7.8(b) shall prohibit the refinancing, replacement, extension or other similar modification of any Indebtedness for Borrowed Money to the extent otherwise permitted by Section 7.2.

7.9     Transactions with Affiliates.  Enter into any transaction or series of transactions, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate thereof (other than among Loan Parties or among non-Loan Parties) involving aggregate payments or consideration in excess of $[1,000,000] unless such transaction is (a) otherwise not prohibited under this Agreement and (b) upon terms materially no less favorable when taken as a whole to the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate; provided with respect to any such transaction involving aggregate payments or consideration in excess of $2,500,000, the Borrower shall deliver to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view.  Notwithstanding the foregoing, the Borrower and its Subsidiaries may:

(i)     make any Restricted Payment permitted pursuant to Section 7.6 (other than by reference to Section 7.9 or any clause thereof) or any Investment permitted pursuant to Section 7.7;

(ii)     perform their obligations pursuant to the Loan Documents and enter into the Transactions;

(iii)     enter into transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business subject to compliance with Section 7.9(b);

(iv)     without being subject to the terms of this Section 7.9, enter into any transaction with any Person which is an Affiliate of the Borrower only by reason of such Person and the Borrower, as applicable, having common directors;

(v)     enter into any transaction among the Borrower and its Subsidiaries in the ordinary course of business consistent with past practice that is not otherwise prohibited by this Agreement;

(vi)     enter into the transactions allowed pursuant to Section 10.6;

(vii)     enter into transactions set forth on Schedule 7.9;

(viii)   enter into any transaction with an officer, director, manager, employee or consultant of the Borrower or any of its Subsidiaries (including compensation or employee benefit arrangements with any such officer, director, manager, employee or consultant) in the ordinary course of business and not otherwise prohibited by the terms of this Agreement;

(ix)   enter into any transaction in which the Borrower or any Subsidiary, as the case may be, delivers to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view and meets the requirements of Sections 7.9(a) and (b);

(x)   enter into transactions with customers, clients, suppliers, or purchasers or sellers of goods or services that are Affiliates, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Subsidiaries, as determined in good faith by the Board of Directors or the senior management of the Borrower, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(xi)   engage in any transaction in the ordinary course of business between the Borrower or a Subsidiary and its own employee stock option plan that is approved by the Borrower or such Subsidiary in good faith;

(xii)   issue Capital Stock to any direct or indirect owner of the Borrower, or any director, officer, employee or consultant thereof;

(xiii)   make any Disposition permitted pursuant to Section 7.5(b)(ii) or Section 7.5(q); and

(xiv)   enter into any transaction with an Affiliate in which the consideration paid by the Borrower or any Subsidiary consists only of Capital Stock of the Borrower.

For the avoidance of doubt, this Section 7.9 shall not restrict or otherwise apply to employment, benefits, compensation, bonus, retention and severance arrangements with, and payments of compensation or benefits (including customary fees, expenses and indemnities) to or for the benefit of, current or former employees, consultants, officers or directors of the Borrower or any of its Subsidiaries in the ordinary course of business.

For purposes of this Section 7.9, any transaction with any Affiliate shall be deemed to have satisfied the standard set forth in clause (b) of the first sentence hereof if such transaction is approved by a majority of the Disinterested Directors of the Board of Directors of the Borrower or such Subsidiary, as applicable.

7.10   Sales and Leasebacks.  Enter into any arrangement with any Person providing for the leasing by the Borrower or any of its Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Subsidiaries.

7.11   Changes in Fiscal Periods.  Permit the fiscal year of the Borrower to end on a day other than December 31; provided, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year end to any day reasonably acceptable to the Required Lenders, in which

case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year end.

7.12    <u>Negative Pledge Clauses</u>. Enter into any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement, other than:

(a)    this Agreement or any other Loan Documents, or any other agreement entered into pursuant to any of the foregoing;

(b)    any agreements governing Indebtedness and/or other obligations secured by a Lien permitted by this Agreement (in which case, any prohibition or limitation shall only be effective against the assets subject to such Liens permitted by this Agreement);

(c)    non-exclusive Intellectual Property licenses entered into in the ordinary course of business consistent with past practice, which do not interfere in any material respect with the conduct of the business of the Borrower or such Subsidiary, pursuant to which such Loan Party is the licensee of the relevant Intellectual Property (in which case, any prohibition or limitation shall relate only to the assets subject to the applicable license);

(d)    Contractual Obligations incurred in the ordinary course of business which (i) limit Liens on the assets that are the subject of the applicable Contractual Obligation or (ii) contain customary provisions restricting the assignment, transfer or pledge of such agreements;

(e)    any agreements regarding Indebtedness or other obligations of any Non-Guarantor Subsidiary not prohibited under <u>Section 7.2</u> (in which case, any prohibition or limitation shall only be effective against the assets of such Non-Guarantor Subsidiary and its Subsidiaries);

(f)    prohibitions and limitations in effect on the Closing Date and listed on <u>Schedule 7.12</u> hereof;

(g)    customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(h)    customary provisions restricting the subletting, assignment, pledge or other transfer of any lease governing a leasehold interest;

(i)    customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses, sublicenses, and cross licenses not prohibited hereunder;

(j)    any agreement in effect at the time any Person becomes a Subsidiary of the Borrower or is merged with or into the Borrower or a Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of the Borrower or a party to such merger;

(k)    restrictions imposed by applicable law or regulation or license requirements;

(l)      restrictions in any agreements or instruments relating to any Indebtedness permitted to be incurred by this Agreement (including any ABL Facility) (i) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Subsidiaries than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Borrower) or (ii) if such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to create and maintain the Liens on the Collateral pursuant to the Security Documents;

(m)      restrictions in respect of Indebtedness secured by Liens permitted by Sections 7.3(g) and 7.3(v) relating solely to the assets or proceeds thereof secured by such Indebtedness;

(n)      customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(o)      restrictions arising in connection with cash or other deposits not prohibited hereunder and limited to such cash or other deposit;

(p)      restrictions and conditions that arise in connection with any Dispositions permitted by Section 7.5; provided, however, that such restrictions and conditions shall apply only to the property subject to such Disposition;

(q)      the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in clauses (a) through (r) above, provided, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

7.13   Clauses Restricting Subsidiary Distributions.   Enter into any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any of its Subsidiaries or (b) make Investments in the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of or consisting of:

(i)      this Agreement or any other Loan Documents, or any other agreement entered into pursuant to any of the foregoing;

(ii)      provisions limiting the Disposition of assets or property in asset sale agreements, stock sale agreements and other similar agreements, which limitation is in each case applicable only to the assets or interests the subject of such agreements but which may include customary restrictions in respect of a Subsidiary in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(iii)      customary net worth provisions contained in Real Property leases entered into by the Borrower and its Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower to

91

meet its ongoing payment obligations hereunder or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement;

(iv)     agreements related to any Indebtedness permitted to be incurred by this Agreement (including any ABL Facility) to the extent that (x) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Subsidiaries than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Borrower) or (y) such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(v)     Contractual Obligations incurred in the ordinary course of business which include customary provisions restricting the assignment, transfer or pledge thereof;

(vi)     customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(vii)     customary provisions restricting the subletting or assignment of any lease governing a leasehold interest;

(viii)     any agreement in effect at the time any Person becomes a Subsidiary or is merged with or into the Borrower or any Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary or a party to such merger;

(ix)     encumbrances or restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(x)     encumbrances or restrictions imposed by applicable law, regulation or customary license requirements;

(xi)     [reserved];

(xii)     any agreement in effect on the Closing Date and described on Schedule 7.13;

(xiii)     restrictions or conditions imposed by any obligations secured by Liens permitted pursuant to Section 7.3 (other than obligations in respect of Indebtedness), if such restrictions or conditions apply only to the property or assets securing such obligations and such encumbrances and restrictions are customary for similar obligations in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(xiv)     restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Borrower or any of its Subsidiaries is a party entered into in the ordinary course of business; provided, that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Subsidiary that are the subject of such agreement, the payment rights arising thereunder or the

proceeds thereof and does not extend to any other asset or property of the Borrower or such Subsidiary or the assets or property of any other Subsidiary; and

(xv)     the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in clauses (i) through (xviii) above, provided, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

7.14    Limitation on Hedge Agreements.  Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business, and not for speculative purposes.

7.15    Liquidity.  Commencing with the last Business Day of the first full calendar month after the Closing Date and tested on the last Business Day of each calendar month thereafter, the Borrower shall not permit Liquidity to be less than $10,000,000 as of such testing date.

SECTION VIII.EVENTS OF DEFAULT

8.1    Events of Default.  If any of the following events shall occur and be continuing:

(a)     The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof or (ii) any interest owed by it on any Loan, or any other amount payable by it hereunder or under any other Loan Document, in the case of this clause (ii), within five (5) Business Days after any such interest or other amount becomes due in accordance with the terms hereof;

(b)     Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate or other document furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall in either case prove to have been inaccurate in any material respect (or if qualified by materiality, in any respect) and such inaccuracy is adverse to the Lenders on or as of the date made or deemed made or furnished;

(c)     The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in Section 6.4(a) (solely with respect to maintaining the existence of the Borrower), or Section 7;

(d)     Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8.1), and such default shall continue unremedied (i) for a period of six (6) Business Days if such breach relates to the terms or provisions of Section 6.7(a), (ii) for a period of ten (10) days if such breach relates to the terms or provisions of Section 6.10, or (iii) for a period of thirty (30) days;

(e)     The Borrower or any of its Subsidiaries shall:

(i)     default in making any payment of any principal of any Indebtedness for Borrowed Money on the scheduled or original due date with respect thereto beyond the

period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created;

(ii)    default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or

(iii)    default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness for Borrowed Money to become due prior to its Stated Maturity or to become subject to a mandatory offer to purchase by the obligor thereunder;

provided, that:

(A)    a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $[2,500,000], and in the case of Indebtedness for Borrowed Money of the types described in clauses (i) and (ii) of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate; and

(B)    this paragraph (e) shall not apply to secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other disposition is not prohibited hereunder and under the documents providing for such Indebtedness;

(f)    [(i)    the Borrower or any Subsidiary of the Borrower (other than an Immaterial Subsidiary) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any Subsidiary of the Borrower (other than an Immaterial Subsidiary) shall make a general assignment for the benefit of its creditors;

(ii)    there shall be commenced against the Borrower or any Subsidiary of the Borrower (other than an Immaterial Subsidiary) any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days;

(iii)    there shall be commenced against the Borrower or any Subsidiary of the Borrower (other than an Immaterial Subsidiary) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against substantially

all of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof;

(iv)     the Borrower or any Subsidiary of the Borrower (other than an Immaterial Subsidiary) shall consent to or approve of, or acquiesce in, any of the acts set forth in clause (i), (ii), or (iii) above; or

(v)     the Borrower or Subsidiary of the Borrower (other than an Immaterial Subsidiary) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;]

(g)     (i)     the Borrower or any of its Subsidiaries shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan;

(ii)     a failure to meet the minimum funding standards (as defined in Section 302(a) of ERISA), whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Lien shall arise on the assets of the Borrower or any of the Borrower's Subsidiaries;

(iii)     a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Single Employer Plan for purposes of Title IV of ERISA;

(iv)     any Single Employer Plan shall terminate in a distress termination under Section 4041(c) of ERISA or in an involuntary termination by the PBGC under Section 4042 of ERISA;

(v)     any Loan Party or any other Commonly Controlled Entity shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency of, a Multiemployer Plan;

(vi)     any Foreign Plan Event occurs; or

(vii)     any other event or condition shall occur or exist with respect to a Plan;

and in each case in clauses (i) through (vii) above, which event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in any liability of the Borrower or any of its Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(h)     One or more final judgments or decrees shall be entered against the Borrower or any of its Subsidiaries (which is not subject to the automatic stay) pursuant to which the Borrower and any such Subsidiaries taken as a whole has a liability (not paid or fully covered by third-party insurance or effective indemnity) of $[2,500,000] or more (net of any amounts which are covered by insurance or an effective indemnity), and all such judgments or decrees shall not have been vacated, discharged, dismissed, stayed or bonded within 60 days from the entry thereof;

(i)     Subject to Schedule 6.10, any limitations expressly set forth herein and the exceptions set forth in the applicable Security Documents:

(i)      any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Borrower or any Subsidiary Guarantor not to be a legal, valid and binding obligation of any party thereto;

(ii)      any security interest purported to be created by any Security Document with respect to any material portion of the Collateral of the Loan Parties on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent (or, in the case of any ABL Priority Collateral following the Borrower's entry into an ABL Facility in accordance with this Agreement, the collateral agent under the definitive documentation governing an ABL Facility pursuant to the terms of an ABL Intercreditor Agreement) in accordance with the Security Documents to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement or otherwise or to file UCC continuation statements or (y) such loss is covered by a lender's title insurance policy and the Administrative Agent (at the direction of Required Lenders) shall be reasonably satisfied with the credit of such insurer; or

(iii)      the Guarantee Obligations pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms hereof or thereof), or such Guarantee Obligations shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations; or

(j)      (iv)      [Reserved].

(k)      (i)      the Borrower shall cease to own, directly or indirectly, 100% of the Capital Stock of each of its Subsidiaries; or

(ii)      for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date, (but excluding (x) any employee benefit plan of such person and its subsidiaries, (y) any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and (z) the Permitted Investors) shall become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, of more than 50% of the then outstanding voting securities having ordinary voting power of the Borrower);

then, and in any such event, (A) if such event is an Event of Default specified in <u>clause (i)</u> or <u>(ii)</u> of paragraph (f) above with respect to the Borrower, automatically, the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Repayment Premium, if any) shall immediately become due and payable, and (B) if such event is any other Event of Default, at the direction of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Repayment Premium, if any) to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this <u>Section 8.1</u> or otherwise in any Loan Document, presentment, demand and protest of any kind are hereby expressly waived by the Borrower.

SECTION IX.   THE AGENTS

9.1     Appointment.

(a)     Each Lender hereby irrevocably designates and appoints each Agent as the agent of such Lender under the Loan Documents; and each such Lender irrevocably authorizes each such Agent, in such capacity, to take such action on its behalf under the provisions of the applicable Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of the applicable Loan Documents, together with such other powers as are reasonably incidental thereto.   Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary, principal-agency, or trustee relationship with the other Agent, any Lender or any other Secured Party (regardless of whether a Default or Event of Default has occurred and is continuing), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents and the duties of the Agents shall be mechanical and administrative in nature.   All references to Administrative Agent in this Article IX shall, where applicable, be read as including a reference to the Collateral Agent.

(b)     The provisions of this Section 9 are solely for the benefit of the Agents and the Lenders, and the Loan Parties shall have no rights as a third-party beneficiary of any of such provisions. In performing its functions and duties hereunder, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of fiduciary, agency or trust with or for the Borrower, the other Loan Parties, or any of their respective Subsidiaries. It is understood and agreed that the use of the term "agent" or "Agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only a representative relationship between independent contracting parties. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases and the Security Documents (which Security Documents shall contain indemnity and expense reimbursement provisions for the benefit of the Agents party thereto that are no more onerous to the Lenders than the provisions contained in the Security Documents as of the Closing Date and shall be binding on the Lenders)) with respect to the Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary), which negotiation, enforcement or settlement will be binding upon each Lender.

9.2     Delegation of Duties.   Each Agent may execute any of its duties under the applicable Loan Documents by or through any of its branches, agents, sub-agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.   Neither Agent shall be responsible for the negligence or misconduct of any agents, sub-agents or attorneys in fact selected by it with reasonable care.   Each Agent and any such agent, sub-agent or attorney-in-fact may perform any and all of its duties by or through their respective Related Parties (including their affiliates, agents, sub-agents, designees, employees or attorneys-in-fact).   The exculpatory and indemnification provisions of this Section shall apply to any such agent, sub-agent or attorney-in-fact and to the Related Parties of each Agent and any such agent, sub-agent or attorney-in-fact, and shall apply to their respective activities in connection with activities as Agent.

9.3     Exculpatory Provisions.

97

Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (a) liable for (i) any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) (and such consent or request and such action or action not taken pursuant thereto shall be binding upon all the Lenders) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable judgment (which shall not include any action taken or omitted to be taken in accordance with clause (i), for which such Agent shall have no liability), or (b) responsible in any manner for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties made in or in connection with this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document, (ii) the contents of any certificate, report, statement or other document delivered, referred to, provided for, or delivered hereunder or thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein, the use of proceeds of the Loans, or the occurrence of any Default or Event of Default, (iv) the execution, validity, enforceability, effectiveness, genuineness, collectability or sufficiency of any Loan Document or any other agreement, instrument or document, or the creation, preservation, perfection, maintenance or continuation of perfection, or priority of any Lien created or purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, (vi) whether the Collateral exists, is owned by the Borrower, another Loan Party or any of their Subsidiaries or Affiliates, is cared for, protected, or insured or has been encumbered, or meets the eligibility criteria applicable in respect thereof, (vii) the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations or (viii) the satisfaction of any condition set forth in Section 5 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent. No Agent shall be under any duty or obligation to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

No Agent nor any of its Related Parties shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by any Person serving as an Agent or any of its Related Parties in any capacity.

Nothing in this Agreement or any other Loan Document shall require any Agent or its Related Parties to expend or risk their own funds or otherwise incur any financial liability in the performance of any duties or in the exercise of any rights or powers hereunder.

No Agent shall be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document, in each case, arising out of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; pandemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

For the avoidance of doubt, and without limiting the other protections set forth in this Section 9, with respect to any determination, designation, or judgment to be made by any Agent herein or in the other Loan Document, such Agent shall be entitled to request that the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) make or confirm such determination, designation, or judgment.

152254164_6

No Agent be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any Loan Document or applicable law.  If either Agent requests instructions from the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders (or such other number or percentage of Lenders); and such Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against either Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary).

Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary, principal-agency, trustee relationship or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or under any Loan Document that such Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided for herein or in the other Loan Document); provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, (i) may expose such Agent to liability or that is contrary to any Loan Document or applicable law, (ii) may create any obligation not expressly set forth in the Loan Document or (iii) may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law or it shall first have been indemnified to its satisfaction by the Lenders against any and all liability and expense (other than liability and expense arising from its own gross negligence or willful misconduct) that may be incurred by it by reason of taking, continuing to take or omitting to take any such action, and (c) except as expressly set forth in the Loan Document, no Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower, any of its Affiliates, or any of the Subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent and/or Collateral Agent or any of its Affiliates in any capacity.

9.4    Reliance by the Agents.  The Agents shall be entitled to rely, not incur any liability for relying and shall be fully protected in relying, upon any instrument, writing, resolution, notice, request, consent, certificate, affidavit, letter, e-mail, telecopy, telex or teletype message, other writing, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons or by acting upon any representation or warranty made or deemed to be made hereunder or under any other Loan Document and upon advice and statements of legal counsel (including counsel to the Loan Parties), independent accountants and other experts selected by the Agents and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each Agent may also rely upon any statement made to it orally or by telephone and reasonably believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent shall be fully justified in failing or refusing to take any action under the applicable Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agents shall in all cases be fully protected in acting, or in refraining from acting, under the applicable Loan Documents in accordance with a request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary), and such request and

any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans. In determining compliance with any conditions hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may deem and treat the Lenders and participants specified in the Register and Participant Register, respectively, with respect to any amount owing hereunder as the owner thereof for all purposes unless the Administrative Agent is satisfied that such amount shall have been assigned in accordance with Section 10.6 and the relevant Register or Participant Register has not yet been updated to reflect the same.

Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such direction, advice or concurrence of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) and such certifications as it deems appropriate, provided that such Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may (i) expose such Agent to liability or that is contrary to any Loan Document or applicable law or (ii) be in violation of the automatic stay under any requirement of law relating to bankruptcy, insolvency, reorganization, or relief of debtors; provided, further, that if such Agent so requests, it shall first be indemnified to its satisfaction (including reasonable advances as may be requested by such Agent) by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such directed action; provided, further, that such Agent may seek clarification or further direction prior to taking any such directed action and may refrain from acting until such clarification or further direction has been provided. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Document in accordance with a request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans and/or Notes. Each Agent may also consult with and rely upon advice and statements of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith to be necessary).

9.5   Notice of Default.  Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders. The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary).

9.6   Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact, Related Parties or Affiliates have made any representations or warranties to it and that no act by any Agent or any such Person hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such

documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the applicable Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of such Agent, its Related Parties or any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates.

       9.7    <u>Indemnification</u>.  The Lenders severally agree to indemnify each Agent, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment in full of the Loans) that may be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, the Loans, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; <u>provided</u>, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct; <u>provided</u>, further, that no action taken by any Agent in accordance with the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) shall be deemed to constitute gross negligence or willful misconduct for purposes hereof.  The agreements in this <u>Section 9.7 shall</u> remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration or termination of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, or any Lender. All amounts due under this Section 9.7 shall be payable on demand therefor. Notwithstanding anything to the contrary set forth herein, no Agent shall be required to take, or to omit to take, any action hereunder or under the Loan Documents unless, upon demand, such Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to such Agent, any other Secured Party) against all liabilities, costs and expenses that, by reason of such action or omission, may be imposed on, incurred by or asserted against such Agent or any of its directors, officers, employees and agents. In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this <u>Section 9.7</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse each Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower or the other Loan Parties; provided that such reimbursement by the Lenders shall not affect the Borrower's or the other Loan Parties' continuing reimbursement obligations with respect thereto. If The indemnity provided to each Agent under this <u>Section 9.7</u> shall also apply to each Agent's respective Affiliates, directors, officers, members, controlling persons, employees, trustees, investment advisors, agents, sub-agents, representatives, counsel and other advisors and successors.

9.8     <u>Agent in Its Individual Capacity</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent hereunder and without any duty to account therefor to the Lenders.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under the applicable Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9     <u>Successor Agents</u>.

(a)     Any Agent may resign upon 30 days' notice to the Lenders and the other Agent, effective upon appointment of a successor Agent, or in accordance with Section 9.9(b) below.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any Lenders.  If no successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Lenders appoint a successor Administrative Agent and/or Collateral Agent, as the case may be.  After any retiring Agent's resignation as Agent, the provisions of this <u>Section 9</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(b)     If no successor Agent has been appointed pursuant to clause (a) above by the 30th day after the date such notice of resignation was given by the retiring Agent, such Agent's resignation shall become effective and all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Agent in accordance with <u>Section 9.9(a)</u> above, as applicable.

(c)     Any resignation by the Administrative Agent pursuant to this <u>Section 9.9</u> shall also constitute its resignation as the Collateral Agent.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Collateral Agent and (ii) the retiring Collateral Agent shall be discharged from all of their respective duties and obligations hereunder and under the other Loan Documents.

(d)     Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder and under the other Loan Documents (if not already discharged therefrom as provided above in this Section) and the retiring (or retired) Agent under this Agreement shall promptly (i) transfer to such successor Agent all sums, Capital Stock and other items of Collateral held by it hereunder or under the Security Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Agent under this Agreement and the other Loan Documents and (ii) execute and deliver to such successor Agent or otherwise authorize the filing of such amendments to financing statements to the extent the applicable Loan Parties cannot otherwise do so, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor Agent of the security interests created under the Security Documents, whereupon such retiring or removed Agent shall be discharged from its duties and obligations under this Agreement, the Security Documents and the other Loan Documents.

102

(e)    Upon a resignation of an Agent pursuant to this <u>Section 9.9</u>, such Agent shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this <u>Section 9</u> (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as Agent, including with respect to such actions taken in accordance with <u>Section 9.9(d)</u>.

9.10    <u>Certain Collateral Matters</u>.

(a)    Each Lender authorizes and directs the Collateral Agent to enter into or join (x) the Security Documents for the benefit of the Lenders and the other Secured Parties and (y) amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to the Security Documents in connection with the incurrence by any Loan Party of Indebtedness pursuant to this Agreement, as applicable or to permit such Indebtedness to be secured by a valid, perfected lien.

(b)    Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents to which it is a party, which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.

(c)    The Agents are hereby irrevocably authorized and directed by each of the Lenders to effect any release of Liens or Guarantee Obligations contemplated by <u>Section 10.15</u>.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.10(c).

(d)    No Agent shall have any obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this <u>Section 9</u> or in any of the Security Documents, it being understood and agreed that in respect of this Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral and that the Collateral Agent shall have no duty or liability whatsoever to any Person, except to the extent of its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The Collateral Agent shall have its own independent right to demand payment of the amounts payable by the Loan Parties under this <u>Section</u>, irrespective of any discharge of the Borrower's or other Loan Parties' obligations to pay those amounts to the Lenders resulting from failure by them to take appropriate steps in insolvency proceedings affecting the Borrower or other Loan Parties to preserve their entitlement to be paid those amounts.

(e)    The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more

acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law; provided, that the Obligations of any regulated Lender may not be credit bid if such regulated Lender cannot comply with such applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the equity interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase); provided, that none of the Secured Parties shall be allowed to credit bid any of the Obligations independently and all such credit bids shall have to be submitted through, and administered by, the Administrative Agent (at the direction of the Required Lenders), as set forth herein.  In connection with any such bid, (i) each Agent shall be authorized but, for the avoidance of doubt, not obligated (regardless of direction from Required Lenders or any other number of Lenders) to (x) form one or more acquisition vehicles to make a bid and (y) adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by any Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.1 of this Agreement) and (ii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

9.11    Agents May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, to the maximum extent permitted by applicable law, each Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether either Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file a single proof of claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Sections 2.9 and 10.5) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agents and, if either Agent shall consent to the making of such payments directly to the Lenders, to pay to such Agent

104

any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under Sections 2.9 and 10.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize any Agent to vote in respect of the claim of any Lender or in any such proceeding.

9.12    Survival. The agreements in this Section 9 shall survive the resignation, removal or replacement of the Agents, any assignment of rights by, or the replacement of, a Lender, the repayment, satisfaction or discharge of any or all Obligations under this or any other Loan Document, and the termination of this Agreement or any other Loan Document.

9.13    Right to Realize on Collateral and Enforce Guarantee.  Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent, the Collateral Agent and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee and Collateral Agreement or to take any other enforcement action hereunder or under any other Loan Document, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Loan Documents may be exercised solely by the Administrative Agent or the Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms hereof and thereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent for the benefit of the Secured Parties in accordance with the terms thereof.

9.14    [Reserved].

9.15    Erroneous Payments.

(a)    If the Administrative Agent (x) notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient, a "Payment Recipient") that the Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 9.15 and held in trust for the benefit of the Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on

105

interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding <u>clause (a)</u>, each Lender, Secured Party or any Person who has received funds on behalf of a Lender or Secured Party, agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)          it acknowledges and agrees that (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(ii)         such Lender or Secured Party shall (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding <u>clauses (x)</u>, <u>(y)</u> and <u>(z)</u>) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this <u>Section 9.15(b)</u>.

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this <u>Section 9.15(b)</u> shall not have any effect on a Payment Recipient's obligations pursuant to <u>Section 9.15(a)</u> or on whether or not an Erroneous Payment has been made.

(c)      Each Lender or Secured Party hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender or Secured Party under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding <u>clause (a)</u>.

(d)      (i) In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor in accordance with immediately preceding <u>clause (a)</u>, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "<u>Erroneous Payment Return Deficiency</u>"), upon the Administrative Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Loans (but not its Commitments) in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the

Loans (but not Commitments), the "Erroneous Payment Deficiency Assignment") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption (or, to the extent applicable, an agreement incorporating an Assignment and Assumption by reference pursuant to a Platform as to which the Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, (B) the Administrative Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (D) the Administrative Agent and the Borrower shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (E) the Administrative Agent will reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(ii)    Subject to Section 10.6 (but excluding, in all events, any assignment consent or approval requirements (whether from the Borrower or otherwise)), the Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent on or with respect to any such Loans acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that any such Loans are then owned by the Administrative Agent) and (y) may, in the sole discretion of the Administrative Agent, be reduced by any amount specified by the Administrative Agent in writing to the applicable Lender from time to time.

(e)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender or Secured Party, to the rights and interests of such Lender or Secured Party, as the case may be) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") (provided that the Loan Parties' Obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party; provided that this Section 9.15 shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Borrower relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent;

*provided*, *further*, that for the avoidance of doubt, immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)     To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(g)     Each party's obligations, agreements and waivers under this Section 9 shall survive the resignation or replacement of the Administrative Agent and/or Collateral Agent, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

SECTION X.    MISCELLANEOUS

10.1    Amendments and Waivers.  No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Agents and the Lenders under the Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (a) of this Section 10.1, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time. No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(a)     Except to the extent otherwise expressly set forth in this Agreement or the applicable Loan Documents, neither this Agreement, nor any other Loan Document, nor any terms, conditions or other provisions hereof or thereof may be amended, supplemented, modified, or waived except in accordance with the provisions of this Section 10.1. In the case of (i) this Agreement, the Borrower, the Administrative Agent and the Required Lenders and (ii) any other Loan Document, the Agents that are party thereto (at the direction of Required Lenders), and the Loan Party or Loan Parties that are parties thereto, may, from time to time, (i) enter into written amendments, supplements or modifications hereto or to any other Loan Document for the purpose of adding, deleting or otherwise modifying any term, condition or other provision of this Agreement or any other Loan Document or changing in any manner the rights or obligations of the Agents (provided that the Collateral Agent shall be party to any document making such changes applicable to it) or the Lenders or of the Loan Parties or their Subsidiaries hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders may specify in such instrument, any of the requirements of this Agreement or any other Loan Document or any Default or Event of Default and its consequences; *provided*, *however*, that no such waiver and no such amendment, supplement or modification shall:

(i)      forgive or reduce the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date or reduce the amount of any amortization payment in respect of any Loan, reduce the stated rate of any interest, fee or premium payable hereunder (except in connection with (x) an election permitting any interest accruing at the Default Rate to be paid in kind (which election shall be effective with the consent of the Required Lenders), (y) the waiver of the applicability of the Default Rate upon the occurrence and during the continuance of an Event of Default (which waiver shall be effective with the consent of the Required Lenders), or (z) any amendment or modification to the defined terms used in the financial ratios in this Agreement shall not constitute a reduction in the rate of interest, fees or premiums for purposes of this clause (i)) or extend the scheduled date of any payment thereof, increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly and adversely affected thereby, which such consent of each Lender directly and adversely affected thereby shall be sufficient to effect such waiver without regard for Required Lender consent;

(ii)      amend, modify or waive any provision this <u>Section 10.1</u> without the written consent of each Lender;

(iii)      (A) reduce any percentage specified in the definition of "Required Lenders" or change any other provision of this Agreement or any other Loan Document specifying the number or percentage of Lenders required to amend, modify or waive any rights hereunder or thereunder or to make any determination or grant any consent hereunder or thereunder, or (B) permit the assignment or transfer by the Borrower of any of its rights or obligations under this Agreement or the other Loan Documents (except as provided in Section 7.4(j));

(iv)      amend, modify or waive any provision of <u>clause (a)</u> or <u>(b)</u> of <u>Section 2.18</u> hereof or <u>Section 6.6</u> of the Guarantee and Collateral Agreement, or amend, modify or waive any similar provision in this Agreement or any other Loan Document in a manner that would alter the *pro rata* sharing of payments required thereby, without the written consent of each Lender;

(v)      prior to an Event of Default under <u>Section 8.1(f)</u>, amend or modify any term or provision of any Loan Document to permit the issuance or incurrence of any Indebtedness for Borrowed Money (including any exchange of existing Indebtedness that results in another class of Indebtedness for Borrowed Money, but excluding (A) Indebtedness that is expressly permitted by this Agreement as in effect on the Closing Date to be senior in payment priority to the Obligations and/or to be secured by a Lien that is senior in priority to the Lien securing such Obligations and (B) for the avoidance of doubt, any "debtor-in-possession" facility (or similar financing under applicable law)) with respect to which (x) the Liens on the Collateral securing the Obligations would be subordinated or (y) all or any portion of the Obligations would be subordinated in right of payment (any such other Indebtedness to which such Liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "<u>Senior Indebtedness</u>"), in each case without the written consent of each Lender directly and adversely affected thereby, unless each adversely affected Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the amount of Obligations that are adversely affected thereby held by each Lender) of the Senior Indebtedness on the same terms (other than bona fide backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "<u>Ancillary Fees</u>") as offered to all other providers (or their Affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its pro rata share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior

152254164_6

Indebtedness afforded to the providers of the Senior Indebtedness (or any of their Affiliates) in connection with providing the Senior Indebtedness;

(vi)     amend or modify the requirement in Section 10.6(h) (or any other provision of any Loan Document that has the effect of modifying) to conduct a Dutch Auction open to all lenders on a pro rata basis or the provisions of <u>Section 10.6(h)(i)</u> or <u>(h)(iv)</u>, in each case, without the written consent of each Lender;

(vii)    amend, modify or waive any of the rights or duties of any Agent under this Agreement or any other Loan Document without the written consent of such Agent; or

(viii)   [(A) release a material portion of the Collateral or a material portion of the value of the Guarantees provided by the Subsidiary Guarantors under the Guarantee and Collateral Agreement, (B) designate any Subsidiary as an unrestricted subsidiary that is not subject to the covenants set forth in this Agreement, or (C) modify the final paragraph of Sections 7.5 or 7.7, in each case, without the written consent of the Supermajority Lenders;]

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders at the time thereof, the Agents and all future Lenders.  In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing unless limited by the terms of such waiver; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (as provided in the definition of "Required Lenders") except that (i) the Commitment of such Lender may not be increased or extended, (ii) the maturity of the Loans of any Defaulting Lender may not be extended, (iii) the stated rate of any interest, fee or premium payable hereunder may not be reduced (except in connection with (x) an election permitting any interest accruing at the Default Rate to be paid in kind (which election shall be effective with the consent of the Required Lenders), (y) the waiver of the applicability of the Default Rate upon the occurrence and during the continuance of an Event of Default, or (z) any amendment or modification to the defined terms used in the financial ratios in this Agreement shall not constitute a reduction in the stated rate of interest, fees or premiums for purposes of this clause (iii)) and the principal amount of any such Loans may not be forgiven, in each case without the consent of such Defaulting Lender.

(b)     Furthermore, notwithstanding the foregoing, if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an ambiguity, mistake, omission, defect, or inconsistency, in each case, in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement or any other Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

(c)     Notwithstanding anything to the contrary contained in this <u>Section 10.1</u>, the Borrower's entry into an ABL Facility in accordance with the terms of this Agreement, each Lender hereunder (a) consents to the subordination of the Liens securing the Obligations solely as to ABL Priority Collateral on the terms to be set forth in the ABL Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent and the Collateral Agent to enter into the ABL

110

Intercreditor Agreement, when applicable, on behalf of such Lender and the Secured Parties, as applicable. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third party beneficiaries of such provisions and the ABL Intercreditor Agreement.

10.2    Notices; Electronic Communications.

(a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered or posted to the Platform, or three Business Days after being deposited in the mail, postage prepaid, hand delivered or, in the case of telecopy notice, when sent (except in the case of a telecopy notice not given during normal business hours (New York time) for the recipient, which shall be deemed to have been given at the opening of business on the next Business Day for the recipient), addressed as follows in the case of the Borrower or the Agents, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such Person or at such other address as may be hereafter notified by the respective parties hereto:

|  |  |
|---|---|
| The Borrower: | Cutera, Inc.<br>3240 Bayshore Boulevard<br>Brisbane, California 94005<br>Attention:  Stephana Patton, Chief Legal Officer<br>Email:  spatton@cutera.com |
| With a copy (which shall not constitute notice) to: | Ropes & Gray, LLP<br>1211 Avenue of the Americas<br>New York, New York 10036-8704<br>Attn: Jennifer Harris; Natasha S. Hwangpo<br>Email:Jennifer.Harris@ropesgray.com;<br>Natasha.Hwangpo@ropesgray.com |
| Agents: | Wilmington Savings Fund Society, FSB,<br>as Administrative Agent and Collateral Agent<br>500 Delaware Avenue, 11th Floor<br>Wilmington, Delaware 19801<br>Attn:    Patrick Healy<br>              Anita Woolery<br>Email:  PHealy@wsfsbank.com<br>              AWoolery@wsfsbank.com |

| | |
|---|---|
| With a copy (which shall not constitute notice) to: | McDermott Will & Emery LLP<br>One Vanderbilt Avenue<br>New York, New York 10017-3852<br>Attn: Jonathan Levine<br>Email: jlevine@mwe.com |

provided, that any notice, request or demand to or upon the Agents, the Lenders or the Borrower shall not be effective until received.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by posting to the Platform or by any electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Section 2 to a Lender that has notified the Administrative Agent that it is incapable of receiving notices under such Section 2 by electronic communication. Any Agent, Lender or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website (including the Platform) shall be deemed received upon the deemed receipt by the intended recipient, at its email address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's email address to which the foregoing notices may be sent by electronic transmission and that the foregoing notice may be sent to such email address.

(c)     The Borrower, each Agent and each Lender hereby acknowledges that (i) the Borrower and/or the Administrative Agent will make available to the Lenders materials, notices, demands, communications, documents and/or information provided by or on behalf of the Borrower or its Affiliates hereunder and under any other Loan Document or the transactions contemplated therein (collectively, "Borrower Materials") by posting the Borrower Materials on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform") and (ii) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive information other than information that is publicly available, or not material with respect to the Borrower or its Subsidiaries, or their respective securities, for purposes of the United States federal and state securities laws (collectively, "Public Information"). The Borrower hereby agrees that it will identify that portion of the Borrower Materials that is Public Information and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 10.14); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for

posting on a portion of the Platform not designated "Public Side Information"; provided, that there is no requirement that the Borrower identify any such information as "PUBLIC.".   Notwithstanding the foregoing, the following Borrower Materials shall be marked or deemed marked "PUBLIC", unless the Borrower notifies the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents and (2) notification of changes in the terms of the Loan Documents.

(d)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."   THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent, the Collateral Agent or any of their respective Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person or entity for losses, claims, damages, liabilities or expenses of any kind, including without limitation, direct or indirect, special, incidental, punitive or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's or an Agent Party's transmission of Borrower Materials through the Internet (including the Platform), except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party.

(e)     Each of the Borrower and the Administrative Agent may change its address, e-mail address, telecopier or telephone number for notices and other communications hereunder by notice to such other Person.  Each Lender may change its address, e-mail address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender. Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Requirement of Law, including United States federal securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain information other than Public Information.

(f)     The Administrative Agent, Collateral Agent and the Lenders shall be entitled to rely and act upon any notices  believed in good faith by the Administrative Agent or the Collateral Agent to be given by or on behalf of the Borrower or any other Person even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.   All telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.3     No Waiver; Cumulative Remedies.

(a)        No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.   The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

(b)        Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 8.1</u> for the benefit of all the Lenders and the Collateral Agent for the benefit of the Secured Parties; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (i) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with <u>Section 10.7(b)</u> (subject to the terms of <u>Section 10.7(a)</u>), or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

10.4        <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5        <u>Payment of Expenses; Indemnification</u>.  Except with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim, the Borrower agrees:

(a)        (A) to pay or reimburse each Agent the reasonable fees and disbursements and other charges of a single firm as counsel to the Agents (plus one firm of special regulatory counsel and one firm of local counsel per material jurisdiction to the Agents as may reasonably be necessary) for all of its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, and, as to the Agents only, the administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of a single firm as counsel to the Agents (plus one firm of special regulatory counsel and one firm of local counsel to the Agents per material jurisdiction as may be reasonably necessary) and the reasonable fees and expenses of any agent, sub-agent or attorney-in-fact appointed by any Agent;

(b)        to pay or reimburse each Lender and the Agent for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in <u>Section 10.5(a)</u> above (including all such costs and expenses incurred in connection with any legal proceeding, including any proceeding under any Debtor Relief Law or in connection with any workout or restructuring), including the documented fees and disbursements of (i) a single firm as counsel to the Agents, any local counsel to the Agents and, if necessary, a single firm of special regulatory counsel for the Agents and the reasonable fees and expenses of any agent, sub-agent or attorney-in-fact appointed by any Agent and, if necessary, a single firm of special regulatory counsel, and (ii) a single firm of counsel, and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may be necessary, for the Lenders, taken as a whole and, in the event of an actual

114

or perceived conflict of interest, where the Agent or Lender affected by such conflict informs the Borrower and thereafter retains its own counsel, one additional counsel for each Lender or Agent or group of Lenders or Agents subject to such conflict; and

(c)     to pay, indemnify or reimburse each Lender, each Agent and their respective Affiliates, and their respective partners that are natural persons, members that are natural persons, officers, directors, employees, trustees, advisors, agents, sub-agents, attorneys-in-fact and controlling Persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising out of any actions, judgments or suits of any kind or nature whatsoever, arising out of or in connection with any claim, action or proceeding (any of the foregoing, a "Proceeding") relating to or otherwise with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents referred to in Section 10.5(a) above and the transactions contemplated hereby and thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties and the reasonable fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower hereunder (all the foregoing in this clause (c), collectively, the "Indemnified Liabilities");

provided, that, the Borrower shall not have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities have resulted from (i) the gross negligence or willful misconduct of such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto) or (ii) disputes solely among Indemnitees or their Related Persons and not arising from any act or omission by the Borrower or any of its Subsidiaries (it being understood that this paragraph shall not apply to the indemnification of an Agent in a suit involving an Agent, in each case, in its capacity as such, unless such suit has resulted from the gross negligence or willful misconduct of such Agent as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto); provided, further, that no action taken by any Agent in accordance with the written direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary) shall be deemed to constitute gross negligence or willful misconduct for purposes hereof)) or (iii) any settlement of any Proceeding effected without the Borrower's consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with the Borrower's written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, the Borrower shall indemnify and hold harmless each Indemnitee from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this Section 10.5.

No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other material distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

For purposes hereof, a "Related Person" of an Indemnitee means (i) if the Indemnitee is any Agent or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Agent and its Affiliates and their respective officers, directors, employees, agents and controlling Persons; provided, that solely for purposes of Section 9, references to each Agent's Related Persons shall also include such Agent's trustees and advisors, and (ii) if the Indemnitee is any Lender or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors,

employees, agents and controlling Persons, any of such Lender and its Affiliates and their respective officers, directors, employees, agents and controlling Persons. All amounts due under this Section 10.5 shall be payable promptly after receipt of a reasonably detailed invoice therefor. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the Borrower at the address thereof set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.

The agreements in this Section 10.5 shall survive repayment of the Obligations.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (other than in accordance with Section 7.4(j)) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) subject to Section 2.24, no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, in compliance with applicable law, assign (other than to any Disqualified Institution or a natural person) to one or more assignees (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(1)    the Borrower; provided, that no consent of the Borrower shall be required for an assignment (x) to a Lender, an Affiliate of a Lender, or an Approved Fund, or (y) if an Event of Default has occurred and is continuing, to any other Person; provided, further, that a consent under this clause (1) shall be deemed given if the Borrower shall not have objected in writing to a proposed assignment within five (5) Business Days after receipt by it of a written notice thereof from the Administrative Agent; and

(2)    the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)    Subject to Section 2.24, assignments shall be subject to the following additional conditions:

(1)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of (I) the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or (II) if earlier, the "trade date" (if any) specified in such Assignment and Assumption) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent; provided, that (1) no such consent of the Borrower shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each assigning Lender and its Affiliates or Approved Funds, if any;

(2)     the parties to each assignment shall execute and deliver to the Administrative Agent (I) an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent and the Borrower (or, at the Borrower's request, manually) together with (II) a processing and recordation fee of $3,500 to be paid by either the applicable assignor or Assignee (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided, that only one such fee shall be payable in the case of contemporaneous assignments to or by two or more related Approved Funds; and

(3)     the Assignee, if not a Lender prior to such assignment, shall deliver to the Administrative Agent an administrative questionnaire and all applicable tax forms.

For the purposes hereof, "Approved Fund" means any Person that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (I) a Lender, (II) an Affiliate of a Lender, (III) an entity or an Affiliate of an entity that administers or manages a Lender or (IV) an entity or an Affiliate of an entity that is the investment advisor to a Lender.  Notwithstanding the foregoing, no Lender shall be permitted to make assignments under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Assumption, the Assignee thereunder shall be a party hereto and, to the extent of the Loans and Commitments assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be subject to the obligations under and entitled to the benefits of Sections 2.20, 2.21, 2.25, 10.5 and 10.14).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 10.6 (and will be required to comply therewith), other than any sale to a Disqualified Institution, which shall be null and void.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the applicable Lenders, and the applicable Commitments of, and principal amount (and stated interest) of the applicable Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error and the Borrower, the Administrative Agent, the Collateral Agent and the applicable Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. The parties intend that any interest in or with respect to the Loans under this Agreement be treated as being issued and maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code and any regulations thereunder (and any successor provisions), including without limitation under United States Treasury Regulations Section 5f.103-1(c) and Proposed Regulations Section 1.163-

117

5 (and any successor provisions), and the provisions of this Agreement shall be construed in a manner that gives effect to such intent.

(v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee (except as contemplated by Section 2.24), the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder) and all applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this Section 10.6 (unless waived by the Administrative Agent) and any written consent to such assignment required by paragraph (b) of this Section 10.6, the Administrative Agent shall accept such Assignment and Assumption and promptly record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)      (i)      Any Lender may, without the consent of or notice to any Person, in compliance with applicable law, sell participations (other than to any Disqualified Institution in accordance with the last sentence of this paragraph or a natural person) to one or more banks or other entities (a "Participant"), in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, Collateral Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.   Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby or requires the consent of each Lender, in each case pursuant to the proviso to Section 10.1(a), and (2) directly and adversely affects such Participant.  Subject to paragraph (c)(ii) of this Section 10.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.20 and 2.21 (if such Participant agrees to have related obligations thereunder (it being understood that the documentation required under Section 2.20 shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.6.  Notwithstanding the foregoing, no Lender shall be permitted to sell participations under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(ii)      A Participant shall not be entitled to receive any greater payment under Section 2.20 or 2.21 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater amounts.  No Participant shall be entitled to the benefits of Section 2.20 unless such Participant complies with Section 2.20(e), (g) or (j), as (and to the extent) applicable, as if such Participant were a Lender (it being understood that the documentation required under Section 2.20 shall be delivered to the participating Lender).

(iii)      Each Lender that sells a participation, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury Regulations issued thereunder on which it enters the name and addresses of each Participant, and the principal amounts (and stated interest) of each Participant's interest in the Commitments, Loans or other obligations under this Agreement (individually and collectively,

the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under the Code or Treasury Regulations, including without limitation Section 5f.103-1(c) of the United States Treasury Regulations, or is otherwise required thereunder.   Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS.   The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (it its capacity as such) shall have no responsibility for maintaining any Participant Register.

(d)     Any Lender may, without the consent of or notice to the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section 10.6 shall not apply to any such pledge or assignment of a security interest; provided, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring the same (in the case of an assignment, following surrender by the assigning Lender of all Notes representing its assigned interests).

(f)     The Borrower may prohibit any assignment if it would require the Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction and the Borrower shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee to determine whether any such filing or qualification is required or whether any assignment is otherwise in accordance with applicable law.

(g)     [Reserved].

(h)     Notwithstanding anything to the contrary herein, any Lender may assign all or any portion of its Loans hereunder to the Borrower or any of its Subsidiaries, but only if:

(i)     such assignment is made pursuant to a Dutch Auction open to all Lenders on a pro rata basis;

(ii)     no Default or Event of Default shall have occurred and be continuing before or immediately after giving effect to such assignment;

(iii)     the relevant Auction Offeror shall represent and warrant, as of the date of the launch of the Dutch Auction and on the date of any such assignment, that it does not have any material non-public information that has not been disclosed to the Lenders generally (other than to the extent any such Lender does not wish to receive material non-public information with respect to the Borrower or its Subsidiaries or any of their respective securities) prior to such date; and

119

(iv)     immediately and automatically, without any further action on the part of the Borrower or any of its Subsidiaries, any Lender, the Administrative Agent or any other Person, upon the effectiveness of such assignment of Loans from a Lender to the relevant Auction Offeror, such Loans and all rights and obligations as a Lender related thereto shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect and such Auction Offeror shall neither obtain nor have any rights as a Lender hereunder or under the other Loan Documents by virtue of such assignment.

(i)     Except as provided in Section 10.6(h), none of the Borrower or any of its Subsidiaries may acquire by assignment, participation or otherwise any right to or interest in any of the Commitments or Loans hereunder (and any attempted acquisition shall be null and void).

(j)     [Reserved].

(k)     Notwithstanding anything to the contrary contained herein, the replacement of any Lender pursuant to Section 2.24 shall be deemed an assignment pursuant to Section 10.6(b) and shall be valid and in full force and effect for all purposes under this Agreement.

(l)     Any assignor of a Loan or Commitment or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the Assignee Lender or purchaser of such participation in the relevant Assignment and Assumption or participation agreement, as applicable, that such Assignee or purchaser is not a Disqualified Institution.  None of the Agents shall have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans or Commitments, or disclosure of confidential information, to any Disqualified Institution.

10.7     Adjustments; Set off.

(a)     Except to the extent that this Agreement provides for payments to be allocated to a particular Lender, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 8.1(f), or otherwise) in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that (i) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (ii) the provisions of this Section 10.7 shall not be construed to apply to any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including prepayments received pursuant to Section 10.6(h)) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or Commitments to any Assignee or Participant.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived

by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) after the expiration of any cure or grace periods, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

10.8    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or electronic (i.e., "pdf" or "tiff") transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    Severability.    Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof.

10.11    GOVERNING LAW.    **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.**

10.12    Submission to Jurisdiction; Waivers.  Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "New York Supreme Court"), and the United States District Court for the Southern District of New York (the "Federal District Court" and, together with the New York Supreme Court, the "New York Courts"), and appellate courts from any of them; provided, that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other

security for the Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this <u>Section 10.12</u> would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment and (iii) if all such New York Courts decline jurisdiction over any Person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction;

(b)        consents that any such action or proceeding may be brought in the New York Courts and appellate courts from either of them, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)        agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in <u>Section 10.2</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)        agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)        waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 10.12</u> any special, exemplary, punitive or consequential damages (<u>provided</u>, that such waiver shall not limit the indemnification obligations of the Loan Parties to the extent such special, exemplary, punitive or consequential damages are included in any third party claim with respect to which the applicable Indemnitee is entitled to indemnification under <u>Section 10.5</u>).

10.13    <u>Acknowledgments</u>.  The Borrower hereby acknowledges on behalf of itself and each Loan Party that:

(a)        it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)        neither the Agents nor any Lender has any fiduciary relationship with or duty to the Borrower or any other Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and Lenders, on the one hand, and the Borrower and Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c)        no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower, Loan Parties and the Lenders;

(d)        no advisory or agency relationship between it and any Agent or Lender (in their capacities as such) is intended to be or has been created in respect of any of the transactions contemplated hereby or in any other Loan Document;

(e)        the Agents and the Lenders, on the one hand, and the Borrower and other Loan Parties, on the other hand, have an arms-length business relationship;

122

(f)     the Borrower and each Loan Party is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents;

(g)     each of the Agents and the Lenders is engaged in a broad range of transactions that may involve interests that differ from the interests of the Borrower and other Loan Parties and none of the Agents or the Lenders has any obligation to disclose such interests and transactions to the Borrower or any other Loan Party by virtue of any advisory or agency relationship; and

(h)     none of the Agents or the Lenders (in their capacities as such) has advised the Borrower or Loan Parties as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including the validity, enforceability, perfection or avoidability of any aspect of any of the transactions contemplated hereby under applicable law, including the Bankruptcy Code or any consents needed in connection therewith), and none of the Agents or the Lenders (in their capacities as such) shall have any responsibility or liability to the Borrower or any Loan Party with respect thereto and the Borrower and each Loan Party has consulted with its own advisors regarding the foregoing to the extent it has deemed appropriate.

To the fullest extent permitted by law, the Borrower and each Loan Party hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby or in any other Loan Document.

10.14   Confidentiality.  Each of the Agents and the Lenders agree to treat any and all information, regardless of the medium or form of communication, that is disclosed, provided or furnished, directly or indirectly, by or on behalf of the Borrower or any of its Affiliates in connection with this Agreement or the transactions contemplated hereby (including any potential amendments, modifications or waivers, or any request therefor), whether furnished before or after the Closing Date ("Confidential Information"), as strictly confidential and not to use Confidential Information for any purpose other than evaluating the Transactions and negotiating, making available and administering this Agreement, the Loan Documents and the transactions contemplated hereby and thereby (the "Agreed Purposes"). Without limiting the foregoing, each Agent and each Lender agrees to treat any and all Confidential Information with adequate means to preserve its confidentiality, and each Agent and each Lender agrees not to disclose Confidential Information, at any time, in any manner whatsoever, directly or indirectly, to any other Person whomsoever, except:

(1)     to each such Person and its and its Affiliates' controlling persons, partners that are natural persons, members that are natural persons, directors, officers, employees, counsel, advisors, trustees, agents (including accountants, legal counsel and other advisors), including any numbering, administration or settlement service providers and in each case, and their Affiliates (collectively, the "Representatives"), to the extent necessary to permit such Representatives to assist in connection with the Agreed Purposes (it being understood that the Representatives to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential);

(2)     to any pledgee referred to in Section 10.6(d) and prospective Lenders and Participants in connection with secondary trading of the Facility and Commitments and Loans hereunder (excluding any Disqualified Institution), in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14;

123

(3)      to any party or prospective party (or their advisors) to this Agreement (including, for the avoidance of doubt, Assignees and prospective Assignees, Participants or prospective Participants) or any swap, derivative or similar transaction under which payments are made by reference to the Borrower and the Obligations, this Agreement or payments hereunder, in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this <u>Section 10.14</u>;

(4)      upon the request or demand of any Governmental Authority having or purporting to have jurisdiction over it;

(5)      in response to any order of any Governmental Authority or as may otherwise be required pursuant to any Requirement of Law (including to the extent required by applicable laws or regulations, pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process or by any subpoena or similar legal process), <u>provided</u>, that in the case of <u>clauses (4)</u> and <u>(5)</u>, the disclosing Agent or Lender, as applicable, agrees, to the extent practicable and not prohibited by applicable Requirement of Law or process, to notify the Borrower prior to such disclosure (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority);

(6)      to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Facility;

(7)      information that has been publicly disclosed or becomes publicly available or is received by such Person from a third party other than by reason of improper disclosure by such Person or any of its Affiliates or any Related Parties thereto other than in breach of this <u>Section 10.14</u>;

(8)      to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or in connection with examinations or audits of such Lender or to market data collectors, similar service providers to the lending industry, and service providers to the Agents and Lenders in connection with the administration and management of this Agreement, the other Loan Documents and the Commitments;

(9)      in connection with the exercise of any remedy under the Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder; <u>provided</u>, that the recipient is informed of the confidential nature of the information;

(10)      to the extent the Borrower has consented to such disclosure in writing;

(11)      to any other party to this Agreement or any of its Affiliates;

(12)      to the extent that such information is received from a third party that is not, to such Agent or Lender's knowledge, subject to contractual or fiduciary confidentiality obligations owing to the Borrower and its Affiliates and their Related Parties;

124

(13)      to the extent that such information is already in the possession of the Agent or Lender prior to any duty or other undertaking of confidentiality or independently developed by such Agent or Lender without use of the Confidential Information;

(14)      for purposes of establishing a "due diligence" defense; or

(15)      by the Administrative Agent to the extent reasonably required or necessary to obtain a CUSIP for any Loans or Commitment hereunder, to the CUSIP Service Bureau.

Each Agent and each Lender acknowledges that (i) Confidential Information includes information that is not otherwise publicly available and that such non-public information may constitute confidential business information which is proprietary to the Borrower and/or its Affiliates and (ii) the Borrower has advised the Agents and the Lenders that it is relying on the Confidential Information for its success and would not disclose the Confidential Information to the Agents and the Lenders without the confidentiality provisions of this Agreement.  All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including federal and state securities laws.  Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this Section 10.14 shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

Any Person required to maintain the confidentiality of Confidential Information as provided in this Section 10.14 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord its own confidential information. Notwithstanding the foregoing, (i) Confidential Information shall not include, with respect to any Person, information available to it or its Affiliates on a non-confidential basis from a source other than the Borrower, (ii) each Agent shall not be responsible for compliance with this Section 10.14 by any Person (other than its officers, directors or employees), (iii) in no event shall any Lender or any Agent be obligated or required to return any materials furnished by the Borrower or any of its Subsidiaries and (iv) each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities, market data collectors, similar services providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration, settlement and management of this Agreement and the other Loan Documents.

10.15   Release of Collateral and Guarantee Obligations.

(a)      Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property permitted by the Loan Documents (including by way of merger and including any assets transferred to a Subsidiary that is not a Loan Party in a transaction permitted by this Agreement) or any Loan Party becoming an Excluded Subsidiary (other than pursuant to clause (a) of the definition thereof) or ceasing to be a Subsidiary (as used in this Section 10.15, "ceasing to be a Subsidiary" with respect to any Loan Party shall mean that no Loan Party or Affiliate thereof shall have retained any direct or indirect equity interests in such Person), all Liens and Guarantees on such assets or all assets of such Excluded Subsidiary or former Subsidiary

shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender being required) execute and deliver all releases reasonably necessary or desirable requested by Borrower in writing (i) to evidence the release of Liens created in any Collateral being Disposed of in such Disposition (including any assets of any Loan Party that becomes an Excluded Subsidiary) or of such Excluded Subsidiary or former Subsidiary, as applicable, (ii) to provide notices of the termination of the assignment of any Property for which an assignment had been made pursuant to any of the Loan Documents which is being Disposed of in such Disposition or of such Excluded Subsidiary or former Subsidiary, as applicable, and (iii) to release the Guarantee and any other obligations under any Loan Document of any Person being Disposed of in such Disposition or which becomes an Excluded Subsidiary or former Subsidiary, as applicable; provided, that at the request of any Agent, the Borrower shall deliver a certificate of a Responsible Officer to the applicable Agent certifying that the Disposition is permitted by the Loan Documents.  Any representation, warranty or covenant contained in any Loan Document relating to any such Property so Disposed of (other than Property Disposed of to the Borrower or any of its Subsidiaries) or of a Loan Party which becomes an Excluded Subsidiary or former Subsidiary, as applicable, shall no longer be deemed to be repeated once such Property is so Disposed of. In addition, upon the reasonable request of the Borrower in connection with (A) any Lien of the type permitted by Section 7.3(g) on Excluded Collateral to secure Indebtedness to be incurred pursuant to Section 7.2(c) (or pursuant to Section 7.2(d) or 7.2(g) if such Indebtedness is of the type that is contemplated by Section 7.2(c) if the holder of such Lien so requires, (B) any Lien of the type permitted by Sections 7.3(p) 7.3(cc), 7.3(dd), and 7.3(ee), in each case to the extent the obligations giving rise to such permitted Lien prohibit (or require the release of) the security interest of the Collateral Agent thereon, (C) the ownership of joint ventures or other entities qualifying under clause (ii) of the definition of Excluded Equity Securities, the Collateral Agent shall execute and deliver all releases necessary or desirable requested by Borrower in writing to evidence that no Liens exist on such Excluded Collateral under the Loan Documents, or (D) any Lien securing Indebtedness incurred pursuant to Section 7.2(u)(i) if the holder of such Lien so requires and pursuant to Section 7.2(u)(ii) if the holder of such Lien so requires and if the holder of the applicable Indebtedness being refinanced also so requires, and in each case to the extent constituting Excluded Collateral.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than any contingent or indemnification obligations not then due) have been paid in full and all Commitments have terminated or expired, upon the request of the Borrower, all Liens and Guarantee Obligations under any Loan Documents shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender being required) take such actions as shall be required to release its security interest in all Collateral, and to release all Guarantee Obligations under any Loan Document, whether or not on the date of such release there may be contingent or indemnification obligations not then due.  Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Subsidiary Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Subsidiary Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

10.16    [Reserved].

10.17    WAIVERS OF JURY TRIAL.  **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE**

**TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND FOR ANY COUNTERCLAIM THEREIN.**

10.18   USA PATRIOT ACT.   The Administrative Agent and each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Publ. 107 56 (signed into law October 26, 2001)) (the "USA Patriot Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of such Loan Parties and other information that will allow the Administrative Agent or such Lender to identify the Loan Parties in accordance with the USA Patriot Act, and the Borrower agrees to provide such information from time to time to any Lender or Agent reasonably promptly upon request from such Lender or Agent.

10.19   [Reserved].

10.20   Interest Rate Limitation.   Notwithstanding anything in this Agreement to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.20 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

10.21   Payments Set Aside.   To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations, the termination of this Agreement and the resignation of Administrative Agent.

10.22   Electronic Execution of Assignments and Certain Other Documents.   The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other notices of borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the

extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

10.23   <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(A)   a reduction in full or in part or cancellation of any such liability;

(B)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)   the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

10.24   <u>Section Headings</u>.   The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

CUTERA, INC.,
as the Borrower


By: _____
Name:
Title:

[Signature Page to Credit Agreement]

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent and Collateral Agent


By: _____
    Name:
    Title:

[Signature Page to Credit Agreement]

[_____],
as a Lender

By: _____
    Name:
    Title:

[Signature Page to Credit Agreement]

**Exhibit D**

**Management Incentive Plan Term Sheet**

**PROJECT CRYSTAL**
**MANAGEMENT INCENTIVE PLAN ("MIP") TERM SHEET**

| Category | Proposed Management Incentive Plan Terms |
|---|---|
| 1. **Form of Incentive Equity Awards** | Stock options |
| 2. **Size of Equity Pool** | 10% of the total number of common shares of Reorganized Cutera (the "Company") (measured on a fully diluted basis as of the closing date of the restructuring transactions (the "Closing Date")) will be reserved for senior management (the "Pool").<br><br>For the avoidance of doubt, this MIP term sheet shall only govern the terms of the MIP.  It is also expected that the Company will provide a long-term incentive program with employee participation in continuation of historical practice.  The Board of Directors of the Company (the "Board") shall determine the performance criteria, structure, and form of compensation in consultation, as needed, with compensation consultants and key shareholders. |
| 3. **Vesting** | Vesting terms to be consistent with market practice for private companies in the medical device industry, as determined by the Board in consultation with a compensation consultant, including with respect to any service-based and/or performance-based vesting conditions applicable to each award. |
| 4. **Initial Grants** | Initial grants will be made on or promptly following the Closing Date and will have a vesting commencement date of the Closing Date.  The CEO to propose an allocation of the initial grants for review by the Board, and subject to approval by the Board.  The portion of the Pool available for the initial grants to be determined by the Board, following consultation with the CEO.  It is expected that there will be a customary reserve left in the Pool to address new hires and promotions. |
| 5. **Other terms** | Other terms to be determined by the Board, including (i) the effect of termination of employment, consistent with market practice for private companies in the medical device industry and (ii) the fair market value. |

## Exhibit E

## Schedule of Retained Causes of Action

<u>Section 4.22</u> of the Plan provides as follows:

Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such retained Causes of Action or Claims and may exercise any and all rights in connection therewith. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.22 include any Claim or Cause of Action with respect to, or against, a Released Party that is released under the Plan.

No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan, Confirmation Order, or a Final Order, all such Causes of Action shall be expressly reserved by the Reorganized Debtors for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of this Plan. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.

The Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any entity, except as otherwise expressly provided in the Plan, including Causes of Action that are not expressly identified in this **Exhibit E**.

Below are identified specific Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors, as applicable, subject to the terms of the Plan and the information provided in this **Exhibit E**.

The Debtors reserve all rights to amend, revise, or supplement this **Exhibit E** to the Plan Supplement, and any of the documents and designations contained herein, at any time before the

Effective Date, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court.

### 1.   Contracts and Leases Cause of Action

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against any entity, based in whole or in part upon any and all contracts and leases to which any Debtor is a party. Furthermore, all such Claims and Causes of Action are reserved unless otherwise released under separate written agreement executed by the Debtors or the Reorganized Debtors, as applicable, for: (a) overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) any liens, including mechanic's, artisan's, materialmen's, possessory, or statutory liens held by any one or more of the Debtors; (f) environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies, or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; (h) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (i) unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort Claims.

### 2.   Tort Causes of Action

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against any entity based in whole or in part upon tort. The Claims and Causes of Action reserved include Causes of Action against vendors, suppliers of goods and services, or any other parties for: (a) overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption, assumption or assignment, or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) any liens, including mechanics', artisans', materialmen's, possessory or statutory liens held by any one or more of the Debtors; (f) arising out of environmental or contaminant exposure matters against landlords, lessors, environmental consultants, environmental agencies or suppliers of environmental services or goods; (g) counterclaims and defenses related to any contractual obligations; and (h) unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property or any business tort Claims.

### 3.  Causes of Action Related to Insurance Policies

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against any entity based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies and occurrence contracts to which any Debtor is or was a party or pursuant to which any Debtor has any rights whatsoever, including Causes of Action against current or former insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, or surety bond issuers relating to coverage, indemnity, contribution, reimbursement, overpayment of premiums and fees, breach of contract or any other matters.

### 4.  Causes of Action Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against any entity based in whole or in part upon any and all postings of a security deposits, adequate assurance payment, or any other type of deposit or collateral owed by any creditor, lessor, utility, supplier, vendor, landlord, sub-lessee, assignee or other entity.

### 5.  Causes of Action Related to Liens

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action based in whole or in part upon any and all liens regardless of whether such lien is specifically identified in the Plan.

### 6.  Causes of Action Related to Defenses, Crossclaims and Counterclaims Related to Litigation and Potential Litigation

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against or related to all entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal or judicial or non-judicial, regardless of whether such entity is specifically identified in the Plan, the Plan Supplement, or any amendments hereto, including, without limitation, all actual or potential: (a) contract and tort actions that may exist or may subsequently arise, (b) actions relating to environmental and product liability matters, and (c) actions arising out of, or relating to, the Debtors' or the Reorganized Debtors', as applicable, intellectual property rights. For the avoidance of doubt, nothing herein shall be read as an admission as to the validity or allowance of any Claim against any Debtor, and any and all prepetition Claims against the Debtors that may be identified herein shall be treated in accordance with the Plan and the Bankruptcy Code.

### 7.  Causes of Action Related to Accounts Receivable and Accounts

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against or related to all entities that owe or that may in the future owe money to the Debtors or the Reorganized Debtors, as applicable, regardless of whether such entity is expressly identified in the Plan, this Plan

Supplement, or any amendments thereto. Furthermore, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action against or related to all entities who assert or may assert that the Debtors owe money to them.

### 8.   Causes of Action Related to Taxes, Fees, and Tax or Fee Refunds or Credits

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Claims and Causes of Action against or related to all entities that owe or that may in the future owe money related to tax or fee refunds, credits, overpayments, recoupments, offsets, or other Claims that may be due and owing to the Debtors or the Reorganized Debtors, as applicable. Furthermore, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all Causes of Action against or related to all entities who assert or may assert that the Debtors owe tax obligations to them.

### 9.   Causes of Action Related to Avoidance Actions

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all avoidance Claims and Causes of Action against or related to all entities arising under chapter 5 of the Bankruptcy Code, including, without limitation, sections 502, 510, 542, 544, 547–553, and 724(a) of the Bankruptcy Code.

### 10.   Causes of Action Related to Disputed Claims

Unless otherwise released under the Plan, the Debtors and the Reorganized Debtors, as applicable, expressly reserve all rights, Claims, defenses, and Causes of Action against any Holder of a Claim seeking to collect a distribution from or assert other rights against the Debtors or Reorganized Debtors, as applicable, whether at law or equity, under any theory and of any nature whatsoever, unless and until each of such Holder's Claims become Allowed Claims.

### 11.   Causes of Action Related to Vendor Obligations

To the extent not otherwise reserved pursuant to this **Exhibit E**, unless otherwise released pursuant to the Plan, the Debtors expressly reserve all Causes of Action against or related to all vendors that owe or may in the future owe money or other obligations to the Debtors or the Reorganized Debtors, whether for unpaid invoices; unreturned, missing, or damaged inventory; indemnification; warranties; any turnover actions arising under section 542 or 543 of the Bankruptcy Code; or any other matter whatsoever.

### 12.   Causes of Action Related to Customer Obligations

To the extent not otherwise reserved pursuant to this **Exhibit E**, unless otherwise released pursuant to the Plan, the Debtors expressly reserve all Causes of Action against or related to all customers that owe or may in the future owe money to the Debtors or the Reorganized Debtors, whether for unpaid invoices; unreturned, missing, or damaged inventory; warranties; or any other matter whatsoever.

### 13. <u>Causes of Action Related to Current or Former Employee Matters</u>

Unless otherwise released pursuant to the Plan, the Debtors expressly reserve all Claims, defenses, cross-claims, and counterclaims against or related to all current or former employees that are party to or that may in the future become party to any workers' compensation Claims or actions, litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicia.

### 14. <u>Causes of Action Against Former Directors and Officers</u>

Unless otherwise released pursuant to the Plan, the Debtors expressly reserve all Claims and Causes of Action against any of the Debtors' former directors and officers that are not a Released Party, including without limitation, any Claims or Causes of Action on account of a breach of fiduciary duties.

### 15. <u>Causes of Action Related to Intellectual Property</u>

Unless otherwise releases pursuant to the Plan, the Debtors expressly reserve all Claims and Causes of Action based in whole or in part upon the Debtors' intellectual property, licensing or licensing agreements, or infringement of intellectual property.

**Exhibit F-1**

**Certificate of Incorporation of Cutera, Inc.**

*Subject to Change*

# SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## of

## CUTERA, INC.

CUTERA, INC., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

The name of the Corporation is Cutera, Inc. The Corporation filed its original Certificate of Incorporation with the Secretary of State of the State of Delaware on August 10, 1998, under the name of Acme Medical, Inc. (the "Original Certificate of Incorporation"). The Original Certificate of Incorporation was amended and restated in its entirety by the filing of an Amended and Restated Certificate of Incorporation with the Secretary of State of the State of Delaware on August 17, 2017 (the "Current Certificate of Incorporation"). This Second Amended and Restated Certificate of Incorporation (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Certificate of Incorporation"), which amends and restates the Current Certificate of Incorporation in its entirety, has been duly adopted by all necessary action of the Board of Directors of the Corporation (the "Board of Directors") and the stockholders of the Corporation in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware (the "DGCL"), with the stockholders of the Corporation acting by written consent in lieu of a meeting in accordance with Section 228 of the DGCL. This Certificate of Incorporation shall become effective on the date of filing with the Secretary of State of the State of Delaware.

The Current Certificate of Incorporation is hereby amended and restated to read in its entirety as follows:

1.    **Name.** The name of the corporation is Cutera, Inc.

2.    **Registered Office and Agent.** The Corporation's registered office in the State of Delaware is located at c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, County of New Castle, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company.

3.    **Purpose.** The nature of the business of the Corporation and its purpose is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

4.    **Authorized Capital Stock; Number of Shares.** The total number of shares of all classes of capital stock that the Corporation shall have the authority to issue is 15,000,000 shares, consisting solely of (i) 10,000,000 shares of Common Stock, $0.001 par value per share ("Common Stock"), and (ii) 5,000,000 shares of preferred stock, $0.001 par value per share ("Preferred Stock").

Contingent and effective immediately upon the filing of this Certificate of Incorporation with the Secretary of State of the State of Delaware, without further action on the part of the Corporation or its stockholders, each then-outstanding share of common stock, $0.001 par value per share, of the Corporation (the "Existing Common Stock") shall be cancelled (the "Common

Cancellation"). Any stock certificate that, immediately prior to the Common Cancellation, represented shares of Existing Common Stock shall, from and after the Common Cancellation, be cancelled, terminated and of no further force or effect, without the need for surrender or exchange thereof, and the Corporation shall not have any continuing obligations thereunder. The Common Cancellation shall occur automatically whether or not the certificates representing affected shares of Existing Common Stock have been surrendered to the Corporation.

Notwithstanding anything herein to the contrary, the Corporation shall not issue non-voting equity securities of any class, series or other designation to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided, however, that the foregoing restriction (a) shall have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, (b) shall only have such force and effect to the extent and for so long as such Section 1123(a)(6) is in effect and applies to the Corporation, and (c) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

5.    **Rights of Stockholders**.

5.1    ***Common Stock***.

5.1.1    *Relative Rights*. Common Stock shall be subject to all of the rights, privileges, preferences and priorities of any series of Preferred Stock.

5.1.2    *Dividends*. Subject to the rights of holders of any outstanding series of Preferred Stock, the Board of Directors may cause dividends to be declared and paid on outstanding shares of Common Stock out of funds legally available for the payment of dividends. When, as and if dividends are declared by the Board of Directors, whether payable in cash, in property, in stock or otherwise, in accordance with this Certificate of Incorporation and the Second Amended and Restated Bylaws of the Corporation, as in effect from time to time (the "Bylaws"), out of the assets of the Corporation which are at law available therefor, the holders of outstanding shares of Common Stock shall be entitled to share equally in, and to receive in accordance with the number of shares of Common Stock held by each such holder, all such dividends.

5.1.3    *Liquidation Rights*. In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the holders of issued and outstanding shares of Common Stock shall be entitled to share, ratably according to the number of shares of Common Stock held by each such holder, in the remaining assets of the Corporation available for distribution to its stockholders after the payment, or provision for payment, of all debts and other liabilities of the Corporation and the payment of any outstanding series of Preferred Stock that has preferential rights on distributions upon a liquidation, dissolution or winding up of the Corporation, and subject to any outstanding series of Preferred Stock that participates with shares of Common Stock with respect to distributions upon a liquidation, dissolution or winding up of the Corporation.

5.1.4    *Stockholder Voting Rights*. Subject to applicable law and except as otherwise expressly provided elsewhere in this Certificate of Incorporation, the Bylaws, or the Stockholders Agreement, and subject to the rights of holders of any outstanding series of Preferred Stock:

(i)    each holder of record of one or more issued and outstanding shares of Common Stock shall be entitled to one vote for each share of Common Stock standing in such holder's name

on the books of the Corporation for matters that holders of shares of Common Stock are entitled to vote on; and

(ii)      the holders of record of the issued and outstanding shares of Common Stock shall possess voting power on, and shall be entitled to act by written consent in lieu of a meeting with respect to, all matters on which the Corporation's stockholders are entitled to vote.

Anything in this Certificate of Incorporation to the contrary notwithstanding, except as otherwise required by applicable law or this Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock), the holders of shares of Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series of Preferred Stock are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Certificate of Incorporation (including any certificate of designations relating to any series of Preferred Stock) or the DGCL.

5.2      ***Preferred Stock***. Preferred Stock may be issued from time to time in one or more series with the prior approval of the Majority Stockholders. Subject to applicable law and the provisions of this Certificate of Incorporation, the Board of Directors is authorized to determine the designation of any series of Preferred Stock, to fix the number of shares of any series of Preferred Stock, and to determine the rights, powers (including voting powers, if any), preferences, privileges, limitations and restrictions granted to or imposed upon any series of Preferred Stock and, within the limits and restrictions stated in any resolution or resolutions of the Board of Directors originally fixing the number of shares constituting any series of Preferred Stock, to increase or decrease (but not below the number of shares of any such series then outstanding) the number of shares of any such series subsequent to the issuance of shares of that series. If the number of shares of any series of Preferred Stock shall be so decreased, the shares constituting such decrease shall resume the undesignated status which they had prior to the adoption of the resolution originally fixing the number of shares of such series.

5.3      ***Special Meetings of Stockholders***. Subject to applicable law, special meetings of stockholders may be called at any time in accordance with the terms of the Bylaws.

5.4      ***Consideration***. Subject to applicable law and except as otherwise provided in this Certificate of Incorporation, the capital stock of the Corporation, regardless of class or series, may be issued for such consideration and for such corporate purposes as the Board of Directors may from time to time determine.

5.5      ***Stockholders Agreement***. To the fullest extent permitted by law, every holder of shares of Common Stock and Preferred Stock shall be subject to, shall be required to enter into, shall be deemed to have entered into, and shall be deemed to be bound by, the Stockholders Agreement dated as of the Plan Effective Date among the Corporation and the stockholders of the Corporation (as the same may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement"), at such time as such holder receives shares of Common Stock and/or Preferred Stock (whether by sale, gift, inheritance or other transfer, through the exercise or conversion of warrants,

3

options or other securities, by operation of law or otherwise), regardless of whether any such holder has actually executed and delivered a counterpart of the Stockholders Agreement, and the Stockholders Agreement shall be deemed to be a valid, binding and enforceable obligation of such holder (including any obligation set forth therein to waive or refrain from exercising any appraisal, dissenters or similar rights) even if such holder has not actually executed and delivered a counterpart of the Stockholders Agreement.

If any provisions of this <u>Section 5.5</u> or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this <u>Section 5.5</u> and the application of such provision to other Persons and circumstances shall not be affected thereby and such provision shall be enforced to the greatest extent permitted by law.

The Corporation will furnish without charge to each holder of record of shares of Common Stock and/or Preferred Stock a copy of the Stockholders Agreement upon written request to the Corporation at its principal place of business.

6.      **Transfers of Shares.** The Corporation shall not record upon its books, and the Corporation shall not cause the Transfer Agent to record upon the Transfer Agent's books, any sale, assignment, disposition or other Transfer of Common Stock, Preferred Stock or other securities of the Corporation except in accordance with the applicable provisions of this Certificate of Incorporation and the Stockholders Agreement. Any purported sale, assignment, disposition or other Transfer of Common Stock, Preferred Stock or other securities of the Corporation in violation of any such provisions shall be void *ab initio* and shall not be recognized by the Corporation for any purpose.

7.      **Directors.**

7.1      *Powers*. Except as may otherwise be provided in this Certificate of Incorporation, the Stockholders Agreement (or any other contract made by the Corporation that is described in Section 122(18) of the DGCL) or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

7.2      ***Composition of the Board of Directors***.

7.2.1      Subject to the rights and preferences of any series of outstanding Preferred Stock, the number of directors constituting the whole Board of Directors shall be determined in accordance with the provisions of the Stockholders Agreement, but in no event shall the number of directors constituting the whole Board of Directors be less than one.

7.2.2      Subject to the terms of the Stockholders Agreement (including the rights of the applicable Designating Group to elect directors) and special voting rights, if any, of holders of any outstanding shares of any series of Preferred Stock, the holders of the shares of Common Stock shall have the right and power to elect all the directors of the Corporation by vote of holders of a plurality of the votes of the shares of Common Stock present in person or represented by proxy at any meeting at which a quorum is present called for the purpose of electing directors or by the affirmative vote (including by written consent) of the Majority Stockholders. Subject to the terms of the Stockholders Agreement, any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares entitled

4

to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent. Subject to the terms of the Stockholders Agreement, if such stockholders fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, then any directorship not so filled shall remain vacant until such time as the applicable stockholders elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by stockholders of the Corporation other than by the stockholders of the Corporation that are entitled to elect a person to fill such directorship.

7.2.3    The election of directors need not be by written ballot.

7.3    ***Cumulative Voting.*** There shall not be cumulative voting by stockholders in the election of directors of the Corporation.

8.    **Limitation of Liability.** To the fullest extent permitted by the DGCL, no director or officer of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer, except for liability (i) for any breach of the director's or officer's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) for unlawful payments of dividends or unlawful stock purchases or redemptions under Section 174 of the DGCL, or (iv) for any transaction from which the director or officer derived an improper personal benefit. If the DGCL is hereafter amended to authorize corporate action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any amendment, repeal or modification of this Section 8, or the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this Section 8, shall not adversely affect any right or protection of a director or officer of the Corporation existing at or prior to the time of such amendment, repeal, modification or adoption of an inconsistent provision.

9.    **Indemnification.**

9.1    ***In Third Party Proceedings.*** To the fullest extent permitted by law, the Corporation shall indemnify and hold harmless any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding ("Proceeding"), whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that the person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise or non profit entity, including service with respect to employee benefit plans ("Other Entity"), against all liability and loss suffered and expenses (including attorneys' fees), judgments, fines (including any excise taxes assessed on a person with respect to an employee benefit plan) and amounts paid in settlement actually and reasonably incurred by the person in connection with such Proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent,

5

152349854_4

shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

9.2     ***In Actions by or in the Right of the Corporation***. To the extent specified by the Board of Directors at any time and to the fullest extent permitted by law, the Corporation shall indemnify and hold harmless any person who was or is a party or is threatened to be made a party to any Proceeding by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that the person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity against all liability and loss suffered expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such Proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the Corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery of the State of Delaware (the "Court of Chancery") or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

9.3     ***Reimbursement or Advancement of Expenses***. The Corporation shall, from time to time, reimburse or advance to any person entitled to indemnification hereunder the funds necessary for payment of expenses, including attorneys' fees and disbursements, incurred by such person in defending any Proceeding, in advance of the final disposition of such Proceeding; provided, however, that, if required by the DGCL, such expenses incurred by any person may be paid in advance of the final disposition of a Proceeding only upon receipt by the Corporation of an undertaking, by or on behalf of such person, to repay any such amount so advanced if it shall ultimately be determined by final judicial decision from which there is no further right of appeal that such person is not entitled to be indemnified for such expenses.

9.4     ***Non-Exclusivity of Rights***. The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 9 shall not be deemed exclusive of any other rights to which a person seeking indemnification or reimbursement or advancement of expenses may be entitled under any statute, this Certificate of Incorporation, the Bylaws, any agreement (including any policy of insurance purchased or provided by the Corporation under which directors or officers of the Corporation are covered), any vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.

9.5     ***Survival***. The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this Section 9 shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

152349854_4

9.6    *__Insurance__*. The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of an Other Entity, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this <u>Section 9</u>, the Bylaws or under Section 145 of the DGCL or any other provision of law.

9.7    *__Indemnification Agreement__*. The provisions of this <u>Section 9</u> shall be a contract between the Corporation, on the one hand, and each director, officer, employee or agent who serves in such capacity at any time while this <u>Section 9</u> is in effect, on the other hand, pursuant to which the Corporation and each such director, officer, employee or agent intend to be legally bound. Notwithstanding anything to the contrary contained in this Certificate of Incorporation, no amendment, repeal or modification of this <u>Section 9</u>, or the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this <u>Section 9</u>, shall affect any rights or obligations with respect to any act or omission that occurred prior to such amendment, repeal, modification or adoption of an inconsistent provision.

9.8    *__Enforceability__*. The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this <u>Section 9</u> shall be enforceable by any person entitled to such indemnification or reimbursement or advancement of expenses in any court of competent jurisdiction. Neither the failure of the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) to have made a determination prior to the commencement of such action that such indemnification or reimbursement or advancement of expenses is proper in the circumstances nor an actual determination by the Corporation (including its Board of Directors, its independent legal counsel and its stockholders) that such person is not entitled to such indemnification or reimbursement or advancement of expenses shall constitute a defense to the action or create a presumption that such person is not so entitled.

9.9    *__Acting on the Request of the Corporation__*. Any director or officer of the Corporation serving as a director, officer, employee or agent of (i) another corporation of which a majority of the shares entitled to vote in the election of its directors is held, directly or indirectly, by the Corporation, or (ii) any employee benefit plan of the Corporation or any corporation referred to in <u>clause (i)</u> shall be deemed to be doing so at the request of the Corporation.

9.10    *__Election to an Interpretation under Applicable Law__*. Any person entitled to be indemnified or to reimbursement or advancement of expenses as a matter of right pursuant to this <u>Section 9</u> may elect to have the right to indemnification or reimbursement or advancement of expenses interpreted on the basis of the applicable law in effect at the time of the occurrence of the event or events giving rise to the applicable Proceeding, to the extent permitted by law, or on the basis of the applicable law in effect at the time such indemnification or reimbursement or advancement of expenses is sought. Such election shall be made, by a notice in writing to the Corporation, at the time indemnification or reimbursement or advancement of expenses is sought; <u>provided</u>, <u>however</u>, that if no such notice is given, the right to indemnification or reimbursement or advancement of expenses shall be determined by the law in effect at the time indemnification or reimbursement or advancement of expenses is sought.

152349854_4

9.11     ___Indemnitor of First Resort___. It is the intent that with respect to all advancement, reimbursement and indemnification obligations under this Section 9, the Corporation shall be the indemnitor of first resort (i.e., its obligations to indemnitees under this Certificate of Incorporation are primary and any obligation of any stockholder (or any of its Affiliates) to provide advancement, reimbursement or indemnification for the same losses incurred by indemnitees are secondary), and if a stockholder or any of its Affiliates pays or causes to be paid, for any reason, any amounts otherwise indemnifiable hereunder or under any other indemnification agreement (whether pursuant to this Certificate of Incorporation, the Bylaws, contract, law or regulation), then (i) such stockholder (or such Affiliate, as the case may be) shall be fully subrogated to all rights hereunder of the indemnitee with respect to such payment, and (ii) the Corporation shall reimburse such stockholder (or such Affiliate, as the case may be) for the payments actually made and waive any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of such stockholder (or such Affiliate, as the case may be).

10.     **Books and Records.** The books and records of the Corporation may be kept (subject to any provision contained in the DGCL or other applicable law) at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws.

11.     **Notices.** All notices, requests, waivers and other communications made pursuant to this Certificate of Incorporation shall be in writing and shall be deemed to have been effectively given, delivered, provided or received: (i) when personally delivered to the party to be notified; (ii) if given by electronic transmission in the manner provided in Section 232 of the DGCL, in accordance with Section 232 of the DGCL; (iii) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (iv) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows: (a) in the case of any stockholder, to such stockholder at its address or e-mail address set forth in the stock records of the Transfer Agent, or at its address or e-mail address set forth in the Stockholders Agreement; and (b) in the case of the Corporation, to the Secretary of the Corporation at the Corporation's principal place of business or at its address or e-mail address set forth in the Stockholders Agreement. A party may change its address or e-mail address for purposes of notice hereunder by giving notice of such change in the manner provided in this Section 11.

12.     **Restrictions on Transactions.** The Corporation elects not to be governed by the provisions of Section 203 of the DGCL.

13.     **Amendments.** Subject to the terms of the Stockholders Agreement, the Corporation reserves the right at any time and from time to time to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by the DGCL, and, except as set forth in Sections 8 and 9, all rights, preferences and privileges of whatever nature conferred herein are granted subject to this reservation. Notwithstanding the provisions of Section 242(b)(2) of the DGCL, the number of authorized shares of Common Stock or Preferred Stock of any class may be increased or decreased (but not below the number of shares of such class then-issued and outstanding, plus the number of shares of such class then reserved for future issuance) in accordance with the preceding sentence, without a separate vote of the holders of such class of Common Stock or Preferred Stock. Anything in this

Certificate of Incorporation to the contrary notwithstanding, but subject to the terms of the Stockholders Agreement, no amendment, alteration, change, repeal or modification of any term, condition or provision of this Certificate of Incorporation shall be made relating to Section 7 hereof or this sentence (including any of the defined terms used in any such sentence, clause or Section, solely to the extent such defined terms are used therein), in any such case, without the affirmative vote or written consent of the applicable Designating Group.

14.     **Forum**. Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery (or, if the Court of Chancery does not have jurisdiction, the federal district court for the District of Delaware (together with the Court of Chancery, the "Delaware Courts" and, individually, a "Delaware Court")) shall, to the fullest extent permitted by law, be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim for breach of a fiduciary duty owed by any current or former director, officer, employee, agent or stockholder of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, this Certificate of Incorporation or the Bylaws, or (iv) any action asserting a claim governed by the internal affairs doctrine, in each case subject to the Delaware Court having personal jurisdiction over the indispensable parties named as defendants therein. If any action or proceeding the subject matter of which is within the scope of this Section 14 is filed in a court other than a Delaware Court (a "Foreign Action") in the name of any stockholder, such stockholder shall be deemed to have consented to (a) the personal jurisdiction of the Delaware Courts in connection with any action brought in any such court to enforce this Section 14 (an "Enforcement Action"), and (b) having service of process made upon such stockholder in any such Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder. Any Person purchasing or otherwise acquiring any shares of capital stock of the Corporation shall be deemed to have notice of and to have consented to the provisions of this Section 14.

15.     **Enforceability; Severability**. Each provision of this Certificate of Incorporation shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in case any one or more of the provisions contained in this Certificate of Incorporation shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Certificate of Incorporation, and this Certificate of Incorporation shall be construed as if such invalid, illegal or unenforceable provision or provisions had never been contained herein.

16.     **Bylaws**. In furtherance and not in limitation of the powers conferred by law, the Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of the Bylaws without any action on the part of the stockholders of the Corporation, subject to the power of the stockholders to amend or repeal any Bylaws adopted or amended by the Board of Directors.

17.     **Certain Definitions**. As used in this Certificate of Incorporation, the following terms shall have the following meanings:

(i)     "Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the

specified Person, and shall also include (a) any Related Fund of such Person, and (b) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person. The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of securities, by contract or otherwise. No stockholder of the Corporation shall be deemed an Affiliate of another Person solely by virtue of being a party to the Stockholders Agreement or by being a lender to or creditor of such other Person.

(ii)     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

(iii)    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

(iv)    "Business Day" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in New York, New York are authorized or obligated by law to close.

(v)     "Designating Group" has the meaning given to such term in the Stockholders Agreement.

(vi)    "Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

(vii)   "Equity Interests" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, membership, beneficial or profits interests of such Person (however designated).

(viii)  "Family Member" means, with respect to any individual, (a) any Related Person of such individual, or (b) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(ix)    "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

(x)     "Liens" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first

10

refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(xi)     "Majority Stockholders" has the meaning given to such term in the Stockholders Agreement.

(xii)     "Person" means an individual, an Entity, or a Governmental Authority.

(xiii)     "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Person that is an individual.

(xiv)     "Plan Effective Date" means [●], 2025, the date on which the Plan of Reorganization became effective.

(xv)     "Plan of Reorganization" means the *Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors*, confirmed by the Bankruptcy Court on [●], 2025.

(xvi)     "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled, managed or advised by (a) such Person, (b) an Affiliate of such Person, or (c) the same investment manager, advisor or subadvisor that controls, manages or advises such Person or an Affiliate of such investment manager, advisor or subadvisor.

(xvii)     "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

(xviii)     "Subsidiary" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (a) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (b) in which such Person, directly or indirectly, owns more than fifty percent (50.0%) of the equity economic interest thereof.

(xix)     "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of shares of Common Stock or Preferred Stock (including (a) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien, and (b) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of shares of Common Stock or Preferred Stock), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise. Notwithstanding the foregoing, (x) any transaction in which a stockholder lends, borrows or sells with an agreement to repurchase any shares of Common Stock or Preferred Stock to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges,

hypothecates, grants a security interest in, Lien on or otherwise encumbers shares of Common Stock or Preferred Stock in connection with such stockholder's or any of its Affiliates' financing arrangements, in any case in the ordinary course of business of such stockholder, shall not constitute a Transfer of shares of Common Stock or Preferred Stock for purposes of this Certificate of Incorporation; provided, however, that any foreclosure (including the retention of shares of Common Stock or Preferred Stock in satisfaction of any obligations) on shares of Common Stock or Preferred Stock by any such broker, bank or other financial institution shall be deemed a Transfer of shares of Common Stock or Preferred Stock, as applicable, for purposes of this Certificate of Incorporation, and (y) a Transfer shall not include any sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition (in whole or in part) of the Equity Interests of any stockholder or direct or indirect equityholder of such stockholder unless such stockholder or such equityholder does not own, directly or indirectly, any substantial assets other than shares of Common Stock, shares of Preferred Stock and/or other securities or indebtedness of the Corporation and/or any of its Subsidiaries. The terms "Transferee," "Transferring", "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

(xx)    "Transfer Agent" means any bank, trust company or other Person (including the Corporation or one of its Affiliates, or any officer of the Corporation) as shall be appointed from time to time by the Corporation to act as registrar and transfer agent for the shares of Common Stock and/or shares of Preferred Stock.

(xxi)    "Voting Securities" means, with respect to any Person, the Equity Interests of such Person the owners or holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Corporation has caused this Second Amended and Restated Certificate of Incorporation, which amends and restates the Corporation's Certificate of Incorporation, to be made, executed and acknowledged by its duly authorized officer this [●] day of [●], 2025.

**CUTERA, INC.**

_____

Name:
Title:

**Exhibit F-2**

**Bylaws of Cutera, Inc.**

*Subject to Change*

# SECOND AMENDED AND RESTATED BYLAWS

## of

## CUTERA, INC.

(*Effective as of [●], 2025*)

# ARTICLE I

## Offices

1.    **Business Offices**. Cutera, Inc. (the "Corporation") may have one or more offices at such place or places, either within or outside the State of Delaware, as the Board of Directors of the Corporation (the "Board of Directors") may from time to time determine or as the business of the Corporation may require.

2.    **Registered Office**. The registered office of the Corporation shall be as set forth in the Second Amended and Restated Certificate of Incorporation of the Corporation (as amended, restated, supplemented or otherwise modified from time to time, the "Certificate of Incorporation"), unless changed as provided by the provisions of the Delaware General Corporation Law (as amended from time to time, the "DGCL").

# ARTICLE II

## Stockholders' Meetings

1.    **Annual Meetings**. Except as otherwise permitted by the DGCL, a meeting of stockholders for the election of directors and such other business as may be properly brought before the meeting in accordance with these Bylaws shall be held annually at such date and time as may be designated by the Board of Directors from time to time; provided, however, that no annual meeting of stockholders need be held if directors are elected by written consent of the stockholders entitled to vote thereon in lieu of an annual meeting in accordance with Section 211 of the DGCL; provided, further, that the directors of the Corporation shall be elected in accordance with the provisions of the Certificate of Incorporation and the Stockholders Agreement, dated as of [●], 2025, among the Corporation and the stockholders of the Corporation (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the provisions thereof, the "Stockholders Agreement").

2.    **Special Meetings**. Special meetings of stockholders may be called at any time by the Chairman of the Board of Directors or the Chief Executive Officer of the Corporation, and shall be called by the Chief Executive Officer of the Corporation or the Secretary of the Corporation when directed to do so by the Board of Directors or upon the written request (which shall state the purpose or purposes therefor) delivered to the Corporation by (i) the holders of not less than thirty percent (30.0%) of the issued and outstanding shares of Common Stock of the Corporation ("Common Stock"), or (ii) any Designating Group (as defined in the Stockholders

Agreement); <u>provided</u>, <u>however</u>, that, in the event that any Designating Group designates an individual to serve as a director pursuant to such Designating Group's Designation Right in accordance with the Stockholders Agreement, then such individual shall be added to the Board of Directors with the vote of such Designating Group, without the need for a special meeting of the stockholders or any other action, and such individual will serve until the next succeeding meeting of the stockholders called for the purpose of electing directors and at which a quorum is present (or until such individual's earlier resignation or removal in accordance with the terms of the Stockholders Agreement). Any written request for a special meeting of stockholders that is delivered to the Corporation by the holders of not less than thirty percent (30.0%) of the issued and outstanding shares of Common Stock pursuant to <u>clause (i)</u> of the immediately preceding sentence or by any Designating Group pursuant to <u>clause (ii)</u> of the immediately preceding sentence may, in either case, specify any of the place (and/or any means of remote communication), date and/or time of such special meeting of stockholders, in each case subject to the requirements of these Bylaws and the DGCL. If such written request does not provide for any such information, then the Board of Directors shall determine the place (and/or any means of remote communication), date and/or time of such special meeting of stockholders, as applicable, subject to the requirements of these Bylaws and the DGCL. The record date for determining the holders of shares of Common Stock entitled to request a special meeting of stockholders shall be the date on which the first demand for a special meeting is made. Business transacted at any special meeting of stockholders shall be limited to the purpose or purposes stated in the notice provided pursuant to <u>Section 4</u> of this <u>Article II</u>; <u>provided</u>, that if such special meeting is being called upon the written request of holders of not less than thirty percent (30.0%) of the issued and outstanding shares of Common Stock pursuant to <u>clause (i)</u> of the first sentence of this <u>Section 2</u> or by any Designating Group pursuant to <u>clause (ii)</u> of the first sentence of this <u>Section 2</u>, then the notice provided pursuant to <u>Section 4</u> of this <u>Article II</u> shall include the purpose or purposes set forth in such written request.

3.    **Place of Meetings**. Meetings of stockholders may be held (i) at any place within or outside the State of Delaware designated by the Board of Directors or, in the case of a special meeting called at the request of the stockholders holding the requisite percentage of shares of Common Stock or by a Designating Group, the stockholders that requested such meeting to be called as set forth in the written request therefor (to the extent set forth therein), and/or (ii) if the Board of Directors or such stockholders so determine, by means of remote communication. Any stockholder participating in a meeting by remote communication is deemed to be present in person at the meeting. In the absence of any such designation by the Board of Directors or such stockholders, stockholder meetings shall be held at the principal place of business of the Corporation.

4.    **Notice of Meetings**. Not less than ten (10) nor more than sixty (60) days prior to each annual or special meeting of the Corporation's stockholders, written notice of the meeting shall be given to each stockholder entitled to vote at such meeting (unless such notice is waived by such stockholder as provided in <u>Article IV</u> of these Bylaws); <u>provided</u>, <u>however</u>, that if greater notice is required by the DGCL, the applicable provisions of the DGCL shall govern. All notices shall be in writing and shall be deemed to have been effectively given, delivered, provided or received: (i) when personally delivered to the stockholder to be notified; (ii) if given by electronic transmission in the manner provided in Section 232 of the DGCL, in accordance with Section 232 of the DGCL; (iii) three (3) Business Days (as defined in the Stockholders Agreement) after

deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the stockholder to be notified; or (iv) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the stockholder to be notified with next-Business Day delivery guaranteed, in each case to such stockholder at its address or electronic mail address set forth in the stock records of the Corporation or its transfer agent, or at its address or e-mail address set forth in the Stockholders Agreement. The notice of any meeting shall state the place (and/or any means of remote communication), if any, date and time of the meeting, and, in the case of a notice of a special meeting, shall also state the purpose or purposes of the meeting, in each case consistent with these Bylaws.

5. **Stockholders List**. A complete record of the stockholders entitled to vote at each meeting of stockholders (or an adjourned meeting described in Section 9 of this Article II), arranged by class of shares and, within each class, in alphabetical order, showing the address of each stockholder and the number of shares of each class of stock registered in the name of such stockholder, shall be prepared by the officer or agent of the Corporation who has charge of the stock transfer books of the Corporation, provided that if the record date for determining the stockholders entitled to vote at any meeting of stockholders is less than ten (10) days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date. Such record of stockholders shall be available for inspection by any stockholder entitled to vote at the meeting beginning ten (10) days before the meeting and continuing through the day before the meeting, subject to the requirements of the DGCL, either on a reasonably accessible electronic network, provided, that the information required to gain access to such network is provided with the notice of the meeting, or during ordinary business hours at the principal place of business of the Corporation.

6. **Organization**. The Chairperson of the Board of Directors or, in the Chairperson's absence, the Chief Executive Officer (or, in the Chief Executive Officer's absence, any Vice President), shall call meetings of stockholders to order and act as chairperson of such meetings. In the absence of said officers, any stockholder entitled to vote at the meeting, or any proxy of any such stockholder, may call the meeting to order and a chairperson shall be elected by the affirmative vote of holders of a majority of the voting power of the shares of Common Stock present in person or represented by proxy and entitled to vote at such meeting. The Secretary or any Assistant Secretary of the Corporation or any person appointed by the chairperson may act as secretary of such meetings.

7. **Agenda and Procedure**. The Board of Directors shall have the responsibility of establishing an agenda for each meeting of stockholders, subject to the rights of stockholders to raise matters for consideration which may otherwise properly be brought before an annual meeting although not included within the agenda. The chairperson shall be charged with the orderly conduct of all meetings of stockholders.

8. **Quorum**. Unless otherwise provided in the Certificate of Incorporation, these Bylaws, the DGCL or other applicable law, at any annual or special meeting of stockholders, the holders of shares of stock representing a majority of the voting power of the then issued and outstanding shares of stock entitled to vote on a matter at the meeting, either present in person or represented by proxy, shall constitute a quorum with respect to action on such matter, and action

may be taken with respect to any matter presented at the meeting only if a quorum exists with respect to such matter.

9. **Adjournment**. When a meeting is for any reason adjourned to another time or place, notice need not be given of the adjourned meeting if the time, place, if any, and the means of remote communications, if any, thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting. If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix a new record date for notice of such adjourned meeting and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

10. **Voting**.

    a.    Except as otherwise required by law or otherwise provided in the Certificate of Incorporation, and subject to the rights of holders of any series of preferred stock of the Corporation (if any), (i) at every meeting of stockholders (or with respect to corporate action which may be taken without a meeting), every holder of record of stock of the Corporation entitled to vote on any matter at such meeting shall be entitled, with respect to such matter, to one (1) vote for each share of such stock held of record by such stockholder on the record date designated therefor pursuant to Section 3 of Article IX of these Bylaws (or the record date established pursuant to statute in the absence of such designation), (ii) whenever directors are to be elected by vote of stockholders, they shall be elected in accordance with the provisions of these Bylaws and the Stockholders Agreement, and (iii) whenever any corporate action, other than the election of directors, is to be taken by vote of stockholders, such corporate action shall be authorized by the affirmative vote of holders of a majority of the voting power of the shares of stock present in person or represented by proxy at the meeting and entitled to vote with respect to such corporate action.

    b.    At any meeting of stockholders, a stockholder may vote such stockholder's shares either in person or by proxy. A stockholder may appoint a proxy in person or through an attorney-in-fact and such appointment may be transmitted by any written statement of appointment permitted by the DGCL (including the appointment made pursuant to the terms of the Stockholders Agreement and the Certificate of Incorporation). The appointment of a proxy shall be effective for the period expressly specified in the appointment form.

    c.    The voting rights of fiduciaries, beneficiaries, pledgors, pledgees and joint, common and other multiple owners of shares of stock shall be as provided from time to time by the DGCL and any other applicable law.

    d.    Shares of stock of the Corporation held of record by another corporation or entity that are entitled to vote may be voted by such officer, agent or proxy as the bylaws or other organizational documents of such other corporation or entity may prescribe, or, in the absence of any applicable provision, as the board of directors or similar governing body of such other corporation or entity may determine.

4

11.     **Inspectors**. The chairperson of any meeting of stockholders may at any time appoint one (1) or more inspectors to serve at such meeting. Such inspectors shall decide upon the qualifications of voters, including the validity of proxies, accept and count the votes for and against the questions presented, report the results of such votes, and subscribe and deliver to the secretary of the meeting a certificate stating the number of shares of stock issued and outstanding and entitled to vote thereon and the number of shares of stock voted for and against the questions presented. The voting inspectors need not be stockholders of the Corporation, and any director or officer of the Corporation may be an inspector on any question other than a vote for or against such director's or officer's election to any position with the Corporation or on any other question in which such officer or director may be directly interested.

## ARTICLE III

### Board of Directors

1.     **Election; Term**. Except as may otherwise be provided in the Certificate of Incorporation, the Stockholders Agreement (or any other contract made by the Corporation that is described in Section 122(18) of the DGCL) or the DGCL, the business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. On the Effective Date (as defined in the Stockholders Agreement), the number of directors constituting the whole Board of Directors shall be five (5). After the Effective Date, subject to the rights and preferences of any series of outstanding preferred stock, the number of directors constituting the whole Board of Directors shall be determined in accordance with the provisions of the Stockholders Agreement, but in no event shall the number of directors constituting the whole Board of Directors be less than one (1). Subject to the terms of the Stockholders Agreement and special voting rights, if any, of holders of any outstanding series of preferred stock, the holders of the shares of Common Stock shall have the right and power to elect all the directors of the Corporation by vote of holders of a plurality of the votes of the shares of Common Stock present in person or represented by proxy at any meeting at which a quorum is present called for the purpose of electing directors; provided, however, that holders of shares of Common Stock shall be required to vote their shares of Common Stock to elect as directors (including by executing written consents) those individuals that are nominated and designated in accordance with the terms of the Stockholders Agreement. Each director shall be elected to serve and to hold office until the next succeeding annual meeting and until such director's successor shall be elected and shall qualify, or until such director's earlier death, resignation or removal.

2.     **Qualification**. Each director must be a natural person at least eighteen (18) years of age on the date of election but need not be a stockholder.

3.     **Annual Meetings**. On the same day as, and immediately following, each annual stockholders' meeting, the Board of Directors shall meet for the purpose of organization, election of officers and the transaction of any other business.

4.     **Regular Meetings**. Regular meetings of the Board of Directors shall be held at such time or times as may be determined by the Board of Directors and specified in the notice of such meetings.

5.      **Special Meetings**. Special meetings of the Board of Directors may be called by any of the Chairperson of the Board of Directors, the Chief Executive Officer or any two (2) directors acting together.

6.      **Place of Meetings**. Any meeting of the Board of Directors may be held at such place or places as shall from time to time be determined by the Board of Directors or, in the case of a special meeting of the Board of Directors, by the Chairperson of the Board of Directors or the directors calling such meeting, and as shall be designated in the notice of the meeting. If no other place is designated in the notice of the meeting, such meeting shall be held at the Corporation's principal executive offices.

7.      **Quorum**. Subject to the terms of the Stockholders Agreement, a quorum for meetings of the Board of Directors will require the attendance of at least a majority of the total number of directors. The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors, unless the express provisions of the DGCL, the Certificate of Incorporation or these Bylaws requires a different vote, in which case such express provisions shall govern and control.

8.      **Notice of Meetings**. At least three (3) Business Days' notice of each regular meeting of the Board of Directors shall be given to each director, unless such notice is waived by such director as provided in Article IV of these Bylaws. No later than twenty-four (24) hours before the day of the meeting, a notice of the place, date and time and the purpose or purposes of each special meeting shall be given to each director, either (i) by personally delivering written notice, (ii) by personally telephoning, or (iii) by email transmission.

9.      **Meetings by Telecommunication**. One (1) or more members of the Board of Directors or any committee designated by the Board of Directors may participate in a meeting of the Board of Directors or such committee by any means of communication, including teleconference or similar remote communications, by which all persons participating in such meeting can hear each other at substantially the same time or by any other means permitted by the DGCL. Any director or committee member participating in a meeting by any such means of communication is deemed to be present in person at such meeting.

10.      **Organization and Procedure**. The Chairperson of the Board of Directors shall preside over the meetings of the Board of Directors; provided, that if the Chairperson of the Board of Directors is not present at any particular meeting of the Board of Directors, then another director selected by a majority of the directors present at such meeting shall preside at such meeting. The Secretary, any Assistant Secretary, or any other person appointed by the Chairperson of the Board of Directors (or appointed by such other director selected to preside at any particular meeting) shall act as secretary of each meeting of the Board of Directors. The procedure for such meetings shall be as determined by the Chairperson of the Board of Directors or such other director selected to preside at any particular meeting.

11.      **Resignation**. Any director of the Corporation may resign at any time by giving written notice of such director's resignation to the Board of Directors, the Chief Executive Officer, any Vice President or the Secretary of the Corporation. Such resignation shall take effect at the

6

date of receipt of such notice or at any later time specified therein and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

12. **Vacancies**. Newly created directorships resulting from any increase in the authorized number of directors on the Board of Directors (including any newly created directorships that occurred on the Effective Date as a result of the increase in the size of the Board of Directors to five (5) seats effective as of the Effective Date) and any vacancies on the Board of Directors shall be filled in the manner provided in the Certificate of Incorporation and the Stockholders Agreement.

13. **Committees**. Subject to the terms of the Stockholders Agreement, the Board of Directors may from time to time designate from among its members any committee deemed appropriate or necessary by the Board of Directors (each such committee to consist of one (1) or more directors) in accordance with the Certificate of Incorporation. The Board of Directors may designate a chairperson of each such committee from among its members. Each such committee, to the extent provided in the resolution establishing such committee and except as otherwise prescribed by the DGCL, shall have and may exercise all of the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation; provided, however, that no such committee shall have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend, or repeal these Bylaws. Rules governing the procedures for meetings of each committee shall be as established by the Board of Directors.

14. **Chairperson of the Board of Directors**. The Chairperson of the Board of Directors shall preside over the meetings of the Board of Directors and meetings of stockholders and have such powers and responsibilities as are incident thereto. However, the Chairperson of the Board of Directors shall not have responsibility for the day-to-day business operations of the Corporation.

## ARTICLE IV

### Waiver of Notice by Stockholders and Directors; Action of Stockholders and Directors by Consent

1. **Waiver of Notice**. A stockholder or director may waive any notice required by the DGCL, the Certificate of Incorporation, or these Bylaws, whether before or after the date or time stated in the notice as the date or time when any action will occur or has occurred. Any such waiver shall be in writing, be signed by the stockholder or director entitled to the notice, and be delivered to the Secretary of the Corporation for inclusion in the minutes or filing with the corporate records, but such delivery and filing shall not be conditions of the effectiveness of the waiver. Attendance of a stockholder (in person or by duly authorized proxy) at a meeting of stockholders, or attendance by a director at a meeting of the Board of Directors, shall be deemed a waiver of objection to (i) lack of required notice or defective notice of the meeting, unless the stockholder or the director attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting was not lawfully called or convened because of lack of notice or defective notice, and does not thereafter vote for or assent to action taken at the

meeting, and (ii) consideration of a particular matter at the meeting that is not within the purpose or purposes described in the meeting notice, or of a matter without special notice required by the DGCL, the Certificate of Incorporation, or these Bylaws, unless the stockholder or director expressly objects to considering the matter when it is presented and does not thereafter vote for or assent to action taken at the meeting with respect to such matter.

2.    **Action By Written Consent Without a Meeting**.

a.    Unless the DGCL expressly requires that such action be taken solely at a stockholders' meeting, any action required or permitted to be taken at an annual or special meeting of the stockholders of the Corporation may be taken without a meeting and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares of stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares of stock entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in Delaware or its principal place of business, or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. Such action shall be effective as of the time the last writing necessary to effect the action is received by the Corporation, unless all writings necessary to effect the action specify a later time, in which case the later time shall be the time of the action; provided, however, such action shall not be effective if the last writing necessary to effect the action is delivered to the Corporation later than sixty (60) days after the date the first such written consent was delivered to the Corporation. Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent shall be given to those stockholders as of the record date for the action by consent who have not consented and who would have been entitled to notice of the meeting if the action had been taken at a meeting and the record date for the notice of the meeting were the record date for the action by consent.

b.    Unless otherwise required by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing, or by electronic transmission. Such action shall be effective as of the time the last director signs a writing, or transmits an electronic transmission, describing the action taken unless before such time the Secretary has received a written revocation of the consent of any other director, and any action so taken shall be effective at the time taken unless the directors specify a different effective time.

## <u>ARTICLE V</u>

## <u>Officers</u>

1.    **Election, Authority and Tenure**. The officers of the Corporation shall consist of such officers as designated by the Board of Directors from time to time, which may include, without limitation, a Chairperson of the Board of Directors, a Chief Executive Officer (who shall also be the President), a Chief Financial Officer, a Secretary and a Treasurer, each of whom shall be appointed by the Board of Directors, except as set forth in these Bylaws. The Board of Directors

may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees. Any two or more offices may be held by the same person. Each officer so appointed shall continue in office until a successor shall be appointed and shall qualify, or until the officer's earlier death, resignation or removal. Each officer shall be a natural person who is eighteen (18) years of age or older.

2. **Resignation, Removal and Vacancies**. Any officer may resign at any time by giving written notice of resignation to the Corporation to the attention of the Board of Directors, the Chief Executive Officer or the Secretary. Such resignation shall take effect when the notice is received by the Corporation unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states. The Board of Directors may at any time terminate, remove or modify the authority of any officer, with or without cause. If any office becomes vacant for any reason, the vacancy may be filled by the Board of Directors. An officer appointed to fill a vacancy shall be appointed for the unexpired term of such officer's predecessor in office and shall continue in office until a successor shall be elected or appointed and shall qualify, or until such officer's earlier death, resignation or removal. The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal of an officer shall not affect the officer's contract rights, if any, with the Corporation, and the resignation of an officer does not affect the Corporation's contract rights, if any, with the officer.

3. **Compensation**. Officers of the Corporation shall be entitled to such salaries, emoluments, compensation or reimbursement as shall be fixed or allowed from time to time by the Board of Directors or in such manner as the Board of Directors shall provide.

4. **Chief Executive Officer**. The Chief Executive Officer, if any, shall: (i) have general and active management of the business of the Corporation, and preside over the day-to-day business operations of the Corporation; (ii) see that all orders and resolutions of the Board of Directors are carried into effect; and (iii) perform all duties as may from time to time be assigned by the Board of Directors. The Chief Executive Officer shall also be the President of the Corporation.

5. **Chief Financial Officer**. The Chief Financial Officer, if any, shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the Chief Executive Officer, if any, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer. In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, if any, responsibility for the day-to-day business operations of the Corporation.

6. **Vice Presidents**. The Vice Presidents, if any, shall perform such duties and possess such powers as from time to time may be assigned to them by the Board of Directors or the Chief Executive Officer, if any. In the absence of the Chief Executive Officer or in the event of the inability or refusal of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board of Directors, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the Chief Executive Officer and when so

9

performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

7.    **Secretary**. The Secretary, if any, shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the Chief Executive Officer, if any. In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including, without limitation, the duty and power to give notice of all meetings of stockholders and the Board of Directors, the preparation and maintenance of minutes of the directors' and stockholders' meetings and other records and information required to be kept by the Corporation under these Bylaws and for authenticating records of the Corporation, and to be custodian of the corporate seal and to affix and attest to the same on documents, the execution of which on behalf of the Corporation is authorized by these Bylaws or by the action of the Board of Directors.

8.    **Treasurer**. The Treasurer, if any, shall perform such duties and shall have such powers as may from time to time be assigned by the Board of Directors or the Chief Executive Officer, if any. In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including, without limitation, the duty and power to keep and be responsible for all funds and securities of the Corporation, to deposit funds of the Corporation in depositories selected in accordance with these Bylaws, to disburse such funds as ordered by the Board of Directors, making proper accounts thereof, and to render as required by the Board of Directors statements of all such transactions as Treasurer and of the financial condition of the Corporation.

9.    **Assistant Secretaries and Assistant Treasurers**. The Assistant Secretaries and Assistant Treasurers, if any, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer, if any, or the Board of Directors. In the absence, inability or refusal of the Secretary or the Treasurer to act, the Assistant Secretaries or Assistant Treasurers, respectively, in the order designated by the Board of Directors, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

## <u>ARTICLE VI</u>

### <u>Execution of Instruments; Borrowing; Checks and Endorsements; Deposits; Proxies</u>

1.    **Execution of Instruments**. The Chief Executive Officer, the Chief Financial Officer or any Vice President shall have the power to execute and deliver on behalf of and in the name of the Corporation any instrument requiring the signature of an officer of the Corporation, except as otherwise provided in these Bylaws or when the execution and delivery of the instrument shall be expressly delegated by the Board of Directors to some other officer or agent of the Corporation. Unless authorized to do so by these Bylaws or by the Board of Directors or incident to the powers of the office of any particular officer, no officer, agent or employee shall have any power or authority to bind the Corporation in any way, to pledge its credit or to render it liable pecuniarily for any purpose or in any amount.

2. **Borrowing**. No loan shall be contracted on behalf of the Corporation, and no evidence of indebtedness shall be issued, endorsed or accepted in its name, unless authorized by the Board of Directors or a committee designated by the Board of Directors so to act. Such authority may be general or confined to specific instances. When so authorized, an officer may: (i) effect loans at any time for the Corporation from any bank or other entity and for such loans may execute and deliver promissory notes or other evidences of indebtedness of the Corporation; and (ii) mortgage, pledge or otherwise encumber any real or personal property, or any interest therein, owned or held by the Corporation as security for the payment of any loans or obligations of the Corporation, and to that end may execute and deliver for the Corporation such instruments as may be necessary or proper in connection with such transaction.

3. **Checks and Endorsements**. All checks, drafts or other orders for the payment of money, obligations, notes or other evidences of indebtedness, bills of lading, warehouse receipts, trade acceptances and other such instruments shall be signed or endorsed for the Corporation by such officers or agents of the Corporation as shall from time to time be determined by resolution of the Board of Directors, which resolution may provide for the use of electronic signatures.

4. **Deposits**. All funds of the Corporation not otherwise employed shall be deposited from time to time to the Corporation's credit in such banks or other depositories as shall from time to time be determined by resolution of the Board of Directors, which resolution may specify the officers or agents of the Corporation who shall have the power, and the manner in which such power shall be exercised, to make such deposits and to endorse, assign and deliver for collection and deposit checks, drafts and other orders for the payment of money payable to the Corporation or its order.

5. **Proxies**. The Board of Directors may: (i) from time to time appoint one (1) or more agents of the Corporation, in the name and on behalf of the Corporation, (a) to cast the votes which the Corporation may be entitled to cast as the holder of stock or other securities in any other corporation, association or other entity whose stock or other securities may be held by the Corporation, at meetings of the holders of the stock or other securities of such other corporation, association or other entity, or (b) to consent in writing to any action by such other corporation, association or other entity; and (ii) instruct the person so appointed (a) as to the manner of casting such votes or giving such consent, and (b) to execute or cause to be executed in the name and on behalf of the Corporation and under its corporate seal, or otherwise, all such written proxies or other instruments as may be deemed necessary or proper.

## ARTICLE VII

## Shares of Stock

1. **Certificates of Stock**. The shares of stock of the Corporation may, but need not, be represented by certificates. Unless the DGCL or another law expressly provides otherwise, the fact that the shares of stock are not represented by certificates shall have no effect on the rights and obligations of stockholders. If the shares of stock are represented by certificates, such certificates shall be signed by any two (2) authorized officers of the Corporation, and may, but need not, be sealed with the corporate seal of the Corporation. Any or all of the signatures on the certificate may be by electronic signature. In case any officer of the Corporation who shall have signed, or

11

whose electronic signature shall have been placed on, any certificate shall cease for any reason to be such officer before such certificate shall have been issued or delivered by the Corporation, such certificate may nevertheless be issued and delivered by the Corporation as though the person who signed such certificate, or whose electronic signature shall have been placed thereon, had not ceased to be such officer of the Corporation. Every certificate representing shares of stock (if any) issued by the Corporation shall state the number of shares of stock owned by the holder in the Corporation, shall designate the class of stock to which such shares belong, and shall otherwise be in such form as is required by law and as the Board of Directors shall prescribe.

2.     **Shares Without Certificates**. The Board of Directors may authorize the issuance of any class or series of shares of stock of the Corporation without certificates. Such authorization shall not affect shares of stock already represented by certificates until they are surrendered to the Corporation or its transfer agent. Within a reasonable time following the issue or transfer of shares of stock without certificates, the Corporation shall send, or direct its transfer agent to send, the stockholder a complete written statement of the information required on certificates by the DGCL, the Certificate of Incorporation and the Stockholders Agreement.

3.     **Record**. A record shall be kept of the name of each person or entity holding the shares of stock represented by each certificate for shares of stock of the Corporation issued, the number and class of shares of stock represented by each such certificate, the date thereof and, in the case of cancellation, the date of cancellation. The person or other entity in whose name shares of stock stand on the books of the Corporation shall be deemed the owner thereof, and thus a holder of record of such shares of stock, for all purposes as regards the Corporation.

4.     **Transfer of Stock**. Transfers of shares of stock of the Corporation shall be made only on the books of the Corporation by the registered holder thereof, or by such registered holder's attorney thereunto authorized, and on the surrender of the certificate or certificates (if any) for such shares of stock properly endorsed. The stock record book and other transfer records shall be in the possession of the Secretary or of a transfer agent for the Corporation.

5.     **Transfer Agents and Registrars; Regulations**. The Corporation, by resolution of the Board of Directors, may from time to time appoint a transfer agent and a registrar, under such arrangements and upon such terms and conditions as the Board of Directors deems advisable, but until and unless the Board of Directors appoints some other person, firm or corporation as its transfer agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary of the Corporation shall be the transfer agent of the Corporation without the necessity of any formal action of the Board of Directors, and the Secretary, or any person designated by the Secretary, shall perform all of the duties of such transfer agent. The Board of Directors may make such rules and regulations as it may deem expedient and as are not inconsistent with the Certificate of Incorporation, the Stockholders Agreement and these Bylaws concerning the issue, transfer and registration of shares of stock of the Corporation.

6.     **Lost, Destroyed or Mutilated Certificates**. In case of the alleged loss, destruction or mutilation of a certificate representing stock of the Corporation, a new certificate may be issued in place thereof, in such manner and upon such terms and conditions as the Board of Directors may prescribe, and shall be issued in such situations as required by the DGCL.

# ARTICLE VIII

## Fiscal Year

The fiscal year of the Corporation shall be the calendar year ending December 31, unless another fiscal year is established by the Board of Directors.

# ARTICLE IX

## Corporate Books and Records

1.   **Books and Records**. The books and records of the Corporation may be kept at such place or places as may be from time to time designated by the Board of Directors. The Corporation shall keep correct and complete books and records of account, including the amount of its assets and liabilities, minutes of the proceedings of its stockholders and the Board of Directors (and any committee of the Board of Directors), and the names and places of residence of its officers.

2.   **Addresses of Stockholders**. Each stockholder shall furnish to the Secretary of the Corporation or the Corporation's transfer agent an address or e-mail address to which notices from the Corporation, including notices of meetings, may be directed, and if any stockholder shall fail so to designate such an address or e-mail address, it shall be sufficient for any such notice to be directed to such stockholder at such stockholder's address or e-mail address last known to the Secretary or transfer agent, or the address or e-mail address for such stockholder set forth in the Stockholders Agreement.

3.   **Fixing Record Date**.

a.   In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board of Directors may fix, in advance, a record date for notice, which shall not be more than sixty (60) days nor less than ten (10) days before the date of such meeting. If the Board of Directors so fixes a record date, such record date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the record date for making such determination.

b.   In order that the Corporation may determine the stockholders entitled to express consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.

c.   In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not

precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) days prior to such action.

If no record date is fixed: (i) the record date for determining stockholders entitled to notice of and to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; (ii) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the day on which the first written consent is delivered to the Corporation in accordance with applicable law; (iii) the record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when prior action by the Board of Directors is required, shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action; and (iv) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the provisions of this Section 3 at the adjourned meeting.

4.    **Audits of Books and Accounts**. The Corporation's books and accounts shall be audited at such times and by such auditors as shall be specified and designated by the Board of Directors.

## ARTICLE X

## Amendments

Subject to the terms of the Stockholders Agreement, the Board of Directors is expressly authorized and empowered to adopt, amend or repeal any or all of these Bylaws, or to adopt new bylaws; provided, however, that any or all of these Bylaws may also be amended or repealed, or new bylaws may also be made, in any such case by the stockholders.

## ARTICLE XI

## Conflicts

These Bylaws are subject to the terms and conditions of the Stockholders Agreement. To the extent that any of the terms of these Bylaws (including any amendment or proposed amendment) conflict, or are otherwise inconsistent, with the terms of the Certificate of Incorporation and/or the Stockholders Agreement, the Corporation, the Board of Directors and the stockholders must and shall act in accordance with the terms of the Certificate of Incorporation and the Stockholders Agreement (including any voting agreements set forth therein), as applicable, and to the extent that there is any ambiguity with respect to whether the Certificate of Incorporation or the Stockholders Agreement, on the one hand, and these Bylaws, on the other hand, control with

respect to any matter affecting the Corporation, the terms of the Certificate of Incorporation or the Stockholders Agreement, as applicable, shall be deemed to control and the Corporation, the Board of Directors and the stockholders shall act in accordance therewith. In these Bylaws, references to law, the Certificate of Incorporation, the Stockholders Agreement and these Bylaws mean the DGCL and the laws promulgated pursuant thereto and thereunder, and the provisions of the Certificate of Incorporation, the Stockholders Agreement and these Bylaws, as may from time to time be in effect.

## Exhibit F-3

**Stockholders Agreement**

*Subject to Change*

**STOCKHOLDERS AGREEMENT**

**by and among**

**CUTERA, INC.**

**and**

**the STOCKHOLDERS that are parties hereto**

**Dated as of [●], 2025**

# TABLE OF CONTENTS

**Page**

ARTICLE I CERTAIN DEFINITIONS ................................................................... 1

ARTICLE II TRANSFERS OF SHARES ............................................................ 13

    SECTION 2.1    Restrictions on Transfers ..................................................... 13

    SECTION 2.2    Certain Stockholders ............................................................ 17

ARTICLE III DRAG-ALONG; TAG-ALONG; PREEMPTIVE RIGHTS .............................. 17

    SECTION 3.1    Drag-Along Rights in Sale Transaction ..................................... 17

    SECTION 3.2    Tag-Along Rights ................................................................. 22

    SECTION 3.3    Preemptive Rights .............................................................. 26

ARTICLE IV BOARD OF DIRECTORS ............................................................. 28

    SECTION 4.1    Election of Directors; Number and Composition ...................... 28

    SECTION 4.2    Meetings; Notice ................................................................. 31

    SECTION 4.3    Quorum; Decisions ............................................................. 31

    SECTION 4.4    Committees ....................................................................... 32

    SECTION 4.5    Subsidiary Governing Bodies ................................................ 32

    SECTION 4.6    Additional Agreements of Stockholders .................................. 32

    SECTION 4.7    PROXY AND POWER OF ATTORNEY .................................. 33

    SECTION 4.8    Board Observers ................................................................ 33

    SECTION 4.9    Reimbursement of Expenses; Insurance; Compensation ............ 34

ARTICLE V CERTAIN ACKNOWLEDGMENTS AND AGREEMENTS ............................ 35

    SECTION 5.1    Affiliate Transactions .......................................................... 35

    SECTION 5.2    Corporate Opportunities ...................................................... 35

    SECTION 5.3    Creditor Relationships ......................................................... 36

    SECTION 5.4    AI Questionnaire ................................................................ 37

    SECTION 5.5    Beneficial Ownership Reporting ............................................ 37

    SECTION 5.6    Approval Rights ................................................................. 39

    SECTION 5.7    Withholding ...................................................................... 39

    SECTION 5.8    Registration Rights ............................................................. 39

    SECTION 5.9    Restriction on Issuance of Non-Voting Shares .......................... 39

ARTICLE VI REPRESENTATIONS AND WARRANTIES ........................................ 40

    SECTION 6.1    Ownership and Authority ...................................................... 40

    SECTION 6.2    Organization ...................................................................... 40

SECTION 6.3    Authority ............................................................................. 40

SECTION 6.4    No Conflict........................................................................... 40

SECTION 6.5    Accredited Investor ............................................................. 40

SECTION 6.6    Survival ................................................................................ 40

ARTICLE VII MISCELLANEOUS ...................................................................... 41

SECTION 7.1    Term and Termination ....................................................... 41

SECTION 7.2    Notices ................................................................................. 41

SECTION 7.3    Confidentiality .................................................................... 41

SECTION 7.4    Binding Effect ..................................................................... 44

SECTION 7.5    Entire Agreement ................................................................ 44

SECTION 7.6    Amendments ........................................................................ 44

SECTION 7.7    No Third Party Beneficiary ................................................ 44

SECTION 7.8    Deemed Execution; Effective Date .................................... 45

SECTION 7.9    Execution; Joinder.............................................................. 45

SECTION 7.10    Interpretation ....................................................................... 45

SECTION 7.11    Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial............................................................... 45

SECTION 7.12    Injunctive Relief.................................................................. 46

SECTION 7.13    Enforceability; Severability ............................................... 46

SECTION 7.14    Recapitalization................................................................... 46

SECTION 7.15    Conflict with Bylaws .......................................................... 46

SECTION 7.16    Additional Actions and Documents .................................... 47

SECTION 7.17    Information Rights ............................................................... 47

SECTION 7.18    Quarterly Teleconference.................................................... 48

SECTION 7.19    Additional Stockholder Information Rights and Access Rights ................. 48

SECTION 7.20    Affiliated Stockholders ...................................................... 49

Exhibit A ............................................................................................................... 1

FORM OF JOINDER AGREEMENT ................................................................... 1

Exhibit B ............................................................................................................... 1

FORM OF TRANSFEREE CONFIDENTIALITY AGREEMENT ..................... 1

Exhibit C ............................................................................................................... 1

FORM OF ACCREDITED INVESTOR QUESTIONNAIRE................................ 1

## CUTERA, INC.

## STOCKHOLDERS AGREEMENT

This STOCKHOLDERS AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "Agreement") is made as of the [●] day of [●], 2025, by and among (a) Cutera, Inc., a Delaware corporation (the "Corporation"), and (b)(i) each of the owners or holders of Shares (as defined below) on the date hereof (each of which, pursuant to Section 7.8 hereof, is deemed to have entered into this Agreement pursuant to the Plan of Reorganization (as defined below), regardless of whether such owner or holder has actually executed this Agreement), and (ii) each Person (as defined below) who hereafter becomes an owner or holder of any Shares or awards providing for the issuance of Shares under the Management Incentive Plan and is thereby required to sign a Joinder Agreement (as defined below) pursuant to the terms hereof (such owners or holders of Shares referred to in this clause (b) are each, a "Stockholder" and, collectively, the "Stockholders").

## W I T N E S S E T H :

WHEREAS, on March 5, 2025, the Corporation and certain of its Subsidiaries (as defined below) filed voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code");

WHEREAS, on [●], 2025, the Bankruptcy Court entered an order at Docket No. [●] (the "Confirmation Order") confirming the *Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors* pursuant to chapter 11 of the Bankruptcy Code (as confirmed, and as may be amended, supplemented or otherwise modified from time to time, and including all exhibits and supplements thereto, the "Plan of Reorganization");

WHEREAS, the effective date of the Plan of Reorganization (the "Effective Date") is occurring on the date of this Agreement; and

WHEREAS, the parties hereto are entering into this Agreement (and, pursuant to the Plan of Reorganization and the Confirmation Order, each of the Stockholders is deemed to have entered into this Agreement) to set forth certain rights and obligations with respect to the affairs of the Corporation and the Shares owned or held by the Stockholders.

NOW, THEREFORE, in consideration of the premises and the mutual agreements, covenants and provisions contained herein, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

As used in this Agreement, the following terms shall have the definitions set forth below:

(a)        "<u>Accredited Investor</u>" means an "accredited investor" as such term is defined in Rule 501 under the Securities Act.

(b)        "<u>Additional Securities</u>" has the meaning specified in <u>Section 3.3(a)</u>.

(c)        "<u>Aequim Stockholders</u>" means, collectively, any Affiliates of Aequim Alternative Investments LLC that own or hold Shares, so long as any such Person remains an Affiliate of Aequim Alternative Investments LLC.

(d)        "<u>Affiliate</u>" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person, and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person. The term "<u>control</u>" (including, with its correlative meanings, "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through ownership of securities, by contract or otherwise. No Stockholder shall be deemed an Affiliate of another Person solely by virtue of being a party to this Agreement or by being a lender to or creditor of such other Person.

(e)        "<u>Affiliate Transaction</u>" has the meaning specified in <u>Section 5.1</u>.

(f)        "<u>AI Questionnaire</u>" means an Accredited Investor Questionnaire in the form of <u>Exhibit C</u> attached hereto.

(g)        "<u>Agreement</u>" has the meaning specified in the preamble of this Agreement.

(h)        "<u>Bankruptcy Code</u>" has the meaning specified in the recitals to this Agreement.

(i)        "<u>Bankruptcy Court</u>" has the meaning specified in the recitals to this Agreement.

(j)        "<u>Board of Directors</u>" means the board of directors of the Corporation.

(k)        "<u>Board Committees</u>" has the meaning specified in <u>Section 4.4(a)</u>.

(l)        "<u>BOI Laws</u>" means the Corporate Transparency Act, 31 U.S.C. § 5336, and all rules, regulations and guidance promulgated thereunder or in connection therewith, and any beneficial ownership reporting law, rule, regulation or guidance of any state or other applicable jurisdiction, as each may be amended, supplemented, updated or replaced from time to time.

(m)        "<u>BOI Reports</u>" has the meaning specified in <u>Section 5.5(a)</u>.

(n)        "<u>Braidwell Stockholders</u>" means, collectively, any Affiliates of Braidwell LP that own or hold Shares, so long as any such Person remains an Affiliate of Braidwell LP.

(o)　　"<u>Business Day</u>" means any day other than a day which is a Saturday, Sunday or legal holiday on which banks in New York, New York are authorized or obligated by law to close.

(p)　　"<u>Bylaws</u>" means the Amended and Restated Bylaws of the Corporation, as amended, restated, supplemented or otherwise modified and in effect from time to time.

(q)　　"<u>CEO Director</u>" has the meaning specified in <u>Section 4.1(a)(i)</u>.

(r)　　"<u>Certificate of Incorporation</u>" means the [Second] Amended and Restated Certificate of Incorporation of the Corporation filed with the Secretary of State of the State of Delaware pursuant to the DGCL, as amended, restated, supplemented or otherwise modified and in effect from time to time.

(s)　　"<u>Chairperson</u>" has the meaning specified in <u>Section 4.1(g)</u>.

(t)　　"<u>Chief Financial Officer</u>" means, as of any time of determination, the Chief Financial Officer of the Corporation as of such time.

(u)　　"<u>Common Stock</u>" means the common stock, par value $0.001 per share, of the Corporation that is designated as "Common Stock" under the Certificate of Incorporation.

(v)　　"<u>Competitor</u>" means, as of any time of determination, (i) any Person that is engaged in the business of the Corporation and its Subsidiaries as of such time of determination as determined by the Board of Directors, and (ii) any Person that is an Affiliate of any Person referred to in <u>clause (i)</u> that is reasonably identifiable as an Affiliate of any such Person on the basis of such Affiliate's name; <u>provided</u>, that a Competitor shall not include (A) any Investment Fund, (B) any Entity that is formed by an Investment Fund and whose only assets are or will be (after giving effect to any proposed or contemplated Transfer), directly or indirectly, Shares or other securities or indebtedness of the Corporation and/or any of its Subsidiaries, and (C) any Person that is an Affiliate of any Person referred to in <u>clause (i)</u> or <u>clause (ii)</u> solely because of its common control by an Investment Fund.

(w)　　"<u>Confidential Information</u>" has the meaning specified in <u>Section 7.3(a)</u>.

(x)　　"<u>Confidentiality Period</u>" has the meaning specified in <u>Section 7.3(a)</u>.

(y)　　"<u>Confirmation Order</u>" has the meaning specified in the recitals to this Agreement.

(z)　　"<u>Context Stockholders</u>" means, collectively, any Affiliates of Context Capital Management, LLC that own or hold Shares, so long as any such Person remains an Affiliate of Context Capital Management, LLC.

(aa)　　"<u>Corporation</u>" has the meaning specified in the preamble of this Agreement.

3

(bb)      "Davidson Kempner Stockholders" means, collectively, any Affiliates of Davidson Kempner Capital Management LP that own or hold Shares, so long as any such Person remains an Affiliate of Davidson Kempner Capital Management LP.

(cc)      "Designating Group" has the meaning specified in Section 4.1(c).

(dd)      "Designation Notice" has the meaning specified in Section 4.1(c).

(ee)      "Designation Right" means the right of the Investor Stockholder Majority or the Majority Stockholders, as the case may be, to nominate and designate any Directors pursuant to Section 4.1(a).

(ff)      "DGCL" means the Delaware General Corporation Law, as amended from time to time.

(gg)      "Director" means a member of the Board of Directors.

(hh)      "Drag-Along Transaction" has the meaning specified in Section 3.1(a).

(ii)      "Drag-Along Transaction Documents" has the meaning specified in Section 3.1(b)(iv).

(jj)      "Drag Notice" has the meaning specified in Section 3.1(a).

(kk)      "Dragged Holder" or "Dragged Holders" has the meaning specified in Section 3.1(a).

(ll)      "Dragged Share" or "Dragged Shares" has the meaning specified in Section 3.1(b)(i).

(mm)      "Effective Date" has the meaning specified in the recitals to this Agreement.

(nn)      "e-mail" has the meaning specified in Section 7.2.

(oo)      "Entity" means any corporation, partnership, limited liability company, limited liability partnership, joint stock company, joint venture, estate, association, trust, unincorporated organization or association, business trust, tenancy in common or other legal entity.

(pp)      "Equity Interests" means, with respect to any Person, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or other equity, ownership, membership, beneficial or profits interests of such Person (however designated).

(qq)      "ERISA" means the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time.

(rr)      "Excepted Transaction" means (i) any transaction or agreement entered into, consummated, effected or contemplated on or around the Effective Date pursuant to the Plan

of Reorganization, (ii) any dividend, distribution or redemption made to Stockholders on a *pro rata* basis, (iii) any open market trading or investing activities with respect to securities and financial instruments in the ordinary course of business, (iv) any employment or consulting arrangement approved by the Board of Directors, (v) any payment of any fees incurred or reimbursements made in connection with service as a Director, an Observer or a member of any board of directors or similar governing body of any Subsidiary of the Corporation, (vi) the prepayment, purchase, satisfaction or repayment of indebtedness of the Corporation or any of its Subsidiaries, including any such indebtedness owed to any of the Investor Stockholders or their Affiliates, (vii) any modifications, amendments, waivers or supplements to any of the Exit Facility Documents (as defined in the Plan of Reorganization), (viii) any refinancing transaction entered into on arms'-length terms, and (ix) any transaction expressly permitted or required by this Agreement, including any issuance of Additional Securities in accordance with <u>Section 3.3</u>.

(ss)     "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(tt)     "<u>Excluded Issuance</u>" means any issuance of Additional Securities (i) by means of a *pro rata* distribution to all owners or holders of any class or series of Shares, (ii) pursuant to the Management Incentive Plan or any other compensation, incentive or similar plan, agreement or arrangement approved by the Board of Directors to directors, managers, officers, employees or consultants of the Corporation or any of its Subsidiaries in connection with their service as managers or directors of the Corporation or any of its Subsidiaries, their employment by the Corporation or any of its Subsidiaries, or their retention by the Corporation or any of its Subsidiaries, (iii) in connection with any underwritten, broadly marketed or syndicated financing transaction, (iv) pursuant to the conversion, exchange or exercise of any options, warrants or other securities granted after the Effective Date so long as the initial sale, issuance or grant of such options, warrants or other securities complied with the terms of <u>Section 3.3</u>, (v) as consideration for an acquisition (whether by equity sale, merger, recapitalization, asset purchase or otherwise) by the Corporation or any of its Subsidiaries of another Person (or portion thereof) so long as such Additional Securities are only issued to the counterparty to such acquisition (or to such counterparty's Affiliates) and in no event to any Stockholder or any Affiliate of any Stockholder, (vi) in connection with the incurrence of any indebtedness or other financing or refinancing of any indebtedness or issuance of debt securities of the Corporation or any of its Subsidiaries (including as an equity kicker in connection therewith) so long as such Additional Securities are only issued to the lender or investor in such financing or refinancing (or to such lender's or investor's Affiliates) and in no event to any Stockholder or any Affiliate of any Stockholder (other than in any broadly marketed or syndicated offering of indebtedness, which shall be deemed an Excluded Issuance even if any Stockholder or any Affiliate of any Stockholder participates in such offering), or (vii) in connection with a joint venture, partnership, strategic alliance or other commercial arrangement entered into by the Corporation or any of its Subsidiaries with another Person so long as such Additional Securities are only issued to such Person (or to such Person's Affiliates) and in no event to any Stockholder or any Affiliate of any Stockholder.

(uu)     "<u>Excluded Tag-Along Transfer</u>" means, with respect to any Stockholder, any Transfer of Shares made by such Stockholder, (i) to a Permitted Transferee of such Stockholder, (ii) in connection with a Drag-Along Transaction pursuant to <u>Section 3.1</u> if such

Stockholder is a Dragged Holder or a Selling Holder, or (iii) in connection with a Tag-Along Transaction pursuant to Section 3.2 if such Stockholder is a Tag-Along Seller.

(vv)     "Family Member" means, with respect to any individual, (i) any Related Person of such individual, or (ii) any trust, limited partnership, limited liability company or other Entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(ww)     "FinCEN" means the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury, or any successor bureau or agency.

(xx)     "GAAP" means generally accepted accounting principles in effect in the United States from time to time consistently applied.

(yy)     "General Stockholder Nominating Committee" means, as of any time of determination, a committee consisting of each Stockholder that holds at least Ten Percent (10.0%) of the issued and outstanding Shares as of such time; provided, that if there are no Stockholders that hold at least Ten Percent (10.0%) of the issued and outstanding Shares, then such committee shall consist of each of the [three (3)] largest Stockholders as of such time; provided, further, that there shall not be a General Stockholder Nominating Committee unless and until the Investor Stockholder Designation Threshold ceases to be satisfied.

(zz)     "Governmental Authority" means any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, body, commission or instrumentality of the United States or any other nation, or any state or other political subdivision thereof, any court, tribunal or arbitrator and any self-regulatory organization.

(aaa)     "Highbridge Stockholders" means, collectively, any Affiliates of Highbridge Capital Management, LLC that own or hold Shares, so long as any such Person remains an Affiliate of Highbridge Capital Management, LLC.

(bbb)     "Identified Person" or "Identified Persons" has the meaning specified in Section 5.2(a).

(ccc)     "Indebtedness" has the meaning specified in Section 5.3.

(ddd)     "Initiating Holder" or "Initiating Holders" has the meaning specified in Section 3.2(a).

(eee)     "Institutional Stockholder" means any Investor Stockholder or any other Stockholder that has been designated as an "Institutional Stockholder" by the Board of Directors.

(fff)     "Investment Company Act" means the Investment Company Act of 1940, as amended.

(ggg)     "Investment Documents" has the meaning specified in Section 3.1(b)(v).

(hhh)     "Investment Fund" means a *bona fide* investment fund or other investment vehicle, such as a hedge fund, private equity fund, an account, a share trust, an investment trust, an investment company, a pension fund, or an insurance company, in each case, the business, operations or assets of which are held for investment purposes and the investments in which are professionally managed.

(iii)     "Investor Stockholder Approval Threshold" means that the Investor Stockholders collectively own or hold at least Fifty Percent (50.0%) of the Shares held by all of the Investor Stockholders on the Effective Date (as adjusted for any stock split, recapitalization or similar transactions).

(jjj)     "Investor Stockholder Designation Threshold" means that the Investor Stockholders collectively own hold at least Seventy-Five Percent (75.0%) of the Shares held by all of the Investor Stockholders on the Effective Date (as adjusted for any stock split, recapitalization or similar transactions).

(kkk)     "Investor Stockholder Director(s)" has the meaning specified in Section 4.1(a)(ii).

(lll)     "Investor Stockholder Majority" means, as of any time of determination, the Investor Stockholders who collectively own or hold more than Fifty Percent (50.0%) of the Shares held by all of the Investor Stockholders as of such time.

(mmm)     "Investor Stockholder Nominating Committee" means, as of any time of determination, a committee consisting of each Investor Stockholder that owns or holds at least Ten Percent (10.0%) of the issued and outstanding Shares as of such time; provided, that if there are no Investor Stockholders that hold at least Ten Percent (10.0%) of the issued and outstanding Shares, then such committee shall consist of each of the [three (3)] largest Investor Stockholders as of such time.

(nnn)     "Investor Stockholder Teleconference" has the meaning specified in Section 7.18.

(ooo)     "Investor Stockholders" means, collectively, (i) the Highbridge Stockholders, (ii) the Braidwell Stockholders, (iii) the Davidson Kempner Stockholders, (iv) the Context Stockholders, (v) the Aequim Stockholders, (vi) the Walleye Stockholders, and (vii) the Silverback Stockholders. Any consent, approval, decision (including any decision as to whether a Person, action or thing is acceptable), determination, nomination, designation, identification, direction, specification, request, removal, instruction or other action to be provided, granted, given, made, performed, rendered or otherwise taken collectively by the Investor Stockholders pursuant to this Agreement at any time shall be provided, granted, given, made, performed, rendered or otherwise taken by the Investor Stockholder Majority. For the avoidance of doubt, a Person that does not own or hold any Shares as of any time of determination shall not constitute an Investor Stockholder as of such time.

(ppp)     "IPO" means (i) an initial underwritten public offering of Common Stock or any other equity interest, or any offering of common shares or other equity of any successor to, or Affiliate of, the Corporation or any Subsidiary, parent or other successor entity

7

thereof or any special purpose acquisition company or "blank-check" company (or a subsidiary thereof) (collectively, a "<u>SPAC</u>") (such equity interests, together with any equity interests referenced in <u>clause (iii)</u> below, "<u>Successor Equity</u>"), (ii) an offering which is an initial public offering of Common Stock or Successor Equity pursuant to an effective registration statement filed under the Securities Act that results in such Common Stock or Successor Equity being listed on the New York Stock Exchange, the Nasdaq Stock Market or an established non-United States securities exchange (which excludes, in the case of <u>clause (i)</u> and <u>(ii)</u>, a registration of Common Stock or Successor Equity (A) pursuant to a registration statement on Form S-8 (or other registration solely relating to an offering or sale to employees or directors of the Corporation pursuant to any employee equity plan or other employee benefit arrangement), (B) pursuant to a registration statement on Form S-4 (or similar form that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto), or (C) in connection with any dividend reinvestment or similar plan), or (iii) the closing of a business combination (in the form of a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination) with or into a SPAC after which the Common Stock, the common equity securities of the SPAC or a Subsidiary thereof, or any other Successor Equity are listed on the New York Stock Exchange, the Nasdaq Stock Market or an established non-United States securities exchange.

(qqq)    "<u>Joinder Agreement</u>" means a Joinder Agreement in the form attached hereto as <u>Exhibit A</u>.

(rrr)    "<u>Liens</u>" means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interest, title defect, hypothecation, easement, right of way, restrictive covenant, encroachment, right of first refusal, preemptive right, judgment, conditional sale or other title retention agreement and all other impositions, imperfections, defects, limitations or restrictions of any nature or kind whatsoever.

(sss)    "<u>Majority Stockholders</u>" means, as of any time of determination, Stockholders who collectively own or hold more than Fifty Percent (50.0%) of all of the issued and outstanding Shares as of such time.

(ttt)    "<u>Management Incentive Plan</u>" means a management incentive plan established by the Board of Directors for certain employees, directors and other service providers of the Corporations and its Subsidiaries, which has been allocated up to [●] Percent ([●]%) of the fully diluted Equity Interests of the Corporation as of the Effective Date.

(uuu)    "<u>Management Stockholder</u>" means any current or former director, officer or employee of the Corporation or any of its Subsidiaries who is (or who acquires Shares from time to time after the date hereof and becomes) a Stockholder (and any Permitted Management Stockholder Transferee of any such Person).

(vvv)    "<u>MIP Shares</u>" means any Shares acquired under the Management Incentive Plan (only to the extent held by a Management Stockholder).

(www)    "<u>Observer</u>" has the meaning specified in <u>Section 4.8(a)</u>.

(xxx)    "<u>Opportunity</u>" has the meaning specified in <u>Section 5.2(a)</u>.

(yyy) "Optionholder" means any holder of options to purchase Shares issued under the Management Incentive Plan.

(zzz) "Other Preemptive Stockholder" or "Other Preemptive Stockholders" has the meaning specified in Section 3.3(d).

(aaaa) "Permitted Liens" means Liens that are imposed (i) by this Agreement, (ii) by the Certificate of Incorporation, or (iii) under applicable securities laws.

(bbbb) "Permitted Management Stockholder Transferee" means, with respect to any Management Stockholder, any Family Member of such Management Stockholder or any transferee by testamentary or intestate disposition or any trust, limited partnership or other legal entity the beneficiary of which is such Management Stockholder or a Family Member of such Management Stockholder; provided, however, that during the period that any such trust, limited partnership or other legal entity holds any right, title or interest in any Common Stock, no Person other than such Management Stockholder or one or more Family Members of such Management Stockholder may be or may become trustees, beneficiaries, stockholders, limited or general partners or members thereof.

(cccc) "Permitted Transferee" means, (i) with respect to any Stockholder (other than any Management Stockholder), (A) any Affiliate of such Stockholder, (B) any investment fund, vehicle or similar entity of which such Stockholder or an Affiliate, advisor or manager of such Stockholder serves as the general partner, manager or advisor, and (C) any direct or indirect limited partner or investor in such limited liability company, limited partnership, investment fund, vehicle or similar entity or any direct or indirect limited partner or investor in any other investment fund, vehicle or similar entity of which such Stockholder or an Affiliate, advisor or manager of such Stockholder serves as the general partner, manager or advisor; and (ii) with respect to any Management Stockholder, any Permitted Management Stockholder Transferee of such Management Stockholder.

(dddd) "Person" means an individual, an Entity, or a Governmental Authority.

(eeee) "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Stockholder that is an individual.

(ffff) "Principal Office" means c/o Cutera, Inc., 3240 Bayshore Boulevard, Brisbane, California 94005.

(gggg) "Plan of Reorganization" has the meaning specified in the recitals to this Agreement.

(hhhh) "Plan Asset Regulation" means the regulation issued by the U.S. Department of Labor at 29 C.F.R. Section 2510.3-101, as modified by Section 3(42) of ERISA.

(iiii) "Preemptive Rights Notice" has the meaning specified in Section 3.3(a).

(jjjj)  "Preemptive Stockholder" or "Preemptive Stockholders" has the meaning specified in Section 3.3(a).

(kkkk)  "Pro Rata Portion" has the meaning specified in Section 3.3(a).

(llll)  "Quarterly Teleconference" has the meaning specified in Section 7.18.

(mmmm)  "Related Company" or "Related Companies" has the meaning specified in Section 5.2(c).

(nnnn)  "Related Fund" means, with respect to any Person, any fund, account or investment vehicle that is controlled, managed or advised by (i) such Person, (ii) an Affiliate of such Person, or (iii) the same investment manager, advisor or subadvisor that controls, manages or advises such Person or an Affiliate of such investment manager, advisor or subadvisor.

(oooo)  "Related Person" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren.

(pppp)  "Representatives" has the meaning specified in Section 7.3(b)(i).

(qqqq)  "Sale Notice" has the meaning specified in Section 3.2(a).

(rrrr)  "Sale Transaction" means the sale, lease, transfer, issuance or other disposition, in one transaction or a series of related transactions, of (i) all or substantially all of the consolidated assets of the Corporation and its Subsidiaries (including by or through the issuance, sale, contribution, transfer or other disposition (including by way of reorganization, merger, share or unit exchange, consolidation or other business combination) of at least a majority of the aggregate voting power of the Voting Securities of any direct and/or indirect Subsidiary or Subsidiaries of the Corporation if substantially all of the consolidated assets of the Corporation and its Subsidiaries are held by such Subsidiary or Subsidiaries), or (ii) Shares representing at least a majority of the then-issued and outstanding Shares (whether directly or indirectly or by way of any merger, share or unit exchange, recapitalization, sale or contribution of equity, tender offer, reclassification, consolidation or other business combination transaction or purchase of beneficial ownership) to (in either case of clause (i) or clause (ii)) any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision).

(ssss)  "SEC" means the United States Securities and Exchange Commission.

(tttt)  "Secretary" means, as of any time of determination, the Secretary of the Corporation as of such time.

(uuuu)  "Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(vvvv)  "Selling Holder" or "Selling Holders" has the meaning specified in Section 3.1(a).

(wwww)  "Shares" means shares of Common Stock.

(xxxx) "Significant Stockholder" means, as of any time of determination, any Stockholder who individually, or together with its Affiliates, owns or holds Shares representing at least Five Percent (5.0%) of all of the issued and outstanding Shares as of such time.

(yyyy) "Silverback Stockholders" means, collectively, any Affiliates of Silverback Asset Management, LLC that own or hold Shares, so long as any such Person remains an Affiliate of Silverback Asset Management, LLC.

(zzzz) "Specified Preemptive Stockholder" or "Specified Preemptive Stockholders" has the meaning specified in Section 3.3(d).

(aaaaa) "Stockholders" has the meaning specified in the preamble; provided, however, for the avoidance of doubt, any Person shall cease to be a Stockholder under this Agreement at such time that such Person becomes a Terminated Party (subject to the first proviso set forth in Section 7.1). The term "Stockholder" means any one of the Stockholders.

(bbbbb) "Stockholder Beneficial Ownership Information" has the meaning specified in Section 5.5(b).

(ccccc) "Subsidiary" means, as of any time of determination and with respect to any specified Person, any limited liability company, partnership, limited partnership, joint venture, association, or other Entity (i) more than a majority of the aggregate voting power of the Voting Securities of which is, as of such time, directly or indirectly owned by such Person, or (ii) in which such Person, directly or indirectly, owns more than Fifty Percent (50.0%) of the equity economic interest thereof.

(ddddd) "Subsidiary Governing Body" means the board of directors, the board of managers or other governing body (including any committee of any such governing body) of any wholly-owned Subsidiary of the Corporation.

(eeeee) "Surviving Entity" has the meaning specified in Section 3.1(b)(v).

(fffff) "Tag-Along Seller" or "Tag-Along Sellers" has the meaning specified in Section 3.2(a).

(ggggg) "Tag-Along Transaction" means any transaction or series of related transactions involving a Transfer (excluding any Excluded Tag-Along Transfer) by one or more Stockholders that represent, in the aggregate, Thirty Percent (30.0%) or more of all of the Shares that are issued and outstanding at the time of such transaction (or, in the case of a series of related transactions, at the time of the first transaction in such series of related transactions) to any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision).

(hhhhh) "Tag-Along Transaction Documents" has the meaning specified in Section 3.2(c).

(iiiii) "Terminated Party" has the meaning specified in Section 7.1.

11

(jjjjj)    "Third Party Purchaser" has the meaning specified in Section 3.1(a).

(kkkkk)    "Transfer" means any direct or indirect sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition of Shares (including (x) a disposition under judicial order, legal process, execution, attachment, foreclosure or enforcement of a Lien and (y) the granting of any option or entering into any agreement for the future sale, transfer or other disposition of Shares), whether voluntary or involuntary, whether of record, constructively or beneficially, whether with or without consideration, and whether by operation of law or otherwise, including by recapitalization, merger, consolidation, division, liquidation, dissolution, dividend, distribution or otherwise. Notwithstanding the foregoing, (i) any transaction in which a Stockholder lends, borrows or sells with an agreement to repurchase any Shares to or from brokers, banks, or other financial institutions for the purpose of effecting margin transactions, or pledges, hypothecates, grants a security interest in, lien on or otherwise encumbers Shares in connection with such Stockholder's or any of its Affiliates' financing arrangements, in any such case in the ordinary course of business of such Stockholder, shall not constitute a Transfer of Shares for purposes of this Agreement; provided, however, that any foreclosure (including the retention of Shares in satisfaction of any obligations) on Shares by any such broker, bank or other financial institution in accordance with such margin transactions and financing arrangements shall be deemed a Transfer of Shares for purposes of this Agreement, and (ii) a Transfer shall not include any sale, transfer, gift, hypothecation, pledge, assignment, devise or other disposition (in whole or in part) of the Equity Interests of any Stockholder or direct or indirect equityholder of such Stockholder unless such Stockholder or such equityholder does not own, directly or indirectly, any substantial assets other than Shares and/or other securities or indebtedness of the Corporation and/or any of its Subsidiaries. The terms "Transferee," "Transferring," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

(lllll)    "Transfer Agent" means any bank, trust company or other Person (including the Corporation or one of its Affiliates, or any officer of the Corporation) as shall be appointed from time to time by the Corporation to act as registrar and transfer agent for the Shares.

(mmmmm)    "Transfer Notice" has the meaning specified in Section 2.1(c).

(nnnnn)    "Vested Options" means the options to acquire MIP Shares issued pursuant to the Management Incentive Plan which as of the relevant measurement time are vested.

(ooooo)    "Voting Securities" means, with respect to any Person, the Equity Interests of such Person the owners or holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of Directors (or persons performing similar functions) of such Person.

(ppppp)    "Walleye Stockholders" means, collectively, any Affiliates of Walleye Capital, LLC, that own or hold Shares, so long as any such Person remains an Affiliate of Walleye Capital, LLC.

12

## ARTICLE II

## TRANSFERS OF SHARES

SECTION 2.1        Restrictions on Transfers.

(a)        *Prohibited Transfers.* Without limiting any other provisions, restrictions or conditions of this Article II, including Section 2.1(h) and the Management Incentive Plan, unless otherwise waived by the Board of Directors in its sole discretion, no Shares shall be Transferred by any Stockholder (regardless of the manner in which the Transferor initially acquired such Shares), if:

(i)        such Transfer would, if consummated, result in any violation of the Securities Act or any state securities laws or regulations, or any other applicable federal or state laws or order of any Governmental Authority having jurisdiction over the Corporation or any of its Subsidiaries;

(ii)        such Transfer would, if consummated, require the Corporation to register any class of Shares or other equity securities under the Exchange Act, unless, at the time of such Transfer, the Corporation is already subject to the reporting obligations under Sections 13 or 15(d) of the Exchange Act;

(iii)        such Transfer would, in the judgment of the Board of Directors, cause the Corporation to be required to register as an "investment company" under the Investment Company Act;

(iv)        such Transfer is not to an Accredited Investor;

(v)        such Transfer would, if consummated, cause the underlying assets of the Corporation to be deemed "plan assets" as defined under and pursuant to the Plan Asset Regulation or constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code;

(vi)        such Transfer is to a Competitor; or

(vii)        such Transfer is to any Person who is not, as of immediately prior to such proposed Transfer, a Stockholder or a Permitted Transferee of the Transferring Stockholder; provided, that in the case of this Section 2.1(a)(vii), the Board of Directors shall not unreasonably delay, withhold or condition its consent to any such proposed Transfer.

(b)        *Certificates; Legal Opinion.* In addition to the restrictions set forth in Section 2.1(a), no Shares shall be Transferred by any Stockholder unless (i) the certificates (if any) representing such Shares bear legends as provided in Section 2.1(e) (and, with respect to uncertificated Shares, notice of such legends is provided in accordance with applicable law), for so long as such legends are applicable, and (ii) either (A) the Transferee is an Affiliate of the Transferor, or (B) prior to such Transfer (1) the Transferee and the Transferor shall have delivered to the Corporation representation letters in such form as may be approved from time to time by the Corporation (including a representation from the Transferee that the Transferee is an Accredited

Investor), and (2) the Transferor shall have delivered to the Corporation a legal opinion (which may include a legal opinion from in-house counsel to the Transferor), reasonably acceptable to the Corporation, stating that the registration of the Shares that are the subject of such proposed Transfer is not required under the Securities Act. Any of the requirements set forth in clause (B) of the immediately preceding sentence may be waived by the Board of Directors in its sole discretion.

(c)        *Notice of Transfer*. Subject to Section 3.1, and unless otherwise provided by the Corporation, any Stockholder proposing to effect a Transfer of Shares must submit to the Corporation, not less than ten (10) Business Days prior to such Transfer, a written notice (a "Transfer Notice") of such Transfer. A Transfer Notice shall be delivered to the Corporation, to the attention of (i) the Secretary or Chief Financial Officer, or any of their designees, and (ii) the Chairperson, in each case in accordance with Section 7.2. A Transfer Notice shall include or be accompanied by (A) the name, address, e-mail address and telephone number of the Transferor and the Transferee, (B) a certification from the Transferee whether the Transferee is a Permitted Transferee of the Transferor, (C) the number and class of Shares proposed to be Transferred to, and acquired by, the Transferee, (D) the date on which the Transfer is proposed to take place, (E) the percentage of the Transferor's total number of Shares of the same class to be Transferred, (F) a Joinder Agreement, duly completed and executed by the Transferee to the extent such Transferee has not already signed a counterpart of this Agreement or executed a Joinder Agreement, (G) an AI Questionnaire, duly completed and executed by the Transferee, (H) an IRS Form W-9 or appropriate IRS Form W-8, as applicable, duly completed and executed by the Transferee to the extent such Transferee has not already delivered to the Corporation such a duly completed and executed tax form that is not obsolete, inaccurate or expired, and (I) a request that the Corporation register the Transfer on the books of the Corporation and inform the Transfer Agent (if any) of the Transfer. So long as the other provisions of this Article II are satisfied and complied with, the Corporation shall cause or, if the Transfer Agent is not the Corporation or one of its Affiliates or officers, use commercially reasonable efforts to cause the Transfer to be registered on the books of the Transfer Agent.

(d)        *Prohibited Transfers Void.* The Corporation shall not record upon its books any Transfer of any Shares except in accordance with the terms and provisions of this Agreement. Any purported Transfer of Shares in violation of such terms and provisions shall be void *ab initio* and shall not be recognized by the Corporation, and the Corporation shall notify the Transferee and Transferor in connection with such purported Transfer of Shares that such purported Transfer is void.

(e)        *Legends*.

(i)        All certificates (if any) or statements related to book-entry accounts representing or otherwise evidencing any Shares that were issued under the Plan of Reorganization pursuant to the exemption from the registration requirements of the Securities Act provided by Section 1145 of the Bankruptcy Code shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 2.1(e)(iv) below):

14

"THE SHARES REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WERE ORIGINALLY ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. 1145. THE SHARES REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE ACT OR ANY STATE SECURITIES LAWS, AND TO THE EXTENT THE HOLDER OF SUCH SHARES IS AN "UNDERWRITER," AS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE,  MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(ii)     All certificates (if any) or statements related to book-entry accounts representing or otherwise evidencing any Shares (excluding Shares that were issued under the Plan of Reorganization pursuant to the exemption from the registration requirements of the Securities Act provided by Section 1145 of the Bankruptcy Code) shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 2.1(e)(iv) below):

"THE SHARES REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS."

(iii)     All certificates (if any) or any statements related to book-entry accounts representing or otherwise evidencing any Shares shall conspicuously bear, or shall be deemed to conspicuously bear (even if such certificate or statement does not actually bear such legend), the following legend (subject to Section 2.1(e)(iv) below):

"THE SHARES REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] ARE SUBJECT TO VARIOUS TERMS, PROVISIONS AND CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER, AS SET FORTH IN THE CORPORATION'S CERTIFICATE OF INCORPORATION AND A STOCKHOLDERS AGREEMENT DATED AS OF [●], 2025 (AS AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "STOCKHOLDERS AGREEMENT"), BY AND AMONG THE CORPORATION AND THE STOCKHOLDERS OF THE CORPORATION. NO REGISTRATION OR TRANSFER OF THE SHARES REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] WILL BE MADE ON THE BOOKS OF THE CORPORATION OR ITS TRANSFER AGENT UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION OR

15

ITS TRANSFER AGENT WILL FURNISH, WITHOUT CHARGE, TO EACH HOLDER OF RECORD OF THE SHARES REPRESENTED OR OTHERWISE EVIDENCED BY THIS [CERTIFICATE] [STATEMENT] A COPY OF THE CERTIFICATE OF INCORPORATION AND THE STOCKHOLDERS AGREEMENT, CONTAINING THE ABOVE-REFERENCED TERMS, PROVISIONS AND CONDITIONS, INCLUDING RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER OF STOCK, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

(iv)     In the event that any Shares shall be registered for Transfer under the Securities Act, the Corporation shall, upon the written request of the owner or holder of such Shares, issue to such owner or holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Shares without the legends required by Sections 2.1(e)(i) and 2.1(e)(ii), if applicable. In the event that any Shares shall cease to be subject to the restrictions on Transfer set forth in this Section 2.1, the Corporation shall, upon the written request of the owner or holder of such Shares, issue to such owner or holder a new certificate or statement of book-entry position, as applicable, representing or otherwise evidencing such Shares without the legend required by Section 2.1(e)(iii).

(v)     In the case of uncertificated Shares, the Corporation shall provide notice to the Stockholders of the applicable legends required by Sections 2.1(e)(i), 2.1(e)(ii) and 2.1(e)(iii) above in accordance with applicable law.

(vi)     Each Stockholder shall be deemed to have actual knowledge of the terms, provisions, restrictions and conditions set forth in this Agreement (including the restrictions on Transfer set forth in this Article II) for all purposes of this Agreement and applicable law (including the DGCL and the Uniform Commercial Code as adopted and in effect in any applicable jurisdiction), whether or not any certificate or statement of book-entry position, as applicable, representing or otherwise evidencing any Shares owned or held by such Stockholder bears the applicable legends set forth in Sections 2.1(e)(i), 2.1(e)(ii) and 2.1(e)(iii) and whether or not any such Stockholder received a separate notice of such terms, provisions, restrictions and conditions.

(f)     *Transfer Agent; Regulations*. The Corporation, by resolution of the Board of Directors, may from time to time appoint a Transfer Agent, under such arrangements and upon such terms and conditions as the Board of Directors deems advisable. Unless and until the Board of Directors appoints some other Person as its Transfer Agent (and upon the revocation of any such appointment, thereafter until a new appointment is similarly made) the Secretary shall be the Transfer Agent without the necessity of any formal action of the Board of Directors, and the Secretary, or any Person designated by the Secretary, shall perform all of the duties of the Transfer Agent. The Board of Directors may make such rules and regulations as it may deem expedient and as are not inconsistent with this Agreement, concerning the issue, registration and Transfer of Shares.

(g)     *No Requirement to List*. The Corporation shall have no obligation under this Agreement to list any of the Shares on any securities exchange, automated quotation system or over-the-counter marketplace.

16

(h)        *Transfers by Management Stockholders*. Without limiting any other provisions, restrictions or conditions of this <u>Article II</u> and the Management Incentive Plan, unless otherwise waived by the Board of Directors in its sole discretion, no Shares shall be Transferred by any Management Stockholder (regardless of the manner in which the Management Stockholder initially acquired such Shares), other than to a Permitted Management Stockholder Transferee of such Management Stockholder.

(i)        *Certain Exempt Transfers*. In no event shall the requirements of this <u>Section 2.1</u> (other than <u>Section 2.1(a)(i)</u>) apply to any Transfer of Shares (i) to the Corporation, (ii) by a Dragged Holder or Selling Holder in connection with a Drag-Along Transaction pursuant to <u>Section 3.1</u>, or (iii) by a Tag-Along Seller in connection with a Tag-Along Transaction pursuant to <u>Section 3.2</u>.

(j)        *Reimbursement of Corporation Expenses*. The Transferor and the Transferee shall be jointly and severally obligated to reimburse the Corporation for all reasonable out-of-pocket third-party costs and expenses (including legal fees) incurred by the Corporation in connection with any Transfer or proposed Transfer of such Transferor's Shares (excluding any Transfer or proposed Transfer pursuant to <u>Section 3.1</u> or otherwise pursuant to a Sale Transaction).

(k)        *FIRPTA Certificate*. In the event of any Transfer of Shares permitted by this Agreement, (including any Transfer or the Transfer of any Shares in connection with a Drag-Along Transaction or Tag-Along Transaction), to the extent permitted under applicable Law, the Corporation shall provide to any requesting Transferor a certificate satisfying the requirements set forth in Treasury Regulation Sections 1.1445-2(c)(3) and 1.897-2(h), certifying that the Corporation is not nor has been a "United States real property holding corporation" (as defined in Section 897(c)(2) of the Internal Revenue Code) at any time during the five (5)-year period preceding the date of the Transfer.

SECTION 2.2        <u>Certain Stockholders</u>. If any Stockholder is an Entity that has no substantial assets other than Shares and indebtedness of, or securities in, the Corporation or any of its Subsidiaries, then such Stockholder agrees that no Equity Interests in such Stockholder may be sold, transferred or otherwise disposed to any Person other than in accordance with the terms and provisions of this <u>Article II</u> as if such Equity Interests were Shares; <u>provided</u>, that a sale, transfer or other disposition of Equity Interests in such Stockholder to any Affiliate of such Stockholder (other than to any Affiliate of such Stockholder that is a portfolio company of such Stockholder or any of its other Affiliates) shall not be subject to this <u>Section 2.2</u>.

# ARTICLE III

## DRAG-ALONG; TAG-ALONG; PREEMPTIVE RIGHTS

SECTION 3.1        <u>Drag-Along Rights in Sale Transaction</u>.

(a)        In the event that the Majority Stockholders at the time of the delivery of a Drag Notice (for purposes of this <u>Section 3.1</u>, each, a "<u>Selling Holder</u>" and, collectively, the "<u>Selling Holders</u>") determine to effect, approve or otherwise take any action that would cause the occurrence of, or desire to consummate, a Sale Transaction (whether or not a vote of the

Stockholders is required) to or with any Person or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) other than the Selling Holders or any Affiliates thereof (a "Third Party Purchaser") (any such Sale Transaction, a "Drag-Along Transaction"), the Corporation or the Selling Holders (or a designated representative acting on behalf of the Selling Holders) will have the right (but not the obligation) to deliver written notice thereof (a "Drag Notice") to all other Stockholders and Optionholders (including, for the avoidance of doubt, all Management Stockholders) that own or hold Shares or Vested Options (each, a "Dragged Holder" and, collectively, the "Dragged Holders"). Such written notice shall be delivered to the Dragged Holders in accordance with Section 7.2 at any time prior to the closing of the Drag-Along Transaction, and shall contain a general description of the material terms and conditions of the Drag-Along Transaction, including the amount and form of consideration to be paid by the Third Party Purchaser, copies of any Drag-Along Transaction Documents or Investment Documents that the Dragged Holders will be required to execute and deliver in connection with such Drag-Along Transaction (to the extent such documents exist and are in substantially final form at the time such Drag Notice is delivered to the Dragged Holders) and the proposed date (which may be an estimated date or range of dates) for the closing of the Drag-Along Transaction; provided, that the Selling Holders may elect to omit from the Drag Notice any such terms and conditions of, or information relating to, the Drag-Along Transaction if the Selling Holders determine that the disclosure thereof to the Dragged Holders would have an adverse effect on the Drag-Along Transaction or the consummation thereof, but the omission of any such terms, conditions or information shall not have any effect on the validity of the Drag Notice.

(b) If a Drag Notice is delivered by the Corporation or by or on behalf of the Selling Holders to the Dragged Holders in accordance with Section 3.1(a), each of the Dragged Holders shall:

(i) if such Drag-Along Transaction is structured as a Transfer of Shares (including any conversion, exchange or other Transfer of Shares by way of a merger of the Corporation with any other Person), be obligated to Transfer to the Third Party Purchaser (subject to the other terms of this Section 3.1(b)), at the closing of such Drag-Along Transaction, all Shares and Shares underlying Vested Options owned or held by such Dragged Holder (any such Share or Share underlying a Vested Option, a "Dragged Share" and collectively, the "Dragged Shares") (or the applicable portion of such Dragged Holder's Dragged Shares that are required to be Transferred in connection with such Drag-Along Transaction, as determined in accordance with Section 3.1(c)) on purchase terms and conditions that are substantially the same as those purchase terms and conditions applicable to the Shares (including any Shares underlying Vested Options) of the Selling Holders of the same class or series (excluding any investment or reinvestment opportunity given to management of the Corporation or any of its Subsidiaries), free and clear of any Liens (other than Permitted Liens); provided, that (A) each Dragged Holder will receive, in respect of such holder's Dragged Shares, the same portion of the aggregate consideration paid in such Drag-Along Transaction that such Dragged Holder would have received if such aggregate consideration had been distributed by the Corporation in complete liquidation pursuant to the rights and preferences set forth in the Certificate of Incorporation as in effect immediately prior to the consummation of such Drag-Along Transaction, (B) if the Selling Holders are given an option as to the form of consideration to be received in exchange for their Shares (including any Shares underlying Vested Options) of any class or series, then each of the Dragged Holders shall be given the same option with respect to their Dragged Shares of the same class or series, and

(C) notwithstanding anything to the contrary in this Section 3.1, the amount of consideration per Share underlying a Vested Option that any Dragged Holder will be entitled to receive in connection with a Drag-Along Transaction will be reduced by the exercise price of such Vested Option;

(ii) if such Drag-Along Transaction is structured as a sale or transfer of assets (including by or through the sale, issuance or other disposition of the Equity Interests of, or reorganization, merger, unit or share exchange, consolidation or other business combination involving, any direct and/or indirect Subsidiary or Subsidiaries of the Corporation), approve any subsequent dissolution and liquidation of the Corporation or any of its Subsidiaries in connection therewith and/or deliver any applicable documents, instruments or agreements related thereto; provided, that, in any such liquidation, each Dragged Holder shall receive on account of its Dragged Shares the distributions pursuant to the rights and preferences set forth in the Certificate of Incorporation as in effect immediately prior to the consummation of such Drag-Along Transaction;

(iii) (A) be required to vote (including by written consent) such Dragged Holder's Dragged Shares (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction, and (B) not raise any objection against such Drag-Along Transaction (including objections relating to the consideration being paid in connection therewith) or the process pursuant to which it was arranged, negotiated or consummated;

(iv) execute and deliver any applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Drag-Along Transaction that the Corporation, the Selling Holders or the Third Party Purchaser may request and which are executed and delivered by the Selling Holders (other than any agreements or documents that relate to any investment or reinvestment opportunity given to management of the Corporation or any of its Subsidiaries) (the "Drag-Along Transaction Documents"); provided, however, that (A) no Dragged Holder shall be required to provide any indemnity relating to such Drag-Along Transaction that is (x) in excess of the amount of gross proceeds payable to such Dragged Holder in connection with such Drag-Along Transaction (other than on account of such Dragged Holder's own fraud), or (y) not pro rata with the other Dragged Holders that own or hold Dragged Shares of the same class or series as owned or held by such Dragged Holder (based on the number of Dragged Shares of such class or series); provided, that any indemnities on account of a Dragged Holder's representations and warranties about itself or a Dragged Holder's own fraud or breach of a Dragged Holder's own covenants shall be solely the responsibility of such Dragged Holder, and (B) no Dragged Holder (other than any Management Stockholder, including any holder of Vested Options) shall be required to provide any non-competition covenants;

(v) if the Dragged Holders will receive any Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the continuing, acquiring, resulting or surviving entity in the Drag-Along Transaction, or any Affiliate thereof (the "Surviving Entity"), execute and deliver any applicable limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of the Surviving Entity and/or the rights or obligations of the owners of the Equity Interests (and/or

19

any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the Surviving Entity that the Corporation, the Selling Holders or the Third Party Purchaser may request and which are executed and delivered by the Selling Holders (the "Investment Documents"), and agree to or provide the same covenants, obligations and agreements as agreed to or provided by the Selling Holders set forth therein;

(vi)    use commercially reasonable efforts to obtain or make any consents or filings necessary to be obtained or made by such Dragged Holder to effectuate such Drag-Along Transaction;

(vii)    waive and refrain from exercising any appraisal, dissenters or similar rights arising from or relating to such Drag-Along Transaction (and each Dragged Holder shall be deemed to have irrevocably waived any appraisal, dissenters or similar rights arising from or relating to any Drag-Along Transaction);

(viii)    not (A) take any action that might impede, be prejudicial to or be inconsistent with, such Drag-Along Transaction, (B) assert, at any time, any claim against the Corporation, any member of the Board of Directors (or any committee thereof), any member of any Subsidiary Governing Body, or any other Stockholder or any of its Affiliates (including any Selling Holder and any of its Affiliates) in connection with such Drag-Along Transaction (including any claim for breach of fiduciary duty), or (C) except as permitted under and pursuant to Section 7.3, disclose to any Person any information related to such Drag-Along Transaction (including the identity of the Third Party Purchaser, the fact that discussions or negotiations are taking place concerning such Drag-Along Transaction, or any of the terms, conditions or other information with respect to such Drag-Along Transaction); and

(ix)    take all necessary or desirable actions reasonably requested by the Selling Holders, the Third Party Purchaser and/or the Corporation in connection with the consummation of such Drag-Along Transaction, including voting such Dragged Holder's Dragged Shares (to the extent of any voting rights), whether by proxy, voting agreement or otherwise, in favor of such Drag-Along Transaction.

(c)    In the case of a Drag-Along Transaction pursuant to which the Selling Holders are collectively Transferring less than One Hundred Percent (100%) of all of the Shares owned or held by the Selling Holders in the aggregate, then each Dragged Holder shall be required to Transfer a percentage of the Dragged Shares owned or held by such Dragged Holder equal to the quotient obtained by dividing (i) the total number of Shares (including any Shares underlying Vested Options) owned or held by the Selling Holders that are proposed to be Transferred in such Drag-Along Transaction by (ii) the total number of Shares (including any Shares underlying Vested Options) owned or held by the Selling Holders in the aggregate.

(d)    At the closing of any Drag-Along Transaction that is structured as a sale or other Transfer of Shares (including any Shares underlying Vested Options) in which the Selling Holders have exercised their rights under this Section 3.1, each Dragged Holder shall deliver at such closing, against payment of the purchase price therefor in accordance with the terms of the Drag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Third Party Purchaser) representing such Dragged Holder's

20

Dragged Shares to be sold or Transferred, duly endorsed for transfer or accompanied by duly endorsed stock powers, and such other documents as are deemed reasonably necessary by any one or more of the Selling Holders, the Third Party Purchaser and/or the Corporation for the proper transfer of such Dragged Shares on the books of the Transfer Agent, free and clear of any Liens (other than Permitted Liens).

(e)       Each Selling Holder and each Dragged Holder will bear its *pro rata* share (based upon the allocation among the Selling Holders and the Dragged Holders of the consideration payable in respect of Shares (including any Shares underlying Vested Options) in the Drag-Along Transaction) of the costs and expenses of any Drag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all Stockholders and Optionholders or the Corporation and are not otherwise paid by the Corporation or the Third Party Purchaser. Costs and expenses incurred by any Stockholder or Optionholder on its own behalf will not be considered costs and expenses of the Drag-Along Transaction and will be borne solely by such Stockholder or Optionholder.

(f)       Subject to applicable law, the Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Drag-Along Transaction and not take any action which might impede, be prejudicial to or be inconsistent with, any such Drag-Along Transaction. Subject to applicable law, pending the completion of any proposed Drag-Along Transaction, the Corporation shall use commercially reasonable efforts to operate in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Drag-Along Transaction Documents) and otherwise comply with the terms of the Drag-Along Transaction Documents to which it is a party.

(g)       Subject to applicable law, the Corporation shall cooperate with the Selling Holders to enter into a Drag-Along Transaction and to take any and all such further action in connection therewith as the Selling Holders may deem necessary or appropriate in order to consummate (or, if directed by the Selling Holders, abandon) any such Drag-Along Transaction. Neither the Corporation, any of its Subsidiaries nor any of the Selling Holders shall have any liability if any such Drag-Along Transaction is not consummated for any reason (including if the Selling Holders elect to abandon such Drag-Along Transaction for any reason or for no reason). Subject to the provisions of this <u>Section 3.1</u> and applicable law, the Selling Holders, in exercising their rights under this <u>Section 3.1</u>, shall have complete discretion over the terms and conditions of any Drag-Along Transaction effected hereby, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows. Subject to applicable law, at the request of the Selling Holders, the Corporation shall, and the Corporation shall cause any of its Subsidiaries to, execute such agreements, documents, applications, authorizations, registration statements and instruments as they may deem necessary or appropriate in connection with any Drag-Along Transaction.

(h)       IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED HOLDER TO VOTE SUCH DRAGGED HOLDER'S SHARES IN FAVOR OF A DRAG-ALONG TRANSACTION AND TO WAIVE ANY APPRAISAL, DISSENTERS OR SIMILAR RIGHTS THAT SUCH DRAGGED HOLDER HAS (OR MAY HAVE) WITH RESPECT TO

ANY DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 3.1(b), EACH DRAGGED HOLDER HEREBY IRREVOCABLY APPOINTS THE SELLING HOLDERS (AND EACH OF THEM) AS SUCH DRAGGED HOLDER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL SHARES OWNED OR HELD BY SUCH DRAGGED HOLDER OR OVER WHICH SUCH DRAGGED HOLDER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES AND WAIVERS FOR THE DURATION OF THE EXISTENCE OF THE CORPORATION. IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH DRAGGED HOLDER TO EXECUTE AND DELIVER THE DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, THE INVESTMENT DOCUMENTS, AND TO TAKE ACTIONS IN CONNECTION WITH THE CONSUMMATION OF A DRAG-ALONG TRANSACTION, IN EACH CASE AS SET FORTH IN SECTION 3.1(b), EACH DRAGGED HOLDER HEREBY IRREVOCABLY GRANTS TO THE SELLING HOLDERS (AND EACH OF THEM) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH DRAG-ALONG TRANSACTION DOCUMENTS AND, IF APPLICABLE, INVESTMENT DOCUMENTS, AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH DRAGGED HOLDER. THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH DRAGGED HOLDER PURSUANT TO THIS SECTION 3.1(h) ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, MERGER, CONSOLIDATION, LIQUIDATION, BANKRUPTCY, INSOLVENCY OR DISSOLUTION OF ANY DRAGGED HOLDER.

(i)     If the Selling Holders enter into any negotiation or transaction for which Rule 506 of Regulation D (or any similar rule then in effect) promulgated by the SEC may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), each Dragged Holder who is not an Accredited Investor shall, at the request of the Corporation or the Selling Holders, appoint a "purchaser representative" (as such term is defined in Rule 501 of Regulation D) reasonably acceptable to the Corporation or the Selling Holders (as applicable) in connection with such negotiation or transaction.

(j)     The provisions of this Section 3.1 shall be in addition to, and not in limitation of, and are independent of, the provisions of the Certificate of Incorporation and the Management Incentive Plan.

(k)     A Transfer of Shares in a Drag-Along Transaction by a Selling Holder or a Dragged Holder pursuant to this Section 3.1 shall not be subject to the requirements of Article II other than Section 2.1(a)(i).

SECTION 3.2     Tag-Along Rights.

(a)     In the event that one or more Stockholders (for purposes of this Section 3.2, each, an "Initiating Holder" and, collectively, the "Initiating Holders") desire to effect a Tag-Along Transaction, the Initiating Holders (or a designated representative acting on their behalf) shall deliver written notice (a "Sale Notice") to all other Stockholders and Optionholders (including, for the avoidance of doubt, all Management Stockholders) that own or hold Shares or Vested Options (any such Stockholder or Optionholder, a "Tag-Along Seller" and collectively, the

"Tag-Along Sellers", and any such Share or any Share underlying any such Vested Option, a "Tag-Along Share" and collectively, the "Tag-Along Shares") and the Corporation, in accordance with Section 7.2, at least ten (10) Business Days prior to the consummation of such Tag-Along Transaction, offering the Tag-Along Sellers the opportunity to participate in such Tag-Along Transaction on the terms and conditions set forth in the Sale Notice (which terms and conditions shall be substantially the same as those terms and conditions (including at the same price) applicable to the Initiating Holders (except that if the Initiating Holders are given an option as to the form of consideration to be received in exchange for their Shares (including any Shares underlying Vested Options), each of the Tag-Along Sellers shall only need to be given the same option with respect to their Tag-Along Shares)); provided, however, that if the consideration to be paid in such Tag-Along Transaction consists, in whole or in part, of securities or any other non-cash consideration, then any Stockholder or Optionholder that is not an Accredited Investor or any Stockholder or Optionholder who does not, promptly following the request of the Initiating Holders or the Transferee in such Tag-Along Transaction (but in any event within three (3) Business Days after receipt of any such request), certify to the Initiating Holders and the Transferee in such Tag-Along Transaction that such Stockholder or Optionholder is an Accredited Investor shall not be offered the opportunity to participate in such Tag-Along Transaction and shall not be deemed a Tag-Along Seller for purposes of such Tag-Along Transaction; and provided, further, that, notwithstanding anything to the contrary in this Section 3.2, the amount of consideration per Share underlying a Vested Option that any Tag-Along Seller will be entitled to receive in connection with a Tag-Along Transaction will be reduced by the exercise price of such Vested Option. The Sale Notice shall contain a general description of the material terms and conditions of the Tag-Along Transaction, including the total number of Shares (including any Shares underlying Vested Options) to be Transferred, the proposed amount and form of consideration for the Shares (including any Shares underlying Vested Options) proposed to be Transferred, and copies of any Tag-Along Transaction Documents that the Tag-Along Sellers will be required to execute and deliver in connection with such Tag-Along Transaction (to the extent such documents exist and are in substantially final form at the time such Sale Notice is delivered to the Tag-Along Sellers).

(b)      Each Tag-Along Seller may, by written notice delivered to the Initiating Holders (or their designated representative) within five (5) Business Days after delivery of the Sale Notice to such Tag-Along Seller, elect to Transfer Tag-Along Shares, on the terms and conditions set forth in the Sale Notice; provided, however, that if the proposed Transferee in the Tag-Along Transaction desires to purchase a number of Shares (including any Shares underlying Vested Options) that is less than the aggregate number of Shares (including any Shares underlying Vested Options) proposed to be Transferred by the Initiating Holders and all Tag-Along Sellers electing to Transfer Shares (including any Shares underlying Vested Options) in the Tag-Along Transaction, then the Initiating Holders may elect to either (i) terminate such Tag-Along Transaction with respect to the Initiating Holders and each Tag-Along Seller, or (ii) consummate such Tag-Along Transaction on the basis of such lesser number of Shares (including any Shares underlying Vested Options) and, upon such election to consummate the Tag-Along Transaction, each Initiating Holder and each electing Tag-Along Seller shall be permitted to Transfer to such Transferee up to that number of Shares (including any Shares underlying Vested Options) owned or held by such Initiating Holder or such Tag-Along Seller, as the case may be, equal to the product of (x) the total number of Shares (including any Shares underlying Vested Options) to be acquired by the Transferee in the proposed Tag-Along Transaction, and (y) such Initiating Holder's or such

Tag-Along Seller's (as applicable) proportionate percentage of the issued and outstanding Shares (including any Shares underlying Vested Options) owned or held by the Initiating Holders and all electing Tag-Along Sellers; provided, further, that if at any time after delivery of a Sale Notice there is a change in the price or other material change in the terms or conditions of the proposed Tag-Along Transaction described in such Sale Notice, then the Initiating Holders shall deliver a revised Sale Notice to all Tag-Along Sellers indicating such revised price and/or other material change, and each Tag-Along Seller shall have an additional five (5) Business Days after delivery of the revised Sale Notice to indicate whether or not it elects to Transfer its Tag-Along Shares in such Tag-Along Transaction, on the terms and conditions set forth in the revised Sale Notice (it being understood and agreed that if a Tag-Along Seller elected to Transfer Tag-Along Shares in such Tag-Along Transaction prior to the commencement of such additional five (5)-Business Day period, then such election will remain in effect unless such Tag-Along Seller revokes, amends or otherwise modifies such election in writing prior to the expiration of such additional five-Business Day period).

(c)     In connection with any Tag-Along Transaction in which any Tag-Along Seller elects to participate pursuant to this Section 3.2, each such Tag-Along Seller shall take all necessary or desirable actions reasonably requested by the Initiating Holders and/or the Transferee in the Tag-Along Transaction in connection with the consummation of such Tag-Along Transaction, including (i) executing and delivering the applicable purchase agreement, merger agreement, indemnity agreement, escrow agreement, letter of transmittal, release or other agreements or documents governing or relating to such Tag-Along Transaction that the Initiating Holders or the Transferee in such Tag-Along Transaction may request (the "Tag-Along Transaction Documents"), and (ii) if the Initiating Holders and the Tag-Along Sellers will receive any Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in the Transferee or any other Person in connection with such Tag-Along Transaction, executing and delivering any applicable limited liability company agreement, stockholders agreement, partnership agreement, investor rights agreement, voting agreement or similar agreement which relates to the internal governance of such Transferee or such other Person and/or the rights or obligations of the owners of the Equity Interests (and/or any options, warrants or other securities that are convertible into, or exchangeable or exercisable for, any Equity Interests) in such Transferee or such other Person that the Initiating Holders or the Transferee may request and which are executed and delivered by the Initiating Holders.

(d)     In connection with any Tag-Along Transaction that complies with this Section 3.2, no Stockholder (whether or not a Tag-Along Seller) shall (i) take any action that might impede, be prejudicial to or be inconsistent with, such Tag-Along Transaction, (ii) assert, at any time, any claim against the Corporation, any member of the Board of Directors (or any committee thereof), any member of any Subsidiary Governing Body or any other Stockholder or any of their respective Affiliates (including any Initiating Holder and any of its Affiliates) in connection with such Tag-Along Transaction (including any claim for breach of fiduciary duty), or (iii) except as permitted under and pursuant to Section 7.3, disclose to any Person any information related to such Tag-Along Transaction (including the identity of the Transferee, the fact that discussions or negotiations are taking place concerning such Tag-Along Transaction, or any of the terms, conditions or other information with respect to such Tag-Along Transaction).

(e)        At the closing of any Tag-Along Transaction in which any Tag-Along Seller has elected to participate under this Section 3.2, such Tag-Along Seller shall deliver at such closing, against payment of the consideration therefor in accordance with the terms of the Tag-Along Transaction Documents, certificates or other documentation (or other evidence thereof reasonably acceptable to the Transferee in such Tag-Along Transaction) representing its Tag-Along Shares to be Transferred, duly endorsed for transfer or accompanied by duly endorsed stock powers, and such other documents as are deemed reasonably necessary by the Initiating Holders, the Transferee in such Tag-Along Transaction and/or the Corporation for the proper Transfer of such Tag-Along Shares on the books of the Transfer Agent, free and clear of any Liens (other than Permitted Liens).

(f)        Each Initiating Holder and each Tag-Along Seller electing to participate in a Tag-Along Transaction under this Section 3.2 will bear its *pro rata* share (based upon the allocation among each such Stockholder of the consideration payable in respect of Shares (including any Shares underlying Vested Options) in the Tag-Along Transaction) of the costs and expenses of any such Tag-Along Transaction to the extent such costs and expenses are incurred for the benefit of all such Stockholders and Optionholders and are not otherwise paid by the Corporation or the Transferee. Costs and expenses incurred by any such Stockholder or Optionholder on its own behalf will not be considered costs of the Tag-Along Transaction and will be borne solely by such Stockholder or Optionholder.

(g)        Subject to the provisions of this Section 3.2, the Initiating Holders shall have complete discretion over the terms and conditions of any Tag-Along Transaction, including price, payment terms, conditions to closing, timing of closing, representations, warranties, affirmative covenants, negative covenants, indemnification, releases, holdbacks and escrows. Neither the Corporation, any of its Subsidiaries nor any of the Initiating Holders shall have any liability if any Tag-Along Transaction is not consummated for any reason (including if the Initiating Holders elect to abandon such Tag-Along Transaction, in whole or in part, for any reason or for no reason).

(h)        Subject to applicable law, the Corporation shall, and shall use its commercially reasonable efforts to cause its officers, employees, agents, contractors and others under its control to, cooperate and assist in any proposed Tag-Along Transaction and not take any action which would reasonably be expected to impede or be prejudicial to any such Tag-Along Transaction. Subject to applicable law, pending the completion of any proposed Tag-Along Transaction, the Corporation shall use commercially reasonable efforts to operate the Corporation and its Subsidiaries in the ordinary course of business and to maintain all existing business relationships in good standing (unless otherwise required by the Tag-Along Transaction Documents) and otherwise comply with the terms of the Tag-Along Transaction Documents to which it is a party.

(i)        If any Tag-Along Seller electing to participate in a Tag-Along Transaction materially breaches any of its obligations under this Section 3.2 in respect of such Tag-Along Transaction or any of its representations or obligations under any of the Tag-Along Transaction Documents, then, (i) at the option of the Initiating Holders, such Tag-Along Seller will not be permitted to participate in such Tag-Along Transaction and the Initiating Holders can proceed to close such Tag-Along Transaction excluding the sale of such Tag-Along Seller's Tag-

Along Shares therefrom, and (ii) if the number of Shares (including any Shares underlying Vested Options) to be Transferred by the Initiating Holders and the Tag-Along Sellers was calculated pursuant to <u>clause (ii)</u> of <u>Section 3.2(b)</u>, then, at the option of the Initiating Holders, the number of Shares (including any Shares underlying Vested Options) to be Transferred by the Initiating Holders and the Tag-Along Sellers (excluding the breaching Tag-Along Seller) shall be recalculated pursuant to <u>clause (ii)</u> of <u>Section 3.2(b)</u> excluding the breaching Tag-Along Seller from such calculation.

(j)        The Initiating Holders shall have the right for a period of ninety (90) days after the expiration of the latest five (5) Business Day period referred to in <u>Section 3.2(b)</u> to consummate the Tag-Along Transaction. In the event that the Initiating Holders have not consummated the Tag-Along Transaction within such ninety-day period, the Initiating Holders shall not thereafter consummate such Tag-Along Transaction and such Tag-Along Transaction will again be subject to this <u>Section 3.2</u>; <u>provided</u>, <u>however</u>, that if such Tag-Along Transaction is unable to be consummated within such ninety-day period as a result of antitrust or other regulatory delay, then such ninety-day period shall be extended on account of such delay as necessary to permit the Initiating Holders to effect such Tag-Along Transaction.

(k)        The provisions of this <u>Section 3.2</u> shall not apply to any Transfer of Shares (including any Shares underlying Vested Options) by any Selling Holder or any Dragged Holder in connection with a Drag-Along Transaction pursuant to <u>Section 3.1</u>.

(l)        In no event shall any Stockholder or Optionholder have any rights under this <u>Section 3.2</u> or otherwise with respect to a sale or other transfer by any other Stockholders or Optionholders of any debt securities or other Indebtedness of the Corporation or any of its Subsidiaries.

(m)        The exercise or non-exercise of the rights of any of the Stockholders or Optionholders under this <u>Section 3.2</u> to participate in one or more Tag-Along Transactions shall not adversely affect their rights to participate in subsequent Tag-Along Transactions subject to this <u>Section 3.2</u>.

SECTION 3.3        <u>Preemptive Rights</u>.

(a)        After the Effective Date, the Corporation shall not, and the Corporation shall not permit any of its Subsidiaries to, sell or issue to any Person (including any then-current Stockholder) (i) any Equity Interests of the Corporation or any of its Subsidiaries, or (ii) any debt securities, options, warrants or other securities or indebtedness (whether or not convertible into, or exchangeable or exercisable for, any Equity Interests of the Corporation or any its Subsidiaries) ((i) and (ii), collectively, the "<u>Additional Securities</u>") (other than pursuant to an Excluded Issuance), unless the Corporation or its applicable Subsidiary first submits written notice (a "<u>Preemptive Rights Notice</u>") to each Stockholder identifying the material terms of the Additional Securities (including the price, number or amount and type of Additional Securities, and all other material terms thereof) and offers to each Stockholder that also demonstrates to the Corporation's reasonable satisfaction that such Stockholder is an Accredited Investor (any such Stockholder, a "<u>Preemptive Stockholder</u>" and, collectively, the "<u>Preemptive Stockholders</u>") the opportunity to purchase up to a portion of the Additional Securities (a "<u>Pro Rata Portion</u>") on such terms and

conditions set forth in the Preemptive Rights Notice. A Preemptive Stockholder's Pro Rata Portion shall be equal to the product of (x) the total number or amount of Additional Securities subject to the sale or issuance, and (y) a fraction, (A) the numerator of which is the number of Shares then owned or held by such Preemptive Stockholder, and (B) the denominator of which is the total number of Shares then owned or held by all Preemptive Stockholders collectively.

(b)     The Corporation's or its applicable Subsidiary's offer to each Preemptive Stockholder shall remain open for a period of thirty (30) days after the Preemptive Rights Notice is delivered to such Preemptive Stockholder in accordance with Section 7.2. A Preemptive Stockholder may accept such offer by delivering written notice of such acceptance to the Corporation prior to the expiration of such thirty (30) day period, which notice shall set forth the number or amount of such Additional Securities to be purchased by such Preemptive Stockholder (which, in any event, shall not exceed the number or amount equal to such Preemptive Stockholder's Pro Rata Portion). If not all Preemptive Stockholders subscribe for their full Pro Rata Portion of Additional Securities, then the Corporation shall notify in writing the fully-subscribing Preemptive Stockholders of such fact and shall offer, or cause its applicable Subsidiary to offer, such fully-subscribing Preemptive Stockholders the right to acquire such unsubscribed Additional Securities on the terms set forth in the Preemptive Rights Notice. Each fully-subscribing Preemptive Stockholder shall have the right to elect to purchase up to its *pro rata* share of such unsubscribed Additional Securities (in proportion to the Pro Rata Portions of all fully-subscribing Preemptive Stockholders), by delivering written notice to the Corporation, within two (2) Business Days from the date such offer from the Corporation or its applicable Subsidiary is delivered to such Preemptive Stockholder. To the extent the procedure described in the preceding sentence does not result in the subscription of all unsubscribed Additional Securities, such procedure shall be repeated until there are no unsubscribed Additional Securities or until no Preemptive Stockholder has elected to purchase additional unsubscribed Additional Securities.

(c)     In the event that any Additional Securities are not subscribed for by the Preemptive Stockholders in accordance with this Section 3.3, the Corporation or its applicable Subsidiary will have ninety (90) days after the expiration of the last period in which Preemptive Stockholders are entitled to subscribe for Additional Securities to issue or sell the unsubscribed Additional Securities, at a price and upon other terms no more favorable to a purchaser of Additional Securities, in the aggregate, than those specified in the Preemptive Rights Notice delivered to the Preemptive Stockholders pursuant to Section 3.3(a). Following the earlier to occur of (i) the date the Corporation or its applicable Subsidiary issues or sells all such unsubscribed Additional Securities, and (ii) the date of the expiration of the ninety (90) day period referred to in the immediately preceding sentence, the Corporation or its applicable Subsidiary will not issue or sell any Additional Securities (other than pursuant to an Excluded Issuance) without first offering such Additional Securities to each of the Preemptive Stockholders in the manner provided in this Section 3.3.

(d)     Notwithstanding anything to the contrary set forth herein, the Corporation may comply with its obligations under this Section 3.3 by first selling or issuing to (or allowing its applicable Subsidiary to sell or issue to) any applicable third party purchaser or more Preemptive Stockholders and/or any of their respective Affiliates (each, a "Specified Preemptive Stockholder" and, collectively, the "Specified Preemptive Stockholders") all or any portion of the Additional Securities contemplated to be issued or sold, and, promptly thereafter,

offering to issue or sell to the Preemptive Stockholders (other than the Specified Preemptive Stockholders) (each, an "Other Preemptive Stockholder" and, collectively, the "Other Preemptive Stockholders") the number or amount of such Additional Securities the Other Preemptive Stockholders would have been entitled to purchase pursuant to this Section 3.3 by applying Sections 3.3(a) and 3.3(b) as if the Corporation or its applicable Subsidiary had not first issued or sold all or the applicable portion of the Additional Securities to the applicable third-party purchaser and/or Specified Preemptive Stockholders but rather had offered to issue or sell such Additional Securities to all Preemptive Stockholders at the same time in accordance with the terms of those Sections. In the event that any Other Preemptive Stockholder purchases Additional Securities pursuant to any such offer referred to in the immediately preceding sentence, then either the Corporation or the applicable Subsidiary will issue to the Other Preemptive Stockholders, and/or any applicable third-party purchaser and the Specified Preemptive Stockholders shall sell or transfer to the Other Preemptive Stockholders or the Corporation or its applicable Subsidiary, for a price equal to the original cost thereof (plus any accrued and unpaid yield or interest thereon, if applicable), the same number or amount and class or series of Additional Securities acquired by the Other Preemptive Stockholders pursuant to such offer.

## ARTICLE IV

## BOARD OF DIRECTORS

SECTION 4.1    Election of Directors; Number and Composition.

(a)    *Designees.* Each Stockholder agrees to vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which it exercises voting control and to take such other actions as are necessary, so as to (x) fix the number of Directors at five (5) persons as of the Effective Date (as such number may be updated from time to time by the Board of Directors), and (y) elect and continue in office as Directors and to take all other action within its control to cause such election and continuance (including using its commercially reasonable efforts to cause the Corporation to call a special meeting of stockholders for the purpose of electing Directors) of the following:

(i)    one (1) Director who shall be the individual serving as the Chief Executive Officer of the Corporation (such person, the "CEO Director"); provided, that if for any reason such individual shall cease to serve as the Chief Executive Officer of the Corporation, each Stockholder shall (A) vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which such Stockholder exercises voting control and take any other action necessary, to remove such individual from the Board of Directors if such individual has not resigned as a member of the Board of Directors, and (B) elect as a Director the successor Chief Executive Officer when such person becomes Chief Executive Officer; and

(ii)    for so long as the Investor Stockholder Designation Threshold is satisfied, four (4) individuals designated from time to time by the affirmative vote or written consent of the Investor Stockholder Majority from candidates selected by the Investor Stockholder Nominating Committee (each such individual, an "Investor Stockholder Director" and, collectively, the "Investor Stockholder Directors").

As of the Effective Date, the CEO Director shall be Taylor Harris and the Investor Stockholder Directors shall be [●], [●], [●] and [●].

(b)     *Termination of Investor Stockholder Designation Right*. If at any time the Investor Stockholder Designation Threshold ceases to be satisfied, then the Designation Right of the Investor Stockholders set forth in Section 4.1(a)(ii) shall terminate, and, at the request of the Majority Stockholders, each Stockholder agrees to vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which such Stockholder exercises voting control and to take any other action necessary, for the removal of the applicable number of Directors previously nominated by the Investor Stockholder Nominating Committee and designated by the Investor Stockholders pursuant to Section 4.1(a)(ii) to give effect to such termination, and any vacancy or vacancies on the Board of Directors created by such removal shall be filled, and the Designation Right set forth in Section 4.1(a)(ii) shall thereafter be exercised, by the affirmative vote or written consent of the Majority Stockholders from candidate(s) selected by the General Stockholder Nominating Committee. If Additional Securities are issued or sold pursuant to Section 3.3(d), then the determination as to whether the Investor Stockholders' Designation Right is terminated shall not be made until after the consummation of the issuance or sale of Additional Securities to Other Preemptive Stockholders pursuant to Section 3.3(d), if any.

(c)     *Designation Notice*. With respect to (i) any nomination and designation of a Director by the Investor Stockholder Majority or the Majority Stockholders pursuant to the Designation Right set forth in Section 4.1(a)(ii) (as applicable, the "Designating Group") (including any such nomination and designation made following the removal of a Director made at the request of the applicable Designating Group pursuant to Section 4.1(e)), or (ii) any request by the applicable Designating Group pursuant to Section 4.1(e) for the removal from the Board of Directors of any Director designated by such Designating Group, the applicable Designating Group shall execute and deliver to the Corporation a written notice (a "Designation Notice") and such Designation Notice shall (A)(1) identify the individual that such Designating Group is nominating and designating, or (2) specify the identity of the Director to be removed from the Board of Directors, (B) certify to the Corporation that the Designating Group executing and delivering such Designation Notice own(s) or hold(s) the requisite number of Shares required to be held by the applicable Designating Group as of such time in order to have the Designation Right under Section 4.1(a)(ii), and (C) include such additional information such that the Corporation can reasonably conclude that the certification in clause (B) is accurate (including the names of each Stockholder included in such Designating Group and the number of Shares owned or held by each such Stockholder). If the Corporation confirms that a Designation Notice has been executed and delivered by the appropriate Designating Group that own(s) or hold(s) the requisite number of Shares required to be held by the applicable Designating Group as of such time in order to have a Designation Right under Section 4.1(a)(ii), then the Corporation shall deliver notice of such fact to the other Stockholders and the other Stockholders may rely on such notice from the Corporation in determining their obligations under this Section 4.1 with respect to the election of a Director that has been nominated and designated pursuant to Section 4.1(a) or the removal of a Director from the Board of Directors pursuant to Section 4.1(b) or Section 4.1(e). If the Corporation confirms that a Designation Notice has not been executed and delivered by the appropriate Designating Group that own(s) or hold(s) the requisite number of Shares required to be held by the applicable Designating Group as of such time in order to have a Designation Right under Section 4.1(a)(ii), then such Designation Notice shall be deemed void and invalid and the

Stockholders shall have no obligation to vote their Shares or any other Shares over which they exercise voting control or to take any other action in respect thereof. For the avoidance of doubt, if the applicable Designating Group fails to designate a Person to fill a directorship pursuant to the Designation Right set forth in <u>Section 4.1(a)(ii)</u> and the terms of this <u>Section 4.1(c)</u>, such directorship shall remain vacant until the applicable Designating Group exercises such Designation Right hereunder. For the avoidance of doubt, subject to the applicable Designating Group having the required number of votes, nothing herein shall limit such Designating Group's right to take action (including by adopting a written consent) to appoint any individual designated pursuant to <u>Section 4.1(a)(ii)</u> to the Board of Directors.

(d)     *Transferability of Designation Right*. The Designation Rights of the Investor Stockholders set forth in <u>Section 4.1(a)(ii)</u> shall not be Transferable to any Person or group of Persons (other than a Permitted Transferee) and the associated right to remove and replace such a designated Investor Stockholder Director shall not be Transferable to any Person or group of Persons (other than a Permitted Transferee). The termination of any Investor Stockholder's Designation Rights shall not affect the Designation Rights of any other non-Affiliated Investor Stockholder to appoint an Investor Stockholder Director.

(e)     *Removal; Replacement of Investor Stockholder Directors*. Subject to <u>Section 4.1(b)</u>, each Stockholder agrees to vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which such Stockholder exercises voting control and take any other action necessary, for the removal of any Investor Stockholder Director upon the request of the Investor Stockholder Majority, and for the election or appointment to the Board of Directors of a substitute nominated by the Investor Stockholder Nominating Committee and designated by Investor Stockholder Majority in accordance with the provisions hereof. For the avoidance of doubt, except for the removal of any Investor Stockholder Director on account of the termination of a Designation Right (which removal shall be governed by <u>Section 4.1(b)</u>), the Investor Stockholders shall have the exclusive right to require the removal, whether with or without cause, of any Investor Stockholder Director. Each Stockholder further agrees to vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which such Stockholder exercises voting control and take any other action as shall be necessary or appropriate, to ensure that any vacancy on the Board of Directors resulting from the resignation or removal of an Investor Stockholder Director (excluding a resignation or removal of an Investor Stockholder Director on account of the termination of the Designation Right of the Investor Stockholders pursuant to <u>Section 4.1(b)</u>), or resulting from an Investor Stockholder Director becoming unable to serve as a result of death, disability or otherwise, shall be filled with an individual that is nominated by the Investor Stockholder Nominating Committee and designated by the Investor Stockholder Majority. In addition, if a newly created seat on the Board of Directors that is to be filled with an individual to be designated or nominated by the Investor Stockholders pursuant to their Designation Right remains vacant, then each Stockholder further agrees to vote, execute proxies or written consents, or otherwise cause to be voted all of its Shares and any other Shares over which such Stockholder exercises voting control and take any other action as shall be necessary or appropriate, to ensure that such newly created seat shall be filled with an individual that is nominated by the Investor Stockholder Nominating Committee and designated by the Investor Stockholder Majority so long as the Investor Stockholder Designation Threshold is satisfied at the time of such nomination or designation. Each Stockholder further agrees not to nominate any individual to fill any vacancy on

30

the Board of Directors or any newly created seat on the Board of Directors that shall be filled with an individual that is to be nominated by the Investor Stockholder Nominating Committee and designated by the Investor Stockholder Majority pursuant to either of the two immediately preceding sentences. For the avoidance of doubt, no Stockholder shall remove, or cause the removal of, any Investor Stockholder Director other than as permitted by this Agreement. If at any time the Investor Stockholder Designation Threshold ceases to be satisfied, then the procedures set forth in this <u>Section 4.1(e)</u> for the replacement and removal of Directors appointed pursuant to <u>Section 4.1(a)(ii)</u> shall apply *mutatis mutandis* to any Directors nominated by the General Stockholder Nominating Committee and designated by the Majority Stockholders.

(f)     *No Liability for Election of Recommended Director*. None of the Stockholders, and no officer, director, manager, stockholder, partner, member, employee or agent of any Stockholder, makes any representation or warranty as to the fitness or competence of the designee or nominee of any party hereunder to serve on the Board of Directors (or any Board Committee) or any Subsidiary Governing Body by virtue of being a party to this Agreement or by the act of such party in voting for such designee or nominee pursuant to this Agreement.

(g)     *Chairperson*. The Chairperson of the Board of Directors (the "<u>Chairperson</u>") shall be determined by the Investor Stockholder Majority, and as of the Effective Date shall be [●]; <u>provided</u>, that in the event the Investor Stockholder Designation Threshold ceases to be satisfied, then any successor Chairperson shall be determined by the Board of Directors.

SECTION 4.2     <u>Meetings; Notice</u>. The Board of Directors shall hold no less than one (1) meeting per fiscal quarter. Regular meetings of the Board of Directors shall be held at such times and places as the Board of Directors shall from time to time determine. Special meetings of the Board of Directors may be called by any of the Chairperson, the CEO Director or any two Directors acting together. At least five (5) Business Days' notice must be given to each member of the Board of Directors and each Observer of regular meetings of the Board of Directors even if such meetings are held at times and places fixed by resolution of the Board of Directors. A notice of the place, date and time and the purpose or purposes of each special meeting of the Board of Directors shall be given to each member of the Board of Directors and each Observer by telephoning or emailing (subject to confirmation of receipt) the same or by delivering the same personally not later than twenty-four (24) hours before the day of the meeting. Except for the first sentence, the provisions of this <u>Section 4.2</u> shall apply *mutatis mutandis* to any Board Committee meetings.

SECTION 4.3     <u>Quorum; Decisions</u>. At each meeting of the Board of Directors (or any Board Committee) at which a quorum is present, each Director (and, in the case of a Board Committee, each Director who is a member of such Board Committee) shall be entitled to one (1) vote on each matter to be voted on at such meeting. A majority of the total seats on the Board of Directors (or Board Committee) shall constitute a quorum. If a quorum shall not be present at any meeting of the Board of Directors (or Board Committee), the Directors present at such meeting may adjourn the meeting from time to time subject to the notice requirements set forth in <u>Section 4.2</u>. The withdrawal of a Director from any meeting shall not cause the failure of a duly constituted quorum at such meeting. A Director who is in attendance at a meeting of the Board of Directors (or Board Committee) but who abstains from the vote on any matter shall not be deemed

31

present at such meeting for purposes of the preceding sentence with respect to such vote, but shall be deemed present at such meeting for all other purposes. In the event that a duly called meeting of the Board of Directors (or Board Committee) is adjourned due to the failure of a quorum to be present, the presence of any such non-attending Director shall not be required to constitute a quorum at the next duly convened meeting related to the same topic as such adjourned meeting; provided, that prior written notice of such meeting is given in accordance with the terms hereof and no less than twenty-four (24) hours has elapsed from the time of such original meeting. Except as may be otherwise required by applicable law or the Certificate of Incorporation or the Bylaws, and subject to Section 5.6, when a quorum is present at any meeting, the vote of a majority of the Directors (and, in the case of a Board Committee, the Directors who are members of such Board Committee) present shall be the act of the Board of Directors (or Board Committee). All Directors may attend meetings of the Board of Directors or Board Committee telephonically if they cannot appear in person. The Board of Directors (or Board Committee) may also take action by unanimous written consent of the members of the Board of Directors (or Board Committee).

SECTION 4.4    Committees.

(a)    *Board Committees*. The Corporation shall cause the Board of Directors to maintain the following committees (collectively, "Board Committees"): (i) an audit committee, (ii) a governance and nominating committee, (iii) a compensation committee, and (iv) any other committee, including an executive committee, as the Board of Directors shall determine in its discretion. Each such Board Committee shall have the composition, power and rights as determined by the Board of Directors from time to time.

(b)    *Stockholder Nominating Committees*. Without limiting the other provisions of this Article IV, the Investor Stockholder Nominating Committee or, if the Investor Stockholder Designation Threshold ceases to be satisfied, the General Stockholder Nominating Committee, as applicable, shall be formed by the applicable Stockholders in accordance with this Agreement and shall be responsible for identifying Director nominees to the applicable Designating Group. The individuals designated as Directors by the applicable Designating Group under Section 4.1(a)(ii) shall have been nominated by the Investor Stockholder Nominating Committee or, if the Investor Stockholder Designation Threshold ceases to be satisfied, the General Stockholder Nominating Committee, as applicable.

SECTION 4.5    Subsidiary Governing Bodies. Unless otherwise determined by the Board of Directors from time to time, each Subsidiary Governing Body shall be comprised of the then-serving Directors and/or any management representatives or other individuals as may be determined by the Board of Directors from time to time in accordance with applicable law.

SECTION 4.6    Additional Agreements of Stockholders. Each Stockholder hereby agrees that, following the Effective Date, such Stockholder shall not vote, execute proxies or written consents, or otherwise cause to be voted any of its Shares or any other Shares over which it exercises voting control in favor of, or to authorize or approve, or to take any other actions to cause (including by requesting the calling of any special meeting of stockholders for the purpose of authorizing or approving), any amendment, amendment and restatement, supplement or other modification of the Certificate of Incorporation or the Bylaws to (a) confer upon any Director any voting powers that are greater than or less than those of other Directors, or (b) provide for any

qualifications for Directors (it being understood and agreed that any such voting powers or qualifications that are set forth in the Certificate of Incorporation or the Bylaws, as in effect on the Effective Date, are not subject to this <u>Section 4.2</u>.

SECTION 4.7    <u>PROXY AND POWER OF ATTORNEY</u>. IN ORDER TO SECURE THE OBLIGATIONS OF EACH STOCKHOLDER TO VOTE SUCH STOCKHOLDER'S SHARES IN ACCORDANCE WITH THE PROVISIONS OF THIS <u>ARTICLE IV</u>, EACH STOCKHOLDER HEREBY IRREVOCABLY APPOINTS EACH OFFICER OF THE CORPORATION (WHETHER AN OFFICER ON THE EFFECTIVE DATE OR THEREAFTER APPOINTED) AS SUCH STOCKHOLDER'S TRUE AND LAWFUL PROXY AND ATTORNEY, WITH FULL POWER OF SUBSTITUTION, TO VOTE ALL SHARES OWNED OR HELD BY SUCH STOCKHOLDER OR OVER WHICH SUCH STOCKHOLDER HAS VOTING CONTROL TO EFFECTUATE SUCH VOTES FOR THE DURATION OF THE EXISTENCE OF THE CORPORATION. IN ADDITION, IN ORDER TO SECURE THE OBLIGATIONS OF EACH STOCKHOLDER TO EXECUTE AND DELIVER PROXIES AND WRITTEN CONSENTS, AND TO TAKE ACTIONS REQUIRED TO BE TAKEN BY SUCH STOCKHOLDER SET FORTH IN THIS <u>ARTICLE IV</u>, EACH STOCKHOLDER HEREBY IRREVOCABLY GRANTS TO EACH OFFICER OF THE CORPORATION (WHETHER AN OFFICER ON THE EFFECTIVE DATE OR THEREAFTER APPOINTED) A POWER-OF-ATTORNEY TO SIGN ANY AND ALL SUCH PROXIES AND WRITTEN CONSENTS AND TO TAKE ANY AND ALL SUCH ACTIONS, IN THE NAME AND ON BEHALF OF SUCH STOCKHOLDER. THE PROXIES AND POWERS OF ATTORNEY GRANTED BY EACH STOCKHOLDER PURSUANT TO THIS <u>SECTION 4.3</u> ARE COUPLED WITH AN INTEREST, ARE IRREVOCABLE, AND SHALL NOT BE AFFECTED BY AND SHALL SURVIVE THE DEATH, INCOMPETENCY, INCAPACITY, DISABILITY, MERGER, CONSOLIDATION, LIQUIDATION, BANKRUPTCY, INSOLVENCY OR DISSOLUTION OF ANY STOCKHOLDER.

SECTION 4.8    <u>Board Observers</u>.

(a)    Subject to <u>Section 4.8(b)</u>, each Investor Stockholder (or group of Affiliated Investor Stockholders) shall have the right to have one (1) designated representative (i) attend, as an observer in a non-voting capacity (each, an "<u>Observer</u>" and, collectively, the "<u>Observers</u>"), each meeting of the Board of Directors and any Board Committee, and (ii) receive copies of all materials and other information (including advance notice of any meeting) given to members of the Board of Directors or such Board Committee, as applicable, in connection with any meeting, in each case, for so long as such Investor Stockholder or its Affiliates owns or holds any Shares.

(b)    Notwithstanding the foregoing, an Observer shall not be entitled to observe any meeting, or a portion of a meeting, or to receive any materials or other information if the Board of Directors (or any applicable Board Committee) determines that (i) it would jeopardize or impair the ability of the Corporation or any of its Subsidiaries to take advantage of the attorney-client, work product or similar privilege if such meeting were observed or if such portion of such notice, such materials or such other information was received by such Observer, (ii) it is necessary (in the judgment of the Board of Directors or any applicable Board Committee) to comply with the terms and conditions of agreements with third parties or applicable law, (iii) that such Observer

or the Investor Stockholder(s) that designated such Observer or any Affiliate of any such Investor Stockholder(s) has/have an actual or potential conflict of interest with respect to the subject matter of such meeting or such materials or other information, or (iv) the Board of Directors (or any applicable Board Committee) otherwise determines that it would be in the best interests of the Corporation and its Subsidiaries to exclude such Observer from a meeting (or any portion thereof) or not provide such Observer with such materials or other information. The failure of any Observer to attend any meeting (or to receive any portion of a notice of a meeting) or to receive any materials or other information shall not prevent any such meeting from proceeding or otherwise affect the validity of such meeting (or any written consent in lieu of a meeting) or any actions taken at such meeting (or any written consent in lieu of a meeting). No Observer shall be entitled to vote on any matters submitted to a vote at any meeting. Without limiting Section 4.9(a), no Observer shall be entitled to any fees or other compensation for acting as an Observer.

(c)     For so long as any Investor Stockholder has the right to appoint an Observer, such Investor Stockholder may from time to time, in its sole discretion and by providing the Corporation with prior written notice thereof, remove the individual serving as such Investor Stockholder's Observer and appoint a new individual to serve as such Investor Stockholder's Observer following such removal. If any Investor Stockholder ceases to have the right to appoint an Observer, then the individual then serving as such Investor Stockholder's Observer will no longer be entitled to serve as an Observer.

(d)     The right of each Investor Stockholder (or group of Affiliated Investor Stockholders) to designate an Observer, and to replace an Observer with a new Observer, shall be subject to the execution and delivery by such Observer of a confidentiality agreement that is acceptable to the Board of Directors.

(e)     The right of each Investor Stockholder (or group of Affiliated Investor Stockholders) to appoint, remove and replace such Investor Stockholder's Observer shall not be Transferable to any Person or group of Persons (other than a Permitted Transferee). The termination of any Investor Stockholder's right to appoint an Observer shall not affect the right of any other non-Affiliated Investor Stockholder to appoint an Observer.

SECTION 4.9     Reimbursement of Expenses; Insurance; Compensation.

(a)     The Corporation shall promptly reimburse each Director and each Observer for his or her reasonable out-of-pocket fees, charges and expenses (including travel and related expenses) incurred in connection with attending meetings and conducting any other business requested by the Corporation or related to such Person's service as a Director or Observer.

(b)     The Corporation shall maintain directors and officers indemnity insurance coverage reasonably satisfactory to the Investor Stockholders, and the Certificate of Incorporation and the Bylaws shall provide for indemnification and exculpation of the Directors to the fullest extent permitted under applicable law.

(c)     Without limiting Section 4.9(a), in no event shall any Director that is an employee of an Investor Stockholder or any Affiliate thereof be entitled to receive any compensation for serving on the Board of Directors.

34

## ARTICLE V

## CERTAIN ACKNOWLEDGMENTS AND AGREEMENTS

SECTION 5.1    Affiliate Transactions. Other than any Excepted Transaction, any transaction or series of related transactions between the Corporation or any of its Subsidiaries, on the one hand, and any Significant Stockholder or an Affiliate thereof (including any portfolio company of a Significant Stockholder), on the other hand (an "Affiliate Transaction"), involving aggregate payments, fundings or other consideration in excess of $1,000,000 per annum shall require the approval of a majority of the votes of the Directors that are disinterested with respect to such Affiliate Transaction.

SECTION 5.2    Corporate Opportunities.

(a)    The Corporation and each Stockholder acknowledge that (i) each Stockholder (other than any Stockholder who is an employee of the Corporation or any of its Subsidiaries, any Stockholder that is a Family Member of any employee of the Corporation or any of its Subsidiaries, or any Stockholder that is controlled by any employee of the Corporation or any of its Subsidiaries or controlled by any such employee's Family Members), (ii) each member of the Board of Directors or any committee thereof (other than any such member who is an employee of the Corporation or any of its Subsidiaries, or is a Family Member of any employee of the Corporation or any of its Subsidiaries) (whether such member is serving as a member of the Board of Directors, a member of a committee of the Board of Directors or a member of any Subsidiary Governing Body), and (iii) each Affiliate, manager, director, principal, officer, employee and other representative of any Stockholder described in clause (i) or any member of the Board of Directors (or committee thereof) described in clause (ii) (other than any such Person who is an employee of the Corporation or any of its Subsidiaries, a Family Member of any employee of the Corporation or any of its Subsidiaries, or controlled by any employee of the Corporation or any of its Subsidiaries or controlled by any such employee's Family Members) (the foregoing Persons being referred to, collectively, as "Identified Persons" and, each individually, as an "Identified Person") may now engage, may continue to engage, and/or may, in the future, decide to engage, in the same or similar activities or lines of business as those in which the Corporation or any of its Subsidiaries, directly or indirectly, now engage or may engage and/or other business activities that overlap with, are complementary to, or compete with those in which the Corporation or any of its Subsidiaries, directly or indirectly, now engage or may engage (any such activity or line of business, an "Opportunity"). No Identified Person shall have any duty to refrain, directly or indirectly, from (x) engaging in any Opportunity, (y) offering or directing any Opportunity to another Person (including any Affiliate of such Identified Person) or (z) otherwise competing with the Corporation or any of its Subsidiaries. No Identified Person shall have any duty or obligation to refer, offer or otherwise make available to the Corporation or any of its Subsidiaries any Opportunity, and the Corporation hereby renounces, on behalf of itself and each of its Subsidiaries, any interest or expectancy of the Corporation or any of its Subsidiaries in, or in being offered, an opportunity to participate in any Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation or any of its Subsidiaries.

(b)    In the event that any Identified Person acquires knowledge of an Opportunity which may be a corporate (or analogous) or business opportunity for the Corporation

or any of its Subsidiaries, such Identified Person shall have no duty to communicate, offer or otherwise make available such Opportunity to the Corporation or any of its Subsidiaries and shall not be liable to the Corporation, any of its Subsidiaries or any of the Stockholders for breach of any purported fiduciary duty by reason of the fact that such Identified Person pursues or acquires such Opportunity for itself, or offers or directs such Opportunity to another Person (including any Affiliate of such Identified Person).

(c)     The Corporation, on behalf of itself and each of its Subsidiaries, and each Stockholder (i) acknowledge that the Identified Persons may now own, may continue to own, and from time to time may acquire and own, investments in one or more other Entities (each such Entity, a "Related Company" and all such Entities, collectively, "Related Companies"), including Entities that are competitors of, or that otherwise may have interests that do or could conflict with those of, the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates, and (ii) agree that (A) the enjoyment, exercise and enforcement of the rights, interests, privileges, powers and benefits granted or available to the Identified Persons under this Agreement and/or the Certificate of Incorporation shall not be in any manner reduced, diminished, affected or impaired, and the obligations of the Identified Persons under this Agreement and/or the Certificate of Incorporation (if any) shall not be in any manner augmented or increased, by reason of any act, circumstance, occurrence or event arising from or in any respect relating to (x) the ownership by an Identified Person of any interest in any Related Company, (y) the affiliation of any Related Company with an Identified Person or (z) any action taken or omitted by any Related Company or an Identified Person in respect of any Related Company, (B) no Identified Person shall, by reason of such ownership, affiliation, action or omission, become subject to any fiduciary duty to the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates, (C) nothing in this Agreement or the Certificate of Incorporation and none of the duties or obligations imposed on an Identified Person, whether by contract or law, if any, do or shall limit or impair the right of any Identified Person to, directly or indirectly, purchase or sell the securities or indebtedness of any other Entity or to compete with the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates and (D) the Identified Persons are not and shall not be obligated to disclose to the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates any information related to their respective businesses or opportunities, including acquisition opportunities, or to refrain from or in any respect to be restricted in competing against the Corporation, any of its Subsidiaries, any of the Stockholders or any of their respective Affiliates in any such business or as to any such opportunities.

(d)     Nothing in this Section 5.2 shall be deemed to limit any Stockholder's obligations under Section 7.3.

SECTION 5.3     Creditor Relationships. Anything in this Agreement to the contrary notwithstanding (including Section 5.1), the Corporation and each of the Stockholders hereby agree and acknowledge that certain Stockholders and/or their Affiliates may also be holders of indebtedness and debt securities of, and guarantees thereof by, the Corporation and its Subsidiaries (collectively, "Indebtedness"), and in such capacity may have interests that are divergent from the Corporation, its Subsidiaries and/or the other Stockholders, and that under no circumstances shall this Agreement prohibit any such Stockholder or any such Affiliate from taking any action or enforcing any right entitled to it under the terms of the documentation relating to or governing the

Indebtedness held by such Stockholder or such Affiliate or to which it is entitled under law. To the fullest extent permitted by law, no holder of Indebtedness shall be liable to the Corporation, any of its Subsidiaries or the other Stockholders for breach of this Agreement or any fiduciary duty by reason of any such activities of such holder, including exercising any rights of such holder under documentation relating to or governing such Indebtedness or to which such holder may be entitled under law, and the Corporation and each Stockholder hereby irrevocably waives any and all rights to claim any such actions are a breach of this Agreement or the fiduciary duties (if any) of such holder. In addition, any holder of Indebtedness, in its capacity as such, in exercising its rights as a lender or creditor of the Corporation or any of its Subsidiaries, including making its decision on whether to foreclose on any collateral security (or direct any agent or trustee under any indebtedness to do the same), will have no duty to consider (a) its status or the status of any of its Affiliates as a Stockholder, (b) the interests of the Corporation, any of its Subsidiaries or any of the Stockholders, or (c) any duty it may have to any other Stockholder, except as may be required under the applicable financing documents relating to such Indebtedness.

SECTION 5.4     AI Questionnaire. If any Stockholder that is an Accredited Investor on the date on which such Stockholder became a party to this Agreement shall thereafter cease to be an Accredited Investor, then such Stockholder shall promptly (but in any event no later than ten (10) Business Days after the date on which such Stockholder ceased to be an Accredited Investor) inform the Corporation in writing of such fact. In addition, the Corporation shall have the right, at any time and from time to time, to request that any Stockholder complete, execute and deliver to the Corporation an AI Questionnaire. The Corporation shall make any such request in writing delivered to the applicable Stockholder in accordance with Section 7.2. If any Stockholder receives any such request, then such Stockholder shall promptly (but in any event no later than ten (10) Business Days after the date on which such Stockholder receives such written request) complete, execute and deliver to the Corporation an AI Questionnaire. Nothing in this Section 5.4 shall amend, alter or otherwise modify the restriction against Transferring Shares to any Person that is not an Accredited Investor pursuant to Section 2.1(a)(iv).

SECTION 5.5     Beneficial Ownership Reporting. The Stockholders agree to cooperate in a commercially reasonable manner in connection with the compliance by the Corporation and any of its Subsidiaries with all applicable BOI Laws, including making any adjustments and/or amendments to this Section 5.5 that may be reasonably necessary or appropriate in consideration of additional guidance issued by FinCEN or any other competent authority in respect of the implementation of BOI Laws. Without limitation of the preceding sentence:

(a)     The Board of Directors shall make or cause to be made any beneficial ownership or related filings or reports ("BOI Reports") required pursuant to any BOI Laws for the Corporation and any of its Subsidiaries. The Board of Directors shall be entitled to rely on the Stockholder Beneficial Ownership Information (as defined below) provided by the Stockholder(s) pursuant to clause (b) (if any). Each Stockholder shall be entitled to review the portion of the BOI Report (or a summary thereof) of the Corporation or any of its Subsidiaries that relates to such Stockholder upon reasonable request made at least fifteen (15) days before such report is due; provided, that a Stockholder's entitlement to review the portion of the BOI Report relating to such Stockholder will be limited if such review would result in a delay in the filing of the BOI Report beyond its due date. For the avoidance of doubt, the Board of Directors shall make the final determination regarding the reporting requirements applicable to the Corporation and its

Subsidiaries under BOI Laws, including the applicability of reporting under the BOI Laws to the Corporation and its Subsidiaries, the application of an exemption from such reporting for the Corporation or any of its Subsidiaries, the timing for filing a BOI Report, the contents of a BOI Report, and the need to update any BOI Report.

(b)      Each Stockholder shall be responsible for (i) initially determining whether there are any reportable "beneficial owners" under any applicable BOI Laws in respect of the Corporation and any of its Subsidiaries as a result of such Stockholder's direct or indirect ownership and/or control of the Corporation or any such Subsidiary, (ii) providing "FinCEN identifiers" and such other identifying information as shall be required to comply with any applicable BOI Laws (the "Stockholder Beneficial Ownership Information") in respect of any such beneficial owners to the Corporation and the Board of Directors as is needed to enable the Corporation and its Subsidiaries to timely comply with their disclosure obligations under any applicable BOI Laws, and (iii) promptly responding to any information and other requests by the Corporation or the Board of Directors in connection with the Corporation and its Subsidiaries' compliance with all applicable BOI Laws, including the Board of Director's independent assessment to identify reportable beneficial owners under applicable BOI Laws. Each Stockholder further represents, warrants and agrees that (x) within a reasonable time after a request by the Corporation, but no later than five (5) Business Days after the Corporation makes such request, it will provide the Corporation and the Board of Directors with all of such Stockholder's applicable Stockholder Beneficial Ownership Information; provided, that if the Corporation requires a response within five (5) Business Days of such request, then the Corporation will provide notice to such Stockholder in such request and such Stockholder will use commercially reasonable efforts to provide the requested Stockholder Beneficial Ownership Information within the timeframe set forth in such request, (y) it will notify the Corporation and the Board of Directors promptly of any updates to or changes to any of its Stockholder Beneficial Ownership Information that would reasonably be expected to require an updated BOI Report in respect of the Corporation or any of its Subsidiaries under any applicable BOI Laws, and (z) it will use reasonable efforts to ensure that any filings or profiles associated with any Stockholder Beneficial Ownership Information that it has provided in connection with the application for a "FinCEN identifier" will be kept current as and to the extent required by any applicable BOI Laws. Each Stockholder authorizes the disclosure by the Corporation and any Subsidiary of the Corporation of its Stockholder Beneficial Ownership Information provided pursuant to this clause (b) to the extent necessary to comply with any applicable BOI Laws.

(c)      To the extent legally permissible and reasonably practicable, the Stockholders shall keep the Corporation promptly informed of each notice or other communication received from FinCEN or any other competent authority concerning any BOI Reports relating to the Corporation and/or any of its Subsidiaries, and shall consult in a reasonable manner with the Corporation prior to communicating with FinCEN or any other competent authority concerning any BOI Reports or compliance with any applicable BOI Laws by the Corporation and/or any of its Subsidiaries.

(d)      Each Stockholder agrees, severally and not jointly, to indemnify and hold harmless the Corporation, its Subsidiaries, the Board of Directors and the other Stockholders from and against any and all liability, damage, cost or expense (including reasonable attorneys'

fees) incurred by them that directly results from any default by such Stockholder in its representations, warranties and agreements under this Section 5.5.

SECTION 5.6    Approval Rights.

(a)    Without limitation of the foregoing, except as may be otherwise required by applicable law or the Certificate of Incorporation or the Bylaws, at each meeting of the Stockholders at which a quorum is present, (i) each Stockholder shall be entitled to one (1) vote on each matter to be voted on at such meeting, and (ii) when a quorum is present at any meeting, the vote of a majority of the Stockholders present shall be the act of the Corporation; provided, that the Stockholders shall be entitled to act by written consent in lieu of a meeting with respect to all matters on which the Stockholders are entitled to vote.

(b)    The Corporation shall not, and the Corporation shall not directly or indirectly cause or permit any of its Subsidiaries to (including, without limitation, by voting, or causing or permitting to be voted, the Equity Interests of any of its Subsidiaries to authorize or approve any such action), take (whether by amendment, merger, consolidation, division, recapitalization or otherwise) any of the actions listed on Schedule A attached hereto without the prior written approval or consent of (a) so long as the Investor Stockholder Approval Threshold is satisfied, the Majority Stockholders, and (b) if the Investor Stockholder Approval Threshold ceases to be satisfied, the Majority Stockholders or at least Sixty Six and Two Thirds Percent (66.67%) of the Board of Directors.

SECTION 5.7    Withholding. The Corporation may withhold from any actual or deemed distribution to any Stockholder the amount of any applicable withholding taxes, and any such withheld amounts shall be treated as having been paid to the applicable Stockholder for all purposes. In the case of any deemed or other non-cash distribution, (1) the Corporation shall be entitled to satisfy such withholding from any other cash payment(s) otherwise payable to such Stockholder and/or through setoff against any cash and/or property of such Stockholder that is held by the Corporation, and (2) if the Corporation is unable to satisfy any such withholding prior to the due date thereof through the actions described in clause (1), within 10 days of written demand therefor, the applicable Stockholder shall pay to the Corporation the amount of applicable withholding (as determined by the Corporation in its sole discretion).

SECTION 5.8    Registration Rights. In connection with and prior to the consummation of an IPO, the Corporation and the Stockholders shall enter into a registration rights agreement on customary terms, including providing for, among other things, customary demand registration rights and piggyback registration rights.

SECTION 5.9    Restriction on Issuance of Non-Voting Shares. Notwithstanding anything herein to the contrary, the Corporation shall not be authorized to issue non-voting Equity Interests of any class, series or other designation to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided, however, that the foregoing restriction shall (a) have no further force and effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code, and (b) only have such force and effect to the extent and for so long as such Section 1123(a)(6) is in effect and applies to the Corporation.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

The Corporation and each Stockholder (including each Stockholder that is deemed to have entered into this Agreement), severally and not jointly, as of the Effective Date or, with respect to any Stockholder that becomes a party hereto after the Effective Date, the date any such Stockholder executes and delivers a Joinder Agreement, represents and warrants that (provided, that the representation and warranty set forth in Section 6.5 is only being provided by the Stockholders and not the Corporation):

SECTION 6.1    Ownership and Authority. This Agreement constitutes the valid and binding obligation of such party, enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other laws relating to or affecting creditors' rights generally and the effect and application of general principles of equity and the availability of equitable remedies).

SECTION 6.2    Organization. If an Entity, such party is duly organized, validly existing and, if applicable, in good standing under the laws of the jurisdiction of its organization.

SECTION 6.3    Authority. Such party has the full power, right and authority to enter into this Agreement, to perform, observe and comply with all of such party's agreements and obligations hereunder, and to consummate the transactions contemplated hereby. If an Entity, such party has taken all action required to be taken by it with respect to the execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby.

SECTION 6.4    No Conflict. The execution, delivery and performance by such party of this Agreement does not and will not, and the consummation of the transactions contemplated hereby in compliance with the terms and provisions hereof will not, to the best knowledge of such party, with or without the giving of notice, the passage of time, or both, conflict with, result in a breach of, constitute a violation or default of, or give any third party the right to terminate, accelerate or modify any obligation under (a) any material agreement or other document or instrument to which such party is a party or by which such party is bound or affected, (b) if an Entity, the organizational documents of such party, or (c) any law, statute, rule, regulation, ordinance, writ, order or judgment to which such party is bound or affected.

SECTION 6.5    Accredited Investor. Such Stockholder is an Accredited Investor.

SECTION 6.6    Survival. The representations and warranties of the Corporation and each Stockholder contained in this Agreement shall survive the execution of this Agreement (including any deemed execution of this Agreement by a Stockholder pursuant to the Plan of Reorganization) by the Corporation or such Stockholder and continue in full force and effect indefinitely.

## ARTICLE VII

## MISCELLANEOUS

SECTION 7.1      Term and Termination. At such time as any Stockholder shall cease to own or hold any Shares (a "Terminated Party"), such Terminated Party shall automatically no longer be a party to this Agreement and shall cease to be a Stockholder hereunder; provided, however, that (a) such Terminated Party shall continue to be bound by the provisions of Section 7.3 in accordance with the terms thereof, and (b)(i) any claims or rights of a Selling Holder or the Corporation against such Terminated Party arising under or relating to Section 3.1 hereof and (ii) any authorizations, obligations, covenants or liabilities of such Terminated Party arising under or relating to Section 3.1 hereof shall, in either such case, survive any such occurrence. Except for the legend requirements set forth in Section 2.1(e) (to the extent still applicable) and, to the extent still applicable, Section 7.3, all of the rights and obligations of the parties set forth in this Agreement shall terminate automatically upon the consummation of an IPO or a Sale Transaction; provided, however, that (x) any claims or rights of a Selling Holder or the Corporation against any Dragged Holder arising under or relating to Section 3.1 hereof, and (y) any authorizations, obligations, covenants or liabilities of a Dragged Holder arising under or relating to Section 3.1 hereof shall, in either such case, survive the termination of this Agreement.

SECTION 7.2      Notices. All notices, requests, waivers, document deliveries and other communications made pursuant to this Agreement shall be in writing and shall be deemed to have been effectively given, sent, provided, delivered or received: (a) when personally delivered to the party to be notified; (b) when sent by electronic mail ("e-mail") to the party to be notified; (c) three (3) Business Days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) Business Day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-Business Day delivery guaranteed, in each case as follows: (i) in the case of any Stockholder, to such Stockholder at its address or e-mail address set forth on its signature page to this Agreement or in a Joinder Agreement; and (ii) in the case of the Corporation, to the Corporation at the Principal Office, Attention: Chief Executive Officer and Secretary (or to another officer of the Corporation that is required to be provided with such notice, request, waiver, document or other communication pursuant to the terms of this Agreement). A party may change its address or e-mail address for purposes of notice hereunder by (x) in the case of the Corporation, giving notice of such change to all of the Stockholders in the manner provided in this Section 7.2, and (y) in the case of any Stockholder, giving notice of such change to the Corporation in the manner provided in this Section 7.2.

SECTION 7.3      Confidentiality.

(a)      Each Stockholder hereby agrees that, during the period commencing on the Effective Date (or, with respect to any Stockholder that becomes a party hereto after the Effective Date, the date any such Stockholder executes and delivers a Joinder Agreement) and ending on the first anniversary of the date on which such Stockholder became a Terminated Party (such period, the "Confidentiality Period"), such Stockholder will keep strictly confidential and will not disclose or divulge to any other Person (other than as permitted by this Section 7.3) any (x) confidential, business, financial or proprietary information regarding the Corporation or any of

41

its Subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any other Stockholder in respect of the Corporation or any of its Subsidiaries (in any such case, whether in written, oral or electronic form), that is obtained by, or on behalf of, such Stockholder from the Corporation or any of its Subsidiaries (including, for all purposes of this Section 7.3, any such information obtained by such Stockholder from any Director or Observer), from the Corporation's or any such Subsidiary's legal or financial advisors or any other agents or advisors engaged by the Corporation or any of its Subsidiaries, or from any other Stockholder and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by such Stockholder or any of its Representatives which contain, reflect or are based upon the information referred to in clause (x) above (collectively, "Confidential Information"). Confidential Information shall not include information which (A) is known or becomes known or available to the public in general or within the industries in which the Corporation or any of its Subsidiaries operate (other than as a result of a breach of this Section 7.3 by a Stockholder or any of its Representatives), (B) is or becomes available to a Stockholder on a non-confidential basis from a source other than the Corporation, any other Stockholder or any of their respective Affiliates or Representatives (provided that such Stockholder is not aware that such source is under an obligation to keep such information confidential), or (C) is independently developed by such Stockholder or its Representatives without reference to the Confidential Information, or derives from such Stockholder's general training, knowledge, skill or experience gained independent from such Stockholder's affiliation with the Corporation or its Affiliates.

(b)      Notwithstanding clause (a) of this Section 7.3, a Stockholder may disclose Confidential Information as follows:

(i)      Confidential Information may be provided by a Stockholder, on a confidential basis, to such Stockholder's Affiliates and the respective managers, officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, auditors, trustees, insurers, other professional advisors and financing sources of such Stockholder and such Stockholder's Affiliates (collectively, "Representatives"), to the extent reasonably necessary in connection with such Stockholder's investment in the Corporation; provided, however, that such Stockholder shall direct its Representatives to comply with the restrictions in this Section 7.3 as if such Representatives were a party hereto and bound by such restrictions, and such Stockholder shall be responsible for ensuring that its Representatives take commercially reasonable steps to comply with such restrictions and shall be responsible and liable for any breach of any such restrictions by any of its Representatives.

(ii)      Confidential Information may be provided by a Stockholder, on a confidential basis, to an actual or potential permitted Transferee of all or a portion of the Shares owned or held by such Stockholder, to the extent reasonably necessary to consummate a sale or other Transfer of such Shares to such actual or potential Transferee that is permitted under this Agreement; provided, however, that prior to such Stockholder's delivery of Confidential Information to an actual or potential permitted Transferee of Shares pursuant to this clause (ii), such actual or potential permitted Transferee shall have executed and delivered to such Stockholder and the Corporation a Transferee confidentiality agreement substantially in the form attached hereto as Exhibit B or otherwise as mutually agreeable between the potential permitted Transferor and Transferee, subject to the consent of the Corporation (not to be unreasonably delayed, conditioned or withheld).

(iii)    In the event that a Stockholder or any of its Representatives determines, in good faith upon the advice of counsel (including internal counsel), that disclosure of Confidential Information is required under applicable law or regulation, or is required or requested by any Governmental Authority having jurisdiction over such Stockholder or such Representative, such Stockholder or such Representative will, to the extent legally permitted and practicable under the circumstances, promptly provide the Corporation with written notice so that the Corporation may seek (at the Corporation's sole expense) an appropriate protective order or other remedy and/or waive compliance with this Agreement and, if requested by the Corporation, assist the Corporation (at the Corporation's expense) to seek such a protective order or other remedy. Provided that such notice (to the extent legally permitted and practicable under the circumstances) is furnished, if, in the absence of a protective order or other remedy, such Stockholder or any applicable Representative is, in the opinion of its counsel, required or requested to disclose Confidential Information, such Stockholder or such Representative may disclose pursuant to this Section 7.3(b)(iii) only that portion of such Confidential Information, and only to those parties, that such counsel has advised is required or requested to be disclosed, without liability under this Agreement. In addition, any Stockholder and any applicable Representative shall be entitled to disclose Confidential Information to Governmental Authorities in connection with routine regulatory audits and examinations that are conducted by such Governmental Authorities of such Stockholder without providing the Corporation with notice of such disclosure.

(iv)    With the prior consent of the Corporation, any Stockholder may provide Confidential Information of the Corporation (but not Confidential Information of any other Stockholder in respect of the Corporation or any of its Subsidiaries) to any Person in connection with a potential Sale Transaction with such Person; provided that such Person has an obligation to the Corporation to keep such Confidential Information confidential.

(v)    Any Stockholder that is a Management Stockholder may disclose Confidential Information in the performance of such employment duties or services to the extent (A) reasonably necessary, in such Management Stockholder's good faith judgment, to the performance of such duties or services, or (B) authorized by the Corporation's or such Subsidiary's policies in respect thereof; provided, that each Management Stockholder hereby acknowledges and agrees that the provisions of this Section 7.3 shall be in addition to, and not in limitation of, and are independent of, any confidentiality restrictions set forth in the Management Incentive Plan and any other agreement such Management Stockholder has with the Corporation or any of its Subsidiaries.

(vi)    Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement prohibits any Management Stockholder from making any good faith report to any Governmental Authority, or any staff person or representative of a Governmental Authority, concerning any act or omission that the Management Stockholder reasonably believes constitutes a possible violation of, law, making other disclosures that are protected under the anti-retaliation or whistleblower provisions of applicable law, or from making any truthful statements or disclosures required by law, regulation or legal process, or from requesting or receiving confidential legal advice, in each case, without notice to or consent of the Corporation.

(c)    _Termination_. All of the rights and obligations of a Stockholder set forth in this Section 7.3 shall terminate automatically upon the expiration of the Confidentiality Period

applicable to such Stockholder; provided, however, that no such termination shall relieve any Stockholder from any liability relating to any breach of this Section 7.3.

SECTION 7.4     Binding Effect. This Agreement shall be binding upon and inure to the benefit of the respective successors and permitted assigns of the parties hereto.

SECTION 7.5     Entire Agreement. This Agreement (including the exhibits and schedules to this Agreement), together with the Certificate of Incorporation and the Bylaws, contains the entire understanding among the Stockholders and the Corporation with respect to the subject matter of this Agreement and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter of this Agreement among the Stockholders and the Corporation.

SECTION 7.6     Amendments. Any term, condition or provision of this Agreement may be amended, modified or waived from time to time if, and only if, such amendment, modification or waiver is in writing and signed, either (a) so long as the Investor Stockholder Designation Threshold is satisfied, the Investor Stockholder Majority or (b) if the Investor Stockholder Designation Threshold ceases to be satisfied, the Majority Stockholders at the time of such amendment, modification or waiver. Notwithstanding the foregoing, no amendment, modification or waiver of any term, condition or provision of this Agreement shall be made (whether by merger, consolidation or reorganization of the Corporation, except in connection with a Sale Transaction) to any of the provisions (including any defined terms) of this Agreement that impact the rights, privileges, preferences, or obligations of the Investor Stockholders without the affirmative vote or written consent of the Investor Stockholder Majority. Further, notwithstanding the foregoing, no amendment, modification or waiver of any provision of this Agreement (including any amendments made pursuant to or in connection with a merger, consolidation or reorganization of the Corporation, except in connection with a Sale Transaction) that would materially and adversely affect the rights or obligations of any Stockholder (or group of Stockholders) set forth in this Agreement in a manner that is disproportionate in any material respect to the comparable rights and obligations of the other Stockholders (or group of Stockholders) at the time of such amendment, modification or waiver (without regard to any effect resulting from (i) the individual circumstances of any such Stockholder (including tax or economic position), (ii) the differences in the respective percentages of ownership of Shares of the Stockholders, or (iii) the different classes or series of Shares owned by the Stockholders) shall be made without the affirmative vote or written consent of such affected Stockholder (or group of Stockholders); provided, however, that, for the avoidance of doubt, neither the authorization or creation of a new class or series of Shares or other Equity Interests or equity-based securities of the Corporation, nor the issuance of any additional Shares or any other Equity Interests or equity-based securities of the Corporation, shall be deemed to adversely affect the rights or obligations of any Stockholder.

SECTION 7.7     No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and its legal representatives, heirs, administrators, executors, successors and permitted assigns, and it is not the intention of the parties hereto to confer third-party beneficiary rights upon any other Person other than Identified Persons (solely with respect to Section 5.2).

SECTION 7.8    Deemed Execution; Effective Date. By virtue of the Plan of Reorganization and the Confirmation Order, on the Effective Date, without any further action on the part of, or notice to, any Person, each Person that receives Shares under, or as contemplated by, the Plan of Reorganization on or as of the Effective Date became a party to this Agreement as a "Stockholder" hereunder, became fully bound by, and subject to all of the covenants, terms, conditions and provisions of this Agreement (including any obligation set forth herein to waive or refrain from exercising any appraisal, dissenters or similar rights) as a "Stockholder" party hereto, and is deemed to have signed this Agreement. This Agreement shall apply to, and be binding upon, all owners or holders of Shares, whether or not such owner or holder has executed a counterpart of this Agreement or a Joinder Agreement, and shall also apply to all Shares no matter when acquired, and by acceptance of Shares each owner or holder agrees to be so bound.

SECTION 7.9    Execution; Joinder. No additional Shares shall be issued by the Corporation unless the Person to whom such Shares are issued is an existing party to this Agreement or executes and delivers to the Corporation a Joinder Agreement. This Agreement shall apply to all Shares owned by a Stockholder, no matter when or how acquired. This Agreement shall take effect immediately and automatically on the Effective Date without any further action on the part of any Person.

SECTION 7.10    Interpretation. The titles and section headings set forth in this Agreement are for convenience of reference only and shall not be deemed to be a part of this Agreement. When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders or neuter. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof. Any reference to the DGCL or other statutes or laws will include all amendments, modifications or replacements of the specific sections and provisions concerned. Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

SECTION 7.11    Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ITS CONFLICTS OF LAW DOCTRINE. EACH OF THE CORPORATION AND EACH STOCKHOLDER HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURT OF CHANCERY AND ANY STATE APPELLATE COURT THEREFROM WITHIN THE STATE OF DELAWARE (UNLESS THE DELAWARE COURT OF CHANCERY SHALL DECLINE TO ACCEPT JURISDICTION OVER A PARTICULAR MATTER, IN WHICH CASE, OF ANY DELAWARE STATE OR FEDERAL COURT WITHIN THE STATE OF DELAWARE), AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE CORPORATION OR ANY STOCKHOLDER WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS. EACH OF THE CORPORATION AND EACH STOCKHOLDER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS

BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE CORPORATION AND EACH STOCKHOLDER HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS SPECIFIED IN SECTION 7.2, OR IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE CORPORATION AND EACH STOCKHOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH PROCEEDING.

SECTION 7.12    Injunctive Relief. It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties to this Agreement fail to comply with any of the obligations imposed on them by this Agreement and that in the event of any such failure, a non-breaching party hereto will be irreparably damaged and will not have an adequate remedy at law. Any such non-breaching party shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which such Person is entitled at law or in equity. Each of the parties hereto hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies. Each of the parties hereto hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason. The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Agreement.

SECTION 7.13    Enforceability; Severability. Each provision of this Agreement shall be enforceable in accordance with its terms to the fullest extent permitted by law, but in the event that any provision hereof would be invalid or unenforceable in any respect under applicable law, such provision shall be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law. The provisions hereof are severable, and in the event any provision hereof should be held invalid or unenforceable in any respect, it shall not invalidate, render unenforceable or otherwise affect any other provision hereof.

SECTION 7.14    Recapitalization. In the event that any Equity Interests or other securities are issued in respect of, in exchange for, or in substitution of, Shares by reason of any reorganization, recapitalization, reclassification, merger, consolidation, division, spin-off, partial or complete liquidation, stock dividend, split-up, sale of assets, distribution to stockholders or combination of any class or series of Shares or any other change in the Corporation's capital structure, appropriate adjustments shall be made to the provisions of this Agreement, as reasonably determined by the Corporation and the Majority Stockholders, so as to fairly and equitably preserve, as far as practicable, the original rights and obligations of the parties hereto under this Agreement.

SECTION 7.15    Conflict with Bylaws. The Stockholders agree that in the event any term or provision of the Bylaws conflicts with this Agreement, this Agreement shall control.

SECTION 7.16    Additional Actions and Documents. The parties agree to execute and deliver any further instruments and perform any additional acts that are or may become reasonably necessary to carry on the Corporation or to effectuate its purpose.

SECTION 7.17    Information Rights.

(a)    Subject to the obligations of the Stockholders under Section 7.3, the Corporation shall make available to: (i) each Institutional Stockholder (other than any Competitor) for so long as such Institutional Stockholder holds any Shares, (A) within one-hundred and twenty (120) days after the end of each fiscal year of the Corporation, copies of the audited consolidated financial statements of the Corporation and its Subsidiaries for such fiscal year, including a consolidated balance sheet and consolidated statements of operations, stockholders' equity and cash flows for such fiscal year, together with the auditors' report on such audited consolidated financial statements in accordance with GAAP, and (B) within sixty (60) days after the end of each fiscal quarter of the Corporation in each of the Corporation's first three (3) fiscal quarters in each fiscal year of the Corporation, copies of the unaudited consolidated financial statements of the Corporation and its Subsidiaries for such fiscal quarter, including a consolidated balance sheet and consolidated statements of operations and cash flows for such fiscal quarter, in accordance with GAAP, subject to the absence of footnotes and to year-end adjustments; and (ii) each Investor Stockholder and each Significant Stockholder for so long as such Person holds any Shares, using its reasonable best efforts, within thirty (30) days after the beginning of each fiscal year of the Corporation, a comprehensive operating budget forecasting the Corporation's and its Subsidiaries' revenues, expenses and cash position on a quarter-to-quarter basis for such fiscal year; provided, however, that if the Corporation does not produce consolidated financial statements and/or a comprehensive operating budget, as applicable, required by this Section 7.17(a) at the Corporation level, but does produce such consolidated financial statements and/or such comprehensive operating budget, as applicable, at the level of one of its Subsidiaries, then, in lieu of making available such consolidated financial statements and/or such comperehensive operating budget, as applicable, of the Corporation and its Subsidiaries, the Corporation shall make available the consolidated financial statements and/or the comprehensive operating budget, as applicable, of its applicable Subsidiary, on the terms set forth in this Section 7.17(a).

(b)    At the option of the Corporation, the Corporation may make available the information described in Section 7.17(a), within the specified time periods, on a password-protected website that is only available to the Stockholders that are entitled to receive such information pursuant to Section 7.17(a) and, upon request of any such Stockholder, any actual or prospective Permitted Transferees of Shares owned or held by such Stockholder. The Corporation shall provide any password or other login information to such Stockholders and, upon request of any such Stockholder, any actual or prospective Permitted Transferee of Shares owned or held by such Stockholder so that any such Person shall be able to access such website. As a condition to gaining access to the information posted on such website, a Person may be required to (i) "click through" certain confidentiality provisions or take other affirmative action pursuant to which such Person shall acknowledge its confidentiality obligations in respect of such information, and (ii) in the case of any Person that is a Stockholder, (x) confirm and ratify that it is a party to, and bound by all of the terms and provisions of, this Agreement, and (y) certify its status as a Stockholder that is entitled to receive such information pursuant to Section 7.17(a).

47

SECTION 7.18    Quarterly Teleconference. The Corporation shall, no less than once per fiscal quarter and no later than twenty (20) Business Days after the date on which the Corporation makes available the financial statements described in Section 7.17(b)(i), hold an informational teleconference (each, a "Quarterly Teleconference"), for which all of the Stockholders (other than any Competitors) will be invited and provided reasonable advance notice in writing at least three (3) Business Days prior to such Quarterly Teleconference, where the Corporation will cause to be discussed the financial condition of the Corporation (including any financial statements delivered to applicable Stockholders pursuant to Section 7.17(a)) and provide for a questions and answers session with senior management members of the Corporation; provided, that, in the event of any material development regarding the Corporation or any of its Subsidiaries following the date on which the Corporation makes available the financial statements described in Section 7.17(b)(i), if such material development was not addressed during the then-most recent Quarterly Teleconference, or otherwise at the reasonable written request of the Investor Stockholders delivered to the Corporation in accordance with Section 7.2 (but in no event more than two times per fiscal year), the Corporation shall hold a separate informational teleconference (each, an "Investor Stockholder Teleconference") for the Investor Stockholders to discuss with senior management members of the Corporation such material development and the financial condition of the Corporation (including any financial statements delivered to applicable Stockholders pursuant to Section 7.17(a)). Each Quarterly Teleconference and Investor Stockholder Teleconference shall be held on such date and at such time as designated by the Board of Directors.

SECTION 7.19    Additional Stockholder Information Rights and Access Rights.

(a)    Subject to the obligations of the Investor Stockholders under Section 7.3, the Corporation shall deliver to each Investor Stockholder, for so long as such Investor Stockholder holds or owns any Shares, a written summary of all matters to be considered by the Board of Directors at any meeting (in advance of any such meeting) and, promptly following the conclusion of any meeting or adoption of a written consent, as the case may be, copies of such meeting minutes or written consent; provided, that the Corporation shall not be required to provide any such documents or information to any Investor Stockholder if the Board of Directors determines that (i) it would jeopardize or impair the ability of the Corporation or any of its Subsidiaries to take advantage of the attorney-client, work product or similar privilege if such documents were provided to the Investor Stockholders, (ii) it is necessary (in the judgment of the Board of Directors) to comply with the terms and conditions of agreements with third parties or applicable law, or (iii) that any Investor Stockholder has an actual or potential conflict of interest with respect to the subject matter of such meeting, written consent or such other materials or information.

(b)    Upon reasonable advance request of any Investor Stockholder or any Significant Stockholder, for so long as such Person holds or owns any Shares, as applicable, the Corporation shall, and shall cause its Subsidiaries to, grant such applicable Stockholder access to the respective facilities (including books and records) and personnel of the Corporation and its Subsidiaries during normal business hours and in a manner that does not unreasonably interefere with the business of the Corporation and/or its applicable Subsidiaries; provided, that any such access will be at the applicable requesting Stockholder's expense; provided, further, that such access may be limited as necessary if the Board of Directors determines that (i) it would jeopardize or impair the ability of the Corporation or any of its Subsidiaries to take advantage of the attorney-client, work product or similar privilege if such access was provided to the applicable

Stockholders, (ii) it is necessary (in the judgment of the Board of Directors) to comply with the terms and conditions of agreements with third parties or applicable law, or (iii) that the applicable Stockholder has an actual or potential conflict of interest with respect to the requested access or other materials or information.

SECTION 7.20    Affiliated Stockholders. All Shares held or acquired by any Stockholder and its Affiliates shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives, or are deemed to have executed this Agreement, as of the date hereof.

**CORPORATION:**

CUTERA, INC.

By: _____

Name:
Title:

## SCHEDULE A

### Actions Requiring Certain Approval

1.      Other than in connection with (i) any asset-based loan facility approved by the Board of Directors, or (ii) any emergency funding that is approved by at Sixty Six and Two Thirds Percent (66.67%) of the Directors, incurring, assuming or guaranteeing, or modifying any terms, of any indebtedness for borrowed money (x) in the first twelve (12) months following the Effective Date, and (y) following the 12-month anniversary of the Effective Date, involving aggregate payments, fundings or other consideration in excess of $10,000,000 per annum; provided, that the Corporation shall exercise reasonable efforts to provide to all of the Stockholders prior written notice of any emergency funding.

2.      Approving or consummating an IPO or the taking of any action to cause the Corporation to become a public company.

3.      Other than (i) sales of inventory in the ordinary course of business, and (ii) any Drag-Along Transaction consummated in accordance with this Agreement, conducting, entering into or consummating any merger, acquisition, divestiture or other strategic transaction (including any joint venture) (x) in the first twelve (12) months following the Effective Date, involving aggregate payments, fundings or other consideration in excess of $5,000,000 per annum, and (y) following the 12-month anniversary of the Effective Date, involving aggregate payments, fundings or other consideration in excess of $10,000,000 per annum.

4.      Without limiting Section 7.6 of this Agreement, amending, modifying, restating or otherwise changing or waiving any term, condition or provision (whether by merger, consolidation or reorganization of the Corporation) of this Agreement, the Certificate of Incorporation, the Bylaws or any other organizational documents of the Corporation or any of its Subsidiaries (other than any amendment or modification which is solely ministerial in nature).

5.      Making any agreement, understanding, contract or commitment or otherwise taking any action to effect any of the foregoing.

**Exhibit A**

## FORM OF JOINDER AGREEMENT

This Joinder Agreement (this "Joinder Agreement"), dated as of [●], is executed by the undersigned pursuant to the terms of that certain Stockholders Agreement, dated as of [●], 2025 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Stockholders Agreement"), by and among Cutera, Inc. (the "Corporation") and the Stockholders (as defined in the Stockholders Agreement) from time to time party thereto. Capitalized terms used herein but not defined herein have the meanings ascribed to such terms in the Stockholders Agreement.

1. Acknowledgement. The undersigned hereby acknowledges and agrees that (a) it has received and reviewed a complete copy of the Stockholders Agreement, (b) by executing and delivering this Joinder Agreement, it is agreeing to become a party to the Stockholders Agreement as a "Stockholder" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the Stockholders Agreement as a "Stockholder" party thereto, (c) it has had sufficient time to consider the Stockholders Agreement and to consult with an attorney if it wished to do so, or to consult with any other Person of its choosing, before signing this Joinder Agreement, and (d) it has willingly executed and delivered this Joinder Agreement with full understanding of the legal and financial consequences of this Joinder Agreement and the Stockholders Agreement.

2. Agreement. The undersigned hereby agrees that, upon execution and delivery to the Corporation of this Joinder Agreement, the undersigned shall become a party to the Stockholders Agreement as a "Stockholder" thereunder and shall be fully bound by, and subject to, all of the covenants, terms, conditions and provisions of the Stockholders Agreement as a "Stockholder" party thereto.

3. Governing Law. This Joinder Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its conflicts of law doctrine.

4. Counterparts. This Joinder Agreement may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement. Delivery of an executed counterpart of this Joinder Agreement by portable document format (PDF) or other electronic transmission will be effective as delivery of a manually executed counterpart of this Joinder Agreement.

5. Headings. The headings of the various sections of this Joinder Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Joinder Agreement.

6. Notice Information. The address and e-mail address to which notices required or permitted by the Stockholders Agreement may be sent to the undersigned are as follows:

Address:

E-mail Address:

[•]

Date:

_____

By:

Title:

<u>**Exhibit B**</u>

**FORM OF TRANSFEREE CONFIDENTIALITY AGREEMENT**

[NAME OF POTENTIAL TRANSFEREE]
[ADDRESS]

Attention:

Re:     Confidentiality Agreement

Ladies and Gentlemen:

In connection with a possible transaction (the "<u>Transaction</u>") involving the sale or transfer of shares of capital stock or other securities of Cutera, Inc. (the "<u>Corporation</u>") owned, held or controlled by [INSERT NAME OF TRANSFEROR] (the "<u>Transferor</u>") to [INSERT NAME OF POTENTIAL TRANSFEREE] (the "<u>Potential Transferee</u>"), the Transferor is prepared to make available to the Potential Transferee certain Confidential Information (as defined below). As a condition to such Confidential Information being furnished to the Potential Transferee, the Potential Transferee hereby agrees that it will comply with the following terms of this letter agreement (this "<u>Confidentiality Agreement</u>"):

1.     <u>Confidential Information</u>. (a) "<u>Confidential Information</u>" means any (x) confidential, business, financial or proprietary information regarding the Corporation or any of its subsidiaries, or any confidential, business, financial or proprietary information regarding the business or affairs of any stockholder of the Corporation in respect of the Corporation or any of its subsidiaries (in any such case, whether in written, oral or electronic form), that has been obtained by, or on behalf of, the Potential Transferee or any of its Representatives from the Corporation or any of its subsidiaries, from the Transferor, or from any of their respective Representatives and (y) notes, analyses, compilations, studies, interpretations or other documents prepared by the Potential Transferee or any of its managers, officers, directors, employees, partners, investors, members, representatives, attorneys, accountants, auditors, trustees, insurers, other professional advisors and financing sources (collectively, "<u>Representatives</u>"), which contain, reflect or are based upon the information referred to in <u>clause (x)</u> above. Confidential Information shall not include information which (A) is known or becomes known to the public in general (other than as a result of a breach of the confidentiality obligations hereunder or otherwise by the Transferor, the Potential Transferee or any of their respective Representatives), (B) is or becomes available to the Potential Transferee on a non-confidential basis from a source other than the Corporation or any of its subsidiaries, the Transferor or any of their respective Representatives (<u>provided</u>, that the Potential Transferee is not aware that such source is under an obligation to keep such Confidential Information confidential) prior to such information being provided to the Potential Transferee by or on behalf of (or obtained from) the Corporation or any of its subsidiaries, the Transferor or any of their respective Representatives or (C) is independently developed by the Potential Transferee or any of its Representatives without reference to the Confidential Information.

(b)     The Potential Transferee recognizes and acknowledges the competitive value and confidential nature of the Confidential Information and the damage that could result to the Corporation, the Transferor and any other stockholder of the Corporation if any Confidential

Information is disclosed to a third party, and hereby agrees that it will keep strictly confidential and will not disclose, divulge or use for any purpose, other than to evaluate the Transaction, any of the Confidential Information; provided, however, that any of the Confidential Information may be disclosed, on a confidential basis, to any of the Potential Transferee's Representatives that need to know such information for the purpose of evaluating the Transaction. The Potential Transferee shall cause its Representatives to comply, and the Potential Transferee shall be responsible for ensuring that its Representatives comply, with the restrictions set forth in this Confidentiality Agreement as if such Representatives were a party hereto and bound by such restrictions, and shall be responsible and liable for any breach of any such restrictions by any of its Representatives.

2.      Disclosure of Confidential Information. In the event that the Potential Transferee or any of its Representatives determines, in good faith upon the advice of counsel, that disclosure of Confidential Information is required under applicable law or regulation, or is required by governmental or by regulatory authorities having jurisdiction over the Potential Transferee or such Representative, the Potential Transferee or such Representative will, to the extent legally permitted and practicable under the circumstances, promptly provide the Transferor and the Corporation with written notice so that they may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Confidentiality Agreement and, if requested by the Transferor or the Corporation, assist the Transferor or the Corporation to seek such a protective order or other remedy. Provided that such foregoing notice (to the extent legally permitted and practicable under the circumstances) is furnished, if, in the absence of a protective order or other remedy, the Potential Transferee or any of its applicable Representatives is, in the opinion of its counsel, required to disclose Confidential Information, the Potential Transferee or such Representative may disclose pursuant to this Section 2 only that portion of such Confidential Information, and only to those parties, that such counsel has advised is required to be disclosed, without liability under this Confidentiality Agreement.

3.      Return and Destruction of Confidential Information. In the event that the Potential Transferee decides not to proceed with the Transaction, the Potential Transferee will promptly inform the Transferor of that decision. In that case, or at any time upon the request of the Transferor for any reason, the Potential Transferee will, as directed by the Transferor, promptly deliver to the Transferor or the Corporation all Confidential Information (and any copies thereof). Upon the Transferor's request, the Potential Transferee shall provide the Transferor with prompt written confirmation of the Potential Transferee's compliance with this Section 3. Notwithstanding the return or destruction of the Confidential Information, the Potential Transferee and its Representatives shall continue to be bound by the obligations of confidentiality and other obligations and agreements hereunder.

4.      No Representations or Warranties. The Potential Transferee understands, acknowledges and agrees that neither the Corporation or any of its subsidiaries, the Transferor nor any other stockholder of the Corporation makes any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information, and neither the Corporation or any of its subsidiaries, the Transferor nor any other stockholder of the Corporation shall have any liability to the Potential Transferee or to any of its Representatives relating to or resulting from the use of the Confidential Information or any errors therein or omissions therefrom. Only those representations or warranties which are made in a final definitive agreement regarding any

2

Transaction, when, as and if executed and delivered, and subject to such limitations and restrictions as may be specified therein, will have any legal effect.

5. <u>Injunctive Relief</u>. It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered by the Corporation and the Transferor if the Potential Transferee fails to comply with any of the obligations imposed on it by this Confidentiality Agreement and that in the event of any such failure, the Transferor and the Corporation will be irreparably damaged and will not have an adequate remedy at law. The Transferor and the Corporation shall, therefore, be entitled to injunctive relief, specific performance or other equitable remedies to enforce such obligations, this being in addition to any other remedy to which either the Transferor or the Corporation is entitled at law or in equity. The Potential Transferee hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies. The Potential Transferee hereby agrees not to assert that specific performance, injunctive relief and other equitable remedies are unenforceable, violate public policy, invalid, contrary to law or inequitable for any reason. The right of specific performance, injunctive relief and other equitable remedies is an integral part of the transactions contemplated by this Confidentiality Agreement.

6. <u>Governing Law</u>. THIS CONFIDENTIALITY AGREEMENT AND ANY CONFLICTS ARISING HEREUNDER OR RELATED HERETO SHALL BE GOVERNED BY, AND CONSTRUED UNDER, THE LAWS OF THE STATE OF DELAWARE, ALL RIGHTS AND REMEDIES BEING GOVERNED BY SAID LAWS, REGARDLESS OF THE LAWS THAT MIGHT OTHERWISE GOVERN UNDER APPLICABLE PRINCIPLES OF CONFLICTS OF LAWS. EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, AND ANY JUDICIAL PROCEEDING BROUGHT AGAINST THE TRANSFEROR OR THE POTENTIAL TRANSFEREE WITH RESPECT TO ANY DISPUTE ARISING OUT OF THIS CONFIDENTIALITY AGREEMENT OR ANY MATTER RELATED HERETO SHALL BE BROUGHT ONLY IN SUCH COURTS. EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION IT MAY HAVE OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUCH PROCEEDING BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO ITS ADDRESS SPECIFIED BELOW, OR IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE TRANSFEROR AND THE POTENTIAL TRANSFEREE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.

7.      Term. This Confidentiality Agreement will terminate on the earlier of (a) one (1) year from the date hereof and (b) the Potential Transferee executing a Joinder Agreement to the Stockholders Agreement of the Corporation, dated as of [●], 2025, among the Corporation and the other parties thereto, as amended, supplemented, amended and restated or otherwise modified from time to time; provided, however, that no such termination of this Confidentiality Agreement shall relieve the Potential Transferee from any liability relating to any breach of this Confidentiality Agreement.

8.      Notices. All notices, requests, waivers and other communications made pursuant to this Confidentiality Agreement shall be in writing and shall be deemed to have been effectively given, delivered, provided or received (a) when personally delivered to the party to be notified; (b) when sent by electronic mail ("e-mail") to the party to be notified; (c) three (3) business days after deposit in the United States mail, postage prepaid, by certified or registered mail with return receipt requested, addressed to the party to be notified; or (d) one (1) business day after deposit with a national overnight delivery service, postage prepaid, addressed to the party to be notified with next-business day delivery guaranteed, in each case as follows:

to the Transferor, at:



to the Potential Transferee, at:



A party may change its address or e-mail address for purposes of notice hereunder by giving notice of such change to the other party in the manner provided in this Section 8.

9.      Miscellaneous. This Confidentiality Agreement contains the entire agreement between the Transferor and the Potential Transferee regarding its subject matter and supersedes all prior agreements, understandings, arrangements and discussions between the Transferor and the Potential Transferee regarding such subject matter. It is understood and agreed that no failure or delay by the Transferor or the Corporation in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. No provision in this Confidentiality Agreement can be waived or amended except by written consent of the Transferor, the Potential Transferee and the Corporation, which consent shall specifically refer to the provision to be waived or amended and shall explicitly make such waiver or amendment. This Confidentiality Agreement may be signed by electronic transmission and in one or more counterparts, each of which shall be deemed an original but all of which shall be deemed to constitute a single instrument. If any provision of this Confidentiality Agreement is found to violate any statute, regulation, rule, order or decree of any governmental authority, such invalidity shall not be deemed to affect any other provision hereof or the validity of the remainder of this Confidentiality Agreement, and such invalid provision shall be deemed deleted herefrom to the minimum extent necessary to cure such violation. The provisions of this Confidentiality Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, heirs, administrators, executors, successors and permitted assigns. The

Potential Transferee may not assign this Confidentiality Agreement without the prior written consent of the Transferor and the Corporation. The Potential Transferee agrees and acknowledges that the Corporation shall be an express third party beneficiary hereof, having all rights to enforce this Confidentiality Agreement.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Confidentiality Agreement as of this ___ day of _____, 20___.

Very truly yours,

TRANSFEROR

[●]

By: _____
      Name:
      Title:


CONFIRMED AND AGREED
as of the date written above:

POTENTIAL TRANSFEREE

[●]

By: _____
      Name:
      Title:

*[Signature page to Confidentiality Agreement]*

**Exhibit C**

## FORM OF ACCREDITED INVESTOR QUESTIONNAIRE

Reference is hereby made to that certain Stockholders Agreement, dated as of [●], 2025 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Stockholders Agreement"), by and among Cutera, Inc. (the "Corporation") and the Stockholders (as defined in the Stockholders Agreement) from time to time party thereto. Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Stockholders Agreement.

For purposes of this Accredited Investor Questionnaire, the term "Accredited Investor" (pursuant to clause (a) of Rule 501 promulgated under the Securities Act) means any Person who comes within any of the following categories:

1. Any bank as defined in section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in section 3(a)(5)(A) of the Securities Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to section 2 of the Securities Exchange Act of 1934; any investment adviser registered pursuant to section 203 of the Investment Advisers Act of 1940 or registered pursuant to the laws of a state; any investment adviser relying on the exemption from registering with the SEC under section 203(l) or (m) of the Investment Advisers Act of 1940; any insurance company as defined in section 2(a)(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in section 2(a)(48) of Investment Company Act of 1940; any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958; any Rural Business Investment Company as defined in section 384A of the Consolidated Farm and Rural Development Act; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

2. Any private business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

3. Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, partnership, or limited liability company, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

4. Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

5.      Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000 (provided, for purposes of calculating net worth under this paragraph 5, that (A) the person's primary residence shall not be included as an asset, (B) indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability) and (C) indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability);

6.      Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

7.      Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Securities Act;

8.      Any entity in which all of the equity owners are Accredited Investors;

9.      Any entity, of a type not listed in paragraph 1, 2, 3, 7, or 8, not formed for the specific purpose of acquiring the securities offered, owning investments in excess of $5,000,000;

10.     Any natural person holding in good standing one or more professional certifications or designations or credentials from an accredited educational institution that the SEC has designated as qualifying an individual for accredited investor status;

11.     Any natural person who is a "knowledgeable employee," as defined in rule 3c-5(a)(4) under the Investment Company Act of 1940 (17 CFR 270.3c-5(a)(4)), of the issuer of the securities being offered or sold where the issuer would be an investment company, as defined in section 3 of such act, but for the exclusion provided by either section 3(c)(1) or section 3(c)(7) of such act;

12.     Any "family office," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1): (i) with assets under management in excess of $5,000,000, (ii) that is not formed for the specific purpose of acquiring the securities offered, and (iii) whose prospective investment is directed by a person who has such knowledge and experience in financial and business matters that such family office is capable of evaluating the merits and risks of the prospective investment; and

13.     Any "family client," as defined in rule 202(a)(11)(G)-1 under the Investment Advisers Act of 1940 (17 CFR 275.202(a)(11)(G)-1), of a family office meeting the requirements in paragraph 12 above and whose prospective investment in the issuer is directed by such family office pursuant to paragraph 12(iii) above.

The undersigned hereby certifies to the Corporation that, as of the date of this Accredited Investor Questionnaire, the undersigned is an Accredited Investor under the following category set forth above (*e.g.*, 1 through 13 of the definition of "Accredited Investor" above): _____.

**[Remainder of Page Intentionally Left Blank]**

IN WITNESS WHEREOF, the undersigned has executed this Accredited Investor Questionnaire on the date set forth above.

**[●]**

By: _____
Name:
Title:

**<u>Exhibit G</u>**

**Identity of New Board Members**

This **<u>Exhibit G</u>** is subject to material revision in all respects.  **<u>Exhibit G</u>** shall be subject to the terms and conditions of the Plan and Disclosure Statement, including all consent rights therein.  The Debtors and each interested party (solely to the extent such party has consent rights over **<u>Exhibit G</u>**) reserve all rights to amend (in whole or in part), revise, or supplement **<u>Exhibit G</u>**, and any of the documents and designations contained therein, at any time before the Effective Date, or any such date as may be permitted by the Plan or by order of the Court.

1. Taylor C. Harris
2. Bradley C. Meyer