United States Bankruptcy Court
Southern District of Texas

**ENTERED**
April 16, 2025
Nathan Ochsner, Clerk

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Cutera, Inc. *et al.*,[1] | Case No. 25-90088 (ARP) |
| Debtors. | (Jointly Administered) |

### ORDER (I) APPROVING DEBTORS' DISCLOSURE STATEMENT AND (II) CONFIRMING THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF CUTERA, INC. AND ITS AFFILIATED DEBTOR
[Relates to Docket Nos. 6, 7, 8, 33, 82, 122, 145, 171, 176, 191, 198, 216, 218, and 227]

Cutera, Inc. and its debtor affiliate, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] having:

a. commenced these chapter 11 bankruptcy cases in this United States Bankruptcy Court for the Southern District of Texas (the "Court") on March 5, 2025 (the "Petition Date");

b. filed on the Petition Date their proposed *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors* [Docket No. 6] (as amended, modified or supplemented, the "Disclosure Statement") and the *Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors* [Docket No. 7] (as may be amended, modified or supplemented, the "Plan"), which is attached hereto as **Exhibit A**;

c. prior to the Petition Date, solicited votes to accept or reject the Plan from certain Holders of Class 3 (Senior Notes Claims); *See Declaration of James Lee Regarding the Solicitation and Tabulation of Votes on the Joint Prepackaged Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors* [Docket No. 33];

d. prior to the Petition Date, on March 4, 2025, Kurtzman Carson Consultants, LLC d/b/a Verita Global LLC, the Debtors' Solicitation Agent (the "Solicitation Agent"), transmitted the Disclosure Statement, Plan, and the Ballots, to the parties

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cutera, Inc. (2262) and Crystal Sub, LLC (6339). The Debtors' service address is 3240 Bayshore Boulevard, Brisbane, CA 94005.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan. The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

identified on the service lists attached to the *Certificate of Service* [Docket No. 145] (the "<u>Solicitation Certificate of Service</u>") as Exhibit B.

e.      after holding a hearing on March 6, 2025 to consider, among other things, the Debtors' Scheduling Motion,[3] obtained entry of  the *Order (I) Scheduling a Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Plan Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan Confirmation; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status and Opt-Out Opportunity; (IV) Conditionally (A) Approving Disclosure Statement, (B) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors, and (C) Waiving Requirements of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (V) Granting Related Relief* [Docket No. 82] (the "<u>Scheduling Order</u>"), which among other things, (i) scheduled the combined hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan on April 16, 2025 at 4:00 p.m. (prevailing Central Time) (the "<u>Combined Hearing</u>"), (ii) established the Objection Deadline, Voting Deadline, and Opt-Out Deadline (each as defined in the Scheduling Order) related to the Plan, (iii) approved the form and manner of the Combined Hearing Notice, Publication Notice, Notice of Non-Voting Status, and Opt-Out Forms (each as defined in the Scheduling Order), (iv) approved the solicitation procedures used in connection with the Debtors' solicitation of the Plan before and after the Petition Date, including the Ballots, (v) conditionally approved the Disclosure Statement, and (vi) conditionally directed that no 341 Meeting be noticed or convened and waived the requirement of the Debtors to file Schedules, SOFAs, and 2015.3 Reports (each as defined in the Scheduling Motion) within the first 60 days following the Petition Date;

f.      caused to be published the Publication Notice (as defined in the Scheduling Order) in *The New York Times* on March 10, 2025, as set forth in the *Affidavit of Publication of the Notice of (I) Commencement of Prepackaged Cases Under Chapter 11 of the Bankruptcy Code, (II) Combined Hearing on the Disclosure Statement, Confirmation of the "Prepackaged" Chapter 11 Plan, and Related Matters, and (III) Objection Deadlines and Summary of Prepackaged Chapter 11 Plan in the New York Times* [Docket No. 122] (the "<u>Affidavit of Publication</u>");

g.      caused the Solicitation Agent to transmit, on March 12–14, 2025, the Solicitation Package, the Rights Offering Package, and the Non-Voting Materials (each as

---

[3]  *See Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Plan Confirmation; (II) Fixing Deadlines Related to Disclosure Statement Approval and Plan Confirmation; (III) Approving (A) Solicitation Procedures, (B) Form and Manner of Combined Hearing Notice and Objection Deadline, and (C) Notice of Non-Voting Status and Opt-Out Opportunity; (IV) Conditionally (A) Approving Disclosure Statement, (B) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors, and (C) Waiving Requirements of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities, and 2015.3 Reports; and (V) Granting Related Relief* [Docket No. 8] (the "<u>Scheduling Motion</u>").

defined in the Solicitation Certificate of Service) to the relevant parties identified on the service lists attached to the Solicitation Certificate of Service as Exhibits C–R.  *Solicitation Certificate of Service* [Docket No. 145];

h.    on April 2, 2025, filed their *Notice of Filing of Plan Supplement* [Docket No. 176] (as amended from time to time, the "<u>Plan Supplement</u>");

i.    caused the Solicitation Agent to forward the Non-Voting Materials upon parties in Non-Voting Classes whose Non-Voting Materials were returned with a forwarding address, as evidenced by the supplemental certificates of service filed on April 1, 2025 [Docket No. 171], April 7, 2025 [Docket No. 191], and April 8, 2025 [Docket No. 198] (the "<u>Supplemental Certificates of Service</u>");

j.    on April 15, 2025, caused the Solicitation Agent to file the *Declaration of James Lee Regarding the Solicitation and Tabulation of Votes in Support of Confirmation of the Amended Joint Prepackaged Plan of Reorganization of Cutera, Inc. and its Affiliated Debtor* (the "<u>Vote Certification</u>"), attesting to the results of the tabulation of all Ballots received by the Solicitation Agent on or before the Voting Deadline (April 9, 2025, unless extended by the Debtors) from Holders of Claims in Class 3 (Senior Notes Claims); and

k.    on April 15, 2025, filed the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Amended Joint Chapter 11 Plan of Reorganization and (III) Omnibus Reply to Objections Thereto* (the "<u>Confirmation Brief</u>").

NOW, THEREFORE, a hearing to consider the Debtors' compliance with the Bankruptcy Code's disclosure requirements under section 1125 of the Bankruptcy Code on a final basis and confirmation of the Plan was held before this Court on April 16, 2025 (the "<u>Combined Hearing</u>") and based upon this Court's review of the Disclosure Statement, Plan, the briefs, affidavits, and declarations submitted in support of confirmation of the Plan, including, without limitation, (a) the Confirmation Brief, (b) the *Declaration of Taylor Harris, Chief Executive Officer of the Debtors, in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtor* (the "<u>Harris Declaration</u>"), (c) the *Declaration of Matthew Braun, in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtor* (the "<u>Braun Declaration</u>"), and (d) the

*Declaration of Paul Wierbicki in Support of Confirmation of the Amended Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtor* (the "Wierbicki Declaration," together with the Harris Declaration and the Braun Declaration, the "Confirmation Declarations"), and upon all of the evidence proffered or adduced at, and arguments of counsel made at the Combined Hearing, and upon the entire record of these Chapter 11 Cases, and after due deliberation thereon,

### THIS COURT HEREBY FINDS:

**I.     Findings of Fact; Conclusions of Law**

A.     The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

**II.     Jurisdiction; Venue; Core Proceeding**

B.     This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. § 1334.  Venue of these proceedings and the Chapter 11 Cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Approval of the Disclosure Statement and confirmation of the Plan are core proceedings pursuant to 28 U.S.C. § 157(b)(2), and this Court may enter a final order hereon under Article III of the United States Constitution.

**III.     Eligibility of Relief; Proper Plan Proponents**

C.     The Debtors were and are eligible for relief under section 109 of the Bankruptcy Code, and the Debtors were and are proper plan proponents under section 1121(a) of the Bankruptcy Code.

**IV.     Commencement and Joint Administration of the Chapter 11 Cases**

D.      On the Petition Date, each of the above-captioned Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  By prior order of the Court [Docket No. 30], the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No official statutory committee, trustee or examiner has been appointed in the Chapter 11 Cases.

**V.      Judicial Notice**

E.      The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Court, including, without limitation, all pleadings and other documents filed, and orders entered thereon.  The Court also takes judicial notice of all hearing transcripts, evidence proffered or adduced, and all arguments made at the hearings held before the Court during the pendency of these Chapter 11 Cases.

**VI.      Burden of Proof**

F.      Each of the Debtors has met the burden of proving that the Plan satisfies or complies with all applicable provisions of sections 1122, 1123, 1125, 1126, and 1129 of the Bankruptcy Code by a preponderance of the evidence.

**VII.      Adequate Assurance**

G.      The Debtors have cured, or provided adequate assurance that the Reorganized Debtors will cure, defaults (if any) under or relating to each of the contracts and leases that are being assumed by the Debtors pursuant to the Plan.  The Debtors also have provided

adequate assurance of the Reorganized Debtors' future performance under such contracts and leases.

## VIII.    Transmittal and Mailing of Materials; Notice

H.    As evidenced by the certificates of service, due, timely, adequate, and sufficient notice of the Disclosure Statement, the Plan, the Plan Supplement, the Combined Hearing, the opportunity to opt out of the releases provided by the Plan, and other dates and deadlines described in the Scheduling Order, together with all deadlines for voting to accept or reject the Plan as well as objecting to the Disclosure Statement and Plan, has been given in substantial compliance with the Court's orders, all applicable provisions of the Bankruptcy Code and Bankruptcy Rules, and no other or further notice is or shall be required.  All affected parties in interest had due and adequate notice and opportunity to participate in the Combined Hearing. Any modifications to the Plan do not require additional disclosure or re-solicitation of votes.

I.    The Debtors published the Publication Notice in *The New York Times*, in substantial compliance with the Scheduling Order and Bankruptcy Rule 2002(l), as evidenced by the Affidavit of Publication.

## IX.    Solicitation

J.    Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, all other applicable provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations.  Specifically, the Disclosure Statement, the Plan, the Combined Hearing Notice, the Ballot, and other materials constituting the solicitation materials approved by the Court in the Scheduling Order, were transmitted to and served on all Holders of Claims in the Voting Class (as defined in the Solicitation Motion). *See Solicitation Certificate of Service* [Docket No.

145].  The Non-Voting Materials were provided to Holders of Claims or Interests in the Non-Voting Classes (except the Holders of Class 5 Intercompany Claims or Class 6 Intercompany Interests), in accordance with the Scheduling Order.  *See id.; Supplemental Certificates of Service*. Such transmittal and service were adequate and sufficient, and no other or further notice is or shall be required. All procedures used to distribute the solicitation materials and other notices and documents described in the Scheduling Order were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations.

K.      Each of the Debtors, the Exculpated Parties, and the Released Parties, and each of their respective Related Parties, have acted fairly, in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the Disclosure Statement and in compliance with the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation and tabulation of votes on the Plan, the participation in the offer, issuance, sale or purchase of a security, offered or sold under the Plan, and the activities described in section 1125 of the Bankruptcy Code, as applicable, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.  The Plan has been proposed with the legitimate purpose of maximizing the returns available to creditors and other parties in interest.  The arm's-length negotiations between, among others, the Debtors and Consenting Senior Noteholders and the fact that General Unsecured Claims will remain unimpaired provide independent evidence of the good faith in proposing the Plan.

L.      The Debtors, the Released Parties, the Exculpated Parties, and their Related Parties have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including Section 1125(g), with regard to the offering, issuance, and distribution of

recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

M.     The solicitation of votes on the Plan complied with the Scheduling Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules for the Southern District of Texas, the Scheduling Order, and applicable non-bankruptcy law.  To the extent that the Debtors' prepetition solicitation was deemed to constitute an offer of securities, such solicitation is exempt from the registration requirements of the Securities Act (as defined below) and state securities laws pursuant to section 4(a)(2) and/or Regulation D of the Securities Act and equivalent state law registration exemptions, as applicable to any recipient deemed an offeree.  Specifically, section 4(a)(2) of the Securities Act creates an exemption from the registration requirements under the Securities Act for transactions not involving a "public offering," and Regulation D is a non-exclusive safe harbor from the registration requirements of the Securities Act promulgated under Section 4(a)(2) for transactions that meet certain requirements, including that the offerees qualify as "accredited investors" (as defined below).  15 U.S.C. § 77d(a)(2); 17 C.F.R. § 230.501 et seq.  The Debtors have complied with the requirements of section 4(a)(2) and Regulation D of the Securities Act (as applicable), to address the scenario where the prepetition solicitation of acceptances would be deemed a private placement of securities.  The prepetition solicitation was made only to those Holders of Class 3 Senior Notes Claims who certified that they were: (i) a "qualified institutional buyer" (as defined in Rule 144A

of the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as amended (the "Securities Act")) or (ii) an "accredited investor" (as defined in Rule 501 of Regulation D of the Securities Act).

**X.**     **Adequacy of Disclosure Statement**

N.     The Disclosure Statement (i) contains sufficient information of a kind necessary to satisfy the disclosure requirements of all applicable non-bankruptcy rules, laws, and regulations, including the Securities Act, (ii) contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in Section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (iii) is hereby approved in all respects.

**XI.**     **Vote Certification**

O.     Before the Combined Hearing, the Debtors filed the Vote Certification. All procedures used to tabulate the Ballots were fair and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Scheduling Order, and all other applicable rules, laws and regulations.

P.     As evidenced by the Vote Certification, Class 3 (Senior Notes Claims) voted as follows: Holders of 87 claims in the aggregate amount of $374,799,000 voted to accept the Plan, while Holders of 2 claims in the aggregate amount of $675,000 voted to reject the Plan. Accordingly, 97.75% of the voting Class 3 creditors voted to accept the Plan, and those creditors in the aggregate held 99.82% of the total dollar amount of the claims held by such voting Class 3 creditors. Therefore, Class 3, the only voting class, has accepted the Plan pursuant to Section 1126(c) of the Bankruptcy Code.

**XII.**     **Plan**

Q. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

R. The record in these Chapter 11 Cases further supports that the Debtors' current directors and officers exhibited the highest standards of professionalism and due diligence in the performance of their roles as directors and officers in these cases. At all times throughout these Chapter 11 Cases, the Debtors' directors and officers: (i) were integral to the restructuring; (ii) exercised the highest level of prudent business judgment after exhaustive diligence in their decision-making; (iii) owed duties only to the Debtors, the Debtors' Estates, and this Court in their roles as directors and officers; and (iv) satisfied such duties fully, completely, and professionally.

S. With respect to those Classes that are deemed to reject the Plan, the requirements of section 1129(b) of the Bankruptcy Code have been satisfied and the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code. The Plan does not unfairly discriminate between similarly situated Classes of Claims or Interests. Furthermore, the Plan is fair and equitable with respect to the Classes of Claims or Interests that are deemed to reject the Plan as the Plan provides that no Holder of any Claim or Interest that is junior to the Claims or Interests of such Classes will receive or retain any property under the Plan on account of such junior Claim or Interest, and no Class of Claims that is senior to any rejecting Class is being paid more than in full.

T. The Debtors are insolvent. Except as provided pursuant to Paragraph 25, Holders of Interests and Section 510(b) Claims (which include the Claims against the Debtors in the actions styled *Erie County Employees' Retirement System v. Cutera, Inc., et al.*, Case No. 4:23-cv-02560 (N.D. Cal.)) are not entitled to any distribution under the Plan on account of such Interests or Section 510(b) Claims.

U.    The disclosures made in the Plan Supplement comply with section 1129(a)(5) of the Bankruptcy Code to the extent applicable.

V.    The Liquidation Analysis, attached as Exhibit C to the Disclosure Statement, and other evidence presented, proffered, or adduced at the Combined Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

W.    The financial projections attached as Exhibit D to the Disclosure Statement, and other evidence presented, proffered, or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that the Plan is feasible and that there is a reasonable prospect of the Reorganized Debtors being able to meet their financial obligations under the Plan and in the ordinary course of their business, and that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan.

X.    As set forth below, the releases, injunctions, and exculpations in Article IX of the Plan are appropriate under applicable law.

(a)    **Releases by the Debtors**. For the reasons set forth in the *Declaration of Taylor Harris, Chief Executive Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 5], Solicitation Certificate of Service, Affidavit of Publication, Vote Certification, Confirmation Declarations, and Confirmation Brief (collectively, the "Confirmation Documents"), the releases being provided by the Debtors in favor of the Released Parties pursuant to Section 9.3(a) of the Plan (the "Debtor Releases") are: (a) fair, equitable, and reasonable; (b)

integral elements of the Plan and resolution of the Chapter 11 Cases, without which the Debtors' ability to confirm the Plan would be seriously impaired; and (c) in the best interests of the Debtors, the Estates, and creditors. Accordingly, such releases constitute a sound exercise of the Debtors' business judgment and, to the extent applicable, otherwise satisfy the standard articulated in *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930 (Bankr. W.D. Mo. 1994). The scope of the Debtor Releases is appropriately tailored under the facts and circumstances of the Chapter 11 Cases. Pursuant to Section 9.3(a) of the Plan and as set forth in the Wierbicki Declaration, the Special Committee of Cutera, Inc. has recommended the Debtors to grant the Debtor Releases. The Debtor Releases are appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical nature of the Debtor Releases to the Plan.

(b)     **Releases by Releasing Parties**.   For the reasons set forth in the Confirmation Documents, the releases being provided by the Releasing Parties in favor of the Released Parties pursuant to <u>Section 9.3(b)</u> of the Plan (the "<u>Third Party Releases</u>") are appropriate.   Pursuant to Section 9.3(b) of the Plan and as set forth in the Wierbicki Declaration, the Special Committee of Cutera, Inc. has recommended the Debtors to grant the Debtor Releases, and, accordingly, none of the Third Party Releases proposed to be given by the Consenting Senior Noteholders is null and void. The Third Party Releases are: (a) consensual under controlling precedent as to those Releasing Parties that did not specifically and timely object or opt-out of such releases; (b) specific in language and scope; (c) given in exchange for the substantial contributions made and the good and valuable consideration provided by the Released Parties, which are integral to the success of the Plan; (d) a condition to the good faith settlement and compromise of the Claims and Causes of Action released by the Third Party Releases; (e) in the best interests of the Debtors and all Holders of Claims and Interests; (f) fair, equitable, and reasonable; (g) given and made after due and adequate notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Releases.

(c)     **Exculpation.** The exculpation provisions contained in <u>Section 9.4</u> of the Plan and this Confirmation Order are appropriately tailored to the circumstances of these Chapter 11 Cases and are appropriate under applicable law, including *In re Highland Capital Mgmt., L.P.,* 48 F. 4th 419 (5th Cir. 2022), because they are supported by proper evidence, proposed in good faith, formulated following extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope. The Exculpated Parties reasonably relied upon the exculpation provisions as a material inducement to engage in postpetition negotiations with key stakeholders that culminated in the Plan, and all other settlements and compromises therein that maximize value for the Debtors' Estates. The

record in these Chapter 11 Cases supports that the exculpation provisions are appropriately tailored to protect the Exculpated Parties from unnecessary litigation and contain appropriate carve outs for actions determined by a Final Order to have constituted intentional fraud, willful misconduct, or gross negligence.

(d)     **Injunction.** For the reasons set forth in the Confirmation Documents, the injunction set forth in <u>Section 9.5</u> of the Plan is appropriate in that such injunction is necessary to implement, preserve, and enforce the releases and exculpations set forth in <u>Article IX</u> of the Plan, and is narrowly tailored to achieve such purpose.

Y.     The settlements and compromises incorporated in the Plan (including, without limitation, the settlement and compromise of Claims, Interests, Causes of Action and controversies relating to the contractual, legal, equitable, and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest or any distribution to be made on account of an Allowed Claim or Allowed Interest), and the settlements and compromises set forth in the Restructuring Support Agreement are in the best interests of the Debtors, the Estates, the Debtors' creditors, any Interest Holders, and other parties in interest, are both fair and equitable, and are within the range of reasonableness, and satisfy the requirements of applicable law for approval pursuant to Bankruptcy Rule 9019.  The compromises and settlements embodied in the Plan are the result of extensive, arm's-length, good faith negotiations that resulted in the Plan, which preserves value for the Debtors, their Estates, and all their stakeholders, avoid extended, uncertain, time-consuming, and value-destructive litigation, and represent a fair and reasonable compromise of all Claims, Interests, and controversies.  Entry into such compromises and settlements represents a sound exercise of the Debtors' business judgment.

Z.     The Claims and Interests placed in each Class are substantially similar to other Claims and Interests in each such Class.  Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and the Debtors' classification scheme does not unfairly discriminate between Holders of Claims or

Interests.  Furthermore, the Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest.

AA.    Except as otherwise provided pursuant to the Plan, the Trustee shall be relieved of all of its duties and responsibilities related to the Senior Notes Documents.

### XIII.   Equity Rights Offering Backstop Commitment Agreement[4]

BB.    In accordance with section 7.1(e) of the Equity Rights Offering Backstop Commitment Agreement, the Court finds and concludes as follows:

(d)    each of the Specified Issuances described in clauses (a)–(d) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code, except that any such Specified Issuances issued to an entity that is an "underwriter" with respect to such securities as that term is defined in Section 1145(b) of the Bankruptcy Code shall be issued in reliance upon Section 4(a)(2) of the Securities Act;

(e)    each of the Specified Issuances described in clauses (e)–(g) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act;

(f)    the solicitation of acceptance or rejection of the Plan by the Commitment Parties and/or any of their respective Related Persons was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Commitment Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code; and

(g)    the participation by the Commitment Parties and/or any of their respective Related Persons in the offer, issuance, sale, or purchase of any security offered, issued, sold, or purchased under the Plan was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Commitment Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.

---

[4]    Capitalized terms used in this subsection but not otherwise defined herein or in the Plan shall have the meanings set forth in the Equity Rights Offering Backstop Commitment Agreement.

**IT IS HEREBY ORDERED THAT:**

**A.      Approval of the Disclosure Statement**

1.      The Disclosure Statement (a) contains adequate information of a kind generally consistent with the disclosure requirements of all applicable non-bankruptcy law, including the Securities Act, (b) contains "adequate information" (as such term is defined in section 1125(a)(1) and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein, and (c) is approved in all respects on a final basis.

**B.      Confirmation of the Plan**

2.      The Plan satisfies or complies with all applicable provisions of sections 1122, 1123, 1125, 1126, and 1129 of the Bankruptcy Code and is confirmed pursuant to section 1129 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors (as applicable) are authorized to take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

3.      The amendments and modifications to the Plan since its filing, in accordance with the terms of the Restructuring Support Agreement, including as may be reflected in the Plan and this Confirmation Order, are approved in accordance with section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019(a).

4.      All objections to, statements, or reservations of rights in respect of the Plan that have not been withdrawn, waived, settled, or otherwise resolved before the Combined Hearing are overruled.

5.      Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise, on the date of and after entry of this Confirmation Order (but subject to the occurrence of the Effective Date), the terms of the Plan, the agreements, instruments, and other applicable documents contained in the Plan Supplement (the "Plan Supplement Agreements"), and all

exhibits, schedules, and other attachments to all of the foregoing are hereby approved by the Court and shall be effective and enforceable and not subject to avoidance or other challenge, legal or otherwise, and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All other relevant and necessary documents executed or to be executed in connection with the transactions contemplated by the Plan shall be effective and binding as of the Effective Date.  Subject to the terms of the Plan and the Restructuring Support Agreement, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement at any time before the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan, the Plan Supplement Agreements, the other Plan Documents, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

6.      Subject to the occurrence of the Effective Date, on and after the entry of this Confirmation Order, the provisions of the Plan shall bind every Holder of a Claim against or Interest in the Debtors and inure to the benefit of and be binding on such Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is impaired under the Plan and whether such Holder has accepted the Plan.

7.      Except as otherwise set forth in the Plan (including, without limitation, Section 3.4, Article V, and Article VII of the Plan), Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), or Class 4 (General Unsecured Claims) of the Plan that are not subject

to the Disputed Claims process set forth in <u>Article VII</u> of the Plan shall retain all of their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors in any forum with jurisdiction over the parties, and all parties shall retain any and all rights, claims, Causes of Action, defenses, and remedies with respect thereto.  Furthermore, from and after the Effective Date, the Reorganized Debtors may satisfy, dispute, settle, or otherwise compromise any such Claims without approval of the Bankruptcy Court.

8.      Each of the settlements and compromises incorporated into the Plan, including, without limitation, the settlements and compromises set forth in the Restructuring Support Agreement, which are adopted by way of the Plan, satisfies the requirements of section 1129 of the Bankruptcy Code and Bankruptcy Rule 9019 and are approved and shall be effective immediately and binding on all parties in interest.  The Plan shall be deemed a valid motion to approve the good faith compromise and settlement of such settlements and compromises pursuant to Bankruptcy Rule 9019 and section 1123(b)(3) of the Bankruptcy Code.

9.      This Confirmation Order constitutes all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan to the fullest extent permitted by law and nothing herein to the contrary shall diminish the authority of section 1142 of the Bankruptcy Code.

10.     Subject only to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other Governmental Unit is authorized and directed to accept for filing and/or recording any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions

contemplated by the Plan and this Confirmation Order.  No such Governmental Unit may require any payment that is the subject of <u>Section 4.17</u> of the Plan in respect of any filing or recording for such purpose.

11.     Any Reorganized Common Equity issued on account of the Common Equity Convenience Buyout Shares, any Reorganized Common Equity that is unsubscribed in the Equity Rights Offering and issued to the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Agreement on account of the Equity Rights Offering Backstop Commitment, any Direct Investment Shares, any Reorganized Common Equity issued to any Equity Rights Offering Backstop Party or any Substitute Purchaser with respect to the Reorganized Common Equity subject to a Funding Default (the "<u>Defaulted Purchased Equity</u>"), and any Reorganized Common Equity issued to an entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code (collectively, the "<u>Placement Securities</u>") is issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions.  The Subscription Rights and all of the Reorganized Common Equity issuable under the Plan (including the Reorganized Common Equity issuable on account of the Put Option Premium, or to Holders of Claims in Class 3 (Senior Notes Claims) on account of the Allowed Senior Notes Claims or upon exercise of the Subscription Rights), excluding the Placement Securities, is exempt, pursuant to section 1145(a) of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.

12.     The Reorganized Debtors shall reflect ownership of all Reorganized Common Equity issued under the Plan (including Reorganized Common Equity issued to Holders of Claims

in Class 3 (Senior Notes Claims) on account of the Allowed Senior Notes Claims, Reorganized Common Equity issued in the Equity Rights Offering, Reorganized Common Equity issued on account of the Common Equity Convenience Buyout Shares, any Reorganized Common Equity that is unsubscribed in the Equity Rights Offering and issued to the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Agreement on account of the Equity Rights Offering Backstop Commitment, any Direct Investment Shares, any Defaulted Purchased Equity, and Reorganized Common Equity issued on account of the Put Option Premium) by means of book-entry registration on the books of the Reorganized Debtors or a transfer agent for the Reorganized Common Equity.  Subject to the occurrence of the Effective Date, Broadridge Financial Solutions, Inc. (and its permitted successors and assigns) is hereby approved as the transfer agent for the Reorganized Debtors.  Should the Reorganized Debtors elect to reflect any ownership of the Reorganized Common Equity to be issued under the Plan through the facilities of the Depository Trust Company (the "DTC"), DTC is authorized to rely solely on this Confirmation Order, and the Reorganized Debtors need not provide any further evidence other than the Plan and this Confirmation Order with respect to the treatment of such Reorganized Common Equity under applicable securities laws.  Any transfer agent or other similarly situated agent, trustee, or other non-governmental Person or Entity (including DTC) shall be required to accept and conclusively rely upon the Plan and this Confirmation Order in lieu of a legal opinion for purposes of determining whether the initial offer and sale of such Reorganized Common Equity under the Plan is exempt from registration under the Securities Act and applicable state securities laws and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable), and whether such Reorganized Common Equity was, under the Plan, validly issued, fully paid and non-assessable.

13.     The assumption or rejection of Executory Contracts and Unexpired Leases as set forth in <u>Article V</u> of the Plan is approved.  As set forth in <u>Section 5.1</u> of the Plan, all prepetition Executory Contracts and Unexpired Leases not subject to an objection or an order requiring rejection shall be deemed assumed as of the Effective Date, except for any Executory Contract or Unexpired Lease that (a) has been previously assumed or rejected by order of this Court, (b) is the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date, (c) is identified on the Schedule of Rejected Executory Contracts and Unexpired Leases, or (d) is rejected or terminated pursuant to the terms of the Plan.

14.     The Debtors shall cure all defaults required to be cured under and in accordance with section 365(b)(1)(A) of the Bankruptcy Code for each assumed Executory Contract or Unexpired Lease and shall comply with section 365(b)(1)(B) of the Bankruptcy Code.

15.     Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and payment of any applicable Cure Cost and satisfaction of any non-monetary defaults, as applicable, pursuant to <u>Article V</u> of the Plan shall result in the full release and satisfaction of any Cure Costs or defaults, whether monetary or non-monetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the Effective Date.

16.     Parties to Executory Contracts and Unexpired Leases assumed by the Debtors pursuant to the Plan shall not be required to file a Proof of Claim or objection in order to assert or preserve any Cure Cost.  Notwithstanding anything to the contrary in the Plan or this Confirmation Order, all Cure Costs shall be Unimpaired by the Plan and this Confirmation Order and all Cure Costs outstanding as of the Effective Date shall remain continuing obligations of the Reorganized

Debtors following the Effective Date, subject to all parties' rights and defenses with respect thereto.

17.     Any "change of control" provision in (a) any Unexpired Lease of non-residential real property shall be unenforceable solely in connection with (x) assumption of such Unexpired Lease and (y) the Restructuring Transactions, to the extent that any "change of control" provision would be triggered by the assumption of such Unexpired Lease or the consummation of Restructuring Transactions, and (b) any contract, agreement, or other document of the Debtors, including any Executory Contract or Unexpired Lease (except as specified in the foregoing clause (a)) assumed by the Debtors, shall be deemed modified in accordance with section 365 of the Bankruptcy Code such that assumption of such agreement and consummation of the transactions contemplated by the Plan shall not (either alone or in combination with any other condition, event, circumstance or occurrence) (i) be prohibited, restricted, or conditioned on account of such provision or require any consent thereunder, (ii) breach or result in the modification or termination of such Executory Contract or Unexpired Lease (other than Unexpired Leases for non-residential real property), (iii) result in any penalty or other fees or payments, accelerated or increased obligations, renewal or extension conditions, or any other entitlement in favor of such non-Debtor party thereunder, including for the avoidance of doubt any penalty or other fees or payments, accelerated or increased obligations, renewal or extension conditions that are triggered upon or after the occurrence of (either alone or in combination with any other condition, event, circumstance or occurrence) a change of control (or term with similar effect), or (iv) entitle the non-Debtor party thereto to do or impose any of the foregoing or otherwise exercise any other default-related rights or remedies with respect thereto.  For the avoidance of doubt, any Executory Contract or Unexpired Lease assumed pursuant to the Plan or otherwise may not be terminated on

account of such assumption or on account of the Plan, the transactions contemplated therein, or any change of control or ownership interest composition or entity conversion that may occur at any time before, on, or in connection with the Effective Date.  The Reorganized Debtors may rely on the Plan and this Confirmation Order as a complete defense to any action by a party to an assumed Executory Contract or Unexpired Lease to terminate such Executory Contract or Unexpired Lease on account of such assumption or on account of the Plan, the transactions contemplated herein, or any change of control or ownership interest composition that may occur at any time before or on the Effective Date.  Each Executory Contract or Unexpired Lease (including any amendments thereto entered into after the Petition Date and prior to the Effective Date) assumed pursuant to <u>Article V</u> of the Plan shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of this Court authorizing and providing for its assumption, or applicable law.

18.     As of the Effective Date, all injunction, release, discharge, and exculpation provisions embodied in the Plan, including those contained in <u>Article IX</u>, and in this Confirmation Order are hereby approved and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan (as amended or modified by the terms of this Confirmation Order), without further order or action by this Court.

19.     Each of the provisions set forth in the Plan (as amended or modified by the terms of this Confirmation Order) with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of any such provision, including third-party beneficiaries, shall have the right to

independently seek to enforce any such provision, and any such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

20.     Notwithstanding anything in the Plan to the contrary, the provisions of <u>Section 9.5</u> of the Plan that require a person or entity seeking to bring a claim or cause of action that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a claim or cause of action related to the Chapter 11 Cases prior to the Effective Date to first seek authorization from the Bankruptcy Court before bringing such claim or cause of action shall only apply to claims or causes of action brought against (i) the Exculpated Parties or (ii) the Released Parties (if such person or entity is a Releasing Party).

21.     In accordance with section 1123(b) of the Bankruptcy Code, (a) on and following the Effective Date, the applicable Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action listed in the Schedule of Retained Causes of Action (the "<u>Retained Causes of Action</u>"), whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Person may rely on the absence of a specific reference in the Plan, Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Person.  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, transferred, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Retained Causes of Action for later adjudication, and therefore, no preclusion doctrine,

including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of this Plan.  It is the intent of the Debtors and the Reorganized Debtors that, in the event a court determines any Released Parties or Exculpated Parties, jointly or individually, are or were, as a result of any acts, omissions or other conduct relating to the Debtors, their businesses, assets or properties, a "joint tortfeasor," as that term is construed under applicable law, with respect to any injury or damage for which the Debtors or the Reorganized Debtors hereafter seeks relief from any person not a Released Party or Exculpated Party ("Non-Released Party"), then the Released Parties and Exculpated Parties shall be entitled to protection from contribution to any Non-Released Party.

22.     The Debtors and Reorganized Debtors, as applicable, are hereby authorized without further notice to or action, order or approval of the Court to enter into, perform under, and consummate the transactions contemplated by the New Organizational Documents, the New Shareholders Agreement, the Exit Facility Documents, the Management Incentive Plan, the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Procedures, the Common Equity Convenience Buyout Procedures and related subscription forms, and shall execute and deliver on the Effective Date, as applicable, all agreements, documents, instruments, financing statements, mortgages, guarantees, security documents, and certificates relating to the New Organizational Documents, the New Shareholders Agreement, the Exit Facility Documents, the Management Incentive Plan, the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Procedures, the Common Equity Convenience Buyout Procedures and related subscription forms, as applicable (collectively, the "Plan Documents"), in each case that are contemplated to be executed and/or delivered, as applicable, on the Effective Date.  All such

documents are approved, incorporated in the Plan and this Confirmation Order by reference, and shall become effective in accordance with their terms and the Plan.  Confirmation of the Plan shall be deemed approval of all obligations to be incurred and fees paid or to be paid by the Debtors or the Reorganized Debtors in connection with the Plan Documents.  The New Shareholders Agreement shall be binding on all holders of the Reorganized Common Equity (and their respective successors and assigns) regardless of whether such holder executes or delivers a signature page to the New Shareholders Agreement, and the Exit Facility Documents shall be binding on all holders of Exit Facility loans, regardless of whether such holder delivers a signature page to the applicable Exit Facility Documents.

23.     Upon the Effective Date, the DIP Obligations (as defined in the DIP Credit Agreement) are deemed repaid through the issuance of term loans under the Exit Facility on a dollar-for-dollar basis (excluding (i) accrued and unpaid interest as of such date, (ii) Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel, and (iii) indemnification obligations solely to the extent due and payable as of the Effective Date payable in Cash on the Effective Date, which amounts (i)–(iii) shall be paid in full in Cash on the Effective Date), in accordance with the Restructuring Support Agreement, Exit Facility Documents, and Plan.

24.     Notwithstanding anything to the contrary in the Plan, on or before the Effective Date, any and all Intercompany Interests shall be reinstated, unaffected by the Plan, continue in place following the Effective Date, and otherwise survive the Debtors' restructuring by virtue of such Intercompany Interests being left Unimpaired.

25.     To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers or exchange of any (i) securities, (ii) instruments or documents, or (iii) property

under the Plan or the Plan Supplement, shall not, in each case, be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All filing or recordation officers (or any Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

26.     On the Effective Date, all of the Liens and security interests to be granted on the Effective Date in accordance with the Plan Documents shall, as applicable, (a) be legal, binding and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Plan Documents, as applicable, without (i) further approval of the Court, (ii) any approvals, consents or waivers of any other party, or (iii) further corporate, limited liability company or similar action or approval, as applicable, by any Debtor or Reorganized Debtor and (b) be deemed automatically attached and perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Plan Documents, as applicable, without the necessity of filing or recording any financing statement, assignment, pledge, notice of lien or any similar document or instrument or taking any other action.  The Reorganized Debtors, and/or

any successors, assigns, or transferees of the applicable Debtors or Reorganized Debtors, including in connection with the Restructuring Transactions, and agents or holder(s) of Liens under the Exit Facility Documents are authorized to make all filings and recordings with the appropriate authorities, financing statements, and other documents, and to take any other action in order to evidence, validate, and perfect such Liens or security interests under the provisions of the applicable state, federal, or foreign law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of this Confirmation Order), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  The claims, guarantees, pledges, Liens, and other security interests granted to secure the obligations arising under the Exit Facility Documents have been granted in consideration for, and for reasonably equivalent value as an inducement to the lenders' agreement thereunder on account of the Exit Facility Loans and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer and shall not otherwise be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including but not limited to equitable subordination) for any purposes whatsoever under applicable federal, state, or foreign law, the Plan, or this Confirmation Order, and shall not constitute unfair preferences, preferential transfers, fraudulent transfers or fraudulent conveyances, or any similar avoidable or voidable transactions under the Bankruptcy Code or any applicable federal, state, or foreign law.

27.     The Debtors shall cause to be served a notice of the entry of this Confirmation Order and occurrence of the Effective Date (the "Notice of Effective Date") upon (a) all parties listed in the creditor matrix maintained by the Solicitation Agent, and (b) such additional persons

and entities as deemed appropriate by the Reorganized Debtors, no later than two (2) Business

Days after the Effective Date.

**C.      Equity Rights Offering Backstop Commitment Agreement**

28.      In accordance with section 7.1(e) of the Equity Rights Offering Backstop

Commitment Agreement,

> (a)      each of the Specified Issuances described in clauses (a)–(d) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to section 1145(a) of the Bankruptcy Code, except that any such Specified Issuances issued to an entity that is an "underwriter" with respect to such securities as that term is defined in Section 1145(b) of the Bankruptcy Code shall be issued in reliance upon Section 4(a)(2) of the Securities Act;

> (b)      each of the Specified Issuances described in clauses (e)–(g) of the definition of "Specified Issuances" are exempt from the registration and prospectus delivery requirements of Section 5 of the Securities Act pursuant to Section 4(a)(2) of the Securities Act;

> (c)      the solicitation of acceptance or rejection of the Plan by the Commitment Parties and/or any of their respective Related Persons was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Commitment Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code; and

> (d)      the participation by the Commitment Parties and/or any of their respective Related Persons in the offer, issuance, sale, or purchase of any security offered, issued, sold, or purchased under the Plan was done in good faith and in compliance with the applicable provisions of the Bankruptcy Code and, as such, the Commitment Parties and any of their respective Related Persons are entitled to the benefits and protections of section 1125(e) of the Bankruptcy Code.

**D.      Professional Fee Claims**

29.      All Professionals seeking approval by the Court of compensation for services

rendered or reimbursement of expenses incurred through and including the Effective Date under

sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall file,

on or before the date that is sixty (60) calendar days after the Effective Date, their respective

applications (collectively, the "Final Fee Applications") for final requests for payment of Professional Fee Claims and serve such applications upon the following parties (collectively, the "Notice Parties"): (a) the attorneys for the Debtors, (i) Ropes & Gray LLP, 191 North Wacker Drive, Chicago, Illinois 60606 (Attn: Ryan Preston Dahl, Esq. (Ryan.Dahl@ropesgray.com) and Conor P. McNamara (Conor.Mcnamara@ropesgray.com)) and Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036 (Attn: Natasha S. Hwangpo, Esq. (Natasha.Hwangpo@ropesgray.com)), and (ii) Hunton Andrews Kurth, LLP, 600 Travis Street, Suite 4200, Houston, TX 77002 (Attn: Tad Davidson (taddavidson@hunton.com), Philip Guffy (pguffy@hunton.com), and Catherine Rankin (catherinerankin@hunton.com)); (b) counsel to the Ad Hoc Committee of Consenting Senior Noteholders: (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Jacob A. Adlerstein, Esq. (jadlerstein@paulweiss.com) and Sean A. Mitchell, Esq. (smitchell@paulweiss.com)), and (ii) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, TX 77002 (Attn: John F. Higgins, Esq. (jhiggins@porterhedges.com)); and (c) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002 (Attn: Ha Nguyen, Esq. (Ha.Nguyen@usdoj.gov) and Vianey Garza, Esq. (vianey.garza@usdoj.gov)).  Any objection to any Final Fee Application must be filed with this Court and served upon the applicable Professional, counsel to the Debtors, counsel to the Ad Hoc Committee of Consenting Senior Noteholders, and the U.S. Trustee, so as to be actually received no later than 4:00 p.m. (Central Time) on the date that is twenty-one (21) calendar days after the filing of the applicable Final Fee Application.

30.    (a) After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and applicable Court orders (including Paragraphs 30 and 31 of this

Confirmation Order), the Allowed amounts of such Professional Fee Claims shall be determined by this Court.

(b)     On or before the Effective Date, the Reorganized Debtors shall establish (if not already established) and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.   Subject to the last sentence of this Paragraph 31(b), the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Retained Professionals, and such funds shall not be considered property of the Debtors' Estates, the Debtors, or the Reorganized Debtors.   Subject to the last sentence of this Paragraph 31(b), no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way; *provided* that Liens granted pursuant to the DIP Facility Documents and Exit Facility Documents, as applicable, shall encumber amounts in the Professional Fee Escrow Account constituting the Residual Fee Escrow Interest.   The Reorganized Debtors shall be obligated to pay Allowed Professional Fee Claims in excess of the Professional Fee Reserve Amount.   The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by a Final Order of the Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims.   When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account (the "Residual Fee Escrow Interest") shall promptly be paid to the Reorganized Debtors without any further action or order of the Court or any other Entity.

(c)    The Retained Professionals shall reasonably estimate in good faith their accrued Professional Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than three (3) Business Days before the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)    From and after the Confirmation Date, but prior to the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.  On and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Debtors (as applicable) after the Confirmation Date but prior to the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Court, except as otherwise specifically provided in this Plan.  The Reorganized Debtors shall pay, within ten (10) Business Days after submission of a detailed

31

invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors after the Confirmation Date but prior to the Effective Date.  If the Debtors or Reorganized Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

### E.    Administrative Claims Bar Date

31.    Except as otherwise provided in this Confirmation Order or the Plan, and except with respect to Administrative Claims that are Restructuring Expenses or Professional Fee Claims, requests for payment of Administrative Claims must be filed and served on the Reorganized Company by the first Business Day that is thirty (30) calendar days following the Effective Date (the "Administrative Claims Bar Date"); *provided* that the Administrative Claims Bar Date does not apply to Professional Fee Claims arising in the ordinary course of business.  Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Company, the estates, or the property of any of the foregoing, and such Administrative Claims shall be deemed discharged as of the Effective Date.

### F.    Miscellaneous

32.    ***Chubb***.  Notwithstanding anything to the contrary in the Disclosure Statement, Plan, the Definitive Documents, the Confirmation Order, any bar date order or notice, any claim objection or notice of satisfaction of claims, or any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that

purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases) (collectively, the "Transaction Documents"):

(a)     on the Effective Date, all insurance policies issued by Federal Insurance Company and/or any of its U.S.-based affiliates and predecessors (collectively, and solely in their capacities as insurers , the "Chubb Companies") to or that provide coverage to any of the Debtors (or any of their predecessors) at any time and for all lines of coverage, all extensions and/or renewals thereof, and all agreements, documents or instruments related thereto (each as amended, modified or supplemented and including any exhibit or addenda thereto, collectively, the "Chubb Insurance Program") shall be assumed in their entireties, unaltered, by the Reorganized Debtors pursuant to sections 105 and 365 of the Bankruptcy Code and shall continue in full force and effect thereafter in accordance with their respective terms and conditions;

(b)     the Reorganized Debtors shall be liable in full for all of their and the Debtors' obligations under the Chubb Insurance Program in accordance with and subject to the terms of the Chubb Insurance Program, regardless of whether any such obligations arise or become due before, on, or after the Effective Date, without the need or requirement for the Chubb Companies to file or serve any objection to a notice of proposed Cure Cost (or lack of such notice) or file or serve a request, motion, or application for payment of or Proof of Claim, Cure Cost, or Administrative Claim;

(c)     nothing in the Transaction Documents shall permit or otherwise effectuate a sale, assignment or other transfer of the Chubb Insurance Program, any portion thereof, and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Chubb Insurance Program without the prior express written consent of the Chubb Companies;

(d)      nothing in Section 9.5 of the Plan or any corresponding provision of the Confirmation Order requires, precludes, and/or prohibits the Chubb Companies to or from administering, handling, defending, settling and/or paying claims covered by the Chubb Insurance Program in accordance with and subject to the terms and conditions of the Chubb Insurance Program and/or applicable non-bankruptcy law; and

(e)      from and after the Effective Date, the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (1) (A) claimants with valid workers' compensation claims, (B) claimants with claims against non-Debtors that may be entitled to coverage under the Chubb Insurance Program with respect to such claims, but solely for the purpose of allowing such claimants to seek a recovery, if any, under any applicable insurance policies issued by the Chubb Companies, or (C) claimants with direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (2) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any of the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay and/or the injunctions set forth in Article IX of the Plan to proceed with its claim, (C) claims against non-Debtors who may be entitled to coverage under the Chubb Insurance Program, and (D) all costs in relation to each of the foregoing; (3) the Chubb Companies to draw on or against, use or apply any or all of the collateral or security provided by or on behalf of the Debtors (and the Reorganized Debtors, as applicable) at any time and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized

Debtors, as applicable) and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the Chubb Insurance Program in such order as the Chubb Companies may determine; and (4) the Chubb Companies to cancel any insurance policies under the Chubb Insurance Program and take other actions relating to the Chubb Insurance Program (including effectuating a setoff and/or asserting any recoupment or subrogation rights or claims), in each case solely pursuant to the terms of the Chubb Insurance Program and applicable non-bankruptcy law; *provided*, *however*, the Debtors, the Reorganized Debtors, and the Chubb Companies reserve all of their respective rights and defenses, if any, under applicable non-bankruptcy law and the Chubb Insurance Program to the extent any of the Chubb Companies takes any action permitted by Paragraph 32(e)(4).

33.     This Confirmation Order (i) is a final order and the period in which an appeal must be filed shall commence upon the entry hereof, (ii) shall be immediately effective and enforceable upon the entry hereof, and (iii) for good cause shown, based on the record of the Combined Hearing, shall not be subject to any stay otherwise applicable under the Bankruptcy Rules, including Bankruptcy Rule 3020(e).  The Plan shall be deemed a valid motion to approve the foregoing.

34.     Except as otherwise provided in the Plan and Plan Documents, all property of the Debtors' Estates and any property acquired by the Debtors or Reorganized Debtors under the Plan, will vest in the Reorganized Debtors as of the Effective Date, free and clear of all Claims, liens, charges, other encumbrances, Interests, and other interests.

35.     The Debtors are authorized to consummate the Plan after the entry of this Confirmation Order, subject to the satisfaction or waiver (in accordance with Section 8.2 of the Plan) of the conditions precedent to the Effective Date (as set forth in Section 8.1 of the Plan) in

accordance with the Plan, and all parties in interest shall be entitled to rely upon this Confirmation Order in taking any actions or performing any obligations to consummate the Plan.  On the Effective Date, the Plan shall be deemed to be substantially consummated under section 1101(2) of the Bankruptcy Code.

36.     If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan before the Debtors' or the Reorganized Debtors' receipt of written notice of any such order; nor shall such reversal, modification, or vacatur of this Confirmation Order affect the validity or enforceability of such acts or obligations. Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such acts or obligations incurred or undertaken pursuant to, and in reliance on, this Confirmation Order before the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Documents and all documents, instruments and agreements related thereto or any amendments or modifications thereto.

37.     Until the complete resolution by a Final Order (of judgment, settlement, dismissal, or otherwise) of the securities class action styled as *In re Cutera, Inc. Securities Litigation*, No. 4:23-cv-02560-JST (N.D. Cal.) (the "Securities Litigation"), the Debtors shall not destroy, abandon, transfer, or otherwise render unavailable any books, records, or other evidence potentially relevant to the Securities Litigation without further order of this Court or the District

Court for the Northern District of California upon notice to Lead Plaintiff[5] and an opportunity to be heard.

38.     As of the date of this Confirmation Order, the 341 Meeting (as defined in the Scheduling Order) has not been convened.  The convening of the 341 Meeting is hereby waived.

39.     As of the date of this Confirmation Order, the Schedules and Statements and Rule 2015.3 Reports (as defined in the Scheduling Motion) have not been filed.  Any obligation to file the Schedules and Statements and Rule 2015.3 Reports is hereby waived.

40.     ***MOR/PCR Requirement***.  The Debtors shall file monthly reports in a form reasonably acceptable to the U.S. Trustee before the Effective Date.  On and after the Effective Date and prior to the closing of these Chapter 11 Cases, the Reorganized Debtors (or the Distribution Agent on behalf of each of the Debtors or Reorganized Debtors) shall file quarterly reports in a form reasonably acceptable to the United States Trustee.

41.     ***Governmental Carve-Out***.  Nothing in this Confirmation Order, the Plan, or Plan Supplement discharges, releases, precludes or enjoins (i) any police or regulatory liability to a Governmental Unit that is not a Claim; (ii) any Claim of a Governmental Unit arising on or after the Effective Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any Entity would be subject to as the owner or operator of property after the Effective Date; or (iv) any liability to a Governmental Unit on the part of any Person or Entity other than the Debtors.  Unless otherwise provided in the Plan or Confirmation Order, the Confirmation Order or the Plan shall not exculpate any Entity that is not a Debtor from any liability to the United States Government or any of its agencies or any state and local authority whatsoever,

---

[5]     As defined in the *Agreed Order Regarding Securities Litigation Opt-Out of Third-Party Releases* [Docket No. 203], entered on April 10, 2025.

including any liabilities arising under the Internal Revenue Code, the environmental laws or any regulatory or criminal laws of the United States or any state and local authority against any party or person.  Neither the United States nor any State is a "Releasing Party" under the Plan.

42.     On the Effective Date, and as a condition precedent to the occurrence of the Effective Date, the Debtors shall indefeasibly pay in full in Cash all Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel incurred or estimated to be incurred, through the Effective Date.

43.     The failure to include specifically any particular provision of the Plan in this Confirmation Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent that the Plan is confirmed in its entirety.

44.     The provisions of the Plan and this Confirmation Order, including any findings of fact and conclusions of law set forth in this Confirmation Order, are non-severable and mutually dependent.

45.     This Confirmation Order supersedes any Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.  If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control.

46.     Except as otherwise may be provided in the Plan or herein, notice of all subsequent pleadings in these cases after the Effective Date shall be limited to: (i) the Notice Parties; and (ii) any party known to be directly affected by the relief sought.

47.     Subject to Article X of the Plan, pursuant to sections 105(a) and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction with respect to all matters arising

from or related to these Chapter 11 Cases, the Plan, and the implementation of this Confirmation Order, including, without limitation, those matters set forth in <u>Article X</u> of the Plan.

Signed: April 16, 2025

Alfredo R Pérez
United States Bankruptcy Judge

## **Exhibit A**

Plan

**IMPORTANT: THE SOLICITATION MATERIALS ACCOMPANYING THIS PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a).  THE DEBTORS EXPECT TO SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THIS PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Cutera, Inc. *et al.*,[1] | Case No. 25-90088 (ARP) |
| Debtors. | (Jointly Administered) |

### AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN
### OF REORGANIZATION OF CUTERA, INC. AND ITS AFFILIATED DEBTOR

**ROPES & GRAY LLP**
Ryan Preston Dahl (admitted *pro hac vice*)
Conor P. McNamara (admitted *pro hac vice*)
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606
Telephone: (312) 845-1200
Facsimile: (312) 845-5500
Email:  ryan.dahl@ropesgray.com
        conor.mcnamara@ropesgray.com

Natasha S. Hwangpo (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
E-mail:  natasha.hwangpo@ropesgray.com

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (TX Bar No. 24012503)
Philip M. Guffy (TX Bar No. 24113705)
Catherine A. Rankin (TX Bar No. 24066008)
600 Travis Street, Suite 4200
Houston, Texas 77002
Telephone: (713) 220-4200
Email: TadDavidson@hunton.com
       PhilipGuffy@hunton.com
       CahterineRankin@hunton.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  April 14, 2025
        Houston, Texas

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Cutera, Inc. (2262) and Crystal Sub, LLC (6339).  The Debtors' service address is 3240 Bayshore Boulevard, Brisbane, CA 94005.

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME .................................................................................. 1

Section 1.1    *Defined Terms* ....................................................................................... 1
Section 1.2    *Rules of Interpretation and Computation of Time* ............................... 17

ARTICLE II. UNCLASSIFIED CLAIMS ............................................................... 18

Section 2.1    *Administrative Claims*........................................................................... 19
Section 2.2    *Priority Tax Claims*............................................................................... 20
Section 2.3    *Professional Fee Claims* ....................................................................... 20
Section 2.4    *DIP Claims*............................................................................................ 21
Section 2.5    *Statutory Fees* ....................................................................................... 22

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....... 22

Section 3.1    *Classification of Claims.*....................................................................... 22
Section 3.2    *Class Identification* ............................................................................... 22
Section 3.3    *Treatment and Voting Rights of Claims and Interests* .......................... 23
Section 3.4    *Special Provision Governing Unimpaired Claims* ............................... 27
Section 3.5    *Voting; Presumptions; Solicitation* ...................................................... 27
Section 3.6    *Nonconsensual Confirmation* ............................................................... 27
Section 3.7    *Subordinated Claims*............................................................................. 27
Section 3.8    *Vacant Classes* ...................................................................................... 28
Section 3.9    *No Waiver* .............................................................................................. 28

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................... 28

Section 4.1    *Compromise or Settlement of Controversies* ........................................ 28
Section 4.2    *Sources of Consideration for Plan Distribution* ................................... 28
Section 4.3    *Restructuring Transactions*................................................................... 29
Section 4.4    *Continued Corporate Existence* ............................................................ 29
Section 4.5    *Private Company* ................................................................................... 30
Section 4.6    *Corporate Action* .................................................................................. 30
Section 4.7    *Vesting of Assets* ................................................................................... 31
Section 4.8    *Indemnification Provisions in Organizational Documents*.................... 31
Section 4.9    *Cancellation of Existing Securities and Agreements* ............................ 32
Section 4.10   *Cancellation of Certain Existing Security Interests* ............................ 33
Section 4.11   *Approval of the Exit Facility and the Exit Facility Documents* ............ 34
Section 4.12   *Issuance of the Reorganized Common Equity.* ...................................... 35
Section 4.13   *Rights Offering.*..................................................................................... 35
Section 4.14   *Common Equity Convenience Buyout.*.................................................... 37
Section 4.15   *Exemption from Registration Requirements* ......................................... 39

Section 4.16 *Organizational Documents* ........................................................ 40
Section 4.17 *Exemption from Certain Transfer Taxes and Recording Fees* ............................ 40
Section 4.18 *Managers, Directors and Officers of the Reorganized Debtor* ............................ 40
Section 4.19 *Incentive Plans* ................................................................ 41
Section 4.20 *Effectuating Documents; Further Transactions* ................................. 41
Section 4.21 *Restructuring Expenses and DIP Facility Expenses* ........................... 41
Section 4.22 *Retained Causes of Action* ..................................................... 42

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
        LEASES ........................................................................ 43

Section 5.1 *Assumption of Executory Contracts and Unexpired Leases* ................................ 43
Section 5.2 *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ........ 44
Section 5.3 *Claims Based on Rejection of Executory Contracts or Unexpired Leases* .......... 44
Section 5.4 *Indemnification Obligations* ..................................................... 45
Section 5.5 *Contracts and Leases Entered Into After the Petition Date* ................................ 45
Section 5.6 *Insurance Policies* ............................................................... 45
Section 5.7 *Reservation of Rights* ........................................................... 45

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 45

Section 6.1 *Distribution on Account of Claims and Interests Allowed as of the*
        *Effective Date* ........................................................... 45
Section 6.2 *Distribution on Account of Claims and Interests Allowed After the*
        *Effective Date* ........................................................... 46
Section 6.3 *Delivery of Distributions* ........................................................ 46
Section 6.4 *Minimum Distributions* ........................................................... 48
Section 6.5 *Foreign Currency Exchange Rate* ................................................. 48
Section 6.6 *Delivery of Distributions; Undeliverable Distributions* ................................ 48
Section 6.7 *Compliance with Tax Requirements/Allocations* ............................... 49
Section 6.8 *Surrender of Cancelled Instruments or Securities* ................................ 49
Section 6.9 *Claims Paid or Payable by Third Parties* ........................................ 50

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR
        INTERESTS ..................................................................... 50

Section 7.1 *No Filings of Proofs of Claim* ..................................................... 50
Section 7.2 *Allowance of Claims and Interests* ................................................ 51
Section 7.3 *Prosecution of Objections to Claims* ............................................ 51
Section 7.4 *Adjustment of Claims and Interests Without Objection* .......................... 52
Section 7.5 *Disallowance of Certain Claims* ................................................. 52
Section 7.6 *Offer of Judgment* ............................................................... 52
Section 7.7 *Amendments to Claims or Interests* .............................................. 53

ARTICLE VIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................ 53

Section 8.1 *Conditions Precedent to the Effective Date* ..................................... 53

ii

Section 8.2    Waiver of Conditions Precedent ........................................................ 55
Section 8.3    Effect of Failure of Conditions Precedent .................................... 56
Section 8.4    Substantial Consummation of Plan ................................................. 56

ARTICLE IX. EFFECT OF PLAN CONFIRMATION ................................................. 56

Section 9.1    Binding Effect ........................................................................................ 56
Section 9.2    Discharge of Claims and Termination of Interests; Compromise and
               Settlement of Claims, Interests, and Controversies ............................... 56
Section 9.3    Releases .................................................................................................. 57
Section 9.4    Exculpation and Limitation of Liability ........................................... 60
Section 9.5    Injunction .............................................................................................. 62
Section 9.6    Setoffs and Recoupment ...................................................................... 64
Section 9.7    Release of Liens .................................................................................... 64

ARTICLE X. RETENTION OF JURISDICTION ......................................................... 65

ARTICLE XI. MISCELLANEOUS PROVISIONS ........................................................ 67

Section 11.1    Immediate Binding Effect ................................................................... 67
Section 11.2    Payment of Statutory Fees ................................................................. 67
Section 11.3    No Substantive Consolidation ........................................................... 67
Section 11.4    Amendments ......................................................................................... 67
Section 11.5    Revocation or Withdrawal of Plan ................................................... 68
Section 11.6    Governing Law ...................................................................................... 68
Section 11.7    Successors and Assigns ....................................................................... 68
Section 11.8    No Successor Liability ......................................................................... 69
Section 11.9    Severability ........................................................................................... 69
Section 11.10   Filing of Additional Documents ....................................................... 69
Section 11.11   Reservation of Rights .......................................................................... 69
Section 11.12   Service of Documents ......................................................................... 70
Section 11.13   Section 1125(e) of the Bankruptcy Code .......................................... 71
Section 11.14   Tax Reporting and Compliance ........................................................ 72
Section 11.15   Exhibits, Schedules, and Supplements ............................................. 72
Section 11.16   Entire Agreement ................................................................................ 72
Section 11.17   Allocation of Payments ...................................................................... 72
Section 11.18   Prepayment. .......................................................................................... 72
Section 11.19   Conflicts ................................................................................................ 72
Section 11.20   Closing of Chapter 11 Cases .............................................................. 73
Section 11.21   Term of Injunctions or Stays. ............................................................ 73
Section 11.22   Dissolution of Committee. .................................................................. 73

## JOINT PREPACKAGED CHAPTER 11 PLAN
## OF REORGANIZATION OF CUTERA, INC. AND ITS AFFILIATED DEBTOR

Cutera, Inc. and Crystal Sub, LLC (each, a "<u>Debtor</u>" and together, the "<u>Debtors</u>") propose this joint prepackaged plan of reorganization (this "<u>Plan</u>") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used in this Plan and not otherwise defined have the meanings ascribed to such terms in <u>Article I</u> hereof.

The Debtors seek to consummate the Restructuring Transactions on the Effective Date of this Plan. Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately for each Debtor.

Reference is made to the accompanying Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.

ALL HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

*Section 1.1     Defined Terms.*

The following terms shall have the respective meanings specified below when used in capitalized form in this Plan:

1.     "***1145 Securities***" has the meaning set forth in <u>Section 4.15</u> of this Plan.

2.     "***2026 Senior Notes***" means those certain unsecured convertible senior notes issued pursuant to the 2026 Senior Notes Indenture.

3.     "***2026 Senior Notes Indenture***" means that certain *First Supplemental Indenture*, dated as of February 24, 2025 to that certain *Indenture* dated as of March 9, 2021, between Cutera, Inc., as issuer, Crystal Sub, LLC, as guarantor, and U.S. Bank National Association, as trustee, for 2.25% Senior Notes due March 15, 2026.

4.     "***2028 Senior Notes***" means those certain unsecured convertible senior notes issued pursuant to the 2028 Senior Notes Indenture.

5.     "***2028 Senior Notes Indenture***" means that certain *First Supplemental Indenture*, dated as of February 24, 2025 to that certain *Indenture* dated as of May 27, 2022, between Cutera,

Inc., as issuer, Crystal Sub, LLC, as guarantor, and U.S. Bank Trust Company, National Association, as trustee, for 2.25% Senior Notes due June 1, 2028.

6. "**2029 Senior Notes**" means those certain unsecured convertible senior notes issued pursuant to the 2029 Senior Notes Indenture.

7. "**2029 Senior Notes Indenture**" means that certain *First Supplemental Indenture*, dated as of February 24, 2025 to that certain *Indenture* dated as of December 12, 2022, between Cutera, Inc., as issuer, Crystal Sub, LLC, as guarantor, and U.S. Bank Trust Company, National Association, as trustee, for 4.00% Senior Notes due June 1, 2029.

8. "**Accredited Investor**" has the meaning ascribed to it in the Securities Act.

9. "**Ad Hoc Committee of Consenting Senior Noteholders**" means the group of Consenting Senior Noteholders represented by the Ad Hoc Committee of Consenting Senior Noteholder Advisors.

10. "**Ad Hoc Committee of Consenting Senior Noteholder Advisors**" means, collectively: (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel; (ii) Porter Hedges LLP, as co-counsel; and (iii) Centerview Partners LLC, as financial advisor and investment banker.

11. "**Administrative Claims**" means any and all requests for payment of costs or expenses (other than DIP Claims) of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority under section 507 of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Bankruptcy Fees; (c) Allowed Professional Fee Claims; (d) the Restructuring Expenses; and (e) Put Option Premium Claims.

12. "**Administrative Claims Bar Date**" means the first Business Day that is the thirtieth (30th) day after the Effective Date.

13. "**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code, including non-Debtor Entities.

14. "**Allowed**" means, with respect to a Claim or Interest: (i) any Claim or Interest as to which no objection to allowance has been interposed (either in the Bankruptcy Court or in the ordinary course of business) on or before the applicable time period fixed by applicable non-bankruptcy law or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order, either before or after the Effective Date, to the extent such objection is determined in favor of the respective Holder; (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, either before or after the Effective Date; or (iii) any Claim or Interest expressly deemed Allowed by this Plan. A Claim or Interest that is Allowed shall include a Claim or Interest that is Disputed to the extent such Claim or Interest becomes Allowed after the Effective

2

Date.  A Claim that is Allowed shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable non-bankruptcy law.  Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, a Claim that is Allowed shall not, for purposes of distributions under this Plan, include interest on such Claim accruing from or after the Petition Date.

15.     "*Ballot*" means a ballot accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote on this Plan shall, among other things, indicate their acceptance or rejection of this Plan in accordance with this Plan and the procedures governing the solicitation process.

16.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended.

17.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or such other court as may have jurisdiction over these Chapter 11 Cases.

18.     "*Bankruptcy Fees*" means any and all fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code.

19.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms, or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases, and the general, local, and chambers rules of the Bankruptcy Court.

20.     "*Business Day*" means any day, other than a Saturday, Sunday, or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

21.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

22.     "*Cash-Out Reduction*" has the meaning set forth in Section 3.3(c)(iii)2 of this Plan.

23.     "*Cash-Out Shares*" has the meaning set forth in Section 3.3(c)(iii)2 of this Plan.

24.     "*Causes of Action*" means any and all claims, interests, damages, remedies, causes of action, demands, rights, debts, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted or assertable, direct or derivative, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including but not limited to:  (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542

through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

25.     "*Chapter 11 Cases*" means the cases pending for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

26.     "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

27.     "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

28.     "*Class*" means a group of Claims or Interests classified together pursuant to section 1122(a)(1) of the Bankruptcy Code.

29.     "*Combined Hearing*" means the hearing to be held by the Bankruptcy Court to consider the adequacy of the Disclosure Statement and confirmation of this Plan under sections 1125 and 1129 of the Bankruptcy Code, respectively, as such hearing may be adjourned or continued from time to time.

30.     "*Common Equity Convenience Buyout*" means the option of Holders of Allowed Senior Notes Claims who are not Consenting Senior Noteholders to elect the Senior Notes Claim Cash Option in lieu of receiving the Senior Notes Claim Equity Recovery on account of such Senior Notes Claims, pursuant to which certain of the Consenting Senior Noteholders shall purchase Reorganized Common Equity on the terms set forth in Section 4.14 of this Plan and the Common Equity Convenience Buyout Documents.

31.     "*Common Equity Convenience Buyout Cap*" means $7,040,000.

32.     "*Common Equity Convenience Buyout Documents*" means the definitive documents and agreements required to effectuate the Common Equity Convenience Buyout, including the Common Equity Convenience Buyout Procedures, the Equity Rights Offering Backstop Commitment Order, and the Equity Rights Offering Backstop Commitment Agreement.

33.     "*Common Equity Convenience Buyout Premium*" means an amount equal to 10% of the Common Equity Convenience Buyout Cap, payable to the Equity Rights Offering Backstop Parties in accordance with the Equity Rights Offering Backstop Commitment Agreement (i) on the Effective Date, in Reorganized Common Equity, issuable at the Equity Rights Offering Share Price, or (ii) if the Equity Rights Offering Backstop Commitment Agreement is terminated prior to the Effective Date, in Cash in accordance with the Equity Rights Offering Backstop Commitment Order.

34.     "*Common Equity Convenience Buyout Procedures*" means those certain procedures with respect to the Common Equity Convenience Buyout, as approved by the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Required Consenting Senior Noteholders and the Debtors.

4

35.     "***Common Equity Convenience Buyout Share Price***" means $5.00 per share, which reflects the plan equity value per share giving effect to the proceeds received on account of the Equity Rights Offering Amount, discounted by 50%.

36.     "***Common Equity Convenience Buyout Shares***" has the meaning set forth in Section 4.14(c) of this Plan.

37.     "***Company***" means Cutera, Inc. and all of its direct and indirect subsidiaries.

38.     "***Confirmation***" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

39.     "***Confirmation Date***" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rule 5003.

40.     "***Confirmation Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

41.     "***Consenting 2026 Senior Noteholders***" means those certain beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, 2026 Senior Notes and are party to the Restructuring Support Agreement.

42.     "***Consenting 2028 Senior Noteholders***" means those certain beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, 2028 Senior Notes and are party to the Restructuring Support Agreement.

43.     "***Consenting 2029 Senior Noteholders***" means those certain beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts or funds that beneficially hold, 2029 Senior Notes and are party to the Restructuring Support Agreement.

44.     "***Consenting Senior Noteholders***" means, collectively, the Consenting 2026 Senior Noteholders, the Consenting 2028 Senior Noteholders, and the Consenting 2029 Senior Noteholders.

45.     "***Consummation***" means the occurrence of the Effective Date.

46.     "***Cure Cost***" means any amount required to cure any monetary default under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by parties to an Executory Contract or Unexpired Lease) that is assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code.

47.     "***D&O Liability Insurance Policies***" means all insurance policies issued to or providing coverage at any time to the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

48.     "**_Debtors_**" has the meaning set forth in the introductory paragraph of this Plan.

49.     "**_Definitive Documents_**" means (i) each of the documents in the Plan Supplement, (ii) the Equity Rights Offering Documents, (iii) the Common Equity Convenience Buyout Documents, (iv) the Equity Rights Offering Backstop Commitment Order, (v) the Confirmation Order, (vi) the Solicitation Materials and the Solicitation Procedures Order, (vii) such other agreements and documentation reasonably desired or necessary to consummate and document the Restructuring Transactions, and (viii) any other document that has or may have a material or adverse impact on the legal or economic rights of the Consenting Senior Noteholders; _provided_ that each Definitive Document shall be in form and substance reasonably satisfactory to the Required Consenting Senior Noteholders (unless otherwise provided for herein).

50.     "**_DIP Agent_**" means Wilmington Savings Fund Society, FSB, as administrative and collateral agent for the DIP Lenders under the DIP Facility Documents, or any successor agents thereunder.

51.     "**_DIP Claims_**" means any and all Claims against the Debtors related to, arising out of, arising under, or arising in connection with the DIP Facility Documents.

52.     "**_DIP Credit Agreement_**" means that certain credit agreement evidencing the DIP Facility by and among Cutera, Inc., as borrower, Crystal Sub, LLC as guarantor, the DIP Agent, and the DIP Lenders, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof.

53.     "**_DIP Facility_**" means the $25 million, new-money, super-priority secured term loan debtor in possession financing facility.

54.     "**_DIP Facility Documents_**" means the DIP Credit Agreement, all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith, including the DIP Agent fee letter and the DIP Orders, together with all documentation executed or delivered in connection therewith as may be amended, modified, or supplemented from time to time, in accordance with the terms and conditions set forth therein.

55.     "**_DIP Lenders_**" means the lenders from time to time under the DIP Credit Agreement, including their designees, successors, and permitted assigns.

56.     "**_DIP Orders_**" means the Interim DIP Order and Final DIP Order.

57.     "**_Direct Investment Shares_**" has the meaning set forth in <u>Section 4.13(b)</u> of this Plan.

58.     "**_Disallowed_**" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is an Administrative Claim for which no request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy

Court or otherwise deemed timely filed under applicable law or the Plan; (c) has been withdrawn by agreement of the Debtors and the Holder thereof; or (d) has been withdrawn by the Holder thereof.

59.     "***Disclosure Statement***" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

60.     "***Disclosure Statement Order***" means the order of the Bankruptcy Court approving the Disclosure Statement, which order may be a part of the Confirmation Order.

61.     "***Disputed***" means, with respect to any Claim or Interest, except as otherwise provided herein, a Claim or Interest that has not been Allowed or Disallowed.

62.     "***Distribution Date***" means the date on which Holders of Claims or Interests are eligible to receive distributions under this Plan, which date shall be the Effective Date, or such other date agreed to by the Debtors and the Required Consenting Senior Noteholders.

63.     "***DTC***" means the Depository Trust Company.

64.     "***Effective Date***" means the date that is the first day on which all conditions to the effectiveness of this Plan set forth in <u>Section 8.1</u> hereof have been satisfied or waived in accordance with the terms of this Plan.

65.     "***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

66.     "***Equity Rights Offering***" means the equity rights offering to be consummated by the Reorganized Company on the Effective Date in accordance with the Equity Rights Offering Documents, pursuant to which it shall issue shares of Reorganized Common Equity.

67.     "***Equity Rights Offering Amount***" means $30 million.

68.     "***Equity Rights Offering Backstop Commitment***" means the commitment of the Equity Rights Offering Backstop Parties to fully backstop the Equity Rights Offering.

69.     "***Equity Rights Offering Backstop Commitment Agreement***" means the backstop commitment agreement, as may be further amended, modified, or supplemented from time to time, in accordance with its terms, entered into in connection with the Equity Rights Offering and the Common Equity Convenience Buyout, which shall be in the form and substance as attached to the Restructuring Support Agreement.

70.     "***Equity Rights Offering Backstop Commitment Order***" means an order or orders of the Bankruptcy Court approving, among other things, (i) Cutera, Inc.'s entry into and performance under the Equity Rights Offering Backstop Commitment Agreement, (ii) the Equity Rights Offering and Equity Rights Offering Procedures, (iii) the Common Equity Convenience

Buyout and Common Equity Convenience Buyout Procedures, and (iv) as Administrative Claims, the Put Option Premium.

71.     "***Equity Rights Offering Backstop Parties***" means the Holders of Senior Notes Claims (and their permitted assigns) who have agreed, as applicable, to backstop the Equity Rights Offering Amount and Common Equity Convenience Buyout and to act as Equity Rights Offering Holdback Parties, in each case pursuant to the Equity Rights Offering Backstop Commitment Agreement.

72.     "***Equity Rights Offering Backstop Premium***" means an amount equal to 10% of the Equity Rights Offering Amount, payable to the Equity Rights Offering Backstop Parties in accordance with the Equity Rights Offering Backstop Commitment Agreement (i) on the Effective Date, in Reorganized Common Equity, issuable at the Equity Rights Offering Share Price, or (ii) if the Equity Rights Offering Backstop Commitment Agreement is terminated prior to the Effective Date, in Cash in accordance with the Equity Rights Offering Backstop Commitment Order.

73.     "***Equity Rights Offering Documents***" means, collectively, the Equity Rights Offering Procedures and related subscription form, the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Backstop Commitment Order, and other material documents necessary to implement the Equity Rights Offering.

74.     "***Equity Rights Offering Holdback Parties***" means the Equity Rights Offering Backstop Parties who have agreed to purchase their respective portions (pursuant to the terms of the Equity Rights Offering Backstop Commitment Agreement) of the Holdback Rights Offering Amount.

75.     "***Equity Rights Offering Procedures***" means those certain rights offering procedures with respect to the Equity Rights Offering, as approved by the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Noteholders.

76.     "***Equity Rights Offering Share Price***" means $7.55 per share, which reflects the plan equity value per share after discounting by 35% the pre-Equity Rights Offering Amount proceeds valuation portion thereof.

77.     "***Equity Rights Offering Shares***" means the shares of Reorganized Common Equity issued pursuant to the Equity Rights Offering.

78.     "***Equity Security***" has the meaning set forth in section 101(16) of the Bankruptcy Code.

79.     "***Estate***" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of its Chapter 11 Case.

80.    "***Exchange Act***" means the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78a *et seq.*, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

81.    "***Exculpated Parties***" means, to the fullest extent permitted by law, the Debtors.

82.    "***Executory Contract***" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

83.    "***Existing Common Interests***" means any Interest in Cutera, Inc. in existence immediately before the Effective Date.

84.    "***Exit Facility***" means the exit term loan credit facility initially consisting of (a) an aggregate outstanding principal amount equal to the principal amount the term loans outstanding under the DIP Facility Documents on the Effective Date (including (i) the amount of any upfront payment payable pursuant to the DIP Facility Documents and (ii) the amount of any repayment premium payable pursuant to the DIP Facility Documents upon the repayment of the DIP Facility on such date, but excluding (x) accrued and unpaid interest as of such date, (y) Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel, and (z) indemnification obligations solely to the extent due and payable as of the Effective Date, which amounts in the foregoing clauses (x) through (z), for the avoidance of doubt, shall be paid in full in Cash on the Effective Date), which term loans issued under the Exit Facility shall be funded on a cashless basis by rolling over such amounts outstanding under the DIP Facility Documents and (b) a $10 million new money term loan to be provided by the Exit Lenders on the Effective Date on the terms and conditions set forth in the Exit Facility Documents.

85.    "***Exit Facility Documents***" means the agreements memorializing the Exit Facility, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, mortgages, deeds of trust, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the Exit Facility.

86.    "***Exit Lenders***" means the DIP Lenders on the Effective Date and the other lenders from time to time under the Exit Facility, including their designees, successors, and permitted assigns.

87.    "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date.

88.    "***Final DIP Order***" means the Final Order of the Bankruptcy Court approving the DIP Facility.

89.    "***Final Order***" means, as applicable, an order, ruling, or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been

reversed, vacated, or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing is pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) has been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing has been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing has expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order, ruling, or judgment shall not cause an order, ruling, or judgment not to be a Final Order.

90.     "*General Unsecured Claims*" means any and all unsecured Claims (other than an Administrative Claim (including any Professional Fee Claim or Put Option Premium Claim), an Intercompany Claim, a Senior Notes Claim, a Priority Tax Claim, an Other Priority Claim, or any Claim subject to subordination under section 510(b) of the Bankruptcy Code) against any Debtor, including (a) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which any Debtor is a party and (b) Claims arising from any litigation or other court, administrative, or regulatory proceeding, including damages or judgments entered against, or settlement amounts owing by any Debtor related thereto.

91.     "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

92.     "*Holdback Rights Offering Amount*" has the meaning set forth in Section 4.13(b) of this Plan.

93.     "*Holder*" means the beneficial holder of, or investment advisor, sub-advisor, or manager of discretionary accounts or funds that beneficially hold, any Claim or Interest.

94.     "*Impaired*" means, with respect to a Claim or Interest, such Claim or Interest that falls within a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

95.     "*Indemnification Obligation*" means the Debtors' obligations to indemnify, reimburse, or otherwise hold financially harmless the Indemnified Parties with respect to or based upon any act or omission taken or omitted in any of the relevant capacities, or for or on behalf of the Debtors, pursuant to and to the maximum extent provided by the Debtors' certificates of incorporation, certificates of formation, bylaws and similar corporate documents, as in effect as of the Petition Date.

96.     "*Indemnified Parties*" means the Debtors' current and former directors, officers, managers, employees, attorneys, other professionals, and agents, and such current and former directors', officers', managers', and employees' respective Affiliates to the extent set forth herein,

that were employed or served in such capacity on or after the Petition Date and that are entitled to be indemnified by the Debtors pursuant to, among other things, the Debtors' bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts, or other agreements.

97.     "*Insurance Policies*" means all insurance policies, including all D&O Liability Insurance Policies, that have been issued at any time that provide coverage, benefits, or proceeds to the Debtors (or their predecessors) and all agreements, documents, or instruments relating thereto.

98.     "*Intercompany Claims*" means any and all Claims against a Debtor held by any Debtor or direct or indirect subsidiary of a Debtor.

99.     "*Intercompany Interests*" means any and all Equity Securities or other ownership interests in an Affiliate of the Debtors held by one or more of the Debtors.

100.     "*Interests*" means any Equity Security or other ownership interest in any Debtor, including any and all issued, unissued, authorized, or outstanding shares of common stock, preferred stock, membership, limited liability company interests (whether certificated or uncertificated), or partnership interests, or other instrument evidencing an ownership interest in any Debtor, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto.

101.     "*Interim DIP Order*" means an order of the Bankruptcy Court approving the DIP Facility on an interim basis.

102.     "*Law*" means any federal, state, local, or foreign "law" (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

103.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

104.     "*Management Incentive Plan*" means a management incentive plan of the Reorganized Company to be implemented on the Effective Date, in form and substance reasonably acceptable to the Debtors and Required Consenting Senior Noteholders and filed with the Plan Supplement.

105.     "*New Organizational Documents*" means, on or after the Effective Date, the organizational and governance documents for the Reorganized Company and the Reorganized Debtors, including, without limitation, certificates of incorporation (including any certificate of designations), certificates of formation or certificates of limited partnership (or equivalent organizational documents), certificates of designation, bylaws, limited liability company agreements, shareholders' agreements, and limited partnership agreements (or equivalent governing documents), as applicable, including the New Shareholders Agreement, if any.

11

106.    "***New Shareholders Agreement***" means any agreement entered into by holders of Reorganized Common Equity governing the rights and obligations with respect to the Reorganized Common Equity.

107.    "***Non-Holdback Rights Offering Amount***" has the meaning set forth in <u>Section 4.13(b)</u> of this Plan.

108.    "***Non-Voting Classes***" means Classes 1, 2, 4, 5, 6, 7, and 8 of this Plan.

109.    "***Notice and Claims Agent***" means Kurtzman Carson Consultants, LLC d/b/a Verita Global in its capacity as noticing, claims, and solicitation agent for the Debtors.

110.    "***Opt-Out Form***" means the form by which Holders of Claims and Interests in Non-Voting Classes may opt-out of becoming a Releasing Party by checking the applicable box on such form.

111.    "***Other Priority Claims***" means any and all Claims against any of the Debtors entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

112.    "***Other Secured Claims***" means any and all Secured Claims against any of the Debtors that are not DIP Claims.

113.    "***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

114.    "***Petition Date***" means the date on which the Debtors filed petitions for relief commencing the Chapter 11 Cases.

115.    "***Placement Securities***" has the meaning set forth in <u>Section 4.15</u> of this Plan.

116.    "***Plan***" means this joint prepackaged plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring Transactions, including all exhibits and schedules to this Plan, and any Plan Supplement, as they may be amended, supplemented or modified from time to time in accordance with the terms hereof, the terms of the Restructuring Support Agreement, the Bankruptcy Code, and the Bankruptcy Rules.

117.    "***Plan Supplement***" means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, as the same may be amended, modified, or supplemented, and including, without limitation, the following: (a) the identity of the known members of the Reorganized Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code; (b) the New Organizational Documents; (c) the Management Incentive Plan; (d) the Schedule of Retained Causes of Action; (e) the Schedule of Rejected Executory Contracts and Unexpired Leases; (f) the Exit Facility Documents; (g) the Restructuring Transactions Memorandum, if any, (h) all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing; and (i) any additional documents filed with the

Bankruptcy Court before the Effective Date as additional documents or amendments to the Plan Supplement; *provided*, that each Plan Supplement document shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Senior Noteholders (unless otherwise provided for herein).

118. "*Priority Tax Claims*" means any and all Claims against a Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

119. "*Professional Fee Claims*" means any and all Claims of a Professional against a Debtor seeking a payment of compensation for services rendered or reimbursement of expenses incurred on or as of the Petition Date and through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

120. "*Professional Fee Escrow Account*" means an interest-bearing escrow account in an amount equal to the Professional Fee Reserve Amount to be funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid Professional Fee Claims.

121. "*Professional Fee Reserve Amount*" means the aggregate accrued and unpaid Professional Fee Claims through the Effective Date as reasonably estimated by the Retained Professionals in accordance with Article II of this Plan.

122. "*Professionals*" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other Entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

123. "*Pro-Rata Share*" means with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

124. "*Proof of Claim*" has the meaning set forth in Bankruptcy Rule 3001, or a motion or request for payment of fees, costs, or expenses made pursuant to section 503 of the Bankruptcy Code filed in the Chapter 11 Cases.

125. "*Put Option Premium*" means, collectively, (i) the Common Equity Convenience Buyout Premium and (ii) the Equity Rights Offering Backstop Premium.

126. "*QIB*" means 'qualified institutional buyer,' as that term is defined in the Securities Act.

127. "*Reinstated*" or "*Reinstatement*" mean, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

128.    "**_Related Parties_**" means, to the fullest extent permitted by law, with respect to any Entity, such Entity's predecessors, successors, assigns, and affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former equity holders (regardless of whether such equity interests are held directly or indirectly), officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors, direct and indirect parent Entities, "controlling persons" (within the meaning of the federal securities law), heirs, administrators and executors, and other professionals, in each case acting in such capacity whether current or former, including in their capacity as directors of the Company, as applicable.

129.    "**_Released Parties_**" means, collectively, (a)(i) the Company, (ii) the Reorganized Debtors,  (iii) the Trustee, (iv) the DIP Lenders, (v) the DIP Agent, (vi) each Holder of a Senior Notes Claim that votes to accept the Plan, and does not affirmatively opt out of, or timely object to, the releases set forth in <u>Section 9.3</u> of the Plan, and (vii) the Ad Hoc Committee of Consenting Senior Noteholders and each member thereof; (b) with respect to each of the foregoing Entities and Persons in clause (a), all of their respective Related Parties to the maximum extent permitted by law; *provided*, that any Entity or Person that affirmatively opts out of, or timely objects either through (1) a formal objection filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not resolved or withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before Confirmation shall not be deemed a Released Party.

130.    "**_Releases_**" means the releases given by the Releasing Parties to the Released Parties under <u>Article IX</u> hereof.

131.    "**_Releasing Parties_**" means, collectively, each of the following in their capacity as such: (i) all Holders of Claims or Interests that vote to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan, (ii) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iii) all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan, (iv) all Holders of Claims or Interests who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (v) each Released Party, (vi) each Related Party to each Entity in clause (i) through (v) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (i) through (v); *provided*, *that*, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases set forth in <u>Section 9.3</u> of the Plan; or (y) timely objects to the releases set forth in <u>Section 9.3</u> of the Plan, either through (1) a formal objection filed on the docket of the Chapter 11 Cases or (2) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before Confirmation.

132.    "**_Reorganized Board_**" means the board of managers of the Reorganized Company, as determined in accordance with the New Organizational Documents.

14

133.    "***Reorganized Common Equity***" means the units of common stock or other common equity Interests of the Reorganized Company authorized under the New Organizational Documents and issued pursuant to this Plan on the Effective Date.

134.    "***Reorganized Company***" means Cutera, Inc. and any successors thereto, by merger, consolidation, or otherwise, as reorganized on or after the Effective Date.

135.    "***Reorganized Debtors***" means collectively, the Debtors and any successors thereto, by consolidation, or otherwise, including, without limitation, the Reorganized Company, as reorganized on or after the Effective Date, in accordance with this Plan.

136.    "***Required Consenting Senior Noteholders***" means as of any date of determination, Consenting Senior Noteholders who own or control as of such date at least 50.1% of the aggregate principal amount of all outstanding Senior Notes owned or controlled by all Consenting Senior Noteholders.

137.    "***Residual Fee Escrow Interest***" has the meaning set forth in Section 2.3(b) of this Plan.

138.    "***Restructuring Expenses***" means the reasonable and documented prepetition and postpetition fees and out-of-pocket expenses incurred or accrued by the Ad Hoc Committee of Consenting Senior Noteholder Advisors (in each case payable in accordance with the applicable fee reimbursement letters entered into by Cutera, Inc. and such professionals and to the extent not otherwise paid pursuant to the DIP Orders or DIP Facility Documents) and the Trustee; in each case, without further order of, or application to, the Bankruptcy Court by such consultant or professionals, including the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases.

139.    "***Restructuring Support Agreement***" means that certain restructuring support agreement, dated as of March 4, 2025, by and among the Debtors and the Consenting Senior Noteholders, and any person or Entity that subsequently becomes a party thereto, including any exhibits thereto, as may be further amended, modified, or supplemented from time to time, in accordance with its terms.

140.    "***Restructuring Transactions***" means the transactions necessary to complete this Plan, as further described in Section 4.3 hereof.

141.    "***Restructuring Transactions Memorandum***" means a document which may be included in the Plan Supplement setting forth a summary of the transaction steps to complete the Restructuring Transactions.

142.    "***Retained Professional***" means an Entity:  (a) employed in these Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to (i) sections 327, 328, 329, 330, or 331 of the Bankruptcy Code or (ii) an order entered by the

15

Bankruptcy Court authorizing such retention; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

143.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan.

144.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to this Plan, as the same may be amended, modified, or supplemented from time to time.

145.    "*Section 510(b) Claims*" means any Claim against any Debtor (i) arising from the rescission of a purchase or sale of a Security of a Debtor or any Affiliate of a Debtor; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such Claim.

146.    "*Secured Claims*" means any and all Claims against any of the Debtors that are secured by a Lien on, or security interest in, property in which any of the Debtors has an interest, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, which Lien or right of setoff, as the case may be, is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, but only to the extent of the value of the Holder's interest in the Debtors' interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

147.    "*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

148.    "*Security*" has the meaning set forth in section 101(49) of the Bankruptcy Code.

149.    "*Senior Notes*" means, collectively, (i) the 2026 Senior Notes, (ii) the 2028 Senior Notes, and (iii) the 2029 Senior Notes.

150.    "*Senior Notes Claim*" means any Claim on account of the Senior Notes.

151.    "*Senior Notes Claim Cash Amount*" has the meaning set forth in Section 3.3(c)(iii)2 of this Plan.

152.    "*Senior Notes Claim Cash Option*" has the meaning set forth in Section 3.3(c)(iii)2 of this Plan.

153.    "*Senior Notes Claim Equity Recovery*" has the meaning set forth in Section 3.3(c)(iii)1 of this Plan.

154.    "***Senior Notes Documents***" means the Senior Notes Indentures and all related agreements and documents executed by the Debtors in connection with the Senior Notes Indentures, including the Senior Notes.

155.    "***Senior Notes Indentures***" means, collectively, (i) the 2026 Senior Notes Indenture, (ii) the 2028 Senior Notes Indenture, and (iii) the 2029 Senior Notes Indenture.

156.    "***Solicitation Materials***" means (i) the Ballot and applicable voting instructions, (ii) the Disclosure Statement and all exhibits thereto, including this Plan, the Equity Rights Offering Procedures and Common Equity Convenience Buyout Procedures and related subscription forms, (iii) the Opt-Out Form, and (iv) any other documents necessary to effect or approve the solicitation of votes with respect to the Restructuring Transactions to be consummated pursuant to this Plan, each of which shall be in form and substance as set forth in, and consistent with, the Restructuring Support Agreement.

157.    "***Solicitation Procedures Order***" means any order(s) of the Bankruptcy Court approving, among other things, the Solicitation Materials and scheduling the Combined Hearing.

158.    "***Stamp or Similar Tax***" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax, privilege taxes, and other similar taxes imposed or assessed by any Governmental Unit.

159.    "***Subscription Rights***" means the non-certified rights to purchase Reorganized Common Equity issued in connection with the Equity Rights Offering.

160.    "***Surviving Senior Notes Provisions***" means any provisions of the Senior Notes Documents that by their terms survive the termination of the Senior Notes Documents.

161.    "***Trustee***" means U.S. Bank Trust Company, National Association, and its successors and assigns, in its capacity as Trustee under the 2026 Senior Notes Indenture, 2028 Senior Notes Indenture and 2029 Senior Notes Indenture, as applicable.

162.    "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

163.    "***Unexpired Lease***" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

164.    "***Unimpaired***" means, with respect to any Claim or Interest, such Claim or Interest that is not Impaired.

*Section 1.2     Rules of Interpretation and Computation of Time.*

(a)     For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(ii) unless otherwise specified, any reference herein to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, restated, amended and restated, supplemented, waived or otherwise modified; (iv) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, of this Plan; (v) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vi) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitations, and shall be deemed to be followed by the words "without limitation"; (vii) references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; (viii) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; and (ix) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

(b)     The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein, unless otherwise provided for herein.

(c)     All references in this Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

(d)     In the event of an inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control.  In the event of an inconsistency between this Plan and the Confirmation Order, the Confirmation Order shall control.

(e)     Notwithstanding anything to the contrary in the Plan, any and all consent rights set forth in the Restructuring Support Agreement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by reference (including to the applicable definitions in Section 1.1 of the Plan) and be fully enforceable as if stated in full in the Plan.  Failure to reference in the Plan the rights referred to in the immediately preceding sentence shall not impair such rights and obligations.  In case of a conflict between the consent rights in the Plan and the consent rights in the Restructuring Support Agreement, the consent rights in the Plan shall govern.

## ARTICLE II.
## UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III hereof.

18

### Section 2.1    Administrative Claims.

(a)    Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, to less favorable treatment, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the following: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

(b)    All requests for payment of an Administrative Claim (other than DIP Claims, Restructuring Expenses, Put Option Premium Claims, or Professional Fee Claims) that accrued on or before the Effective Date that were not otherwise paid in the ordinary course of business must be filed with the Bankruptcy Court and served on the Debtors no later than the Administrative Claims Bar Date.  Holders of Administrative Claims (other than DIP Claims, Restructuring Expenses, Put Option Premium Claims, or Professional Fee Claims) that are required to, but do not, file and serve a request for payment of such Administrative Claims by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, or the Reorganized Debtors, and such Administrative Claims shall be deemed discharged, compromised, settled, and released as of the Effective Date; *provided*, that the foregoing shall not apply to Allowed Administrative Claims that arise in the ordinary course of the Debtors' business during the Chapter 11 Cases, which shall be paid by such applicable Debtor or Reorganized Debtor in full in Cash in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice without further notice to or order of the Bankruptcy Court.

(c)    The Reorganized Debtors may settle Administrative Claims (other than DIP Claims, Restructuring Expenses, and Put Option Premium Claims) in the ordinary course of business without further Bankruptcy Court approval.  The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim (other than DIP Claims, Restructuring Expenses, and Put Option Premium Claims) no later than sixty (60) days after the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) objects to a timely-filed and properly served Administrative Claim, such Administrative Claim shall be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors (or other party with standing) objects to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court shall determine whether such Administrative Claim should be allowed and, if so, in what amount.

Section 2.2      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim shall be paid on the later of (i) in accordance with the terms of any agreement between the Debtors and the Holder of such Allowed Priority Tax Claim, (ii) when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy Law, or (iii) in the ordinary course of business.  On the Effective Date, any Liens securing any Allowed Priority Tax Claims shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order or rule, or the vote, consent, authorization, or approval of any Person.

Section 2.3      *Professional Fee Claims.*

(a)      All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses must be filed no later than the first Business Day that is sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)      On or before the Effective Date, the Reorganized Debtors shall establish (if not already established) and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  Subject to the last sentence of this Section 2.3(b), the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of the Retained Professionals, and such funds shall not be considered property of the Debtors' Estates, the Debtors, or the Reorganized Debtors.  Subject to the last sentence of this Section 2.3(b), no Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way; *provided* that Liens granted pursuant to the DIP Facility Documents and Exit Facility Documents, as applicable, shall encumber amounts in the Professional Fee Escrow Account constituting the Residual Fee Escrow Interest.  The Reorganized Debtors shall be obligated to pay Allowed Professional Fee Claims in excess of the Professional Fee Reserve Amount.  The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by a Final Order of the Bankruptcy Court; *provided* that in the event the Professional Fee Reserve Amount is insufficient to satisfy the Professional Fee Claims, the Reorganized Debtors shall be required to satisfy the Allowed amounts of the remainder of any outstanding Professional Fee Claims.  When all such Allowed amounts owing to Retained Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account (the "Residual Fee Escrow Interest") shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

(c)      The Retained Professionals shall reasonably estimate in good faith their accrued Professional Fee Claims prior to and as of the Effective Date and shall deliver such estimate to the Debtors no later than three (3) Business Days before the anticipated Effective Date; *provided* that

20

such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional. The total amount estimated as of the Effective Date shall consist of the Professional Fee Reserve Amount; *provided* that the Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(d)     From and after the Confirmation Date, but prior to the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Reorganized Debtors (as applicable) after the Confirmation Date but prior to the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, except as otherwise specifically provided in this Plan. The Reorganized Debtors shall pay, within ten (10) Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors after the Confirmation Date but prior to the Effective Date. If the Debtors or Reorganized Debtors (as applicable) dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

Section 2.4     *DIP Claims.*

(a)     The DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreement as of the Effective Date, including principal, interest, fees, costs, other charges, and expenses, and all other obligations related to the DIP Facility.

(b)     Notwithstanding anything to the contrary herein, except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, on the Effective Date, the Holders of all Allowed DIP Claims, in full and final satisfaction, settlement, release, and discharge of and in exchange for all such DIP Claims, shall receive (i) term loans issued under the Exit Facility in an aggregate outstanding principal amount equal to the principal amount the term loans outstanding under the DIP Facility Documents on the Effective Date (including (A) the amount of any upfront payment payable pursuant to the DIP Facility Documents and (B) the amount of any repayment premium payable pursuant to the DIP Facility Documents upon the repayment of the DIP Facility on such date, but excluding (x) accrued and unpaid interest as of such date, (y) Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel, and (z) indemnification obligations solely to the extent

21

due and payable as of the Effective Date payable in Cash on the Effective Date, which amounts in the foregoing clauses (x) through (z), for the avoidance of doubt, shall be paid in full in Cash on the Effective Date), which term loans issued under the Exit Facility shall be funded on a cashless basis by rolling over such amounts outstanding under the DIP Facility Documents.

Section 2.5     Statutory Fees.

The Debtors and the Reorganized Debtors, as applicable, shall pay all quarterly fees under 28 U.S.C § 1930(a), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Reorganized Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Section 3.1     Classification of Claims.[2]

(a)      In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims (including Professional Fee Claims and Put Option Premium Claims), Priority Tax Claims, and DIP Claims, as described in Article II hereof.

(b)      All Claims and Interests required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code are set forth below.  Such classification is for all purposes, including for purposes of voting, Confirmation, and distribution pursuant to this Plan.

Section 3.2     Class Identification.

The following chart sets forth the classification of the Claims against and Interests in each Debtor, whether that Class of Claims or Interests is Impaired, and the voting rights of the members of such Class.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Senior Notes Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[2]     The Debtors reserve the right to separately classify Claims to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable Law.

| Class | Claims and Interests | Status | Voting Rights |
|:-----:|:--------------------:|:------:|:-------------:|
| 5 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Deemed to Reject) |
| 6 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept) / Deemed to Reject |
| 7 | Existing Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

Section 3.3      *Treatment and Voting Rights of Claims and Interests.*

Except to the extent that the Debtors and a Holder of an Allowed Claim or Allowed Interest, as applicable, agree to less favorable treatment, such Holder shall receive under this Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, or, if payment is not due, in accordance with its terms in the ordinary course.

(a)      *Class 1—Other Secured Claims.*

(i)      *Classification:* Class 1 consists of all Other Secured Claims.

(ii)      *Treatment:* Subject to the conditions described in the first paragraph of Section 3.3 of this Plan, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the election of the Debtor: (A) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim; (B) the collateral securing its Allowed Other Secured Claim; (C) Reinstatement of its Allowed Other Secured Claim; or (D) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)      *Impairment and Voting*: Class 1 is Unimpaired under this Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject this Plan.

23

(b)     *Class 2—Other Priority Claims.*

    (i)     *Classification*: Class 2 consists of all Other Priority Claims.

    (ii)     *Treatment*:  Subject to the conditions described in the first paragraph of Section 3.3 of this Plan, on the Effective Date, each Holder of an Allowed Other Priority Claim shall receive treatment in a manner consistent with Section 1129(a)(9) of the Bankruptcy Code.

    (iii)     *Impairment and Voting*:  Class 2 is Unimpaired under this Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Thus, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject this Plan.

(c)     *Class 3—Senior Notes Claims.*

    (i)     *Classification*: Class 3 consists of Senior Notes Claims.

    (ii)     *Allowed Amount:*  The Senior Notes Claims shall be Allowed in an amount not less than $429,125,000 of principal plus accrued and unpaid interest owed under the Senior Notes Indentures through the Petition Date.

    (iii)     *Treatment*:  Subject to the conditions described in the first paragraph of Section 3.3 of this Plan, on the Effective Date, each Holder of an Allowed Senior Notes Claim shall receive either:

        1.     (A) its Pro-Rata Share of 100% of the Reorganized Common Equity, subject to dilution from the Equity Rights Offering, the Put Option Premium, and Management Incentive Plan; and (B) the right to participate in the Equity Rights Offering for its Pro-Rata Share of the Non-Holdback Rights Offering Amount ((A) and (B), collectively, the "Senior Notes Claim Equity Recovery"); or

        2.     if such Holder of an Allowed Senior Notes Claim elects to participate in the Common Equity Convenience Buyout (the "Senior Notes Claim Cash Option"), in lieu of all of its Senior Notes Claim Equity Recovery, (A) Cash in an amount (the "Senior Notes Claim Cash Amount") equal to the product of the Common Equity Convenience Buyout Share Price times the number of shares of Reorganized Common Equity such Holder was entitled to receive pursuant to clause (A) of the Senior Notes Claim Equity Recovery (the "Cash-Out Shares"), with the number of Cash-Out Shares of such Holder subject to reduction on a *pro rata* basis to ensure the aggregate Senior Notes Claim Cash Amount does not exceed the Common Equity Convenience Buyout Cap (the "Cash-Out Reduction") and (B) to the extent the Cash-Out Reduction occurs,

24

shares of Reorganized Common Equity equal to the number of Cash-Out Shares of such Holder that were reduced in accordance with the Cash-Out Reduction;

*provided* that only those Holders which vote to accept the Plan are eligible to exercise the Senior Notes Claim Cash Option, absent the consent of the Debtors and the Required Consenting Senior Noteholders.

(iv)  *Impairment and Voting*:  Class 3 is Impaired under this Plan.  Holders of Allowed Senior Notes Claims are entitled to vote to accept or reject this Plan.

(d)  *Class 4—General Unsecured Claims.*

(i)  *Classification*: Class 4 consists of all General Unsecured Claims.

(ii)  *Treatment*:  Subject to the conditions described in the first paragraph of <u>Section 3.3</u> of this Plan, on the Effective Date, each Holder of an Allowed General Unsecured Claim shall (1) receive payment in full in Cash of the unpaid portion of its Allowed General Unsecured Claim paid on the later of (A) the Effective Date and (B) in the ordinary course of business, (2) have its Allowed General Unsecured Claim Reinstated, or (3) receive such other treatment in rendering its Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)  *Impairment and Voting*:  Class 4 is Unimpaired under this Plan.  Holders of Allowed General Unsecured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Thus, Holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject this Plan.

(e)  *Class 5—Intercompany Claims.*

(i)  *Classification*:  Class 5 consists of all Intercompany Claims.

(ii)  *Treatment*:  On the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim either reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled or released without any distribution, at the Debtors' election with the reasonable consent of the Required Consenting Senior Noteholders.

(iii)  *Impairment and Voting*:  Class 5 is either Impaired with no distribution or Unimpaired under this Plan.  Holders of Allowed Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code.  In either case, Holders

25

of Allowed Intercompany Claims are not entitled to vote to accept or reject this Plan.

(f)     *Class 6—Intercompany Interests.*

    (i)     *Classification*: Class 6 consists of all Intercompany Interests

    (ii)    *Treatment*: On the Effective Date, each Holder of an Allowed Intercompany Interest in the Debtors shall have its Interest (1) Reinstated or (2) cancelled, released, and extinguished and without any distribution at the Debtors' election.

    (iii)   *Impairment and Voting*: Class 6 is either Impaired with no distribution or Unimpaired under this Plan.  Holders of Allowed Intercompany Interests in the Debtors are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code.  In either case, Holders of Allowed Intercompany Interests are not entitled to vote to accept or reject this Plan.

(g)     *Class 7—Existing Common Interests.*

    (i)     *Classification*: Class 7 consists of all Existing Common Interests.

    (ii)    *Treatment*:  On the Effective Date, all Existing Common Interests shall be cancelled, released, and extinguished, and Holders of Existing Common Interests shall not receive or retain any property or distributions under this Plan.

    (iii)   *Impairment and Voting*:  Class 7 is Impaired under this Plan.  Holders of Allowed Existing Common Interests are deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Thus, Holders of Allowed Existing Common Interests will not be entitled to vote to accept or reject this Plan.

(h)     *Class 8—Section 510(b) Claims.*

    (i)     *Classification*: Class 8 consists of all Section 510(b) Claims.

    (ii)    *Treatment*:  Section 510(b) Claims shall be cancelled, released, discharged, and extinguished as of the Effective Date and shall be of no further force or effect, and Holders of Section 510(b) Claims shall not receive any distribution on account of such Section 510(b) Claims.

    (iii)   *Impairment and Voting*:  Class 8 is Impaired under this Plan.  Holders of Allowed Section 510(b) Claims are deemed to not have accepted this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Thus, Holders of

Allowed Section 510(b) Claims will not be entitled to vote to accept or reject this Plan.

Section 3.4    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, the DIP Orders, or the DIP Facility Documents, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

Section 3.5    *Voting; Presumptions; Solicitation.*

(a)    *Acceptance by Certain Impaired Classes*.  Only Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Allowed Claims or Interests in Class 3 have received Ballots containing detailed voting instructions.

(b)    *Conclusively Presumed Acceptance by Unimpaired Classes*.  Holders of Claims in Classes 1, 2, and 4, and certain Holders of Claims in Class 5 are conclusively presumed to accept this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)    *Deemed Not to Accept by Certain Impaired Classes*.  Holders of Claims in Classes 7 and 8, certain Holders of Claims in Class 5, and certain Holders of Interests in Class 6 are deemed not to accept this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(d)    *Disputes Regarding Impairment*.  If a Holder of a Claim or Interest disputes the classification of such Holder's Claim or Interest, then upon the filing of an objection to the Plan by such Holder, the Bankruptcy Court shall, after notice and a hearing, determine the proper classification of such Claim or Interest on or before the Confirmation Date.

Section 3.6    *Nonconsensual Confirmation.*

Because certain Classes of Claims or Interests are deemed not to vote to accept this Plan, the Debtors will seek Confirmation of this Plan under section 1129(b) of the Bankruptcy Code.

Section 3.7    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under this Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

Section 3.8    *Vacant Classes*.

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Combined Hearing shall not be deemed to have voted on this Plan for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

Section 3.9    *No Waiver.*

Nothing contained in this Plan shall be construed to waive the Debtors' or Reorganized Debtors' right to object on any basis to any Claim, including after the Effective Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1    *Compromise or Settlement of Controversies.*

(a)    Other than as specifically set forth herein, this Plan shall be deemed a motion to approve the good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

(b)    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved under this Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Section 4.2    *Sources of Consideration for Plan Distribution.*

(a)    The Debtors shall fund distributions under this Plan with: (1) Cash on hand, including Cash from operations; (2) the proceeds of the Exit Facility; (3) the proceeds of the Equity Rights Offering (including the Equity Rights Offering Backstop Commitment); and (4) the amounts being funded by the Equity Rights Offering Backstop Parties to fund the Senior Notes Claim Cash Amount related to the Common Equity Convenience Buyout in an amount up to the Common Equity Convenience Buyout Cap.  Cash payments to be made pursuant to this Plan will be made by the Debtors or the Reorganized Debtors.  The Reorganized Debtors shall be entitled

28

to transfer funds between and among their affiliates as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors to satisfy their obligations under this Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of this Plan.

(b)      From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the Exit Facility Documents, the Equity Rights Offering Documents, and the New Organizational Documents), the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the Reorganized Board (or other applicable governing body) deems appropriate.

### Section 4.3      *Restructuring Transactions.*

Following the Confirmation Date and subject to any applicable limitations set forth in any post-Effective Date agreements, the Debtors and the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan (the "Restructuring Transactions"), including but not limited to: (a) the execution and delivery of appropriate agreements or other documents of reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of conversion, formation or incorporation or consolidation with the appropriate governmental authorities pursuant to applicable Law; (d) the execution, delivery, and filing, if applicable, of the Equity Rights Offering Documents, Common Equity Convenience Buyout Documents, and Exit Facility Documents; (e) such other transactions that are required to effectuate the Restructuring Transactions including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; and (f) all other actions that the Reorganized Debtors reasonably determine are necessary or appropriate. For the purposes of effectuating this Plan, none of the Restructuring Transactions contemplated herein shall constitute a change of control under any agreement, contract, or document of the Debtors.

### Section 4.4      *Continued Corporate Existence.*

Except as otherwise provided in this Plan, or as otherwise may be agreed between the Debtors and the Required Consenting Senior Noteholders, each Debtor, as a Reorganized Debtor, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with a Reorganized Debtor, each Reorganized Debtor may, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing:

(a) the Reorganized Debtor to be merged into another Debtor or one or more of its Affiliates; (b) the Reorganized Debtor to be dissolved; (c) the conversion of the Reorganized Debtor from one entity type to another entity type; (d) the legal name of the Reorganized Debtor to be changed; (e) the closure of the Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (f) the reincorporation of the Reorganized Debtor under the Law of a jurisdiction other than the Law under which the Debtor is currently incorporated.

Section 4.5   *Private Company*

The Reorganized Company (a) shall emerge from the Chapter 11 Cases on the Effective Date as a private company and the Reorganized Common Equity shall not be listed on a public stock exchange, (b) shall not be a public reporting company pursuant to the Exchange Act and the rules and regulations promulgated thereunder, nor shall it be voluntarily subjected to any reporting requirements promulgated by the SEC, and (c) shall not be required to list the Reorganized Common Equity on a U.S. or any foreign stock exchange.  To the extent the following actions have not been completed on or prior to the Effective Date, the Reorganized Company shall (i) take all actions reasonably necessary or desirable to delist the Existing Common Interests from the Nasdaq Global Select Market and to deregister under the Exchange Act as promptly as practicable in compliance with SEC rules, (ii) file post-effective amendments to terminate all of the Company's and Reorganized Company's effective registration statements under the Securities Act and deregister any and all unsold securities thereunder, (iii) file a Form 15 to terminate the Debtors' registration under the Exchange Act and to suspend the Debtors' reporting obligations under the Exchange Act with respect to the Existing Common Interests, and (iv) take all actions reasonably necessary or desirable to ensure (A) that the Reorganized Common Equity shall not be listed on a public securities exchange and that the Reorganized Debtors shall not be required to list the Reorganized Common Equity on a recognized securities exchange, except, in each case, as otherwise may be required pursuant to the New Organizational Documents, as applicable, and (B) that the Reorganized Debtors shall not be voluntarily subjected to any reporting requirements promulgated by the SEC.

Section 4.6   *Corporate Action.*

(a)   On the Effective Date, all actions contemplated by this Plan and the Restructuring Transactions shall be deemed authorized and approved in all respects, including:  (i) the selection of the managers or directors, as applicable, and officers of the Reorganized Debtors; (ii) the issuance  of the Reorganized Common Equity under this Plan, including pursuant to the Equity Rights Offering and the Common Equity Convenience Buyout, and any related fees in connection therewith; (iii) the execution and entry into the Exit Facility Documents, the Equity Rights Offering Documents, the New Organizational Documents, and the Common Equity Convenience Buyout Documents; and (iv) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in this Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with this Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized Debtors, or otherwise.

(b)     On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, securities, certificates of conversion, certificates of formation, certificates of incorporation, operating agreements, and instruments contemplated by this Plan  (or necessary or desirable to effect the transactions contemplated by this Plan) in the name and on behalf of the Reorganized Debtors, including the New Organizational Documents, the Exit Facility Documents, the Equity Rights Offering Documents, the Common Equity Convenience Buyout Documents, and any and all agreements, documents, securities, and instruments relating to the foregoing.

(c)     The authorizations and approvals contemplated by this <u>Section 4.6</u> shall be effective notwithstanding any requirements under non-bankruptcy Law.

Section 4.7     *Vesting of Assets.*

Except as otherwise provided in (a) this Plan, (b) the Confirmation Order, (c) with respect to the Liens securing the DIP Facility, which Liens shall be retained by the DIP Agent to secure the Exit Facility and any remaining obligations under the DIP Facility, or (d) any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to the Plan or the Plan Supplement, on the Effective Date, all property of the Estates of the Debtors, including all Claims, Intercompany Interests, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with this Plan, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of this Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Intercompany Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

Section 4.8     *Indemnification Provisions in Organizational Documents.*

Any D&O Liability Insurance Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) pursuant to which any of the Debtors' current or former directors, officers, managers, or other employees are insured shall remain in force through the expiration of any such Insurance Policy (or "tail policy," as applicable).

On or before the Effective Date, to the extent not already obtained, the Debtors shall obtain a new D&O Liability Insurance Policy and a "tail policy" for the existing D&O Liability Insurance Policy for the benefit of the Debtors' current and former directors, officers, managers, or other employees on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement, and at an expense reasonably acceptable to the Debtors and the Required Consenting Senior Noteholders.  Alternatively, if the D&O Liability Insurance Policy has not expired, the Debtors shall assume (and assign to the Reorganized Debtors if necessary), pursuant to section 365(a) of the Bankruptcy Code, pursuant to the terms of the Plan and Confirmation Order, the D&O Liability Insurance Policy.

31

All Indemnification Obligations (and provisions) currently in place (whether in the by-laws, certificates of incorporation, articles of limited partnership, limited liability company agreements, board resolutions, management agreements or employment or indemnification contracts, or otherwise) for the current and former directors, officers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors' and officers' respective affiliates shall be assumed by the Debtors pursuant to the provisions in <u>Article V</u> herein, to the extent assumable, and shall remain obligations of the Reorganized Debtors, irrespective of when such obligation arose.

No Reorganized Debtor shall amend or restate its certificate of incorporation, bylaws, or similar organizational document after the Effective Date to terminate or materially adversely affect (a) any Reorganized Debtor's obligations referred to in this <u>Section 4.8</u> or (b) the rights of such managers, directors, officers, employees, or agents referred to in this <u>Section 4.8</u>.

*Section 4.9      Cancellation of Existing Securities and Agreements.*

(a)      On the Effective Date, except as otherwise specifically provided for in this Plan or the Confirmation Order, including, for the avoidance of doubt, with respect to the Exit Facility Documents and the Liens securing the DIP Facility, which Liens shall be retained by the DIP Agent to secure the Exit Facility and any remaining obligations under the DIP Facility: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to this Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder, except, with respect to the Senior Notes Documents, as necessary to (a) enforce the rights, claims and interests of the applicable Trustee and any predecessor thereof vis-a-vis parties other than the Released Parties; (b) allow the receipt of and to make distributions under the Plan in accordance with the terms of the Senior Notes Documents, as applicable; (c) to permit the applicable Trustee to preserve any rights of the applicable Trustee and any predecessor thereof as against any money or property distributable to Holders of Senior Notes Claims; (d) permit the Trustee to seek compensation and reimbursement for any function necessary to effectuate the foregoing; (e) preserve any rights of the Trustee to payment of fees, expenses, and indemnification obligations as against any distributions, including any rights to priority of payment and/or to exercise charging liens pursuant to the Senior Notes Documents and enforce its rights, claims, and interests, vis-à-vis any party other than the Debtors; and (f) allow the applicable Trustee to appear and participate in the Chapter 11 Cases or any other proceeding with respect to clauses (a) through (e) above, as applicable, and any other proceedings or appeals related to the Plan; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the

32

Debtors that are specifically Reinstated or assumed pursuant to this Plan, if any) shall be released and discharged; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, any agreement that governs the rights of a Holder of a Senior Notes Claim shall also continue in effect to allow the applicable Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court to enforce the respective obligations owed to such parties under the Plan. Holders of or parties to such cancelled or terminated certificates, shares, notes, bonds, agreements, indentures, purchase rights, options, warrants, or other instruments or documents directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest shall have no rights arising from or related thereto, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to this Plan or the Confirmation Order.

(b)    Notwithstanding such cancellation and discharge, subject to the applicable provisions of this Plan and the Confirmation Order:

(i)    The interests of the Debtors or Reorganized Debtors, as applicable, in their direct and indirect subsidiaries shall remain unaffected by this Plan.

(ii)    The DIP Facility Documents shall continue in effect solely for purposes of allowing the DIP Agent to (A) receive distributions from the Debtors under this Plan and to make further distributions to the Holders of the DIP Claims on account of such DIP Claims, as set forth in Article VI hereof; (B) enforce its interests with respect to the DIP Lenders; (C) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of DIP Claims, including any rights to priority of payment with respect to the DIP Lenders; and (D) appear and be heard in the Bankruptcy Court or in any other court of competent jurisdiction to enforce any obligation owed to the DIP Agent or Holders of DIP Claims under this Plan.

Except for the foregoing, subject to the performance by the applicable Trustee and the DIP Agent of their obligations under the Plan, such Trustee and DIP Agent and their agents shall be relieved of all further duties and responsibilities related to the Senior Notes Documents upon the occurrence of the Effective Date and the 2026 Senior Notes Indenture, 2028 Senior Notes Indenture, and 2029 Senior Notes Indenture shall automatically be terminated (*provided*, that the Surviving Senior Notes Provisions shall survive in accordance with the terms of the Senior Notes Documents).

Section 4.10    *Cancellation of Certain Existing Security Interests*.

(a)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim or Allowed DIP Claim or promptly thereafter, the Holder of such Claims shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of the Debtors held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Claims that may be reasonably required to terminate any related financing statements, guaranties, mortgages, mechanics' or other Liens, or *lis pendens*, or similar interests or documents.

33

(b)      Furthermore, upon full payment or other satisfaction of the foregoing Claims, on or after the Effective Date, the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, or evidence the release of any and all guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests with respect to such Claims, including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any guaranties, mortgages, deeds of trust, Liens, pledges, and other security interests, including, without limitation, UCC-3 termination statements.

Section 4.11    Approval of the Exit Facility and the Exit Facility Documents.

(a)      On the Effective Date, the Reorganized Debtors' funded debt shall consist of the Exit Facility.  The Reorganized Debtors may use the Exit Facility for any purpose permitted by the Exit Facility Documents, including the funding of obligations under this Plan and satisfaction of ongoing working capital needs.

(b)      Confirmation of this Plan shall be deemed to constitute approval of the Exit Facility, the Exit Facility Documents (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein), and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the Exit Facility Documents, and such other documents as may be reasonably required or appropriate, in each case, in accordance therewith.

(c)      The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.

(d)      On the Effective Date, all of the Liens and security interests granted or to be granted in accordance with the Exit Facility Documents shall:  (i) be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents; (ii) be deemed automatically, without any further action being required by the Debtors, the Reorganized Debtors, or any of the lenders under the Exit Facility, perfected on the Effective Date on a first-priority basis, subject only to (solely with respect to the first-priority nature of such Liens and security interests) such Liens and security interests as may be permitted to be senior thereto under the Exit Facility Documents; and (iii) not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Debtors and the Entities granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary

34

to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

Section 4.12    *Issuance of the Reorganized Common Equity.*

(a)    Units of the Reorganized Common Equity (including the Direct Investment Shares and the Reorganized Common Equity issuable as Senior Notes Claim Equity Recovery or (i) upon the exercise of the Subscription Rights in the Equity Rights Offering, (ii) on account of the Equity Rights Offering Backstop Commitment, the Equity Rights Offering Backstop Premium, and the Common Equity Convenience Buyout Premium, or (iii) in the Common Equity Convenience Buyout, as applicable) shall be authorized under the New Organizational Documents.  Units of the Reorganized Common Equity shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with this Plan.  All such Reorganized Common Equity issuable in accordance with this Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  The issuance of the Reorganized Common Equity is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Interest.  All Holders of Reorganized Common Equity, however issued, shall be deemed to be a party to, and bound by, the New Shareholders Agreement and the other applicable New Organizational Documents, in accordance with their terms, without the requirement to execute a signature page thereto.

(b)    All Existing Common Interests outstanding prior to Consummation (including all rights exchangeable or exercisable for shares of Existing Common Interests) shall be extinguished upon Consummation, and Holders thereof shall not receive any payment or property on account of any such shares of capital stock.

Section 4.13    *Rights Offering.*

(a)    The Equity Rights Offering shall be conducted by the Debtors or Reorganized Debtors and consummated in accordance with this Plan and on the terms and subject to the conditions set forth in the Equity Rights Offering Procedures and the related subscription form and the Equity Rights Offering Backstop Commitment Agreement.  The Equity Rights Offering shall be fully backstopped by the Equity Rights Offering Backstop Parties in accordance with and subject to the terms and conditions of the Equity Rights Offering Backstop Commitment Agreement.

(b)    In accordance with the Equity Rights Offering Procedures, the Debtors shall distribute the Subscription Rights to holders of Senior Notes Claims to purchase Reorganized Common Equity in an amount equal to the Equity Rights Offering Amount.  In accordance with this Plan, the Equity Rights Offering Backstop Commitment Agreement, and the Equity Rights Offering Procedures and the related subscription form, (i) each Holder of a Senior Notes Claim shall be offered Subscription Rights entitling it to subscribe for and purchase its Pro-Rata Share of

shares of Reorganized Common Equity in an aggregate amount equal to 55% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Non-Holdback Rights Offering Amount"), and (ii) the Equity Rights Offering Holdback Parties will agree to purchase (based on the respective amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) their respective portion of shares of Reorganized Common Equity in the Equity Rights Offering in an aggregate amount equal to 45% of the Equity Rights Offering Amount (exclusive of the Equity Rights Offering Backstop Premium) (such amount, the "Holdback Rights Offering Amount" and such aggregate number of Equity Rights Offering Shares to be purchased on account of the Holdback Rights Offering Amount, the "Direct Investment Shares").  The Equity Rights Offering Shares will be offered in the Equity Rights Offering for Cash at the Equity Rights Offering Share Price, which reflects the plan equity value per share after discounting by 35% the pre-rights offering proceeds valuation portion thereof.

(c)     The Subscription Rights are not detachable from the Senior Notes Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights) (such acts, collectively, "transfer" or "transferred"), except, in the case of the Equity Rights Offering Backstop Parties, as set forth in the Equity Rights Offering Backstop Commitment Agreement.  Any transfer following the subscription record date of the corresponding Senior Note Claim (except as provided in the Equity Rights Offering Procedures) shall void the Subscription Right, and neither the transferring party nor the purported transferee will receive any Equity Rights Offering Shares otherwise purchasable on account of such transferred Subscription Rights.

(d)     To facilitate the Equity Rights Offering and in exchange for the Equity Rights Offering Backstop Premium, the Equity Rights Offering Backstop Parties, all of whom are QIBs, and/or Accredited Investors, have entered into the Equity Rights Offering Backstop Commitment Agreement.  In accordance with the Equity Rights Offering Backstop Commitment Agreement and subject to the terms and conditions thereof, (i) each of the Equity Rights Offering Backstop Parties and the Equity Rights Offering Holdback Parties shall fully exercise all of its Subscription Rights, (ii) each of the Equity Rights Offering Holdback Parties shall purchase its portion of the Direct Investment Shares in accordance with the Equity Rights Offering Backstop Commitment Agreement; and (iii) each of the Equity Rights Offering Backstop Parties shall purchase its respective share (in accordance with the amounts and percentages applicable thereto as set forth in the Equity Rights Offering Backstop Commitment Agreement) of any Equity Rights Offering Shares that are not subscribed and purchased by the Holders of Allowed Senior Notes Claims in the Equity Rights Offering.  In exchange for providing the above commitments under the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Backstop Parties will receive their respective allocations of the Equity Rights Offering Backstop Premium.  The Equity Rights Offering Backstop Commitment shall be treated as a put option and the Equity Rights Offering Backstop Premium shall be treated as remuneration for agreeing to enter into such put option.  The Equity Rights Offering Backstop Premium shall be paid in accordance with the Equity Rights Offering Backstop Commitment Order.

(e)     The proceeds of the Equity Rights Offering shall be used to (1) fund Plan distributions, (2) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes, and (3) pay all reasonable and documented Professional Fee Claims, Restructuring Expenses, and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel.

(f)     Distribution of Reorganized Common Equity pursuant to the Equity Rights Offering, the Equity Rights Offering Backstop Commitment Agreement (including as payment of the Equity Rights Offering Backstop Premium), or the Plan may be made by means of book-entry registration on the books of the Reorganized Debtors or a transfer agent for the Reorganized Common Equity, or by means of book-entry exchange through the facilities of a depositary or transfer agent reasonably satisfactory to the Debtors and the Required Consenting Senior Noteholders, in accordance with the customary practices of such agent, as and to the extent practicable.  Any Entity's acceptance of Reorganized Common Equity in connection with the Equity Rights Offering (including as payment of Equity Rights Offering Backstop Premium) shall be deemed as its agreement to the New Organizational Documents, including the New Shareholders Agreement, if any.  The New Organizational Documents may be amended or modified from time to time following the Effective Date in accordance with their respective terms.

(g)     In order to subscribe to the Equity Rights Offering pursuant to this Section 4.13 with respect its Allowed Senior Notes Claims, a Holder of an Allowed Senior Notes Claim will be required to tender all of the underlying Senior Notes into a contra-CUSIP pursuant to DTC's ATOP procedures by the deadline specified in the Equity Rights Offering Documents, and the Senior Notes that are tendered into the contra-CUSIP will no longer be transferable.

(h)     Entry of the Equity Rights Offering Backstop Commitment Order shall constitute Bankruptcy Court approval of the Equity Rights Offering and the Equity Rights Offering Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the issuance of Reorganized Common Equity pursuant thereto and the payment of all fees, indemnities, expenses, and other payments provided for in connection therewith, and authorization of the Reorganized Debtors to enter into and execute any other documents necessary to effectuate the transactions in this Section 4.13.

Section 4.14     Common Equity Convenience Buyout.

(a)     The Common Equity Convenience Buyout shall be conducted by the Debtors and consummated in accordance with this Plan and on the terms and subject to the conditions set forth in the Common Equity Convenience Buyout Procedures and the Equity Rights Offering Backstop Commitment Agreement.  The Common Equity Convenience Buyout shall be fully backstopped by the Equity Rights Offering Backstop Parties in accordance with and subject to the terms and conditions of the Equity Rights Offering Backstop Commitment Agreement.

(b)     In accordance with the Common Equity Convenience Buyout Procedures and this Plan, any Holder of an Allowed Senior Notes Claim may (solely at the option of such Holder) elect the Senior Notes Claim Cash Option in lieu of the Senior Notes Claim Equity Recovery such Holder would otherwise be entitled to receive under this Plan; *provided*, that only Holders which

vote to accept the Plan are eligible to elect the Senior Notes Claim Cash Option, absent the consent of the Debtors and the Required Consenting Senior Noteholders.

(c)     Pursuant to the Equity Rights Offering Backstop Commitment Agreement, the Equity Rights Offering Backstop Parties, all of whom are QIBs, and/or Accredited Investors, have agreed to (i) refrain from electing the Senior Notes Claim Cash Option, and (ii) fund on or prior to the Effective Date, severally but not jointly, their respective shares (as set forth in the Equity Rights Offering Backstop Commitment Agreement) of the incremental capital necessary to fund the aggregate Senior Notes Claim Cash Amount, up to the Common Equity Convenience Buyout Cap, in exchange for (x) shares of Reorganized Common Equity issued by the Reorganized Company that would have otherwise been issued to Holders of Allowed Senior Notes Claims that elected the Senior Notes Claim Cash Option pursuant to clause (A) of the Senior Notes Claim Equity Recovery minus the number of shares of Reorganized Common Equity issued to Holders of Allowed Senior Notes Claims that elected the Senior Notes Claim Cash Option on account of the Cash-Out Reduction (the "Common Equity Convenience Buyout Shares") and (y) the Common Equity Convenience Buyout Premium.  The Equity Rights Offering Backstop Commitment shall be treated as a put option and the Common Equity Convenience Buyout Premium shall be treated as remuneration for agreeing to enter into such put option.  The Common Equity Convenience Buyout Premium shall be paid in accordance the Equity Rights Offering Backstop Commitment Order.

(d)     To the extent any Senior Notes Claim Cash Option is elected, the Common Equity Convenience Buyout Shares will instead be issued and sold by Reorganized Debtors to the Equity Rights Offering Backstop Parties funding the Senior Notes Claim Cash Amount, for Cash equal to the aggregate Senior Notes Claim Cash Amount.  For the avoidance of doubt, the Equity Rights Offering Backstop Parties shall not be required or authorized to fund more than an amount equal to the aggregate Common Equity Convenience Buyout Cap.

(e)     In order to elect to receive the Senior Notes Claim Cash Option pursuant to this Section 4.14 with respect all of its Allowed Senior Notes Claim, a Holder of an Allowed Senior Notes Claim will be required to tender all of the underlying Senior Notes into a contra-CUSIP pursuant to DTC's ATOP procedures by the deadline specified in the Common Equity Convenience Buyout Documents, and the Senior Notes that are tendered into the contra-CUSIP will no longer be transferable.

(f)     Entry of the Equity Rights Offering Backstop Commitment Order shall constitute Bankruptcy Court approval of the Common Equity Convenience Buyout and the Common Equity Convenience Buyout Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the issuance of Reorganized Common Equity pursuant thereto and the payment of all fees, indemnities, expenses, and other payments provided for in connection therewith, and authorization of the Reorganized Debtors to enter into and execute any other documents necessary to effectuate the transactions in this Section 4.14.

Section 4.15    *Exemption from Registration Requirements.*

The issuance, and distribution of the Subscription Rights and the Reorganized Common Equity under the Plan, including in connection with the Equity Rights Offering, shall be exempt from registration requirements under Securities Act, or any state or local law requiring registration for offer and sale of a security, in reliance upon the exemption provided in section 1145(a) of the Bankruptcy Code to the maximum extent permitted by law, or, if section 1145(a) of the Bankruptcy Code is not available, then the Reorganized Common Equity will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws.

Any Reorganized Common Equity issued on account of the Common Equity Convenience Buyout Shares, any Reorganized Common Equity that is unsubscribed in the Equity Rights Offering and issued to the Equity Rights Offering Backstop Parties pursuant to the Equity Rights Offering Backstop Commitment Agreement on account of the Equity Rights Offering Backstop Commitment, any Direct Investment Shares, and any Reorganized Common Equity issued to an entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code (collectively, the "Placement Securities") shall be issued in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. The Subscription Rights and all of the Reorganized Common Equity issuable under the Plan other than the Placement Securities (collectively, the "1145 Securities") shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Subject to the transfer provisions, if any, and other applicable provisions of the New Organizational Documents, the Reorganized Common Equity comprising 1145 Securities may be resold without registration under the Securities Act or other federal securities Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder (i) is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy code, (ii) is an "affiliate" of the Reorganized Debtors (as defined in rule 144(a)(1) in the Securities Act), or (iii) has been such an "affiliate" within ninety (90) days of such transfer. In addition, subject to the transfer provisions, if any, and other applicable provisions of the New Organizational Documents, such 1145 Securities may generally be resold without registration under state securities laws pursuant to various exemptions provided by the respective Laws of the several states.

The Placement Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the New Shareholders Agreement, if any, and the New Organizational Documents.

Neither the Debtors, the Reorganized Company, or any other Person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the

treatment of the Reorganized Common Equity under applicable securities laws. DTC and any transfer agent (as applicable) shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Common Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable).

Notwithstanding anything to the contrary in this Plan, no Person (including DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Reorganized Common Equity are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Section 4.16    *Organizational Documents.*

On the Effective Date, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of this Plan. The New Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code.

Section 4.17    *Exemption from Certain Transfer Taxes and Recording Fees.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from the Debtors to the Reorganized Debtors or to any Entity pursuant to, in contemplation of, or in connection with this Plan, the Restructuring Transactions, or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors, including the Reorganized Common Equity, (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means, including the grant of collateral as security for any or all of the Exit Facility; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, this Plan.

Section 4.18    *Managers, Directors and Officers of the Reorganized Debtor.*

Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of any Debtor is designated in the Plan Supplement to serve as a director, manager, or sole manager of the Reorganized Debtors on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of any Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the

Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager, or sole manager of the Reorganized Debtors on the Effective Date.

Each of the directors, managers, sole managers and officers of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of the Reorganized Debtors and may be designated, replaced, or removed in accordance with such New Organizational Documents. The members of the Reorganized Board, if known, shall be disclosed prior to the Combined Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

Section 4.19   *Incentive Plans.*

(a)     All existing equity incentive plans of the Debtors shall be terminated, or deemed terminated, as of the Effective Date.

(b)     The Reorganized Company shall reserve for senior management a pool of 10% of the fully diluted Reorganized Common Equity that is issued and outstanding on the Effective Date for a post-Effective Date Management Incentive Plan.

(c)     It is also expected that the Reorganized Company will provide a long-term incentive program with employee participation in continuation of historical practice and the Reorganized Board shall determine the performance criteria, structure, and form of compensation, in consultation with compensation consultant(s) and key holders of Reorganized Common Equity as appropriate.

Section 4.20   *Effectuating Documents; Further Transactions.*

(a)     Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the board of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the Restructuring Support Agreement, the Exit Facility Documents, the Equity Rights Offering Documents, the Common Equity Convenience Buyout Documents, the New Organizational Documents, and any other securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

(b)     The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

Section 4.21   *Restructuring Expenses and DIP Facility Expenses.*

The Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel, and the Restructuring Expenses

and fees and expenses payable to the Trustee, including fees and expenses of counsel, shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without any requirement to file a fee application with the Bankruptcy Court, without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents and to the Trustee, including fees and expenses of counsel, to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date (or such other period as the Debtors and the Required Consenting Senior Noteholders may reasonably agree); *provided*, that such estimate shall not limit any party's entitlement to be paid or repaid its Restructuring Expenses or fees and expenses payable to the DIP Agent under the DIP Facility Documents or to the Trustee, including fees and expenses of counsel.  On or as soon as reasonably practicable after the Effective Date (but no later than thirty (30) days after the Effective Date), final invoices for all Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents or to the Trustee, including fees and expenses of counsel incurred prior to and as of the Effective Date, shall be submitted to the Debtors.

Section 4.22    *Retained Causes of Action.*

(a)    Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Plan, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such retained Causes of Action or Claims and may exercise any and all rights in connection therewith. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Section 4.22 include any Claim or Cause of Action with respect to, or against, a Released Party that is released under the Plan.

(b)    **No Entity may rely on the absence of a specific reference in this Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  Unless any such Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan, Confirmation Order, or a Final Order, all such Causes of Action shall be expressly reserved by the Reorganized Debtors for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation of this Plan.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

# ARTICLE V.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1    *Assumption of Executory Contracts and Unexpired Leases.*

(a)    All Executory Contracts and Unexpired Leases of the Debtors shall be assumed absent an objection as set forth in Section 5.2 hereof or an order requiring rejection, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code as of the Effective Date, except for those Executory Contracts and Unexpired Leases that, in each case, (i) have been assumed or rejected by the Debtors by prior order of the Bankruptcy Court, (ii) are the subject of a motion to reject filed by the Debtors pending on the Effective Date, (iii) are identified as rejected Executory Contracts and Unexpired Leases by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases to be filed in the Plan Supplement, which may be amended by the Debtors up to and through the Effective Date to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court a subsequent Plan Supplement and serving it on the affected non-Debtor contract parties; or (iv) are rejected or terminated pursuant to the terms of this Plan.  Each Executory Contract and Unexpired Lease shall be fully enforceable by the Reorganized Debtors in accordance with the terms thereof, except as otherwise modified by the provisions of this Plan, or by any order of the Bankruptcy Court.

(b)    The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption of all Executory Contracts or Unexpired Leases, as described in this Plan, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assumption and assignment, or rejection, as the case may be, is in the best interests of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied.  Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to this Plan are effective as of the Effective Date.

(c)    Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests.  To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in

43

connection therewith.

Section 5.2    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

(a)      Unless otherwise agreed in writing by such counterparty, any monetary defaults that are required to be cured to assume an Executory Contract or Unexpired Lease shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code in the ordinary course of business.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely raise any objection that could have been raised under section 365 of the Bankruptcy Code shall be deemed to have consented to the Debtors' assumption of such Executory Contract or Unexpired Lease, to the extent any such consent is required, and all such counterparties shall be forever enjoined and barred from objecting to the Debtors' assumption of such Executory Contract or Unexpired Lease for any reason.

(b)      If there is a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (iii) any other matter pertaining to assumption, then the Bankruptcy Court shall retain jurisdiction in all respects to hear such disputes; *provided* that the occurrence of any such dispute shall not prevent or delay Confirmation or Consummation of this Plan; *provided further* that the Debtors may settle any such dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court; *provided further* that notwithstanding anything to the contrary herein, the Debtors reserve the right to either reject or nullify the assumption of any Executory Contract or Unexpired Lease within forty-five (45) days after the entry of a Final Order resolving an objection to assumption, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolving any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

(c)      Assumption of any Executory Contract or Unexpired Lease pursuant to this Plan or otherwise, and the continued performance thereunder (or the payment of a Cure Cost, if any), shall result in the full release, satisfaction, and cure of any defaults thereunder, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of such assumption or assumption and assignment.  Any and all Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure Cost has been fully paid pursuant to this Section 5.2, shall be deemed Disallowed and expunged as of the Effective Date, without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

Section 5.3    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*.

If the rejection by the Debtors, pursuant to this Plan or otherwise, of an Executory Contract or Unexpired Lease gives rise to a Claim, a Proof of Claim must be served upon the Debtors and their counsel within thirty (30) days after the earlier of (i) notice of entry of the Confirmation Order or (ii) other notice that the Executory Contract or Unexpired Lease has been rejected.  Any Claims

not served within the applicable time period will be forever barred from assertion against the Debtors, the Reorganized Debtors, their Estates, and their property.

Section 5.4    *Indemnification Obligations.*

Any and all Indemnification Obligations of the Debtors, including pursuant to its corporate charter, agreements, bylaws, memorandum, or other organizational documents, or board resolutions, employment contracts, or other agreements for the directors, officers, managers, employees, attorneys, other professionals, and agents employed by the Debtors to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors based upon any act or omission for or on behalf of the Debtors shall remain in full force and effect to the maximum extent permitted by applicable Law and shall not be discharged, impaired, or otherwise affected by this Plan.  All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations in this Section 5.4 herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

Section 5.5    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, shall be performed by the Debtors or Reorganized Debtors liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

Section 5.6    *Insurance Policies.*

All Insurance Policies pursuant to which the Debtors have any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to this Plan and shall be assumed by the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

Section 5.7    *Reservation of Rights.*

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors have any liability thereunder.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1    *Distribution on Account of Claims and Interests Allowed as of the Effective Date.*

Except as otherwise provided in this Plan or a Final Order, or as agreed to by the relevant parties receiving such distributions, distributions under this Plan on account of Claims Allowed on or before the Effective Date shall be made on the Distribution Date; *provided* that (a) Allowed

Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or arising under Executory Contracts or Unexpired Leases assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, orders, course of dealing, course of business, or industry practice and (b) in accordance with Article II of this Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between a Debtor and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

> **Section 6.2    *Distribution on Account of Claims and Interests Allowed After the Effective Date.***

(a)    *Payments and Distributions on Disputed Claims*.  Except as otherwise provided in this Plan, a Final Order, or as agreed to by the relevant parties, distributions under this Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the first day that is thirty (30) Business Days after the Disputed Claims become Allowed Claims; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims and paid in the ordinary course of business.

(b)    *Special Rules for Distributions to Holders of Disputed Claims*.  Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

(c)    *Timing and Calculation of Amounts to Be Distributed*.  Except as otherwise provided herein, on the Distribution Date (or if a Claim is not an Allowed Claim on the Distribution Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that this Plan provides for such Allowed Claims in the applicable Class.  Except as otherwise provided in this Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

> **Section 6.3    *Delivery of Distributions*.**

(a)    *Record Date for Distributions*.  On the Distribution Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business

on the Distribution Date, provided, that the foregoing shall not apply to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Notes Claims), as to which distributions may be made on or promptly after the Distribution Date in accordance with the applicable procedures of DTC.

(b)  *Delivery of Distributions in General*.  Except as otherwise provided in this Plan, including with respect to any publicly held securities held in the name of, or by a nominee of, DTC (including, without limitation, the Senior Notes Claims), as to which distributions may be made on or promptly after the Distribution Date in accordance with the applicable procedures of DTC, distributions to Holders of Allowed Claims shall be made to Holders of record as of the Distribution Date by the Reorganized Debtors at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; *provided further* that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder.  All securities to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent or the Reorganized Debtors in accordance with the New Organizational Documents.

(c)  *Delivery of Distributions on Account of Senior Notes Claims*.  Cash distributions on account of the Senior Notes Claims in Class 3 on account of the Senior Notes Claims Cash Option may be made by the Debtors directly to Holders of the Senior Notes who have tendered their underlying Senior Notes into a contra-CUSIP as specified in Section 4.14(e) hereof or to the applicable Trustee for further distribution as directed in writing by the Debtors with specific instructions provided to the Trustee by the Debtors to be sent by the Trustee to DTC in order to allow DTC to make distributions to Holders who have tendered their underlying Senior Notes into a contra-CUSIP as specified in Section 4.14(e) hereof.  Distributions other than Cash shall be made directly to applicable Holders of Senior Notes and will not be made to or by the Trustee, and the Trustee shall have no responsibility with respect to such distributions.  All distributions shall be subject in all respects to the rights of the Trustee to assert its charging lien against such distributions as set forth in the 2026 Senior Notes Indenture, 2028 Senior Notes Indenture, and 2029 Senior Notes Indenture.  The Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible, and the Debtors and Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of any Senior Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date, or as soon as reasonably practicable thereafter.  Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, no Trustee shall have any liability to any Entity with respect to distributions made or directed to be made by such Trustee pursuant to this Plan.  The Reorganized Debtors shall reimburse the Trustee promptly upon invoicing for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred on or after the Effective Date in connection with the implementation of the Plan, including making distributions pursuant to, and in accordance with, the Plan, without the need for further approval or order of the Bankruptcy Court.

(d)      *Delivery of Distributions on Account of DIP Claims*.  The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent.  As soon as practicable following compliance with the requirements set forth in Article VI hereof (as applicable), the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facility, subject to any modifications to such distributions in accordance with the terms of this Plan. Notwithstanding anything in this Plan to the contrary, and without limiting the exculpation and release provisions of this Plan, the DIP Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Agent.

Section 6.4      *Minimum Distributions*.

No fractional units of Reorganized Common Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to this Plan on account of an Allowed Claim would otherwise result in the issuance of a number of units of Reorganized Common Equity that is not a whole number, the actual distribution of units of Reorganized Common Equity shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized units of Reorganized Common Equity to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

Section 6.5      *Foreign Currency Exchange Rate*.

Except as otherwise provided in a Final Order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

Section 6.6      *Delivery of Distributions; Undeliverable Distributions.*

(a)      Pursuant to Section 3.3(d) hereof, Holders of Allowed General Unsecured Claims may receive payment in full in Cash paid in the ordinary course of business if (i) not otherwise Reinstated, (ii) not given other less favorable treatment as reasonably agreed to by the Debtors and the Required Consenting Senior Noteholders, or (iii) not given such other treatment in rendering its Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.  Distributions to Holders of Allowed General Unsecured Claims shall be made by the Reorganized Debtors at the address set forth in the Reorganized Debtors' books and records. Distributions to Holders of Allowed Senior Notes Claims shall be made in accordance with Section 6.3 hereof.  If any Holder's distribution is returned as undeliverable, no further distributions to such Holder shall be made unless and until the Reorganized Debtors or applicable Trustee is notified of such Holder's then current address, at which time all missed distributions shall be made to such Holder without interest.  The applicable Trustee shall deliver any non-deliverable Cash to the Reorganized Debtors no later than ten (10) Business Days following the first anniversary of the Effective Date.  All Claims for undeliverable distributions must be made within one (1) year after the Effective Date, after which date the Claim of any Holder or successor to such Holder with

48

respect to such property will be discharged and forever barred. After such date, any unclaimed or undeliverable distribution of Cash to Holders of Allowed Claims shall become property of the Reorganized Debtors free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary. Any Reorganized Common Equity or amounts available pursuant to the Equity Rights Offering, Common Equity Convenience Buyout, or Exit Facility held for distribution shall be cancelled and of no further force or effect. Nothing contained in this Plan shall require the Reorganized Debtors or the Trustees to attempt to locate any Holder of an Allowed Claim.

(b)    *Failure to Present Checks*. Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the issuance of such check. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within ninety (90) days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the Reorganized Debtors or their property. Within ninety (90) days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors. Nothing contained herein shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

Section 6.7    *Compliance with Tax Requirements/Allocations.*

In connection with this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances, and such distributions shall be treated as if distributed to the applicable Holder of the Allowed Claim or Allowed Interest.

Section 6.8    *Surrender of Cancelled Instruments or Securities.*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Interest that is discharged by this Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtor. Except as otherwise expressly provided in this Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect (as modified pursuant to this Plan, to the extent applicable). Notwithstanding anything to the contrary herein, this

paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under this Plan.

Section 6.9    *Claims Paid or Payable by Third Parties.*

(a)    *Claims Paid by Third Parties*.   The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.   Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the date of any such distribution under this Plan.   The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14)-day grace period specified above until the amount is repaid.

(b)    *Claims Payable by Insurance*.   No distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' Insurance Policies, if any, until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policies.   To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, if any, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    *Applicability of Insurance Policies*.   Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.   Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS OR INTERESTS

Section 7.1    *No Filings of Proofs of Claim*

(a)    Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as provided otherwise in <u>Section 2.1</u> and <u>Section 5.3</u> of this Plan or by order of the Bankruptcy Court, Holders of Claims should not, and shall not be required to file Proofs of Claim with the Bankruptcy Court. The amount and validity of any disputed, contingent or unliquidated Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced and all of

the Debtors' legal and equitable rights in respect of any such Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced; *provided*, *however*, that the Debtors reserve the right to file with the Bankruptcy Court an objection to any Claim as to which the Holder of such Claim has filed a Proof of Claim in the Chapter 11 Cases; *provided further* that this <u>Section 7.1(a)</u> shall not apply to any objections or disputes, including any objection or dispute that could have been raised under section 365 of the Bankruptcy Code, with respect to the Debtors' assumption of Executory Contracts and Unexpired Leases under this Plan, and any such objections or disputes shall be subject in all respects to <u>Section 5.1</u> and <u>Section 5.2</u> of this Plan.  The Debtors shall be authorized to, and shall, resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having jurisdiction over the validity, nature, or amount thereof.

(b)       The Debtors or the Holder of a contingent or unliquidated Claim may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.   All of the aforementioned Claim objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

Section 7.2      *Allowance of Claims and Interests.*

(a)       Except as provided in <u>Article IX</u> hereof, the Reorganized Debtors after the Effective Date shall have and retain any and all rights and defenses the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date, except with respect to any Claim deemed Allowed under this Plan.

(b)       Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim.  All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019 or otherwise, shall be binding on all parties.

Section 7.3      *Prosecution of Objections to Claims.*

Except as otherwise specifically provided in this Plan or order of the Bankruptcy Court, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on

and after the Effective Date, the Reorganized Debtors shall have the sole authority:  (1) to file, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Section 7.4     *Adjustment of Claims and Interests Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, superseded, cancelled, or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the Debtors may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.5     *Disallowance of Certain Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due have been turned over or paid to the Reorganized Debtor.  All Proofs of Claim filed on account of an Indemnification Obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to this Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.6     *Offer of Judgment.*

The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.7      *Amendments to Claims or Interests.*

On or after the Effective Date, except as provided herein, a Claim or Interest may not be filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim or Interest filed shall be deemed Disallowed in full and expunged without any further action.

# ARTICLE VIII.
# CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1      *Conditions Precedent to the Effective Date.*

The following are conditions precedent to the Effective Date that must be satisfied, waived pursuant to Section 8.2 hereof, or are conditions that must be satisfied substantially contemporaneous with consummation of the Restructuring Transactions, as applicable:

(a)      the following documents shall be in full force and effect substantially contemporaneous with the consummation of the Restructuring Transactions, and shall not be stayed, modified, revised, or vacated, or subject to any pending appeal, and shall not have been terminated prior to the Effective Date:  (a) the New Organizational Documents; (b) the Exit Facility Documents; (c) the Equity Rights Offering Documents; (d) the Management Incentive Plan; (e) the Common Equity Convenience Buyout Documents; (f) such other motions, orders, agreements, and documentation necessary or desirable to consummate and document the transactions contemplated by the Restructuring Support Agreement and this Plan; (g) to the extent not included in the foregoing, all financing documents needed to effectuate the Restructuring Transactions, and (h) all other material customary documents delivered in connection with transactions of this type (including, without limitation, any and all other documents implementing, achieving, contemplated by or relating to the Restructuring Transactions);

(b)      (i) the Restructuring Support Agreement shall not have been terminated by any party thereto in accordance with the provisions thereof; (ii) the Restructuring Support Agreement shall not have been invalidated or deemed unenforceable by the Bankruptcy Court or any other Governmental Unit; and (iii) to the extent not otherwise waived, there shall not be continuing any properly noticed cure period with respect to any event, occurrence, or condition that would permit the Required Consenting Senior Noteholders to terminate the Restructuring Support Agreement in accordance with its terms following the end of such cure period;

(c)      each of the conditions precedent for consummation of the transactions contemplated in Section 7.1 of the Equity Rights Offering Backstop Commitment Agreement shall have been satisfied or waived in accordance with the terms thereof;

(d)      the Bankruptcy Court shall have entered the Confirmation Order, and the Confirmation Order shall be a Final Order;

(e)     the Bankruptcy Court shall have entered the Equity Rights Offering Backstop Commitment Order, and the Equity Rights Offering Backstop Commitment Order shall be a Final Order;

(f)     the Bankruptcy Court shall have entered the Disclosure Statement Order, and the Disclosure Statement Order shall be a Final Order;

(g)     the Bankruptcy Court shall have entered the DIP Orders, and the Final DIP Order shall be a Final Order;

(h)     no Default or Event of Default (each as defined in the DIP Credit Agreement or DIP Orders, as applicable) shall have occurred and be continuing under the DIP Credit Agreement or the DIP Order, as applicable, that has not been waived by the DIP Agent or cured by the Debtors in a manner consistent with the DIP Facility Documents;

(i)     each of (a) the Exit Facility, (b) the Equity Rights Offering, (c) the Common Equity Convenience Buyout, and (d) the Reorganized Common Equity shall have been issued or completed, as applicable, and any funding required thereunder shall have occurred substantially contemporaneously with consummation of the Restructuring Transactions, in each case, in accordance with the terms of the Restructuring Support Agreement, the Equity Rights Offering Documents, the Common Equity Convenience Buyout Documents, and the documents and agreements governing the same;

(j)     all documents, certificates, and agreements necessary to implement this Plan shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable Laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

(k)     all actions necessary to implement this Plan shall have been effected;

(l)     all requisite governmental, regulatory, and material third-party approvals, KYC requirements, and any other authorizations, consents, rulings, or documents required to implement and effectuate the Restructuring Transactions shall have been obtained;

(m)     there shall be no ruling, judgment, or order issued by any Governmental Unit making illegal, enjoining or otherwise preventing or prohibiting the consummation of the Restructuring Transactions;

(n)     the Professional Fee Escrow Account shall have been established and the Professional Fee Reserve Amount shall have been funded in accordance with this Plan;

(o)    the Debtors shall have paid in full in Cash (or the Debtors shall pay in full in Cash substantially contemporaneously with consummation of the Restructuring Transactions) all Restructuring Expenses and fees and expenses payable to the DIP Agent under the DIP Facility Documents, including fees and expenses of counsel incurred or estimated to be incurred, through the Effective Date;

(p)    the guarantees, mortgages, deeds of trust, Liens, pledges, or other security interests held by any Holders of Other Secured Claims shall be fully released and discharged (or will be fully released and discharged substantially contemporaneously with the consummation of the Restructuring Transactions);

(q)    the conditions to the effectiveness of the Exit Facility set forth in the Exit Facility Documents (other than the occurrence of the Effective Date) shall have been or contemporaneously will be satisfied or waived;

(r)    the conditions of the effectiveness of the Equity Rights Offering set forth in the Equity Rights Offering Documents (other than the occurrence of the Effective Date) shall have been satisfied or waived;

(s)    the Equity Rights Offering Backstop Commitment Agreement shall not have terminated as to all parties thereto and shall continue to be in full force and effect;

(t)    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein (and any amendment thereto) shall have been filed in a manner consistent with the consent rights contained herein; and

(u)    each Definitive Document shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Senior Noteholders (unless otherwise provided for herein).

For the avoidance of doubt, any condition that requires any agreement, order or document to be in full force and effect, or entered by the Bankruptcy Court, as applicable, shall include a requirement that such agreement, order or document is consistent with the Restructuring Support Agreement and otherwise in form and substance as set forth in the Restructuring Support Agreement.

*Section 8.2    Waiver of Conditions Precedent.*

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Required Consenting Senior Noteholders, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm this Plan. The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

### Section 8.3 *Effect of Failure of Conditions Precedent.*

If the Effective Date does not occur, then:  (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under this Plan, and any document or agreement executed pursuant to this Plan, shall be deemed null and void; and (c) nothing contained in this Plan, the Confirmation Order, or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

### Section 8.4 *Substantial Consummation of Plan.*

Substantial consummation of this Plan under section 1101(2) of the Bankruptcy Code shall be deemed to occur on the Effective Date.

## ARTICLE IX.
## EFFECT OF PLAN CONFIRMATION

### Section 9.1 *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind and inure to the benefit of the Debtors, the Reorganized Debtors, the Consenting Senior Noteholders, and each Holder of a Claim against or Interest in the Debtors or Reorganized Debtors and inure to the benefit of and be binding on the Debtors', Reorganized Debtors', the Consenting Senior Noteholders', and each Holder's respective successors and assigns, regardless of whether the Claim or Interest of such Holder is Impaired under this Plan and whether such Holder has accepted or rejected this Plan or is deemed to have accepted or rejected this Plan.

### Section 9.2 *Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their properties, including property of the Estates, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (i) a Proof of Claim is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is Allowed; or (iii) the Holder of such Claim or Interest has accepted or rejected, or been deemed to accept or reject, this

56

Plan.  Except as otherwise provided herein, any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in this Plan.

Section 9.3     Releases.

(a)     **_RELEASES BY THE DEBTORS_.**  **NOTWITHSTANDING ANYTHING CONTAINED IN THIS PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT TO ENFORCE THE PLAN, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING THE OBLIGATIONS OF THE DEBTORS UNDER THE PLAN AND THE CONTRIBUTIONS OF THE RELEASED PARTIES TO FACILITATE AND IMPLEMENT THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED BY AND ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, REPRESENTATIVES, AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURE OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE CHAPTER 11 CASES, THE DEBTORS, ANY RESTRUCTURING TRANSACTION, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF OR CLAIM AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, EXECUTION, FILING, SOLICITATION, ENTRY INTO, AND/OR**

CONSUMMATION OF THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP FACILITY, DIP CREDIT AGREEMENT, EXIT FACILITY, THE EQUITY RIGHTS OFFERING AND EQUITY RIGHTS OFFERING DOCUMENTS, THE COMMON EQUITY CONVENIENCE BUYOUT AND COMMON EQUITY CONVENIENCE BUYOUT DOCUMENTS, OR ANY RELATED CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE REORGANIZED COMMON EQUITY), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH IN THIS SECTION 9.3 SHALL NOT BE CONSTRUED AS (I) RELEASING ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED INTENTIONAL FRAUD (PROVIDED THAT FRAUD SHALL NOT EXEMPT FROM THE SCOPE OF THESE DEBTORS RELEASES ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER SECTIONS 544 OR 548 OF THE BANKRUPTCY CODE OR STATE LAWS GOVERNING FRAUDULENT OR OTHERWISE AVOIDABLE TRANSFERS OR CONVEYANCES), GROSS NEGLIGENCE, RECKLESSNESS OR WILLFUL MISCONDUCT, (II) RELEASING ANY CONTRACTUAL, POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR (III) TO THE EXTENT THE SPECIAL COMMITTEE OF CUTERA, INC. DETERMINES TO RECOMMEND THAT ANY DEBTOR SHOULD NOT GRANT RELEASES IN FAVOR OF ANY PARTY WITH RESPECT TO ANY CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING THOSE THAT ARE PROPOSED TO BE RELEASED HEREIN BY THE DEBTORS, ANY SUCH RELEASES GIVEN BY THE DEBTORS WILL BE NULL AND VOID AGAINST SUCH PARTY AND ITS RELATED PARTIES; *PROVIDED* HOWEVER, THAT NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 9.3, UPON THE RECOMMENDATION OF THE SPECIAL COMMITTEE OF CUTERA, INC., THE RELEASES SET FORTH IN THIS SECTION 9.3 MAY INCLUDE RELEASES IN FAVOR OF ANY RELEASED PARTY WITH RESPECT TO ANY CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND

**LIABILITIES WHATSOEVER, INCLUDING THOSE THAT ARE PROPOSED TO BE RELEASED HEREIN BY THE DEBTORS, INCLUDING THOSE IN THE ACTION STYLED <u>NIQUETTE V. HARRIS ET AL.</u>, CASE NO. 1:23-CV-01371 (DE).**

(b) ***<u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>.*** **NOTWITHSTANDING ANYTHING CONTAINED IN THIS PLAN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT TO ENFORCE THE PLAN, PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTEGRATED AFTER THE EFFECTIVE DATE, EACH RELEASING PARTY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED, AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ESTATES, AND THE RELEASED PARTIES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, REPRESENTATIVES, AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION ASSERTED OR THAT MAY BE ASSERTED ON BEHALF OF THE DEBTORS OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURE OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING ANY CLAIMS OR CAUSES OF ACTION BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE CHAPTER 11 CASES, THE DEBTORS, ANY RESTRUCTURING TRANSACTION, THE GOVERNANCE, MANAGEMENT, TRANSACTIONS, OWNERSHIP, OR OPERATION OF THE DEBTORS, THE PURCHASE, SALE OR RESCISSION OF ANY SECURITY OF OR CLAIM AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, EXECUTION, FILING, SOLICITATION, ENTRY INTO, AND/OR CONSUMMATION**

OF THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP FACILITY, DIP CREDIT AGREEMENT, EXIT FACILITY, THE EQUITY RIGHTS OFFERING AND EQUITY RIGHTS OFFERING DOCUMENTS, THE COMMON EQUITY CONVENIENCE BUYOUT AND COMMON EQUITY CONVENIENCE BUYOUT DOCUMENTS, OR ANY RELATED CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT (INCLUDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT, OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY RELEASED PARTY ON THE PLAN OR CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN OR CONFIRMATION ORDER, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE REORGANIZED COMMON EQUITY), OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN, OR ANY OTHER AGREEMENT, ACT OR OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH IN THIS SECTION 9.3 SHALL NOT BE CONSTRUED AS (I) RELEASING ANY RELEASED PARTY FROM CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION JUDICIALLY DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED INTENTIONAL FRAUD (PROVIDED THAT FRAUD SHALL NOT EXEMPT FROM THE SCOPE OF THESE RELEASES ANY CLAIMS OR CAUSES OF ACTION ARISING UNDER SECTIONS 544 OR 548 OF THE BANKRUPTCY CODE OR STATE LAWS GOVERNING FRAUDULENT OR OTHERWISE AVOIDABLE TRANSFERS OR CONVEYANCES), GROSS NEGLIGENCE, RECKLESSNESS OR WILLFUL MISCONDUCT, (II) RELEASING ANY CONTRACTUAL, POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY OR ENTITY UNDER THE PLAN, THE CONFIRMATION ORDER, ANY RESTRUCTURING TRANSACTION, OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN, OR (III) TO THE EXTENT THE SPECIAL COMMITTEE OF CUTERA, INC. DETERMINES TO RECOMMEND THAT ANY DEBTOR SHOULD NOT GRANT RELEASES IN FAVOR OF ANY PARTY WITH RESPECT TO ANY CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, ANY SUCH RELEASES GIVEN BY THE CONSENTING SENIOR NOTEHOLDERS WILL BE NULL AND VOID AND THE CONSENTING SENIOR NOTEHOLDERS WILL HAVE NO OBLIGATIONS TO OFFER OR CONSENT TO SUCH RELEASES OF SUCH PARTY OR ANY OF ITS RELATED PARTIES.

Section 9.4      *Exculpation and Limitation of Liability.*

WITHOUT AFFECTING OR LIMITING THE RELEASES SET FORTH IN SECTION 9.3 OF THIS PLAN, AND NOTWITHSTANDING ANYTHING HEREIN TO

THE CONTRARY, NO EXCULPATED PARTY SHALL HAVE OR INCUR LIABILITY FOR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PLAN, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE DIP FACILITY, DIP CREDIT AGREEMENT, EXIT FACILITY, THE EQUITY RIGHTS OFFERING AND EQUITY RIGHTS OFFERING DOCUMENTS, THE COMMON EQUITY CONVENIENCE BUYOUT AND COMMON EQUITY CONVENIENCE BUYOUT DOCUMENTS, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION OF ANY OF THE FOREGOING OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH ANY OF THE FOREGOING, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE SOLICITATION OF VOTES ON THE PLAN, OR PARTICIPATION IN THE COMMON EQUITY CONVENIENCE BUYOUT AND THE EQUITY RIGHTS OFFERING, THE PURSUIT OF CONSUMMATION OF THE PLAN, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE RELATED OR RELATING TO THE FOREGOING, EXCEPT FOR CLAIMS OR CAUSES OF ACTION ARISING FROM AN ACT OR OMISSION THAT IS JUDICIALLY DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED INTENTIONAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE, BUT IN ALL RESPECTS, SUCH EXCULPATED PARTIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES.  THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE LAWS WITH REGARD TO THE SOLICITATION OF, VOTES AND DISTRIBUTION OF CONSIDERATION PURSUANT TO, THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.  THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAWS, RULES, OR REGULATIONS PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

Section 9.5     *Injunction*.

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST (OTHER THAN CLAIMS THAT ARE REINSTATED UNDER THE PLAN), ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO SECTION 9.4 OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION; (II) ENFORCING, LEVYING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR CAUSES OF ACTION UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT ON OR BEFORE THE EFFECTIVE DATE EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING, CONDUCTING, OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR

CAUSES OF ACTION RELEASED OR SETTLED PURSUANT TO THE PLAN. NO PERSON OR ENTITY MAY COMMENCE OR PURSUE A CLAIM OR CAUSE OF ACTION OF ANY KIND AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES THAT RELATES TO OR IS REASONABLY LIKELY TO RELATE TO ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF A CLAIM OR CAUSE OF ACTION RELATED TO THE CHAPTER 11 CASES PRIOR TO THE EFFECTIVE DATE, WITHOUT REGARD TO WHETHER SUCH PERSON OR ENTITY IS A RELEASING PARTY, WITHOUT THE BANKRUPTCY COURT (1) FIRST DETERMINING, AFTER NOTICE AND A HEARING, THAT SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM AND (2) SPECIFICALLY AUTHORIZING SUCH PERSON OR ENTITY TO BRING SUCH CLAIM OR CAUSE OF ACTION AGAINST THE DEBTORS, REORGANIZED DEBTORS, OR RELEASED PARTY. AT THE HEARING FOR THE BANKRUPTCY COURT TO DETERMINE WHETHER SUCH CLAIM OR CAUSE OF ACTION REPRESENTS A COLORABLE CLAIM OF ANY KIND, THE BANKRUPTCY COURT MAY, OR SHALL IF ANY DEBTOR, REORGANIZED DEBTOR, EXCULPATED PARTY, RELEASED PARTY, OR OTHER PARTY IN INTEREST REQUESTS BY MOTION (ORAL MOTION BEING SUFFICIENT), DIRECT THAT SUCH PERSON OR ENTITY SEEKING TO COMMENCE OR PURSUE SUCH CLAIM OR CAUSE OF ACTION FILE A PROPOSED COMPLAINT WITH THE BANKRUPTCY COURT EMBODYING SUCH CLAIM OR CAUSE OF ACTION, SUCH COMPLAINT SATISFYING THE APPLICABLE RULES OF FEDERAL PROCEDURE, INCLUDING, BUT NOT LIMITED TO, RULE 8 AND RULE 9 (AS APPLICABLE), WHICH THE BANKRUPTCY COURT SHALL ASSESS BEFORE MAKING A DETERMINATION. FOR THE AVOIDANCE OF DOUBT, ANY PARTY THAT OBTAINS SUCH DETERMINATION AND AUTHORIZATION AND SUBSEQUENTLY WISHES TO AMEND THE AUTHORIZED COMPLAINT OR PETITION TO ADD ANY CLAIMS OR CAUSES OF ACTION NOT EXPLICITLY INCLUDED IN THE AUTHORIZED COMPLAINT OR PETITION MUST OBTAIN AUTHORIZATION FROM THE BANKRUPTCY COURT BEFORE FILING ANY SUCH AMENDMENT IN THE COURT WHERE SUCH COMPLAINT OR PETITION IS PENDING. THE BANKRUPTCY COURT WILL HAVE SOLE AND EXCLUSIVE JURISDICTION TO ADJUDICATE THE UNDERLYING COLORABLE CLAIM OR CAUSE OF ACTION.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION DOES NOT ENJOIN ANY PARTY UNDER THIS PLAN, THE CONFIRMATION ORDER, OR UNDER ANY OTHER DEFINITIVE DOCUMENT OR OTHER DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THIS PLAN OR THE CONFIRMATION ORDER, FROM BRINGING AN ACTION TO ENFORCE THE TERMS OF THIS PLAN, THE CONFIRMATION ORDER, OR SUCH DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THIS PLAN OR THE CONFIRMATION ORDER.

**THE INJUNCTIONS IN THIS <u>SECTION 9.5</u> SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.**

Section 9.6    *Setoffs and Recoupment.*

(a)    Except as otherwise provided herein or in the DIP Orders, the Reorganized Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may hold against the Holder of such Allowed Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to this Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to this Plan shall constitute a waiver or release by such Reorganized Debtors of any such Claims, rights, and Causes of Action.

(b)    In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with <u>Section 11.12</u> hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Section 9.7    *Release of Liens.*

(a)    Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to this Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates (other than Liens securing the DIP Facility, which Liens shall be retained by the DIP Agent to secure the Exit Facility and any remaining obligations under the DIP Facility) shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.

(b)    To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to this Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

## ARTICLE X.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and this Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, nature, validity, amount, or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance, priority or amount of Claims or Interests;

(b)     Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or this Plan;

(c)     Resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Costs arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (iii) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(e)     Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(f)     Adjudicate, decide, or resolve any and all matters related to Causes of Action;

(g)     Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)     Resolve any and all avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

(i)     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(j)     Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases,

65

indentures, and other agreements or documents created in connection with this Plan or the Disclosure Statement;

(k)      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(l)      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan;

(m)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in this Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(n)      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

(o)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(p)      Determine any other matters that may arise in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, the Restructuring Support Agreement, or any contract, instrument, release, indenture, or other agreement or document created in connection with this Plan or the Disclosure Statement;

(q)      Enter an order or final decree concluding or closing the Chapter 11 Cases;

(r)      Adjudicate any and all disputes arising from or relating to distributions under this Plan;

(s)      Consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(t)      Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with this Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Facility Documents, Equity Rights Offering Documents, Common Equity Convenience Buyout Documents, the New Organizational Documents, and the Management Incentive Plan, which such disputes shall be adjudicated in accordance with the terms of the Exit Facility Documents, Equity Rights Offering Documents, Common Equity Convenience Buyout Documents, the New Organizational Documents, and the respective documents evidencing the Management Incentive Plan, respectively).

(u)      Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(v)      Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(w)      Enforce all orders previously entered by the Bankruptcy Court; and

(x)      Hear any other matter not inconsistent with the Bankruptcy Code, this Plan, or the Confirmation Order.

# ARTICLE XI.
## MISCELLANEOUS PROVISIONS

*Section 11.1    Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and the final versions of the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims and Interests (irrespective of whether Holders of such Claims or Interests have or are deemed to have accepted this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in this Plan, each Entity acquiring property under this Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

*Section 11.2    Payment of Statutory Fees.*

All Bankruptcy Fees as determined by the Bankruptcy Court or as agreed to by the U.S. Trustee and Debtors or Reorganized Debtors, as applicable, shall be paid when due and payable for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

*Section 11.3    No Substantive Consolidation.*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

*Section 11.4    Amendments.*

(a)      *Plan Modifications*.  Subject to the limitations contained in this Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules:  (a) to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order

of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; *provided* that such amendment in (a) or (b) above shall be reasonably acceptable to the Required Consenting Senior Noteholders.

(b) *Effect of Confirmation on Modifications*.  Entry of the Confirmation Order shall mean that all modifications or amendments to this Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

(c) *Certain Technical Amendments*. Prior to the Effective Date, with the reasonable consent of the Required Consenting Senior Noteholders, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.

Section 11.5    *Revocation or Withdrawal of Plan.*

Subject to the conditions to the Effective Date and subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw this Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw this Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then:  (a) this Plan with respect to the Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void with respect to the Debtors; and (c) nothing contained in this Plan with respect to the Debtors shall:  (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

Section 11.6    *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules, or other federal Law, rule, or regulation is applicable, or to the extent that an exhibit, supplement, or other document related to this Plan (including, without limitation, the DIP Facility Documents, the Exit Facility Documents, the Equity Rights Offering Documents, the Common Equity Convenience Buyout Documents, the New Organizational Documents, and the Management Incentive Plan), provides otherwise, this Plan shall be governed by and construed in accordance with the Laws of the State of New York, without giving effect to the principles of conflict of Laws thereof that would require application of the Law of another jurisdiction.

Section 11.7    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate,

assign, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of each such Entity.

Section 11.8    *No Successor Liability*.

Except as otherwise expressly provided in this Plan and the Confirmation Order, the Reorganized Debtors (a) are not, and shall not be deemed to assume, agree to perform, pay or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Person relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) are not, and shall not be, successors to the Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of the Debtors prior to the Effective Date and (c) shall not have any successor or transferee liability of any kind or character.

Section 11.9    *Severability*.

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.10    *Filing of Additional Documents*.

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan, subject to the terms of this Plan and the Restructuring Support Agreement.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to this Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.

Section 11.11    *Reservation of Rights*.

This Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision contained in this Plan, or the taking of any action by the Debtors with respect to this Plan or the Disclosure Statement, shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests or any other matter prior to the Effective Date.

Section 11.12  *Service of Documents.*

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

> Cutera, Inc.
> 3240 Bayshore Boulevard
> Brisbane, CA 94005-1021
> Attn:   Stephana Patton
> Email:  spatton@cutera.com

> with copies to:

> Ropes & Gray LLP
> 191 North Wacker Drive, 32nd Floor
> Chicago, IL 60606
> Attn:    Ryan Preston Dahl
>          Conor P. McNamara
> Email:   Ryan.Dahl@ropesgray.com
>          Conor.McNamara@ropesgray.com

> -and-

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, New York 10036
> Attn:     Natasha S. Hwangpo
> Email:    Natasha.Hwangpo@ropesgray.com

> *Co-Counsel to the Debtors*

> and

> Hunton Andrews Kurth LLP
> 600 Travis Street, Suite 4200
> Houston, Texas 77002
> Attn:    Timothy A. ("Tad") Davidson II
>          Philip M. Guffy
>          Catherine A. Rankin
> E-mail:  taddavidson@hunton.com
>          philipguffy@hunton.com
>          catherinerankin@hunton.com

> *Co-Counsel to the Debtors*

> and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn:       Jacob A. Adlerstein
            Sean A. Mitchell
Email:     jadlerstein@paulweiss.com
            smitchell@paulweiss.com

*Counsel to the Ad Hoc Committee of Consenting Senior Noteholders*

and

Porter Hedges LLP
1000 Main St., 36th Floor
Houston, TX 77002
Attn:   John F. Higgins
E-mail: jhiggins@porterhedges.com

*Co-Counsel to Ad Hoc Committee of Consenting Senior Noteholders*

and

Office of the United States Trustee
Southern District of Texas
515 Rusk Street, Suite 3516
Houston, TX 77002
Attn:  Ha Nguyen
      Vianey Garza
Email:  ha.nguyen@usdoj.gov
       vianey.garza@usdoj.gov

After the Effective Date, the Reorganized Debtors are authorized to send a notice to Entities informing them that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

Section 11.13 *Section 1125(e) of the Bankruptcy Code.*

As of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy Law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and the Consenting Senior Noteholders and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys shall be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and

issuance of any securities under this Plan, and, therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable Law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

Section 11.14  *Tax Reporting and Compliance.*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 11.15  *Exhibits, Schedules, and Supplements.*

All exhibits, schedules, and supplements to this Plan are incorporated into and are a part of this Plan as if fully set forth herein.

Section 11.16  *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, this Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

Section 11.17  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

Section 11.18  *Prepayment*.

Except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time; *provided*, *however*, that any such prepayment shall not be violative of, or otherwise prejudice, the relative priorities and parities among the Classes of Claims.

Section 11.19  *Conflicts.*

In the event of a conflict or inconsistency between this Plan and the Disclosure Statement, the terms of this Plan shall control in all respects.  In the event of a conflict between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided* that if there is determined to be any

inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of this Plan and shall control and take precedence.

Section 11.20  *Closing of Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules; *provided* that, as of the Effective Date, the Reorganized Debtors may submit orders to the Bankruptcy Court under certification of counsel closing one of the Chapter 11 Cases and changing the caption of the Chapter 11 Cases accordingly; *provided* further that, matters concerning Claims may be heard and adjudicated in any Debtor's Chapter 11 Case that remains open regardless of whether the applicable Claim is against a Debtor in a Chapter 11 Case that is closed.

Section 11.21  *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

Section 11.22  *Dissolution of Committee.*

On the Effective Date, any official committees appointed in the Chapter 11 Cases, shall dissolve; *provided that* following the Effective Date, any such committees shall continue in existence solely for the purpose of filing and prosecuting applications for allowance of Professional Fee Claims.  Upon the dissolution of any official committees appointed in the Chapter 11 Case such committee members and their respective Professionals shall cease to have any duty, obligation, or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

Respectfully submitted,

Cutera, Inc.
(on behalf of itself and its affiliated Debtor)


By:  _/s/ Taylor Harris_____
    Name: Taylor Harris
    Title: Chief Executive Officer